**EXHIBIT A**

E-FILED
IN COUNTY CLERK'S OFFICE
PIERCE COUNTY, WASHINGTON

September 22 2025 3:49 PM

PIERCE COUNTY CLERK
NO: 25-2-11719-2

IN THE SUPERIOR COURT IN THE STATE OF WASHINGTON
IN THE COUNTY OF PIERCE

FRANCIS FAYE OAK,

        Plaintiff,

    v.

MULTICARE HEALTH SYSTEM,

        Defendant.

NO.

**COMPLAINT**

**DEMAND FOR JURY TRIAL**

## I.    INTRODUCTION

1.    Plaintiff Francis Faye Oak ("Ms. Oak") has the right to be free from sex, sexual orientation, and gender identity discrimination in her employment. Discrimination because an employee is transgender is prohibited sex and/or sexual orientation discrimination under the Washington Law Against Discrimination ("WLAD").

2.    MultiCare Health System ("MultiCare" or "Defendant") discriminates against Ms. Oak on the basis of sex and/or sexual orientation by treating her less favorably than non-transgender colleagues in its terms and conditions of employment. Specifically, MultiCare engages in sex and/or sexual orientation discrimination by imposing a categorical exclusion of certain treatment for gender dysphoria, a serious medical condition that only affects transgender employees like Ms. Oak.

COMPLAINT – 1

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

3.      MultiCare is organized in Washington State and headquartered in Tacoma, Washington and operates medical facilities throughout Washington. MultiCare is an employer for the purposes of the WLAD.

4.      As part of its compensation for employment, MultiCare provides its employees with health care coverage through a self-funded plan, the MultiCare Health System Flexible Benefits Program, MultiCare MyConnected Care Plan administered by MultiCare ("Plan").  A "self-funded plan" is a plan that is designed and funded by the employer, while administered by a third-party, commonly referred to as a "third-party administrator" or "TPA."  The Plan is **_not_** health insurance under Washington law.

5.      In the Plan, MultiCare singles out transgender employees for unequal treatment by depriving them of coverage for certain gender-affirming care to treat gender dysphoria that it considers "cosmetic."  These discriminatory exclusions appear in the terms of the Plan:

6.      MultiCare facially excludes all coverage of certain medically necessary gender affirming care to treat gender dysphoria, including treatment that is well-within the generally accepted standard of care:

Transgender/gender affirming services
- Services that are considered cosmetic including but not limited to:
    o Abdominoplasty
    o Blepharoplasty
    o Calf Implants
    o Cheek/malar implants
    o Chin augmentation (reshaping or enhancing the size of the chin)
    o Collagen injections
    o Cryothyroid approximations (voice modification surgery)
    o Face-lift
    o Facial bone reduction
    o Forehead lift
    o Hair transplantation

COMPLAINT – 2

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303    FAX (206) 223-0246

> ○ Laryngoplasty (reshaping of laryngeal framework/voice modification surgery)
> ○ Lip reductions/enhancement (decreasing/increase lip size)
> ○ Liposuction
> ○ Mastopexy (breast lift)
> ○ Neck tightening
> ○ Pectoral implants
> ○ Rhinoplasty
> - Travel and lodging

*Exh. 1*, p. 88.   These provisions are referred to herein, collectively, as the "TGAS Exclusion" or "Exclusion."

7.    This standard exclusion specifically targets treatment for gender dysphoria, and therefore singles out transgender employees to specifically limit their access to coverage for surgical care, even when medically necessary.   Through MultiCare's design and administration of this exclusion to Ms. Oak's request for coverage, defendant specifically discriminated against Ms. Oak on the basis of sex and/or sexual orientation.

8.    Specifically, Ms. Oak and her treatment team determined that she required medically necessary facial feminization surgery to address her diagnosis of gender dysphoria.   This determination was consistent with the generally accepted standard of care for the treatment of gender dysphoria.   Ms. Oak and her treatment team submitted a pre-authorization request for the required surgery.   However, due to the TGAS Exclusion in the MultiCare Plan, her request for coverage was denied.

9.    This is facial discrimination under the WLAD, which protects against discrimination based upon sex and sexual orientation.   RCW 49.60.010; 49.60.040(29); 49.60.180.   *See also* Washington Human Rights Commission, *Guide to Sexual Orientation and Gender Identity and the Washington State Law Against Discrimination.*[1]

---

[1]https://www.hum.wa.gov/sites/default/files/public/publications/20241119_SO%20GI%20Guide.pdf (last visited 8/11/25).

COMPLAINT – 3

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

10.     On the face of the Plan, these surgical procedures are excluded expressly when they are sought as treatment for gender dysphoria, a condition with which only transgender people are diagnosed.  "An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'" *Bostock v. Clayton County*, 590 U.S. 644, 660 (2020) (citing *Price Waterhouse v. Hopkins*, 490 U. S. 228, 239 (1989) (plurality opinion)) (The WLAD is aligned with Title VII's anti-discrimination requirements when it comes to sex, including gender identity).

11.     Transgender identity is "inextricably bound up with sex." *Id.* at 661. "By discriminating against transgender persons, the employer unavoidably discriminates against persons with one sex identified at birth and another today." *Id.* Under the TGAS Exclusion, Ms. Oak is unable to access medically necessary care in substantial part because she was assigned male at birth, not female, and identifies as female today. Her medically necessary treatment is only excluded because she is transgender.

12.     Such discrimination is "built on a foundation of irrational prejudice toward fellow citizens whose gender identity does not match their sex assigned at birth." *Orr v. Trump*, No. 1:25-cv-10313-JEK, 2025 U.S. Dist. LEXIS 74577, at *5 (D. Mass. Apr. 18, 2025.

13.     Gender dysphoria is serious medical condition that results in clinically significant distress from the perceived dissonance between one's gender identity and sex assigned at birth. Only transgender people are diagnosed with gender dysphoria. MultiCare's Exclusion contravenes a well-established medical consensus that gender dysphoria treatment can be medically necessary and even life-saving. MultiCare employees who are not transgender do not face blanket exclusions in the Plan barring coverage for medically necessary surgical care that they require.  They have access to surgical procedures when medically necessary to treat their diagnosed medical conditions.

COMPLAINT – 4

14.     By placing these coverage exclusions in the Plan, MultiCare ensures that no medical reviewer can overturn MultiCare's decision to eliminate all coverage for the specifically listed gender affirming treatment, even when medically necessary.

15.     MultiCare's categorical exclusion of certain medically necessary gender-affirming care is irrational and arbitrary, and may be more expensive for MultiCare than covering the disputed procedures. Indeed, the longer MultiCare refuses to cover medically necessary gender-affirming care to treat gender dysphoria, the more it puts its employees' health and well-being at risk.

16.     Because of MultiCare's discriminatory exclusion, Ms. Oak was forced to delay her medically necessary gender-affirming surgery and then later, proceed without any coverage. Unlike her non-transgender colleagues, Ms. Oak was required to pay the full out-of-pocket expense for her medically necessary health care at a considerable cost, impairing her and her family's financial security. These surgeries depleted Ms. Oak's entire life savings, including retirement accounts and other monies provided by her late father's estate that she had hoped to use to buy a home and build a secure future for her and her family following a successful transition. She has also experienced loss of enjoyment of life, humiliation, pain and suffering, personal indignity, embarrassment, fear, anxiety, and anguish because of MultiCare's targeted discrimination against transgender employees, which wrongly deems their clinically effective health care needs as "unnecessary."

17.     Ms. Oak brings this action to challenge MultiCare's blanket exclusion of medically necessary gender-affirming care as illegal sex discrimination and/or sexual orientation discrimination and to obtain a judgment declaring it unlawful, thereby preventing its enforcement.

COMPLAINT – 5

## II.  PARTIES

18.    *Plaintiff Oak.*  Oak is a MultiCare employee and enrolled in a MultiCare MyConnected Plan, an employment benefit. *See* **Exh. 1**.

19.    *Defendant.*  Defendant MultiCare is an employer subject to the WLAD and provides health care coverage to its employees through its self-funded Plan.

## III.  JURISDICTION AND VENUE

20.    The Superior Court of Washington has jurisdiction of Plaintiff's claims pursuant to RCW 2.08.010.

21.    Venue in Pierce County is appropriate pursuant to RCW 4.12.025.

22.    Defendant operates MultiCare in Tacoma, Washington and in the State of Washington, and at least some of the acts and omissions alleged in this Complaint took place in the State of Washington and Pierce County.

## IV.  FACTUAL BACKGROUND

A.    **Gender Dysphoria and Its Treatment**

23.    Gender identity is a well-established concept, referring to an individual's fundamental, internal sense of being a particular gender. It is an essential element of human identity that everyone possesses. Gender identity is innate, has biological underpinnings, and is fixed at an early age.

24.    Sex is a designation assigned at birth based solely on a visual assessment of external genitalia at the time of birth. External genitalia are only one of several sex-related characteristics and are not the same as an individual's sex chromosome.

25.    Most people possess a gender identity based on social expectations derived from their sex assigned at birth and on other sexual characteristics. This is not the case for transgender people, who are defined as transgender because their gender identity is not expressed in a manner that is consistent with social expectations based on sex assigned at birth.

COMPLAINT – 6

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

26.     Every individual's sex is multifaceted and comprises a number of characteristics, including but not limited to chromosomal makeup, hormones, internal and external reproductive organs, secondary sex characteristics, and most importantly, gender identity.

27.     Gender identity is based on a person's internal sense. It is an essential element of human identity that everyone possesses, and a well-established concept in medicine.

28.     Where a person's gender identity deviates from that person's sex assigned at birth, however, gender identity is the critical determinant of that person's sex.

29.     The ability to live in a manner consistent with one's gender identity is vital to the health and wellbeing of transgender people.

30.     For transgender people, an incongruence in their gender identity and sex assigned at birth can result in a feeling of clinically significant stress and discomfort known as gender dysphoria.

31.     Being transgender is not a medical condition to be treated or cured. But gender dysphoria—the clinically significant distress that some transgender people experience as a result of the incongruence between their gender identity and sex assigned at birth—is a serious medical condition that can be treated successfully (or responds to treatment).

32.     Gender dysphoria is recognized in the American Psychiatric Association's Diagnostic *and Statistical Manual of Mental Disorders, Fifth Edition, Text Revision* ("DSM-5-TR"), which sets forth the diagnostic criteria for gender dysphoria, and by other leading medical and mental health professional groups, including the American Medical Association ("AMA") and the American Psychological Association.

33.     The World Professional Association for Transgender Health ("WPATH") and the Endocrine Society have published evidence-based and widely accepted clinical

COMPLAINT – 7

practice guidelines for the assessment, diagnosis, and treatment of gender dysphoria, namely the WPATH *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8* ("SOC 8"), published in 2022, the accepted standards of care for transgender people, and the *Endocrine Treatment of Gender-Dysphoric/Gender Incongruent Persons: An Endocrine Society Clinical Practice Guideline*, published in 2017. These treatment guidelines reflect the standard of medical care for the treatment of gender dysphoria in the United States.

34.     The goal of medical treatment for gender dysphoria is to eliminate or alleviate the clinically significant distress by helping a transgender person live in alignment with their gender identity. This treatment is sometimes referred to as "gender transition," "transition-related care," or "gender-affirming care."

35.     The clinical practice guidelines for the treatment of gender dysphoria, such as WPATH's Standards of Care and the Endocrine Society's Guidelines, are widely accepted as best practices for the treatment of individuals diagnosed with gender dysphoria and have been recognized as authoritative by leading medical organizations, including the American Academy of Pediatrics, AMA, and American Psychological Association, which agree that this care is safe, effective, and medically necessary for many transgender individuals suffering from gender dysphoria.

36.     The precise treatment for gender dysphoria depends upon each person's individualized needs, and the guidelines for medical treatment differ depending on whether the treatment is for an adolescent or an adult.

37.     Under the WPATH Standards of Care, medically necessary treatments may include, among other things, "[h]ormone therapy" and "[s]urgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring)."

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

38.     The individualized steps that transgender people take to live in a manner consistent with their gender, rather than the sex they were assigned at birth, are known as transitioning.

39.     Transitioning is particular to the individual but typically includes social, legal, and medical transition.

40.     Social transition entails a transgender individual living in accordance with their gender identity in all aspects of life. For example, social transition can include wearing attire, following grooming practices, and using pronouns consistent with that person's gender identity. The steps a transgender person can take as part of their social transition help align their gender identity with all aspects of everyday life.

41.     Legal transition involves steps to formally align a transgender individual's legal identity with their gender identity, such as legally changing one's name and updating the name and gender marker on their driver's license, birth certificate, and other forms of identification.

42.     Medical transition, a critical part of transitioning for many transgender people, includes gender affirming care that bring the sex-specific characteristics of a transgender person's body into alignment with their gender identity. Gender affirming care can involve counseling to obtain a diagnosis of gender dysphoria, hormone replacement therapy, surgical care, or other medically necessary treatments for gender dysphoria.

43.     Gender affirming surgical care might be sought by a transgender person to better align primary or secondary sex characteristics with their gender identity. Surgical care can include, but is not limited to, hysterectomies, gonadectomies, mammoplasties, mastectomies, orchiectomies, vaginoplasties, facial surgeries, and phalloplasties. These treatments are for the purpose of treating gender dysphoria.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

44.     These various components associated with transition—social, legal, and medical transition—do not change an individual's sex, as that is already established by their gender identity, but instead bring the individual's appearance, legal identity, and sex-related characteristics into greater alignment with the individual's gender identity and lived experience.

45.     Medical treatment recommended for and provided to transgender individuals with gender dysphoria can substantially reduce lifelong gender dysphoria and eliminate the medical need for surgery or other medical interventions later in life.

46.     Providing gender affirming medical care is lifesaving treatment and positively changes the short- and long-term health outcomes for transgender individuals.

47.     The consequences of untreated, or inadequately treated, gender dysphoria are dire. Symptoms of untreated gender dysphoria include intense emotional suffering, anxiety, depression, suicidality, and other attendant mental health issues. Untreated gender dysphoria is associated with higher levels of stigmatization, discrimination, and victimization, contributing to negative self-image and the inability to function effectively in daily life.

48.     When transgender people are provided with access to appropriate and individualized gender affirming care in connection with treatment of gender dysphoria, these symptoms can be alleviated and even prevented.

**B.      Mainstream Medical Organizations Support Gender Affirming Medical Care and Oppose Coverage Exclusions Like the One in MultiCare's Plan**

49.     The AMA, American Psychological Association, American Psychiatric Association, Endocrine Society, American College of Obstetricians and Gynecologists, American Academy of Family Physicians, and other major medical organizations have recognized that gender affirming care is medically necessary, safe, and effective

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

treatment for gender dysphoria—and that access to such treatment improves the health and well-being of transgender people. Each of these groups has publicly opposed exclusions of coverage of this treatment by private and public health care administrators and payors, like the exclusion at issue here.

50.     WPATH has stated that, like hormone replacement therapy and other gender affirming treatments, the "medical procedures attendant to sex reassignment are not 'cosmetic' or 'elective' or for the mere convenience of the patient," but instead are "medically necessary for the treatment of the diagnosed condition." Nor are they experimental, because "decades of both clinical research and medical research show that they are essential to achieving well-being for the [transgender] patient."

51.     In 2008, the AMA passed Resolution 122 (A-08) recognizing gender dysphoria (then known as gender identity disorder) as a "serious medical condition" which, "if left untreated, can result in clinically significant psychological distress, dysfunction, debilitating depression, and for some people without access to appropriate medical care and treatment, suicidality and death." American Med. Ass'n, *Resolution 122: Removing Financial Barriers to Care for Transgender Patients* (June 16, 2008). The AMA also opposes exclusions of coverage for treatment of gender dysphoria because "many of these same treatments … are often covered for other medical conditions" and "the denial of these otherwise covered benefits for patients suffering from [gender dysphoria] represents discrimination based solely on a patient's gender identity." *Id*. In 2022, the AMA reaffirmed the policy adopted in 2008, which states that the "AMA supports public and private health insurance coverage for treatment of gender dysphoria as recommended by the patient's physician." American Med. Ass'n, Policy No. H-185.950: *Removing Financial Barriers to Care for Transgender Patients* (reaffirmed 2022).

52.     In 2019, the AMA published an Issue Brief reiterating that, "The AMA opposes any discrimination based on an individual's sex, sexual orientation or gender

COMPLAINT – 11

identity, opposes the denial of health insurance on the basis of sexual orientation or gender identity, and supports public and private health insurance coverage for treatment of gender dysphoria as recommended by the patient's physician." AMERICAN MED. ASS'N and GLMA, Issue brief: *Health insurance coverage for gender-affirming care of transgender patients* (2019), at 5, *see* https://www.ama-assn.org/system/files/2019-03/transgender-coverage-issue-brief.pdf (last visited 8/11/25).

53.    And in June 2023, the AMA, through the adoption of Resolution No. 223 (A-23), reaffirmed that the AMA "recognizes that medical and surgical treatments for gender dysphoria and gender incongruence, as determined by shared decision making between the patient and physician, are medically necessary as outlined by generally-accepted standards of medical and surgical practice" and (2) "will advocate for equitable, evidence-based coverage of gender-affirming care by health insurance providers, including public and private insurers." American Med. Ass'n, Policy No. H-185-927: *Clarification of Evidence-Based Gender-Affirming Care* (last modified 2023).

54.    Similarly, in February 2024, the American Psychological Association adopted a policy statement affirming that "the APA opposes efforts to obstruct access to evidence-based interventions for transgender people, advocating for inclusive healthcare coverage without gender-based discrimination" and that "insurance plans should extend coverage for healthcare services tailored to the developmental needs of children, adolescents, and adults identifying as transgender, gender-diverse, or nonbinary, encompassing both psychological and medical gender-affirming care." American Psych. Ass'n, *APA Policy Statement on Affirming Evidence-Based Inclusive Care for Transgender, Gender Diverse, and Nonbinary Individuals, Addressing Misinformation, and the Role of Psychological Practice and Science* (Feb. 2024).

COMPLAINT – 12

55. While public and private health administrators, insurers, and payors excluded coverage for medically necessary treatment of gender dysphoria in the past on the erroneous assumption that such treatments were cosmetic or experimental, today, the medical establishment consensus recognizes that exclusions of medical and surgical treatment for gender dysphoria on those grounds have no basis in medical science.

56. This pattern or practice of discrimination violates the Washington Law Against Discrimination. RCW 49.60.030.

**C.    MultiCare's Discriminatory Transgender Exclusion**

57. MultiCare designs a self-funded Plan that delivers health coverage to its employees. MultiCare designed the Exclusion and directed its third-party administrator to administer it in order to exclude specific treatment when sought to treat gender dysphoria.  By intentional design, the Exclusion is uniquely targeted at transgender employees, since transgender persons are the only individuals diagnosed with gender dysphoria. MultiCare deliberately included the Exclusion to ensure that certain medically necessary treatment of gender dysphoria needed by transgender employees would not be covered.

58. MultiCare's Plan language includes the following provision:

> **Transgender/Gender Affirming Services:**
> FCH pre-authorization required for inpatient admissions and gender affirming surgery. These services are intended to provide treatment for patients with gender dysphoria. This assistance may include primary care, gynecologic and urologic care, reproductive options, mental health services (e.g., assessment, counseling, psychotherapy, psychotropic medication management), and hormonal and gender affirming surgical treatments. Gender affirming surgical treatments are limited to members age 18 and older. Transportation and lodging are not covered. FDA approved medications for support and treatment of transgender related services are covered through the Pharmacy Benefit.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

*See Exh. 1*, p. 77.  This language purports to cover all medically necessary gender-affirming surgical care without exception.  However, the TGAS Exclusion, which appears elsewhere in the Plan contradicts this broad promise of coverage.

59.     In the Plan, MultiCare lists general exclusions, including the TGAS Exclusion described above in ¶ 6.  *Exh. 1*, p. 88.  The Plan arbitrarily and automatically deems the treatment included in the TGAS Exclusion to be "cosmetic" regardless of medical necessity. *Id.*

60.     Confusingly, in the Plan, MultiCare defines "Cosmetic services" to expressly *exclude* gender affirming care.  Specifically, the Plan  has a separate exclusion for "Plastic and Reconstructive Services."  *Id.,* pp. 86-87.  This provision defines "Cosmetic services" as "services, supplies or surgery to repair, modify or reshape a functioning body structure for improvement of the patient's appearance or self-esteem *(except for gender affirmation surgery)"* (emphasis added). In other words, the Plan exempts gender affirming surgery from the definition of "Cosmetic services" in one place, while excluding gender affirming surgeries in the TGAS Exclusion as cosmetic in another.

61.     As a result, the Plan instructs transgender employees that they may receive "plastic surgery" and that "gender affirming surgery" is not excluded as cosmetic, but certain "Transgender/Gender Affirming Services" are categorically "cosmetic" when sought to treat gender dysphoria. The Plan language is nonsensical.

62.     In practice, MultiCare ignores the definition of "Cosmetic services" in the Plan and denies all coverage for the services listed in the TGAS Exclusion.  That is precisely what happened with Plaintiff Oak.

63.     Because the listed services are categorically excluded when sought to treat gender dysphoria, no medical necessity evaluation is conducted on pre-authorization requests for those services.  No appeals seeking coverage of these procedures can be

COMPLAINT – 14

successful because the categorical TGAS Exclusion in the Plan blocks all consideration of medical necessity.

64.    MultiCare's design and administration of the TGAS Exclusion discriminates against Plaintiff as a transgender person. As a result of the Exclusion, certain gender affirming surgeries that are clinically effective and within the generally-accepted standard of care, are arbitrarily deemed "cosmetic" (despite the Plan definition of "cosmetic") and thus, excluded regardless of medical necessity.

65.    At the same time, non-transgender people receive coverage for their medically necessary surgical treatment for their medical conditions without the application categorical exclusions of specific procedures in the Plan.  Accordingly, cisgender enrollees whose requests for coverage are denied based on the "cosmetic" exclusion can still appeal on the basis that their treatment is medically necessary and not cosmetic. For example, coverage is available for non-gender-affirming oral surgery such as "reduction or manipulation of fractures of facial bones" when a diagnosis other than gender dysphoria is present. *Exh. 1*, p. 74. Similarly, the Plan covers reconstructive or plastic procedures when performed to correct or repair abnormal structures of the body caused by "congenital defects, trauma, infection, tumors, disease, accidental injury or prior surgery" but not if the procedures are listed in the TGAS Exclusion.  *See Exh. 1*, p. 74.  Enrollees have coverage for breast reconstruction surgery following a mastectomy for breast cancer, but not when needed for a diagnosis of gender dysphoria.  *Id.* (emphasis added).

66.    MultiCare generally covers medically necessary care including procedures and medications to treat illness or injury. These benefits would cover the gender-affirming surgical procedures prescribed for Ms. Oak "but for" the Plan's application of the TGAS Exclusion.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

67.     MultiCare's facial sex and/or sexual orientation discrimination in its health plan is an unfair employment practice under both the WLAD and Title VII. Specifically, employers may not discriminate against any person in the terms, conditions, or privileges of employment because of an individual's sex and/or sexual orientation. RCW 49.60.180(3). Health insurance and other fringe benefits are a form of compensation or privileges of employment. WAC 162-32-030; *see, e.g.*, *Newport News Shipbuilding Dry Dock Co. v. EEOC*, 462 U.S. 669, 682 (1983) ("a plan that provided complete hospitalization coverage for the spouses of female employees but did not cover spouses of male employees when they had broken bones would violate Title VII by discriminating against male employees."). A health benefit design, established and imposed by an employer, that discriminates based on sex and/or sexual orientation violates the WLAD.

68.     Indeed, courts around the country have reached the same conclusion when considering exclusions for gender-affirming care. *Dekker v. Weida*, 679 F.Supp.3d 1271, 1289-91 (N.D. Fla. 2023); *Fletcher v. Alaska*, 443 F. Supp. 3d 1024, 1027, 1030 (D. Alaska 2020); *Flack v. Wisconsin Dep't of Health* Servs., 395 F. Supp. 3d 1001, 1019-22 (W.D. Wis. 2019); *Boyden v. Conlin*, 341 F.Supp.3d 979, 1002-03 (W.D. Wis. 2018). *See also Erickson v. Bartell Drug Co.*, 141 F. Supp. 2d 1266, 1271 (W.D. Wash. 2001) ("when an employer decides to offer a prescription plan covering everything except a few specifically excluded drugs and devices, it has a legal obligation to make sure that the resulting plan does not discriminate based on sex-based characteristics and that it provides equally comprehensive coverage …"); *L.B. v. Premera Blue Cross*, 2025 WL 2326966, at *2-3 (W.D. Wash., Aug. 12, 2025) (distinguishing the holding in *United States v. Skrmetti*, 605 U.S. __, 145 S. Ct. 1816 (2025) and holding it did not affect a statutory claim of facial discrimination).

COMPLAINT – 16

69.     The Washington Human Rights Commission promulgated rules under the authority provided by the WLAD, and specifically under RCW 49.60.180, to make absolutely clear that "[e]mployee benefits provided in whole or in part by an employer must be consistent between all employees and equal for all employees regardless of the employee's sexual orientation or gender expression or gender identity." WAC 162-32-030.

**D.    MultiCare's Denial of Coverage for Ms. Oak's Medically Necessary Care**

70.     Ms. Oak was employed as a bereavement counselor for MultiCare. She began working for MultiCare in 2023.

71.     As part of the terms, conditions, privileges, and status of her employment with MultiCare, Ms. Oak is and, at all relevant times, was enrolled in MultiCare's Plan.

72.     Ms. Oak is a woman. She is also transgender.

73.     Ms. Oak was diagnosed with gender dysphoria in 2021 and since then has received gender-affirming health care to alleviate the stress and mental health impact associated with her experience as a transgender woman. As part of her ongoing treatment for gender dysphoria, multiple health providers following the generally accepted standards of care established by WPATH 7 & 8, recommended Ms. Oak undergo facial feminization surgery.

74.     Prior to accepting employment with MultiCare as a bereavement counselor, Ms. Oak had sought and received pre-authorization for her gender-affirming facial feminization surgery and had scheduled surgery. Upon her employment with MultiCare, Ms. Oak promptly requested pre-authorization for the same procedures under the Plan provided by her new employer.

75.     Ms. Oak requested pre-authorization from the Plan for her scheduled surgeries and proffered letters of support from her Licensed Providers, one stating she "more than met the WPATH criteria for [facial feminization surgery]." *Exh. 2*.

COMPLAINT – 17

76.     On February 27, 2024, MultiCare denied pre-authorization based on its "specific benefit exclusion … not based on the medical necessity of the service requested." *Exh. 3*.

77.     Ms. Oak appealed the determination and the result was the same. *Exh. 4*; *Exh. 5*. She received a final determination that the terms of her MultiCare Plan, specifically the TGAS Exclusion, excluded her requested medically necessary care, and the Plan defined her prescribed care as "not medically necessary and cosmetic" when sought to treat gender dysphoria.  *Exh. 5*.

78.     After the denial, Ms. Oak tried to raise the issue further with her employer asking that they revisit their discriminatory policy.  Ultimately, MultiCare, including through its physician Dr. Michael Shannon, enforced the TGAS Exclusion, denying coverage for Ms. Oak's medically necessary gender-affirming surgery.

79.     MultiCare's categorical TGAS Exclusion expressly discriminates against transgender employees, such as Ms. Oak, because of sex and/or sexual orientation discrimination.

80.     MultiCare's exclusion of gender-affirming services is also facial proxy for transgender discrimination.

**E.     Ms. Oak Has Stated a Claim Under the WLAD**

81.     The WLAD prohibits discrimination based on sex, including gender identity and transgender status. An exclusion of care in employment benefits, which treats transgender individuals differently than non-transgender individuals, by expressly excluding coverage for care used to treat gender dysphoria, is sex discrimination in violation of the WLAD. In 2014, the Washington State Office of the Insurance Commissioner (OIC) provided an advisory letter to insurers "to clarify prohibitions in Washington State against discrimination in insurance coverage on the basis of gender identity or gender dysphoria." *Exh. 6.* The OIC provided letter, in the

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

insurance context, "serves as a reminder that Washington state law affords policyholders who identify as transgender the full measure of benefits under health insurance policies as individuals seeking medically necessary treatment for non-gender identity related conditions." *Id.* The OIC recognized "the potential harm to consumers arising from the denial or exclusion of services on the basis of gender identity and related medical conditions, has prompted a review of transgender health care service exclusions and denials in plans. . ." *Id.* Ultimately, the OIC confirmed that "[r]eading the provisions of state law in conjunction with the definitions contained in Washington state's Law Against Discrimination, and the requirements of the federal Affordable Care Act, it is clear that exclusions, prohibitions, and other forms of discrimination by issuers against policy holders who identify as transgender is prohibited." *Id.*

82.     In *Bostock,* the U.S. Supreme Court concluded that discrimination under Title VII means "[t]o make a difference in treatment or favor (of one as compared with others)." 590 U.S. at 657. "To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated." *Id.* When the same or similar surgical treatment is available to people without a diagnosis of gender dysphoria, but an exclusion applies to eliminate such coverage for people with gender dysphoria, the practice is illegal sex discrimination. This is so because the exclusion "necessarily and intentionally appl[y] sex-based rules." *Bostock*, 590 U.S. at 667 (an entity that discriminates based on transgender status "inescapably ***intends*** to rely on sex in its decision making").

83.     Here, the WLAD prohibits the same practices that Title VII outlaws. *See Shaw v. Delta Airlines,* 463 U.S. 85 (1983); *see, e.g., Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023).

84.     Ms. Oak exhausted her administrative remedies before the EEOC with regard to Title VII.

COMPLAINT – 19

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

85.     There are no administrative exhaustion requirements under the WLAD. Ms. Oak has met all applicable exhaustion requirements.

**COUNT I –VIOLATION OF THE WLAD**

86.     Ms. Oak re-alleges all of the paragraphs above.

87.     MultiCare is an employer for purposes of the WLAD.

88.     RCW 49.60.180 provides that it is an "unfair practice for any employer" to "discriminate against any person in compensation or in other terms or conditions of employment because of sex and/or sexual orientation. RCW 49.60.180(3).

89.     MultiCare's "Transgender/Gender Affirming Services" Exclusion is illegal facial or proxy discrimination based on sex.  On the face of the MultiCare Plan, certain clinically effective surgeries that are the standard of care for treatment of gender dysphoria are expressly singled out and excluded from coverage precisely because they treat transgender people.  At the same time, non-transgender enrollees do not have specific surgeries listed in the Plan as categorically excluded, such that those enrollees have the opportunity to demonstrate whether the services are medically necessary.  The same surgical procedure is not automatically deemed "cosmetic" under the express terms of the Plan.  In sum, these surgical procedures are only expressly excluded when they are sought by transgender people.  This is sex discrimination.

90.     MultiCare violated the law when it applied the TGAS Exclusion to Oak, denied her benefits, and prevented her from receiving coverage.

91.     Ms. Oak is entitled to remedies under the WLAD, including injunctive relief requiring MultiCare to stop its facially discriminatory policy, actual damages resulting from the enforcement of the Transgender Exclusion, emotional distress damages, attorney fees, and all other appropriate remedies permitted under RCW 49.60.030(2).  By excluding "Transgender/Gender Affirming Services" as "cosmetic" (despite the definition of "Cosmetic services" elsewhere in the Plan)

COMPLAINT – 20

MultiCare has drawn a classification that discriminates based on sex and/or sexual orientation, including but not limited to gender identity, transgender status, and gender transition.

### V. DEMAND FOR RELIEF

WHEREFORE, Ms. Oak requests that this Court:

1.      Enter declaratory judgment that MultiCare violated Ms. Oak's rights under the WLAD, as consistent with Title VII, and that MultiCare's blanket exclusion of gender-affirming care discriminates because of sex and/or sexual identity in violation the WLAD;

2.      Award Ms. Oak compensatory and consequential damages against Defendant in an amount that would fully compensate Ms. Oak for the financial harm, emotional distress and suffering, embarrassment, humiliation, pain and anguish, violation of her dignity, and other damages that have been caused by Defendant's conduct in violation of Ms. Oak's rights under the WLAD;

3.      Declare that MultiCare may not design or implement the TGAS Exclusion or other exclusions that eliminate coverage for gender-affirming care as "cosmetic" or because the treatment is for or related to an employee's sex or diagnosis with gender dysphoria.    Rather, MultiCare must cover gender affirming treatment of gender dysphoria when medically necessary, based on generally accepted medical standards, such as WPATH;

4.      Enjoin MultiCare from maintaining its TGAS Exclusion now and in the future to claims from Ms. Oak;

5.      Award Ms. Oak her costs, expenses, and reasonable attorneys' fees pursuant the WLAD and any other applicable laws;

6.      Award Ms. Oak prejudgment and post judgment interest;

COMPLAINT – 21

7.    Grant other legal and equitable or injunctive relief as the Court deems appropriate, just, and proper;

8.    The declaratory relief requested in this action is sought against Defendant and its officers, agents, servants, employees, and attorneys, as well as any other persons who are in active concert or participation with them;

9.    Award Ms. Oak their attorney fees and costs under the WLAD, RCW 19.86, and other applicable law; and

10.    Award any such other relief as is just and proper.

DATED:  September 22, 2025.

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC

 s/ Eleanor Hamburger
Eleanor Hamburger (WSBA #26478)
ehamburger@sylaw.com

 s/ Ari Robbins Greene
Ari Robbins Greene, Of Counsel (WSBA #54201)
arobbinsgreene@sylaw.com

3101 Western Avenue, Suite 350
Seattle, WA 98121
Tel. (206) 223-0303; Fax (206) 223-0246

MEHRI & SKALET, PLLC

 s/ Ellen L. Eardley
Ellen L. Eardley (DC #488741)*
eeardley@findjustice.com

2000 K St. NW, Suite 325
Washington, DC  20006
Tel. (202) 822-5100; Fax (202) 822-4997

*Pro Hac Vice Application Forthcoming

**Attorneys for Plaintiff**

SIRIANNI YOUTZ
SPOONEMORE HAMBURGER PLLC
3101 WESTERN AVENUE, SUITE 350
SEATTLE, WASHINGTON 98121
TEL. (206) 223-0303   FAX (206) 223-0246

# Exhibit 1





# MultiCare Health System
# Flexible Benefits Program
# Medical, Pharmacy and Vision Benefits

## MyConnected Care Plan
## Standard PPO Plan
## High Deductible PPO Plan

Effective January 1, 2023

www.fchn.com

**Puget Sound Region benefits**

*In the event there is a discrepancy between information provided during open enrollment and the contents of this Benefits Summary, the contents herein shall prevail.*

# Table of Contents

Important Information about this Plan ....................................................................................... 1

Contacting FCH Member Services ........................................................................................... 2

How to Obtain Health Services ............................................................................................... 3

- Your ID Card ................................................................................................................ 3
- Choosing a Provider ..................................................................................................... 3

Medical Management .............................................................................................................. 5

- Pre-authorization Requirements ................................................................................... 5
- Notification for Emergency Admissions ........................................................................ 7
- Concurrent Review and Discharge Coordination .......................................................... 7
- Care Management ........................................................................................................ 7

MyConnected Care Plan  Payment Provisions ........................................................................ 9

- Highlights of Plan Provisions ........................................................................................ 9
- Annual Deductible ...................................................................................................... 10
- Annual Out-of-Pocket Maximum ................................................................................ 10

Standard PPO Plan Payment Provisions .............................................................................. 13

- Highlights of Plan Provisions ...................................................................................... 13
- Annual Deductible ...................................................................................................... 14
- Annual Out-of-Pocket Maximum ................................................................................ 14
- Annual Pharmacy Out-of-Pocket Maximum ............................................................... 15

High Deductible PPO Plan  Payment Provisions ................................................................... 17

- Highlights of Plan Provisions ...................................................................................... 17
- Annual Deductible and Out-of-Pocket Maximums  (Additional information) ................. 18

Benefit Maximums ................................................................................................................ 20

- Participant Reimbursement Liability ........................................................................... 21

Summary of Medical Benefits ............................................................................................... 22

Medical Benefits ................................................................................................................... 62

- Acupuncture ............................................................................................................... 62
- Allergy Care ............................................................................................................... 62
- Alternative Care ......................................................................................................... 62
- Ambulance Services ................................................................................................... 62
- Anesthesia .................................................................................................................. 63
- Applied Behavior Analysis (ABA) ............................................................................... 63

- Autologous Blood Donation/Blood Transfusions ........................................................... 64
- Chemical Dependency ................................................................................................... 64
- Chiropractic Spinal Manipulation ................................................................................... 65
- Clinical Trials ................................................................................................................. 65
- COVID-19 ....................................................................................................................... 66
- Dental Trauma ............................................................................................................... 66
- Diabetic Education and Diabetic Nutrition Education ...................................................... 66
- Diagnostic Testing ......................................................................................................... 67
- Dialysis .......................................................................................................................... 67
- Durable Medical Equipment (DME) and Supplies .......................................................... 67
- Emergency Services and Urgent Care ........................................................................... 68
- Family Planning .............................................................................................................. 68
- Foot Orthotics ................................................................................................................ 68
- Genetic Services ............................................................................................................ 69
- Habilitative Services ....................................................................................................... 69
- Hearing Exams/Appliances ............................................................................................ 69
- Home Health Care .......................................................................................................... 69
- Hospice Care .................................................................................................................. 70
- Hospital Inpatient Medical and Surgical Care ................................................................ 71
- Hospital Outpatient Surgery and Services ..................................................................... 71
- Infertility Diagnostic Services ......................................................................................... 71
- Infusion Therapy ............................................................................................................ 71
- Massage Therapy ........................................................................................................... 71
- Maternity and Newborn Care .......................................................................................... 72
- Medication Therapy Management ................................................................................... 72
- Mental Health Care ........................................................................................................ 73
- Nutritional Counseling .................................................................................................... 73
- Nutritional and Dietary Formulas ................................................................................... 73
- Oral Surgery ................................................................................................................... 73
- Plastic and Reconstructive Services .............................................................................. 74
- Podiatric Care ................................................................................................................ 74
- Preventive Care .............................................................................................................. 74
- Professional/Physician Services ..................................................................................... 75
- Rehabilitation Therapy ................................................................................................... 75
- Skilled Nursing Facility ................................................................................................... 76

- Temporomandibular Joint Syndrome (TMJ) ............................................................... 76
- Tobacco Cessation ............................................................................................... 76
- Transgender/Gender Affirming Services .................................................................. 77
- Transplants (Organ and Bone Marrow) .................................................................... 77
- Vision ................................................................................................................. 79
- Weight Management .............................................................................................. 79
- Wigs ................................................................................................................... 81

## Plan (Medical and Vision) Exclusions and Limitations ........................................... 82

## Summary of Pharmacy Benefits ............................................................................ 90
- The Ventegra, Inc. Drug Formulary: ...................................................................... 93

## Pharmacy Benefits ............................................................................................. 94
- Filling a Prescription ............................................................................................ 95

## Pharmacy Exclusions and Limitations .................................................................... 97

## Claim and Appeal Procedures ............................................................................... 99
- Claim .................................................................................................................. 99
- How to File a Claim for Plan Benefits ..................................................................... 99
- Claim Types ......................................................................................................... 99
- Claim Procedure .................................................................................................. 100
- Adverse Benefit Determination .............................................................................. 100
- Appeal Procedure ................................................................................................ 102

## Independent Dispute Resolution .......................................................................... 105

## Coordination of Benefits ..................................................................................... 106
- Calculation of Benefit Payments ............................................................................ 106
- How Do I Know Which Plan is my Primary Plan? ...................................................... 107
- What if I'm Covered by Medicare? .......................................................................... 109
- Pre-authorization when this Plan is Secondary ........................................................ 109
- Meaning of Plan for COB ...................................................................................... 109
- Claim Determination Period .................................................................................. 110
- Right of Recovery ................................................................................................ 110
- Facility of Payment .............................................................................................. 111
- Right to Receive and Release Information ............................................................... 111

## Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA) ....................... 112
- Who Is a COBRA Qualified Beneficiary? .................................................................. 112
- Qualifying Events and Continuation Periods ............................................................ 113
- When COBRA Coverage Ends ............................................................................... 113

- Contribution Payment Requirements ..................................................................................... 114
- Election Requirements ......................................................................................................... 114
- What Coverage Must Be Offered When Electing COBRA? ................................................. 114

Subrogation, Reimbursement and Right of Recovery ............................................................. 116
- No application of "make whole," "double recovery," and "common fund" rules .................. 116
- Assignment of Rights (Subrogation) ................................................................................... 116
- Equitable Lien and Other Equitable Remedies ................................................................... 117
- Obligation to Assist in the Plan's Reimbursement Activities .............................................. 118

Plan Definitions ....................................................................................................................... 119

# Important Information about this Plan

This booklet describes your coverage and payment levels, claim and appeal procedures, continuation coverage, definitions and how to use your benefits under the MyConnected Care, Standard PPO, and High Deductible PPO – medical plan options offered under the MultiCare Health System Flexible Benefits Program (Plan) as of January 1, 2023. For information on eligibility and enrollment, terminating, administration, definitions and other details of the Welfare Benefit Plan, see the Flexible Benefits Program Summary Plan Description (SPD).

MultiCare Health System (MultiCare), the employer, Plan Sponsor and Plan Administrator of this self-funded Plan, delegates to First Choice Health (FCH – a division of First Choice Health Network, Inc.), a Third Party Administrator (TPA), responsibility and authority to perform certain Plan services. However, MultiCare maintains the ultimate fiduciary authority, responsibility and control over Plan assets, management, and administration.

The benefit plan includes provider networks. The network tier structure is listed from least expensive to you (Tier 1) to most expensive to you (Tier 4). Your out-of-pocket costs are lowest when you choose to get care from a Tier 1 MultiCare Connected Care Clinically Integrated Network (MCC CIN) provider. If you receive care from an out-of-network provider (Tier 4), you will receive the lowest level of benefits and your out-of-pocket costs are greatest.

Please review this booklet carefully and share it with your family. If you have questions, contact the MultiCare Human Resources Benefits Department (Plan Administrator) or FCH. If you have questions about whether a provider is considered 'in-network', contact the appropriate network listed under *How to Obtain Health Services*.

*Coverage under this Plan will take effect for eligible employees and dependents when all eligibility requirements are satisfied. MultiCare Health System expects to maintain this Plan indefinitely, but reserves the right to terminate, suspend, discontinue or amend the Plan at any time, for any reason.*

*The Plan will pay benefits only for expenses incurred while this coverage is in force. No benefits are payable for expenses incurred before coverage began or after it terminated, even if the expenses result from an accident, injury or disease that occurred, began or existed while coverage was in force. An expense for a service or supply is incurred on the date the service or supply is furnished. If the Plan is amended or terminated, the rights of participants and beneficiaries are limited to charges incurred before amendment or termination. No oral interpretations can change this Plan.*

*This Medical, Pharmacy and Vision Benefits booklet is part of and should be read in conjunction with the MultiCare Health System Flexible Benefits Program Summary Plan Description (SPD). A copy of the SPD and, if desired, the formal legal document for the Plan, known as the MultiCare Health System Flexible Benefits Program plan document, is available from the MultiCare Human Resources Benefits Department. These materials do not create a contract of employment or any rights to continued employment with MultiCare Health System.*

# Contacting FCH Member Services

You may call FCH Member Services directly whenever you have questions or concerns at the number printed on your ID card or contact FCH by mail, fax or Internet:

> First Choice Health
> Member Services Department
> PO Box 12659
> Seattle, WA  98111-4659
> Toll-free: (888) 889-1112
> Fax: (888) 206-3092
> Medical pre-authorization: (800) 808-0450
> Mental health/chemical dependency pre-authorization: (800) 640-7682
> www.fchn.com

**Spanish (Español)**: Para obtener asistencia en Español, llame al (888) 889-1112.

**Tagalog (Tagalog)**: Kung kailangan ninyo ang tulong sa Tagalog tumawag sa (888) 889-1112.

**Chinese**（中文）： 如果需要中文的帮助，请拨打这个号码 (888) 889-1112.

**Navajo (Dine)**: Dinek'ehgo  shika  at'ohwol  ninisingo, kwiijigo  holne' (888) 889-1112.

FCH's Member Services Department business hours are Monday through Friday, 8:00 AM to 5:00 PM Pacific Standard Time (PST).

You can access benefit information or your specific claim and enrollment status anytime at www.fchn.com or by calling FCH's Member Services automated voice response system at (888) 889-1112.

# How to Obtain Health Services

## Your ID Card

Your ID card identifies you as a Plan participant and contains important information about your coverage and benefits. We recommend presenting your ID card each time you receive care. If you lose your ID card, you may order a new one either through contacting FCH Member Services at (888) 889-1112, or logging into www.fchn.com. Under no circumstances should you give your ID card to another person for their use.

## Choosing a Provider

To receive the network level of benefit coverage, whether living in the specific geographic location or traveling, your covered services must be obtained from providers within the following networks:

| PPO Networks | State/Area | Phone | Websites |
|---|---|---|---|
| MultiCare Connected Care Clinically Integrated Network (MCC CIN) (Tier 1) | Washington | (800) 231-6935 | www.fchn.com/Provider Search |
| First Choice Health (except those noted in Tier 3 below) (Tier 2 – FCHN) | Alaska, Idaho, Oregon, Washington, Montana, Wyoming, North Dakota, South Dakota | (800) 231-6935 | www.fchn.com/Provider Search |
| First Health (Tier 2 – FHN) | All states/areas not served by FCHN | (800) 226-5116 | www.myfirsthealth.com/ |
| Providence, Swedish, Virginia Mason Franciscan Health, Pacific Medical Center providers and facilities (Prov/Swed/VMFH/PacMed) (Tier 3) | Washington State | (800) 231-6935 | www.fchn.com/Provider Search |
| Out-of-Network (Tier 4) | Facilities/providers who are not contracted in any of the networks previously noted above. | N/A | N/A |

*Remember: To ensure you receive the highest level of benefits, confirm provider participation with one of the above networks prior to seeking care.*

MultiCare and the MultiCare Connected Care Clinically Integrated Network (MCC CIN) may not be able to offer all services required for your care. Each service you receive is paid based on the applicable network tier, and no exceptions are made if a service cannot be provided within a particular network (except Recognized Providers and Recognized No Surprises Providers).

## Services Received Outside the U.S.

If you are traveling outside of the United States and require treatment for an injury or medical emergency, any payments you make for medical treatment may be reimbursed, provided the following guidelines are met:

- Participants must pay for medical services at the time of service.
- Upon returning to the United States, submit an itemized statement of charges that includes diagnosis and all charges paid. The exchange rate for foreign currency must also be noted on submitted forms.
- Charges submitted must be for an Emergency or Urgent Care as defined in the Group Health Plan Summary Plan Document.
- Claims in a foreign language must be submitted in English.

## Continuity of Care

When you are receiving certain types of in-network (Tiers 1, 2, or 3) care and the treating in-network provider leaves the network(s) (Tiers 1, 2, or 3), the Plan must provide 90 days of continued in-network (Tiers 1, 2, or 3) coverage (or 90 days from the date that you are no longer a continuing care patient, whichever is earlier) and the provider cannot send you a balance bill. A continuity of care patient is a person who is: (1) undergoing a course of treatment for a serious and complex condition from the provider or facility; (2) undergoing a course of institutional or inpatient care from the provider or facility; (3) scheduled to undergo non-elective surgery from the provider; (4) pregnant and undergoing a course of treatment for pregnancy from the provider; or (5) determined to be terminally ill and receiving treatment for such illness from the provider or facility. This requirement does not apply to for-cause terminations of a provider.

# Medical Management

## Pre-authorization Requirements

All inpatient admissions and certain outpatient services and procedures **require FCH pre-authorization**, unless noted as a benefit exclusion in your Summary Plan Document. If pre-authorization is not obtained on the services noted below, your claim may be denied. Submit requests via our Provider Portal at www.fchn.com/Providers#PreAuthorization or via fax to (888) 272-3289. For questions, call FCH at (800) 808-0450. *Emergency Services* do not need to be pre-authorized. Pre-authorization is required for:

- **Ambulance**
  - Air Ambulance Transport - non-urgent transport
  - Non-emergent ground or air ambulance transport to a MultiCare Health facility
- **Anesthesia for Dental Services**
- **Clinical Trials** (including all interventions/medications)
- **Dental Trauma Services** (follow-up services)
- **Durable Medical Equipment, Medical Supplies and Prosthetics**
  - Bone growth stimulators
  - Compression devices for home use
  - Custom and power operated wheelchairs and supplies
    - Standard, manual wheelchair rental for transition of care for up to 3 months does not require pre-authorization
  - Electrical stimulators- spinal- external
  - Myoelectric components for upper limb and powered components for ankle-foot and knee Prosthetics
  - Oscillatory devices and cough stimulating devices
  - Scooters
  - Speech generating devices
  - Tumor treating fields for glioblastoma
- **Enteral Formula, Medical Food and Associated Services**
- **Facet Joint Injections, Medial Branch Blocks and Neurotomies** (any location)
- **Gene, Immune, and CAR T-Cell Therapy**
- **Genetic Testing**
  - Over $500
- **Home Health Care Services** (certain home infusion drugs may still require pre-authorization. See *Medical Injectables*)
  - Home health visits (for wound therapy only)
- **High Dose Rate Electronic Brachytherapy**
- **Hyperbaric Oxygen Therapy**
- **Imaging**
  - PET scans
- **Inpatient Admissions**

- **Medical Injectables, Chemotherapy and Other Drugs over $5,000/annually** (The following list includes drugs that may require pre-authorization and/or may require use of a designated specialty pharmacy provider, regardless if covered under Medical or Pharmacy Benefit. This list is not all inclusive. Newly FDA-approved drugs not included on the list below may also require pre-authorization. For questions, call FCH at the number above.)
  - Biosimilar or alternative comparable biologics (eg. Renflexis, Ogivri, Mcasi, Truxima) are preferred over originator biologics (eg. Remicade, Herceptin, Avastin, Rituxan) unless the patient has had an inadequate response or intolerance to biosimilars or alternative comparable biologics.
  - Botulinum toxin A (Xeomin® is plan preferred for covered medical indications, cosmetic is not covered)
  - Other Medications including:
    - Blood Clotting Factors, All types, All brands
    - Select Hormone Therapy
    - Intravenous Immunoglobulin Therapy- IVIG, All types, All brands
    - Botulinum Toxin, All types, All brands
- **Oral Appliances for Sleep Apnea Therapy**
- **Organ and Bone Marrow Transplants**
- **Peripheral Nerve Blocks** (except Occipital and Cranial)
- **Radiation Therapy**
  - Proton beam, neutron beam or helium ion radiation therapy
  - Stereotactic body radiation therapy (SBRT)
  - Stereotactic radiosurgery (Gamma Knife, Cyber Knife)
- **Surgery**
  - BAHA-bone anchored hearing aid (surgical benefit applies)
  - Bariatric surgery (No benefit on the Standard PPO Plan)
  - Breast surgeries- selected (Pre-authorization is not required for breast reconstruction and nipple/areola reconstruction following mastectomy for breast cancer)
    - Implant removal
    - Mastectomy for gynecomastia
    - Reduction mammoplasty
  - Cochlear implants (surgical benefit applies)
  - Cosmetic or reconstructive surgery
  - Deep brain stimulation
  - Fetal/Intrauterine surgery
  - Gender affirming surgery
  - Implantable peripheral nerve and/or spinal cord stimulator placement (temporary and permanent) including electrodes and/or pulse generator/receiver
  - Orthognathic surgery
  - Ovarian, internal iliac and gonadal vein embolization, ablation and sclerotherapy
  - Spinal surgery (selected)
    - Artificial intervertebral disc
    - Cervical fusions
    - Lumbar fusions
    - Minimally invasive, percutaneous & endoscopic spine surgery
  - Surgical interventions for sleep apnea

- – TMJ surgery
- – Vagus nerve stimulation
- – Varicose vein procedures
- – Ventricular assist devices and total heart replacement
- **Transcranial Magnetic Stimulation**

The medical pre-authorization number is (800) 808-0450 and the mental health and chemical dependency pre-authorization number is (800) 640-7682.

Your provider may submit an advance request to FCH Medical Management for benefit or medical necessity determinations. **Experimental and investigational services are not covered.** If a service could be considered experimental and investigational for a given condition, we recommend a benefit determination in advance.

Claims denied due to lack of pre-authorization will not apply toward your Plan year deductible or out-of-pocket maximums.

# Notification for Emergency Admissions

Admissions directly from the emergency department do not require pre-authorization. However, notification is required within two (2) business days after the admission, or as soon as possible, unless there are extenuating circumstances (as determined by FCH). You, or your provider, may call FCH at the number on your ID card.

# Concurrent Review and Discharge Coordination

Continued hospitalization is subject to periodic clinical review to ensure timely, quality care in the appropriate setting. Discharge coordination assists those transferring from the hospital to home or another facility.

# Care Management

Care Management services are provided by PSW Care Management. Case Management services for Organ and Bone Marrow Transplants are provided by First Choice Health (see *Transplants (Organ and Bone Marrow)* in the Medical Benefits section).

Enrolling in any MultiCare medical plan allows you and your covered dependents access to a Nurse Care Manager (NCM). We have partnered with PSW Care Management, a population health company to provide this service. The philosophy of PSW Care Management is to collaborate with you and your family to be a resource for coordinating care and services to support your needs and goals for health and well-being. The care management team serves as a catalyst to support you across the care continuum to improve health outcomes. Your Nurse Care Manager is employed by PSW Care Management, so all of your personal health information is completely confidential.

If you or a covered dependent have a sudden onset acute medical condition, are living with a chronic health condition, have an upcoming surgery or are starting a new treatment, your NCM can help.  Your NCM works with you and your current providers to support your plan of care. This coordination of care can enhance decision-making related to your treatment plan in support of making your treatment more effective and less expensive for you.  As a registered nurse who specializes in care management and in helping those with acute or chronic health conditions, your Nurse Care Manager is your expert resource for:

- Guidance when navigating the healthcare system
- Coordinating your healthcare providers to reduce the stress associated with management of a new diagnosis
- Phone outreach following emergency room visits or inpatient stays
- Making sure you get the right tests and treatment for your condition
- Helping you set personal goals for improving your health
- Answering any questions you may have about your condition, medication or treatment
- You can reach the PSW Care Management Team at 1 (360) 786-8690, option 2.

**Care management is a voluntary service**. There is no reduction of benefits or penalty if you choose not to participate. Each treatment is individually tailored and should not be seen as appropriate or recommended for any other patient, even one with the same diagnosis. The final decision on the course of treatment rests with you and your providers.

# MyConnected Care Plan Payment Provisions

*Provider Referral Waivers are available to MyConnected Care plan members when services are not available within MultiCare or the MCC CIN. This must be initiated proactively to the services by your MultiCare/MCC referring provider. All Provider Referral Waivers are reviewed by the MCC Chief Medical Officer for approval. Members will receive a determination letter for each Provider Referral Waiver. Provider Referral Waivers are not approved retrospectively.*

## Highlights of Plan Provisions

- The benefits of this Plan are provided for medically necessary covered services at the percentages specified in the *Summary of Medical Benefits*, after you meet the applicable deductible.
- Benefit payment is based on the allowed amount under the plan. Your benefit coverage will vary by network tier, but generally, your out-of-pocket costs are less when you choose a MultiCare Connected Care network provider (MCC CIN -Tier 1).
- When your annual out-of-pocket maximum is reached, the Plan will provide benefits for many covered services at 100% of the allowed amount for the remainder of that Plan year.
- Certain services and procedures require pre-authorization.
- MultiCare and the MultiCare Connected Care Clinically Integrated Network (MCC CIN) may not be able to offer all services required for your care. Each service you receive is paid based on the applicable network tier, and no exceptions are made if a service cannot be provided within a particular network (except Recognized Providers and Recognized No Surprises Providers).
- Services received from a Recognized Provider (see *Plan Definitions*) will be paid at the appropriate tier or Network level. Benefits will be based on Usual, Customary and Reasonable data or a case negotiated rate. You will be responsible for the difference (if any) between the Plan payment and the billed charges on Recognized Provider claims and this difference would not apply to your Out-of-Pocket (OOP) maximum as discussed below.
- For services received from out-of-network providers (who are not covered under Recognized No Surprises Provider), you are responsible to pay the difference between the Plan payment and the provider's actual charges.
- Services received from a Recognized No Surprises Provider (see *Plan Definitions* under Section II - Summary Plan Description) provided by out-of-network Emergency Departments and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances, the cost-sharing amount is determined by the Qualifying Payment Amount (see *Plan Definitions* under Section II - Summary Plan Description).
- Claims are processed according to the diagnoses and services billed by the provider(s). Billing disputes regarding services received should be addressed with the rendering provider.

- When you receive services from an in-network hospital or ambulatory surgical center, certain providers there may be out-of-network. In these cases, the most that those providers may bill you is your Plan's lowest in-network cost-sharing amount. This applies to emergency services, anesthesia, pathology, radiology, laboratory, neonatology, assistant surgeon, hospitalist, or intensivist services. These providers cannot balance bill you and may not ask you to give up your protections. If you receive other services at these in-network facilities, out-of-network providers cannot balance bill you, unless you give written consent and give up your protections.
- Certain serious and complex care treatments may apply to the Continuity of Care section. See Continuity of Care under *How to Obtain Health Services* for care from a provider who leaves the network.

# Annual Deductible

The annual deductible is the amount you (or your family) must pay each Plan year (January 1 – December 31) before your employer is obligated to pay for covered services. The deductible must be met in full before any coinsurance applies. Only covered services are applied towards the calculation of the annual deductible. If your annual deductible has not been met, the amount due a provider is your liability until the deductible has been satisfied. The MCC CIN deductible in Tier 1, is exclusive of the Tier 2, 3, and 4 annual deductibles. The Tier 2, 3, and 4 deductibles are inclusive of each other, so depending upon how you access care, you may be accumulating annual deductible expenses in two benefit tiers. The following benefits do **not** apply toward the annual deductible:

- Pharmacy;
- In Network Routine eye exams;
- In Network Routine hearing exams,
- Tiers 1, 2, and 3 Preventive Care; and,
- Vision hardware.

**Prior Plan Deductible:** If your employer replaces this Plan with another employer group plan, any portion of the annual deductible that you satisfied under the previous plan will be credited to the new group plan. This credit will occur only during the Plan year in which the new group plan becomes effective. You may call Member Services with questions regarding prior plan deductible credits.

**Embedded Deductible:** Each individual will meet no more than the individual deductible, but the family will meet no more than the stated family deductible amount (regardless of family size). In this case, some individuals may meet less than the individual deductible amount, if the family deductible is met.

# Annual Out-of-Pocket Maximum

The annual out-of-pocket (OOP) maximum is the most you will need to pay in a Plan year. Once you have met the out-of-pocket maximum indicated, the Plan will provide benefits at 100% of the allowed amount for the remainder of the Plan year. MultiCare Connected Care network (MCC CIN – Tier 1) out-of-pocket and coinsurance maximum is exclusive of the Tiers 2, 3, and 4 Plan year out-of-pockets and coinsurance maximums. The Tiers 2, 3, and 4 out-of-pocket and coinsurance maximums are inclusive of each other.

The following do **not** apply toward the annual out-of-pocket maximum:

- Benefits paid at 100% (such as routine eye and hearing exams);
- Claims denied for lack of required pre-authorization;
- Charges for non-covered services and treatment;
- Charges for services that are denied as not being medically necessary;
- Charges over Usual, Customary and Reasonable (UCR) for out-of-network provider services as determined by FCH;
- Charges that exceed any applicable benefit maximum;
- Pharmacy coinsurance; and,
- Vision Hardware for adults 19 and older.

**Embedded Out-of-Pocket Maximum:** Each individual will meet no more than the individual out-of-pocket maximum, but the family will meet no more than the stated family out-of-pocket maximum amount (regardless of family size). In this case, some individuals may meet less than the individual out-of-pocket maximum amount, if the family out-of-pocket is met.

*See chart on the next page.*

**Your annual deductible and annual out-of-pocket maximum amounts under the Plan follow:**

| Deductible and Out-of-Pocket Maximums | MCC CIN Tier 1 | FCHN Tier 2 | Prov/Swed/ VMFH/PacMed Tier 3 | OON Tier 4 |
|---|---|---|---|---|
| **Annual Deductible (per Plan Year)** | | | | |
| Individual only | $0 for services with MCC $500 for Emergency Care only | $1,500 | $2,000 | |
| Family | $0 for services with MCC $1,000 for Emergency Care only | $4,500 | $6,000 | |
| **Annual Out-of-Pocket Maximum (per Plan Year)** | | | | |
| Individual only | $3,100 | $6,500 | | |
| Family | $6,200 | $19,500 | | |
| **Annual Pharmacy Out-of-Pocket Maximum (per Plan Year)** | | | | |
| Individual only | $1,500 | N/A | | |
| Family | $3,000 | N/A | | |

You receive the highest level of benefit coverage for care at the MultiCare Connected Care network (MCC CIN).

# Standard PPO Plan Payment Provisions

## Highlights of Plan Provisions

- The benefits of this Plan are provided for medically necessary covered services at the percentages specified in the *Summary of Medical Benefits*, after you meet the applicable deductible.

- Under the Standard PPO Plan, benefits will be paid at the highest level when you receive care at a MultiCare Connected Care network (MCC CIN - Tier 1) facility. If MCC CIN does not offer a particular service, your coverage will be greatest when you receive care from a Tier 2 network provider/facility (*benefits will be paid at the Tier 2 network level*). The higher benefit for services received from MultiCare Connected Care network facilities is not available for services received at providers outside the MCC CIN, regardless of whether MCC CIN offers a particular service or not.

- Benefit payment is based on the allowed amount under the plan. Your benefit coverage will vary by network tier, but generally, your out-of-pocket costs are less when you choose a network provider.

- When your annual out-of-pocket maximum is reached, the Plan will provide benefits for many covered services at 100% of the allowed amount for the remainder of that Plan year.

- Certain services and procedures require pre-authorization.

- Services received from a Recognized Provider (see *Plan Definitions*) will be paid at the appropriate tier or Network level. Benefits will be based on Usual, Customary and Reasonable data or a case negotiated rate. You will be responsible for the difference (if any) between the amount paid by the Plan and the billed charges on Recognized Provider claims and this difference would not apply to your Out-of-Pocket (OOP) maximum as discussed below.

- For services received from out-of-network providers (who are not covered under Recognized No Surprises Provider), you are responsible to pay the difference between the Plan payment and the provider's actual charges.

- Services received from a Recognized No Surprises Provider (see *Plan Definitions* under Section II - Summary Plan Description) provided by out-of-network Emergency Departments and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances, the cost-sharing amount is determined by the Qualifying Payment Amount (see *Plan Definitions* under Section II - Summary Plan Description).

- Claims are processed according to the diagnoses and services billed by the provider(s). Billing disputes regarding services received should be addressed with the rendering provider.

- When you receive services from an in-network hospital or ambulatory surgical center, certain providers there may be out-of-network. In these cases, the most that those providers may bill you is your Plan's lowest in-network cost-sharing amount. This applies to emergency services, anesthesia, pathology, radiology, laboratory, neonatology, assistant surgeon, hospitalist, or intensivist services. These providers cannot balance bill you and may not ask you to give up your protections. If you receive

other services at these in-network facilities, out-of-network providers cannot balance bill you, unless you give written consent and give up your protections.

- Certain serious and complex care treatments may apply to the Continuity of Care section. See Continuity of Care under *How to Obtain Health Services* for care from a provider who leaves the network.

# Annual Deductible

The annual deductible is the amount you (or your family) must pay each Plan year (January 1 – December 31) before your employer is obligated to pay for covered services. The deductible must be met in full before any coinsurance applies. Only covered services are applied towards the calculation of the annual deductible. If your annual deductible has not been met, the amount due a provider is your liability until the deductible has been satisfied. The Tiers 1 and 2 annual deductibles are exclusive of each other. Tiers 3 and 4 are inclusive of each other. The following benefits do **not** apply toward the annual deductible:

- Pharmacy;
- In Network Routine eye exams;
- In Network Routine hearing exams;
- Preventive Care for Tier 1 & 2 network providers; and,
- Vision hardware.

**Deductible Carry-over:** Covered expenses incurred during the last three months of a calendar year and applied to the deductible may also be applied to the next calendar year's deductible.

**Prior Plan Deductible:** If your employer replaces this Plan with another employer group plan, any portion of the annual deductible that you satisfied under the previous plan will be credited to the new group plan. This credit will occur only during the Plan year in which the new group plan becomes effective. You may call Member Services with questions regarding prior plan deductible credits.

**Embedded Deductible:** Each individual will meet no more than the individual deductible, but the family will meet no more than the stated family deductible amount (regardless of family size). In this case, some individuals may meet less than the individual deductible amount, if the family deductible is met.

# Annual Out-of-Pocket Maximum

The annual out-of-pocket (OOP) maximum is the most you will need to pay in a Plan year. Once you have met the out-of-pocket maximum indicated, the Plan will provide benefits at 100% of the allowed amount for the remainder of the Plan year. The Tiers 1 and 2 Plan year out-of-pocket and coinsurance maximums are exclusive of each other. Tiers 3 and 4 are inclusive of each other. The following do **not** apply toward the annual out-of-pocket maximum:

- Benefits paid at 100% (such as routine eye and hearing exams);
- Claims denied for lack of required pre-authorization;
- Charges of non-covered services and treatment;
- Charges for services that are denied as not being medically necessary;
- Charges over Usual, Customary and Reasonable (UCR) for out-of-network provider services as determined by FCH;

- Charges that exceed any applicable benefit maximum;
- Pharmacy coinsurances; and,
- Vision Hardware for adults 19 and older.

**Embedded Out-of-Pocket Maximum:** Each individual will meet no more than the individual out-of-pocket maximum, but the family will meet no more than the stated family out-of-pocket maximum amount (regardless of family size). In this case, some individuals may meet less than the individual out-of-pocket maximum amount, if the family out-of-pocket is met.

# Annual Pharmacy Out-of-Pocket Maximum

The annual pharmacy out-of-pocket (OOP) maximum is the most you will need to pay in a Plan year. Once you have met the pharmacy out-of-pocket maximum indicated, the Plan will provide pharmacy benefits at 100% of the allowed amount for the remainder of the Plan year.

Benefits are not available through out-of-network pharmacies; the Pharmacy OOP maximum noted refers to prescriptions received through Network pharmacies only. Pharmacy expenses (coinsurances, etc.) do not apply to the medical deductible or out-of-pocket maximums.

**Your annual deductible, annual out-of-pocket maximum and annual pharmacy out-of-pocket maximum amounts under the Plan follow:**

| Deductible and Out-of-Pocket Maximums | MCC CIN Tier 1 | FCHN Tier 2 | Prov/Swed/ VMFH/PacMed Tier 3 | OON Tier 4 |
|---|---|---|---|---|
| **Annual Deductible (per Plan Year)** | | | | |
| Individual only | $600 | | $1,500 | |
| Family | $1,800 | | $3,000 | |
| **Annual Out-of-Pocket Maximum (per Plan Year)** | | | | |
| Individual only | $3,200 | | $4,850 | |
| Family | $8,300 | | $12,500 | |
| **Annual Pharmacy Out-of-Pocket Maximum (per Plan Year)** | | | | |
| Individual only | $1,500 | | N/A | |
| Family | $3,000 | | N/A | |

# High Deductible PPO Plan Payment Provisions

## Highlights of Plan Provisions

- The benefits of this Plan are provided for medically necessary covered services at the percentages specified in the *Summary of Medical Benefits*, after you meet the applicable deductible.

- Benefit payment is based on the allowed amount under the plan. Your benefit coverage will vary by network tier, but generally, your out-of-pocket costs are less when you choose a network provider.

- When your annual out-of-pocket maximum is reached, the Plan will provide benefits for many covered services at 100% of the allowed amount for the remainder of that Plan year.

- Certain services and procedures require pre-authorization.

- Services received from a Recognized Provider (see *Plan Definitions*) will be paid at the appropriate tier or Network level. Benefits will be based on Usual, Customary and Reasonable data or a case negotiated rate. You will be responsible for the difference (if any) between the amount paid by the Plan and the billed charges on Recognized Provider claims and this difference would not apply to your Out-of-Pocket (OOP) maximum as discussed below.

- For services received from out-of-network providers (who are not covered under Recognized No Surprises Provider), you are responsible to pay the difference between the Plan payment and the provider's actual charges.

- Services received from a Recognized No Surprises Provider (see *Plan Definitions* under Section II - Summary Plan Description) provided by out-of-network Emergency Departments and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances, the cost-sharing amount is determined by the Qualifying Payment Amount (see *Plan Definitions* under Section II - Summary Plan Description).

- Claims are processed according to the diagnoses and services billed by the provider(s). Billing disputes regarding services received should be addressed with the rendering provider.

- When you receive services from an in-network hospital or ambulatory surgical center, certain providers there may be out-of-network. In these cases, the most that those providers may bill you is your Plan's lowest in-network cost-sharing amount. This applies to emergency services, anesthesia, pathology, radiology, laboratory, neonatology, assistant surgeon, hospitalist, or intensivist services. These providers cannot balance bill you and may not ask you to give up your protections. If you receive other services at these in-network facilities, out-of-network providers cannot balance bill you, unless you give written consent and give up your protections.

- Certain serious and complex care treatments may apply to the Continuity of Care section. See Continuity of Care under *How to Obtain Health Services* for care from a provider who leaves the network.

**The MultiCare Health System High Deductible PPO Plan is a qualifying high deductible health plan under Code §223(c)(2). It is eligible to be paired with a Health Savings Account (HSA).**

| Deductible and Out-of-Pocket Maximums | MCC CIN Tier 1 | FCHN Tier 2 | Prov/Swed/ VMFH/PacMed Tier 3 | OON Tier 4 |
|---|---|---|---|---|
| **Annual Deductible (per Plan Year)** | | | | |
| Individual only | $1,500 | | $2,500 | |
| Family | $3,000 | | $5,000 | |
| **Annual Out-of-Pocket Maximum (per Plan Year)** | | | | |
| Individual only | $3,500 | | $6,500 | |
| Family | $6,850 | | $13,000 | |

# Annual Deductible and Out-of-Pocket Maximums (Additional information)

## Annual Deductible

The annual deductible is the amount you (or your family) must pay each Plan year (January 1 – December 31) before your employer is obligated to pay for covered services. The deductible must be met in full before any coinsurance applies. Only covered services are applied towards the calculation of the annual deductible. If your annual deductible has not been met, the amount due a provider is your liability until the deductible has been satisfied. The Tiers 1, 2, 3, and 4 annual deductibles are inclusive of each other. The following benefits do **not** apply toward the annual deductible:

- In Network Routine eye exams;
- In Network Routine hearing exams;
- In Network Tier 1 & 2 Preventive Care; and,
- Vision hardware.

**Non-Embedded Family Deductible:** With a Non-Embedded Family deductible, covered expenses incurred by each person in family coverage accumulate and are credited toward the one "family" deductible. When only one member is covered by the Plan, only the "employee only" deductible amount indicated in the grid above needs to be met. The deductible must be met in full before any coinsurance applies. The network and out-of-network Plan year deductibles are inclusive of each other.

## Annual Out-of-Pocket Maximum

The annual out-of-pocket (OOP) maximum is the most you will need to pay in a Plan year. Once you have met the out-of-pocket maximum indicated, the Plan will provide benefits at 100% of the allowed amount for the remainder of the Plan year. Tiers 1, 2, 3, and 4 annual out-of-pocket maximums are inclusive of each other. The following benefits do **not** apply toward the annual out-of-pocket maximum:

- Benefits paid at 100% (such as routine eye and hearing exams);
- Claims denied for lack of required pre-authorization;
- Charges of non-covered services and treatment;
- Charges for services that are denied as not being medically necessary;
- Charges over Usual, Customary and Reasonable (UCR) for out-of-network provider services as determined by FCH;
- Charges that exceed any applicable benefit maximum; or,
- Vision hardware for adults 19 and older.

**Non-Embedded Family Out-of-Pocket Maximum:**  With a Non-Embedded Family out-of-pocket maximum, covered expenses incurred by <u>each</u> person in family coverage accumulate and are credited toward the <u>one "family"</u> out-of-pocket maximum. When only one member is covered by the Plan, only the "employee only" out-of-pocket amount indicated in the grid above needs to be met. The Out-of-Pocket Maximum must be met in full before the Plan will provide benefits at 100%.  The network and out-of-network Plan year out-of-pocket and coinsurance maximums are inclusive of each other.

# Benefit Maximums

Below is a summary of benefit and Plan Year maximums applicable to the MyConnected Care, Standard PPO, and High Deductible PPO Plans. Note the High Deductible PPO is referred to as HDHP within the Benefit Summary tables, except where a difference is indicated. Benefit visit and dollar maximums listed in this section apply to network benefits and out-of-network benefits combined.

| Lifetime Maximum Benefits | |
|---|---|
| **Bariatric Surgery** | $50,000<br>(This benefit available for MCC and HDHP Plans only. Benefit exclusion on Standard PPO Plan.) |
| **Organ Transplants**<br>Benefit subject to 6-month waiting period.<br>• Transportation/Lodging | $2,500 per episode |
| **Plan Year Maximums** | |
| **Acupuncture** | 12 visits |
| **Chiropractic Spinal Manipulation** | 16 visits |
| **Hearing Aid and Appliances** | $2,000 every 3 Calendar years |
| **Hearing Exams** | 1 exam |
| **Home Health Care** | 130 visits |
| **Hospice**<br>• **Hospice Care**<br>• **Respite Care** (minimum of 4 hours per day) | 14 inpatient days per 12-month period<br>30 day maximum within 12-month period |
| **Massage Therapy** | 20 visits |
| **Obesity Counseling, visits 1- 12** | 12 visits |
| **Obesity Counseling, visits 13 – 20** | 8 visits<br>(This benefit available for MCC and HDHP Plans only. Benefit exclusion on Standard PPO Plan.) |
| **Out of Network (OON) Inpatient Admissions** | 10 admissions |

| | |
|---|---|
| **Rehabilitation Therapy**<br>• **Inpatient**<br>• **Outpatient/Cardiac Rehabilitation**<br>(Speech, Occupational, and Physical) | 30 days (spinal cord injuries are allowed an additional 15 days)<br>45 visits |
| **Skilled Nursing Facility** | 90 days |
| **Vision Care**<br>• **Routine Vision Care**<br>• **Vision Appliances** (hardware) - Adults 19 and older<br>• **Vision Appliances** (hardware) - Children 18 and under | 1 routine eye exam<br>$225<br><br>1 pair of lenses and frames, or a 12 month supply of contact lenses |
| **Wigs** | 1 per Plan year |

# Participant Reimbursement Liability

Remember, your care must be from network providers from Tiers 1, 2, or 3 to be covered at the Tiers 1, 2, or 3 network levels. You are always responsible for the following health care costs:

- Annual deductible, if applicable;
- Coinsurance, if applicable;
- Difference between an out-of-network provider's charge for a service and FCH's allowed amount for that service;
- Care you receive after your benefit limits are exhausted; and,
- Non-covered service

# Summary of Medical Benefits

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Allergy Care** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Alternative Care -** * MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible. | | | | | | | | | | | | | | |
| • **Acupuncture*** Maximum 12 visits per Plan year. | ✓ * | ✓ * | 90% | 50% | | | 90% | 50% | | | 90% | 50% | | |
| • **Massage Therapy*** Maximum 20 visits per Plan year. | ✓ * | ✓ * | 90% | 50% | | | 90% | 50% | | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Ambulance Services**<br>FCH pre-authorization required for non-emergent air ambulance. | | | | | | | | | | | | | | |
| • **Ambulance services** (transfers from a MultiCare Health Facility to a non-MultiCare facility will process under the Tier 2 FCHN Benefit level) | ✓ | ✓ | 90% | | | | | | | | | | | |
| • **Ground ambulance transfers to a MultiCare Health Facility** (non-emergent requires FCH pre-authorization) | ✓ | ✓ | 100% | | | | 100% | | | | 100% | | | |
| **Anesthesia** | | | | | | | | | | | | | | |
| • **Anesthesia** (in general) | ✓ | ✓ | 90% | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    23
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Anesthesia related to dental services** (Limited benefit, see Anesthesia for details) | ✓ | ✓ | 90% | | | | | | | | | | | |
| **Applied Behavior Analysis** (ABA) Therapy Inpatient/Outpatient (facility or professional) -- *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* FCH pre-authorization required for inpatient. | ✓ * | ✓ * | 90% | | 50% | | 90% | 70% | 50% | | 90% | | 50% | |
| **Autologous Blood Donation/Blood Transfusions** | ✓ | ✓ | 90% | 80% | | | 80% | | | | 80% | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

24

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Chemical Dependency -** *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* FCH pre-authorization required for inpatient, residential and partial hospitalization. | | | | | | | | | | | | | | |
| • **Facility Services\*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| • **Professional Services\*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| **Chiropractic Spinal Manipulation-** *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* | | | | | | | | | | | | | | |
| • **Chiropractic Spinal Manipulation\*** Maximum 16 spinal manipulations per Plan year. Maintenance therapy is not covered. | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| **Cochlear Implants** | Covered based on place of service | | | | | | | | | | | | | |
| **Clinical Trials** | Covered as specifically outlined under *Clinical Trials* in the Medical Benefits section below. | | | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder: The High Deductible PPO Plan is referred to within the table as "HDHP."

25

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Dental Trauma** <br> FCH pre-authorization required for follow-up services and anesthesia. | ✓ | ✓ | 80% | | | | | | | | | | | |
| **Diabetic Education & Diabetic Nutrition Education** <br> The first 3 Diabetic Nutrition Education visits or Nutritional Counseling visits per calendar year are considered preventive. This benefit applies after the first 3 visits per calendar year are exhausted. | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Professional Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Diagnostic Testing** <br> **(Lab and Radiology Services. Non-routine, facility and professional services)** | | | | | | | | | | | | | | |
| • **Hospital Inpatient** (professional fees) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Hospital Outpatient** (facility fees) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    26
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Hospital Outpatient** (professional fees) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Independent Facility** Diagnostic Testing provided by an independent diagnostic testing provider, group, facility or office. Billed separately from the provider of care. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Doctor's Office - Primary Care Provider**<br>Office based lab or radiology service provided as part of the office visit, and billed as part of the office visit.<br>Office Visit copay will be assessed for the office visit portion of the visit. | ✓<br>(N/A for MyConnected Care Plan) | ✓ | 100% | | 50% | | 100% | | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Doctor's Office - Specialist** Office based lab or radiology service provided as part of the office visit, and billed as part of the office visit. Office Visit copay will be assessed for the office visit portion of the visit. | ✓ | ✓ | 100% | 50% | | | 100% | 50% | | | 90% | 70% | 50% | |
| • **FIT-Fecal DNA** 1 per calendar year. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Dialysis End Stage Renal Disease (ESRD/Dialysis)** | Covered based on place of service. | | | | | | | | | | | | | |
| **Durable Medical Equipment and Supplies -** *MyConnected Care Plan "Network and Out-of-Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* | | | | | | | | | | | | | | |
| • **Breastfeeding Supplies and Equipment** | N/A | N/A | 100% | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023

Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.

*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*

Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

29

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Durable Medical Equipment\*** | ✓ \* | ✓ \* | 90% | | 50% | | 90% | | 50% (Tier 1 deductible and OOP max apply) | | 90% | | 50% (Tier 1 deductible and OOP max apply) | |
| • **Medical Supplies\*** | ✓ \* | ✓ \* | 90% | | 50% | | 90% | | 50% (Tier 1 deductible and OOP max apply) | | 90% | | 50% (Tier 1 deductible and OOP max apply) | |
| • **Oral Appliances\*** For treatment of obstructive sleep apnea only. Oral appliances for Temporomandibular Joint Syndrome fall to the *Temporomandibular Joint Syndrome* benefit | ✓ \* | ✓ \* | 90% | | 50% | | 90% | | 50% (Tier 1 deductible and OOP max apply) | | 90% | | 50% (Tier 1 deductible and OOP max apply) | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Orthopedic Appliances/Braces\*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% (Tier 1 deductible and OOP max apply) | | 90% | | 50% (Tier 1 deductible and OOP max apply) | |
| • **Prosthetic Devices\*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% (Tier 1 deductible and OOP max apply) | | 90% | | 50% (Tier 1 deductible and OOP max apply) | |
| **Emergency Care** | | | | | | | | | | | | | | |
| • **Emergency Department** – facility services Copay is waived if admitted. | ✓ (On MyConnected Care plan, Tier 1 separate $500 individual/ $1,000 | ✓ | Visits 1 & 2 $250 Copay / Visits 3 & 4 $350 Copay | | | | Visits 1 & 2 $250 Copay / Visits 3 & 4 $350 Copay | | | | 90% | 70% | 70% (Tier 1 and 2 ded applies) | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder: The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| | family ER deductible applies across all Tiers. On Standard PPO Plan and HDHP Plan, Tiers 1 & 2 deductible applies across all Tiers ) | | Visits 5+ $500 Copay | | | | Visits 5+ $500 Copay | | | | | | | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder: The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Emergency Department** – professional | ✓ (On MyConnected Care plan, Tier 1 separate $500 individual/ $1,000 family ER deductible applies across all Tiers. On Standard PPO Plan and HDHP Plan, Tiers 1 & 2 deductible applies across all Tiers ) | ✓ | 100% | | | | 100% | | | | 90% | 70% | 70% (Tier 1 and 2 ded applies) | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101      33
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Urgent Care** | ✓ | ✓ | $20 copay | 50% | | | $20 copay | $50 copay | 50% | | 90% | 70% | 50% | |
| **Family Planning** | | | | | | | | | | | | | | |
| • **Office Visits – Female** | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Office Visits – Male** | ✓ | ✓ | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Diagnostic Testing – Female** | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Diagnostic Testing – Male** | ✓ | ✓ | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Contraceptive Services – Supplies, Devices, Implants** (oral contraceptives covered under Pharmacy) | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101     34
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Sterilization – Female** | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Sterilization – Male** | ✓ | ✓ | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Termination of Pregnancy** – facility services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Termination of Pregnancy** – Professional services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Termination of Pregnancy** – Outpatient | | | | | | | | | | | | | | |
| – Primary Care Physician | ✓ | ✓ | $20 copay then 100% | 50% | | | $20 copay then 100% | $25 copay then 100% | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| – Specialist | ✓ | ✓ | $35 copay then 100% | 50% | | | $35 copay then 100% | $40 copay then 100% | 50% | | 90% | 70% | 50% | |
| **Foot Orthotics** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Genetic Services** FCH pre-authorization required for genetic testing over $500. | | | | | | | | | | | | | | |
| • **BRCA Testing** | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Genetic Testing/Counseling - Facility** FCH pre-authorization required for genetic testing over $500. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Genetic Testing/Counseling - Professional** FCH pre-authorization required for genetic testing over $500. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **All other Genetic Testing/Counseling** | Refer to *Diagnostic Testing* | | | | | | | | | | | | | |
| **Habilitative Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Hearing-** *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* | | | | | | | | | | | | | | |
| • **Routine Hearing Exams** 1 per Plan year maximum. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Hearing Aids and Appliances*** $2,000 every 3 Plan years. | ✓* | ✓* | 90% | 50% | | | 90% | 50% | | | 90% | 50% | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023

Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.

*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*

Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

37

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Home Health Care (HHC)** FCH pre-authorization required for wound therapy, enteral formula, medical food and associated services. | | | | | | | | | | | | | | |
| • **Home Health Care** 130 visits combined plan year maximum. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Phototherapy** (home) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Hospice Care** FCH pre-authorization required. | | | | | | | | | | | | | | |
| • **Hospice Care** Maximum 14 inpatient days per 12-month period. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Respite Care** 30-day maximum within 12-month period. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Hospital Inpatient Medical and Surgical Care**<br>FCH pre-authorization required. | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Inpatient Doctor Visits or Consultations** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Inpatient Professional Services** (surgeon, radiologist, pathologist) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Hospital Outpatient Surgery and Services**<br>FCH pre-authorization required for certain OP services; refer to Pre-authorization Requirements.<br>Dialysis claims received by a Network Provider pay at the MCC Network benefit level. | | | | | | | | | | | | | | |
| • **Surgical Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Ambulatory Surgery Center** (ASC) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health  |  One Union Square  |  600 University Street, Suite 1400  |  Seattle, WA 98101
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

39

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Outpatient professional services** (surgeon, radiologist, pathologist) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Pre-admission Outpatient Testing** | | | Refer to *Diagnostic Testing* | | | | | | | | | | | |
| **Infertility Services** (IVF, GIFT, fertility drugs, etc.) Coverage for evaluation only at Professional Service coinsurance levels. | | | Not Covered | | | | | | | | | | | |
| **Infusion Therapy** (includes infusion therapy provided in the home) FCH pre-authorization required for certain infusion therapy drugs, see *Pre-Authorizations Requirements*. | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Professional Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Lab and Radiology Services (Refer to *Diagnostic Testing*)** | | | | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101      40
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Maternity and Newborn Care** Covered for employees or their spouse/domestic partner only. | | | | | | | | | | | | | | |
| • **Maternity care** - facility | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Maternity care** - professional services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Newborn care** - facility services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Newborn care** - professional services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Medication Therapy Management** | ✓ (waived for all Tiers except HDHP Tier 1 when billed as non-preventive) | N/A | 100% | Not Covered | | | 100% | Not Covered | | | 100% | Not Covered | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    41
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Mental Health Care** | | | | | | | | | | | | | | |
| FCH pre-authorization required for inpatient, residential and partial hospitalization. | | | | | | | | | | | | | | |
| • **Inpatient and Outpatient** - facility services | ✓ | ✓ | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| • **Inpatient and Outpatient** - professional services | ✓ | ✓ | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| **Nutritional Counseling** | | | | | | | | | | | | | | |
| The first 3 Nutritional Counseling visits or Diabetic Nutrition Education visits per calendar year are considered preventive. This benefit applies when the first 3 visits per calendar year are exhausted. | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | | 50% | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Professional Services** | ✓ | ✓ | 90% | | 50% | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Nutritional and Dietary Formulas** | | | | | | | | | | | | | | |
| • **PKU Formula** | ✓ | ✓ | 90% | | 50% | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    42
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **All Others** Limited benefit, see *Nutritional and Dietary Formulas* for details. | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Oral Surgery** | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Professional Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Plastic and Reconstructive Services** FCH pre-authorization required. | | | | | | | | | | | | | | |
| • **Facility Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Professional Services** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    43

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Podiatric Care** Routine foot care excluded (Not related to Diabetes or Peripheral Vascular Disease) | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Preventive Care Guidelines** | | | | | | | | | | | | | | |
| **Important Notes: The following Preventive Care Guidelines are meant to be a reference guide for recommended preventive care timelines and services. These guidelines are not meant to be benefit limitations** (except nutritional counseling, which does apply to the stated limits). | | | | | | | | | | | | | | |
| **Preventive Care Visits** | | | | | | | | | | | | | | |
| • **Adult Periodic Preventive Visit** (19 and over) 1 visit per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Pelvic Exam** 1 visit per Plan year for women age 18 and/or sexually active. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    **44**
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Well Baby Care** (through 36th month) 11 visit maximum. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Well Child Care** (3 to 18 years) 1 visit per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| **Nutritional Counseling** | | | | | | | | | | | | | | |
| • **Nutritional Counseling Visits - First 3 visits per Plan year** Visits 4 and beyond are paid under the applicable medical benefits (subject to deductible and coinsurance.) | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Obesity Screening and Counseling** 12 counseling visits per calendar year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    45
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Preventive Screening Procedures** Screening tests are covered in accordance with the recommendations set forth by the US Preventive Services Task Force (USPSTF) and the Health Resources and Services Administration (HRSA). Below is a summary of the most commonly obtained preventive screening services (this is not meant to be an all-inclusive list). See *Preventive Care* for more details. | | | | | | | | | | | | | | |
| • **Abdominal Aortic Aneurysm Ultrasound Screening** One (1) test per lifetime for current or prior male tobacco users between ages 65 – 75. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    46
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Colonoscopy** The first colonoscopy per calendar year is covered under the Preventive Care benefit, regardless of diagnosis. Subsequent colonoscopies in the same calendar year are covered under the medical benefits, regardless of diagnosis. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Hearing Screening** 1 visit per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    47
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Mammogram** The first mammogram per calendar year is covered under the Preventive Care benefit, regardless of diagnosis. Subsequent mammograms in the same calendar year are covered under the medical benefits, regardless of diagnosis. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Obesity Prevention Counseling** For women aged 40-60 years who are normal weight or overweight. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101     48
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Sigmoidoscopy** The first sigmoidoscopy per calendar year is covered under the Preventive Care benefit, regardless of diagnosis. Subsequent sigmoidoscopies in the same calendar year are covered under the medical benefits, regardless of diagnosis. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Periodic Bone Density Screening** 1 test every other Plan year, women age 65, or, age 60 for those with increased risk for osteoporotic fractures. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Preventive Laboratory Screenings** | | | | | | | | | | | | | | |
| • **Chemistry Panel** (CHEM) 1 per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Cholesterol/Lipid** 1 every 5 Plan years. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Completed Blood Count** (CBC) 1 per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Fecal Occult Blood Tests** The first fecal occult blood test per calendar year is covered under the Preventive Care benefit, regardless of diagnosis. Subsequent fecal occult blood tests in the same calendar year are covered under the medical benefits, regardless of diagnosis. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **FIT-Fecal DNA** 1 per Calendar year | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **HIV Screening** As needed. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

51

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023

Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.

*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*

Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Lead Level Tests** 1 test for children, age 2 or under. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Pap tests/Pelvic Exam** 1 per Plan year for women 18 and/or sexually active. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Periodic Blood Glucose Testing** 1 per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Prostate Cancer Screening (PSA)** 1 per Plan year, for men, beginning age 50 years. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| • **Sexually Transmitted Disease Screening** 1 per Plan year | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Urinalysis (UA)** 1 per Plan year. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |
| **Immunizations** Immunizations for children and adults are covered in accordance with the recommendations set forth by the Centers for Disease Control and Prevention. Except for the (Travel immunizations are covered.) Covered immunizations done at a pharmacy are covered at the In Network benefit level at billed charges. | ✓ (OON Only) | ✓ (OON Only) | 100% | | | 50% | 100% | | | 50% | 100% | | | 50% |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101     53
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Professional/Physician Services** (office visits and certain telemedicine visits) | | | | | | | | | | | | | | |
| *Standard PPO and MCCN Plans: Virtual care visits are covered like any other professional service subject to deductible and coinsurance based on the network status of the provider.* | | | | | | | | | | | | | | |
| *HDHP Plan: Virtual care visits are covered like any other professional service subject to deductible and coinsurance based on the network status of the provider.* | | | | | | | | | | | | | | |
| • **Office Visits** – Primary Care Provider | ✓ (N/A for MyConnected Care Plan) | ✓ | $20 copay | 50% | | | $20 copay | $25 copay | 50% | | 90% | 70% | 50% | |
| • **Office Visits** – Specialist | ✓ | ✓ | $35 copay | 50% | | | $35 copay | $40 copay | 50% | | 90% | 70% | 50% | |
| **Rehabilitation Therapy** * *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* | | | | | | | | | | | | | | |
| • **Inpatient *** FCH pre-authorization required; 30-day maximum per Plan year. Spinal cord injuries have a maximum of 45 days. | | | | | | | | | | | | | | |
| – Facility Services | ✓ * | ✓ * | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| – Professional Services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    54
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Outpatient** (includes physical, speech and occupational therapies)<br>45 visit maximum per Plan year; all therapies combined. | | | | | | | | | | | | | | |
| – Facility Services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| – Professional Services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| • **Cardiac Rehab**<br>Services count toward 45 visit outpatient rehabilitation maximum. | | | | | | | | | | | | | | |
| – Facility Services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| – Professional Services | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Skilled Nursing Facility** *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* FCH pre-authorization required. | | | | | | | | | | | | | | |
| • **Skilled Nursing Facility*** 90 days Plan year max; maintenance and custodial care are not covered. | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| **Temporomandibular Joint Syndrome** (TMJ) FCH pre-authorization required for inpatient care. | ✓ | ✓ | 90% | | 50% | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Tobacco Cessation** Must complete course of treatment to obtain reimbursement. | ✓ | ✓ | 90% | | 50% | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101       56

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Transgender/Gender Affirming Services** FCH pre-authorization required for surgery. Limited benefit, see *Transgender/Gender Affirming Services* for details. | | | Payment is based on Place of Service and Provider type | | | | | | | | | | | |
| **Transplants** (Organ and Bone Marrow) - * *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.* FCH pre-authorization required. Case Management for Transplants provided by FCH. Subject to benefit waiting period of 6 months. | | | | | | | | | | | | | | |
| • **Recipient/Donor Expenses*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| • **Transportation and Lodging*** Travel and Lodging maximum: $2,500 per episode. | ✓ * | ✓ * | 90% | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101        57
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Vision** | | | | | | | | | | | | | | |
| • **Routine Eye Exams** 1 exam per Plan year. | N/A | N/A | 100% | | | | 100% | | | | 100% | | | |
| • **Adult Hardware** (includes scratch coat, anti-reflective coating, tinting, contact lens fitting, etc.) - Adults 19 and older. $225 max per Plan year. | N/A | N/A | 80% | | | | 80% | | | | 80% | | | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| • **Pediatric Hardware** (includes scratch coat, anti-reflective coating, tinting, contact lens fitting, etc.) - Children 18 and younger. 1 pair of frames and lenses or a 12-month supply of contact lenses per Plan year maximum. | N/A | ✓ | 80% up to $225, then 60% thereafter | | | | 80% up to $225, then 60% thereafter | | | | 80% up to $225, then 60% thereafter | | | |

**Weight Management**

UWMC Weight Loss and Metabolic Surgery for bariatric surgery and weight management will be processed under Tier 1 for the MyConnected Care and HDHP Plans. Bariatric surgery and weight management is not covered on the Standard PPO Plan. All other services billed in relation to bariatric surgery from UWMC are subject to deductible and coinsurance based on the applicable medical benefit and network status of the provider.

- **Non-Surgical Weight Management**

  The first 12 Obesity Screening and Counseling visits per calendar year for members with an obesity diagnosis are considered preventive. This benefit applies for visits 13 through 20.

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101    59
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| –  Obesity Screening and Counseling (visits 13-20) | ✓ | ✓ | $35 copay | Not covered | | | Not covered | | | | $35 copay | Not covered | | |
| • **Surgical Weight Management (Bariatric Surgery)** <br> FCH pre-authorization required. Care Management through PSW required. <br> $50,000 Lifetime Maximum | | | | | | | | | | | | | | |
| –  Facility Services | ✓ (N/A for MyConnected Care and PPO Plan) | ✓ | 90% | Not covered | | | Not covered | | | | 90% | Not covered | | |
| –  Professional Services | ✓ (N/A for MyConnected Care and PPO Plan) | ✓ | 90% | Not covered | | | Not covered | | | | 90% | Not covered | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023

*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*

*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*

Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

60

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| – Anesthesia | ✓ (N/A for MyConnected Care and PPO Plan) | ✓ | 90% | 90% when services performed at a MCC facility | | | Not covered | | | | 90% | 90% when services performed at a MCC facility | | |
| **Wigs** Limit 1 per calendar year | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101
MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
*Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.*
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder:  The High Deductible PPO Plan is referred to within the table as "HDHP."

61

# Medical Benefits

FCH administers the benefits described in this section for MultiCare Plan participants. All benefits are subject to plan exclusions and limits. Coinsurance and deductibles apply as previously noted above. See *Payment Provisions*, *Summary of Medical Benefits* and *Medical Limitations and Exclusions* for more details, along with definitions in the Group Health Summary Plan Description.

Coverage is provided only when all these conditions are met:

- The service or supply is a listed covered benefit;
- Specific benefit limits or lifetime maximums are not exhausted;
- All pre-authorization and benefit requirements are met;
- The participant is eligible for coverage and enrolled in this plan at the time the service or supply is received; and,
- The service or supply is considered *medically necessary* for a covered medical condition, as defined.

## Acupuncture

Refer to *Alternative Care.*

## Allergy Care

Benefits include allergy tests, injections, and serums. Coverage is provided when administered by a physician, allergist or specialist. Serum is covered only when received and administered within the provider's office. If received from a pharmacy, the serum may be covered under the pharmaceutical benefit.

## Alternative Care

Benefits include services of an acupuncturist and or massage therapist to treat a covered illness or injury. Maintenance therapy is not covered. The massage therapy benefit applies to services coded as massage therapy on the claim, which include, but are not limited to, manual lymphatic drainage, mobilization, and manual traction. These services will process to the appropriate benefit based on the codes submitted on the claim.

## Ambulance Services

The plan covers medically necessary licensed ambulance transportation when the following conditions apply:

- The transportation is to the nearest available health care facility where medically necessary services can be provided;
- Other forms of transportation would likely endanger the participant's health.

Air ambulance transport services require pre-authorization for non-urgent transport and non-emergent ground or air ambulance transport to a MultiCare Health facility.

*Note:  Emergent Air Ambulance Transport will be reviewed retrospectively.*

Transportation for personal or convenience reasons is not a covered benefit and is excluded.

# Anesthesia

Anesthetics cause the partial or complete loss of sensation, with or without consciousness. Benefits for anesthesia are covered if and when required for certain procedures or surgeries.

## General Anesthesia for Dental Care

Coverage is provided for general anesthesia and associated facility charges in conjunction with dental care provided to a participant if such participant is:

- Six years of age or younger or is physically developmentally disabled; or,
- An individual who has a medical condition that the person's physician determines will place the person at undue risk if the procedure is performed in a dental office. The covered participant's physician must approve the procedure.

Anesthesia must be administered within a hospital or ambulatory surgical center.

# Applied Behavior Analysis (ABA)

This benefit will provide coverage for behavioral interventions based on the principles of Applied Behavior Analysis (ABA).

ABA therapy programs incorporate behavior modification, training and education.

This benefit will cover the five components of ABA:

- Initial assessment
- Direct clinical treatment
- Program development
- Treatment planning
- Supervision of the providers of direct service

Coverage will be provided for medically necessary services to develop, maintain, and/or restore the functioning of an individual. Duplicate services, provider training and group classes are not covered.

## Covered Providers

**For ABA:**

ABA services are provided by a state certified behavior health facility that has ABA services overseen by a BCBA- BCBA-D or provided directly by them as independent practitioners. Qualified network providers can be located using the FCH provider search at www.fchn.com, by selecting "other facilities" and then "Applied Behavior Analysis Facility."

- **Board Certified Behavior Analyst® (BCBA® (graduate level), BCBA-D™ (doctoral level)** – The BCBA and BCBA-D are independent practitioners who also may work as employees or independent contractors for an organization. The BCBA conducts descriptive and systematic behavioral assessments, including functional analyses, and

provides behavior analytic interpretations of the results. The BCBA designs and supervises behavior analytic interventions. The BCBA is able to effectively develop and implement appropriate assessment and intervention methods for use in unfamiliar situations and for a range of cases. The BCBA seeks the consultation of more experienced practitioners when necessary. The BCBA teaches others to carry out ethical and effective behavior analytic interventions based on published research and designs and delivers instruction in behavior analysis. BCBAs supervise the work of Board Certified Assistant Behavior Analysts and others who implement behavior analytic interventions.

- **Board Certified Assistant Behavior Analyst® (BCaBA®)** – The BCaBA conducts descriptive behavioral assessments and is able to interpret the results and design ethical and effective behavior analytic interventions for clients. The BCaBA designs and oversees interventions in familiar cases (e.g., similar to those encountered during their training) that are consistent with the dimensions of applied behavior analysis. The BCaBA obtains technical direction from a BCBA for unfamiliar situations. The BCaBA is able to teach others to carry out interventions and supervise behavioral technicians once the BCaBA has demonstrated competency with the procedures involved under the direct supervision of a BCBA. The BCaBA may assist a BCBA with the design and delivery of introductory level instruction in behavior analysis. It is mandatory that each BCaBA practice under the supervision of a BCBA. Governmental entities, third-party insurance plans and others utilizing BCaBAs must require this supervision.

- **Registered Behavior Technician™ (RBT™) or Therapy Assistant (TA)** – The RBT/TA is a paraprofessional who practices under the close, ongoing supervision of a BCBA or BCaBA ("Designated therapy supervisor"). The RBT/TA is primarily responsible for the direct implementation of skill-acquisition and behavior-reduction plans developed by the supervisor. The RBT/TA may also collect data and conduct certain types of assessments (e.g., stimulus preference assessments). The RBT/TA does not design intervention or assessment plans. It is the responsibility of the therapy supervisor to determine which tasks an RBT/TA may perform as a function of his or her training, experience, and competence. The therapy supervisor is ultimately responsible for the work performed by the RBT/TA and bills for their services.

# Autologous Blood Donation/Blood Transfusions

Autologous blood donations are those in which the blood being transfused was donated by the patient during surgery. Blood transfusions are the replacement of blood or one of its components, depending on the condition being treated.

# Chemical Dependency

All inpatient admissions and partial hospitalizations **require FCH pre-authorization** by calling (800) 640-7682. The plan covers services provided to of individuals requiring chemical dependency treatment for abuse of substances (e.g. alcohol or other drugs). Care must be medically necessary and provided at the least restrictive level of care.

Care may be received at a hospital, a chemical dependency facility, and/or received through residential treatment programs, partial hospital programs, and intensive outpatient programs or through group or individual outpatient services.

# Chiropractic Spinal Manipulation

Coverage includes chiropractic manipulation of the spine when performed within the scope of the provider's license. Non-manipulation services provided by a chiropractor are not included in this benefit and are covered based on the service billed. For example, an office visit will be billed as a professional visit under the professional benefit. Maintenance therapy is not covered.

# Clinical Trials

An exception to the plan's exclusion of experimental or investigational treatments or services may be made for members participating in an approved clinical trial when this participation has been pre-authorized.

An approved clinical trial is defined as follows:

- Pre-authorization for clinical trial participation has been granted as described below.
- The clinical trial is a phase I, phase II, phase III, or phase IV clinical trial that is conducted in connection with the prevention, detection, or treatment of cancer or other life-threatening disease or condition. A "life-threatening condition" is a disease or condition likely to result in death unless the disease or condition is interrupted. The principal purpose of the trial intervention must be the therapeutic intent to potentially improve health outcomes.
- The clinical trial intervention must be intended for a condition covered by the health plan.
- The approved clinical trial must be classed as one of the following:
  - A federally funded or federally approved trial.
  - A clinical trial conducted under a U.S. Food and Drug Administration (FDA) investigational new drug application.
  - A drug trial that is exempt from the requirement of an FDA investigational new drug application.
- The clinical trial must be conducted under a written research protocol approved by an appropriate Institutional Review Board (IRB). This protocol must demonstrate that the trial is in compliance with Federal regulations relating to the protection of human subjects.
- The clinical trial must provide a thorough informed consent document to the participating member, and this document must be signed by the member.
- All applicable plan limitations for coverage of out-of-network care along with all applicable plan requirements for precertification, and registration, will apply to any costs associated with member participation in the trial. The plan may require a qualified member to use an in-network provider participating in a clinical trial if the provider will accept the member as a participant. A member participating in an approved clinical trial conducted outside the state of the member's residence will be covered if the plan otherwise provides out-of-network coverage for routine patient costs.
- A "qualified member" is a group health plan member or beneficiary who is eligible, according to the trial protocol, to participate in the approved clinical trial for the treatment of disease and either:
  - The referring health care professional is a participating provider and has concluded that the member's or beneficiary's participation in the clinical trial would be appropriate; or

    – The member or beneficiary provides medical and scientific information establishing that the individual's participation in the clinical trial would be appropriate.

Costs associated with clinical trial participation may be covered as follows:

Costs Covered:

- Routine Patient Costs defined as follows-
  - Items or services that are typically provided under the plan for a participant not enrolled in a clinical trial. (e.g., usual care/standard care.).
  - Items, services, or tests that are required to safely provide the investigational intervention to include clinically appropriate monitoring of the effects of the intervention.
  - Medically necessary diagnosis and treatment for conditions that are medical complications resulting from the member's participation in the clinical trial.

Costs Not Covered:

- Investigational items, services, tests, or devices that are the object of the clinical trial.
- Interventions, services, tests, or devices provided by the trial sponsor without charge.
- Data collection or record keeping costs that would not be required absent the clinical trial; this exclusion extends to any activity (e.g. imaging, lab tests, and biopsies) necessary only to satisfy the data collection needs of the trial.
- Services or interventions clearly not consistent with widely accepted and established standards of care for the member's particular diagnosis.
- Interventions associated with treatment for conditions not covered by the Plan.

# COVID-19

The plan covers medically necessary diagnostic and treatment services related to COVID-19.

# Dental Trauma

Not intended as dental coverage, this benefit coverage is provided for repair of sound natural teeth and/or implants of sound natural teeth, and repair of the jawbone or supporting tissues, due to accidental injury. After the initial examination by your dentist, a pre-authorization for further services is required by FCH. Treatment must begin within 30 days of the date of injury and be completed within 24 months from the date of occurrence. Any services received after you become disenrolled from this Plan are not covered. Anesthesia related to the accidental injury is covered within 24 months.

Injury due to biting or chewing is not covered, and is not considered an accidental injury. For the purposes of this coverage, a "sound natural tooth" is a tooth that is (i) free of active or chronic clinical decay, (ii) contains at least fifty percent (50%) bony structure, (iii) is functional in the arch, and (iv) has not been excessively weakened by multiple dental procedures.

# Diabetic Education and Diabetic Nutrition Education

Medically necessary diabetic education regarding nutrition and insulin management of diabetes is covered. The education may take place in classes through approved diabetic courses or as individual instruction.

# Diagnostic Testing

The plan covers testing such as lab and radiology for diagnostic purposes when medically necessary and ordered by a qualified health care provider.

# Dialysis

Benefits are provided for kidney dialysis treatment including drugs and supplies used during the treatment.

# Durable Medical Equipment (DME) and Supplies

DME is medical equipment that can withstand repeated use, is not disposable, is used for a medically therapeutic purpose, is generally not useful in the absence of sickness or injury and is appropriate for use in the home. DME may be rented or purchased (at FCH's discretion) and total cost for rental must not exceed the purchase price. Repair or replacement is only covered when needed due to normal use, a change in the patient's physical condition or the growth of a child. Duplicate items are not covered. When more than one option exists, benefits will be limited to the least expensive model or item appropriate to treat the patient's covered condition.

Examples of DME include, but are not limited to:

- Crutches
- Oxygen and equipment for administering oxygen
- Walkers
- Wheelchairs

This benefit also covers:

- Breastfeeding Supplies & Equipment: Benefits include electric, hospital grade, or manual breast pumps, as well as replacements of tubing, power adapters, breast shields, caps for breast pump bottles, polycarbonate bottles, and locking ring. Breast milk storage/freezer bags and breastfeeding supplies are also covered. Nursing pads, nipple shields, nipple cream, and nursing bras are not covered.
- Diabetic monitoring equipment, such as the initial cost of an insulin pump and blood glucose monitor (including supplies related to such equipment). Diabetic supplies such as insulin, syringes, needles, lancets, etc., are covered under the pharmacy benefit.
- Medical supplies needed for the treatment or care of an appropriate covered condition, including but not limited to compression garments, mastectomy supplies and ostomy supplies. Supplies available over-the-counter are excluded.
- Oral appliances when related to the treatment of Sleep Apnea
- Orthopedic appliances/braces: These include appliances used to support abnormal joints, limit pressure on a joint after injury to allow it to heal or correct abnormal curves in the spine.
- Prosthetic devices: Benefits include external prosthetic appliances that are used to replace all or part of a missing body part and are necessary for the alleviation or correction of illness, injury, or congenital defect.

Surgically implanted devices may be covered under the appropriate surgical benefit and are not considered DME. Benefits for durable medical equipment are determined by the type of device and its intended use, and not by the entity that provides or bills for the device.

# Emergency Services and Urgent Care

The Plan covers emergency department visits (including pre-stabilization, post-stabilization, certain ancillary services) and urgent care visits to evaluate an Emergency Medical Condition at in network and out-of-network facilities.

Emergency (or emergent) means the sudden and acute onset of a symptom(s), including severe pain, that would lead a prudent layperson, acting reasonably, to believe a health condition exists that requires immediate medical attention and that failure to provide medical attention would result in serious impairment to bodily functions or serious dysfunction of a bodily organ or part, or would place the person's health in serious jeopardy.

Examples of **emergent** conditions include severe pain, difficulty breathing, deep cuts or severe bleeding, poisoning, drug overdose, broken bones, unconsciousness, stab or gunshot wounds, automobile accidents, and pain or bleeding during pregnancy. Examples of **urgent** conditions include cuts and lacerations, diarrhea, allergic reactions, sprains, urinary tract infections and vomiting.

In the case of an emergency, at home or away from home, seek the most immediate care available. To receive the network level of benefits, you must obtain all follow-up care from network providers. If you require out-of-network follow-up services, you must obtain a pre-authorization from FCH in order to receive your best benefits, unless the services are part of the post-stabilization treatment.

If you are admitted to an out-of-network hospital or facility, you are responsible for notifying FCH within two (2) business days or as soon as reasonably possible (see the Medical Management section). FCH may arrange for your transfer to a network hospital, as soon as your condition permits, at no cost to you.

# Family Planning

Voluntary sterilization procedures and FDA-approved birth control methods are covered. Over-the-counter products are not covered. Oral contraceptives are covered under the prescription drug benefit.

## Termination of Pregnancy

Voluntary termination of pregnancy is covered for an employee or spouse/domestic partner only, not a dependent child.

# Foot Orthotics

An orthotic is a device involving the ankle-foot or knee-ankle-foot used to support, align, prevent or correct deformities, or to improve the function of movable parts of the body. Items obtained under this benefit shall be limited to the standard and/or most cost-effective model of such orthotic. Repairs or replacement costs will only be covered if the orthotic was used by the member in the manner and for the purpose for which the orthotic was intended and damage was incurred due to normal wear and tear of the orthotic.

# Genetic Services

Genetic testing, counseling, interventions, therapy and other genetic services are covered when determined to be an essential component of medically necessary care or treatment of a covered condition, or a medically necessary precursor to obtaining prompt treatment of a covered condition.

# Habilitative Services

Benefits are provided for habilitative services when medically necessary and must be recognized by the medical community as efficacious:

- For partial or full development;
- For keeping and learning age appropriate skills and functioning within the individual's environment; and
- To compensate for a progressive physical, cognitive, and emotional Illness.

Covered Services include Speech, occupational, physical and aural therapy services.

Day habilitation services designed to provide training, structured activities and specialized assistance to adults, chore services to assist with basic needs, vocational and custodial services are not covered.

# Hearing Exams/Appliances

Routine hearing exams to detect/prevent auditory deterioration are covered for employees and their dependents.

Hearing aids and appliances are covered when needed for auditory deterioration. Costs for these device(s), repairs and other related services such as surgical implantation are all subject to the limit(s) noted within the Summary of Medical Benefits for Hearing Aids and Appliances.

*Note: Cochlear implants and Bone Anchored Hearing Aids (BAHA) are not considered hearing aids/appliances and are covered under the surgical benefit, and not under the Hearing Aids/ Appliances benefit.*

# Home Health Care

**FCH pre-authorization is required** for wound therapy. Home health care is covered when prescribed by your physician. The patient must be homebound (except for lactation and perinatal services) and require skilled care services (as defined by the Plan). Benefits are limited to intermittent visits by a licensed home health care agency.

For this benefit, a visit is a time-limited session or encounter with any of the following home health agency providers:

- Nursing services (RN, LPN);
- Licensed or registered physical, occupational, respiratory or speech therapist (or an assistant working under the supervision of one of these providers);
- Home health aide working directly under the supervision of one of the above providers;
- Licensed as a social worker - masters prepared;

- Nutritional guidance; or,
- Registered dietician

Private duty nursing, shift or hourly care services, custodial care, maintenance care, housekeeping services, respite care and meal services are not covered.

This benefit is not intended to cover care in the home when FCH determines care in a skilled nursing facility or a hospital is more cost-effective. Any charges for home health care that qualify under this benefit and under any other benefit of this plan will be covered under the most appropriate benefit, as determined by FCH.

# Hospice Care

**FCH pre-authorization is required** for inpatient and home hospice benefits. Hospice care is covered when prescribed by your physician and s/he has determined that life expectancy is 12 months or less and a palliative, supportive care treatment approach has been chosen. This benefit includes acute, respite, and home care to meet the physical, psychosocial, and special needs of a patient-family unit during the final stages of illness and dying. Hospice care is provided at a variety of levels to meet the individual needs of the patient-family unit. Levels offered are:

- **Intermittent in-home visits** are provided on an as needed basis by the hospice team, which includes health care professionals, support staff, and a twenty-four (24) hour a day "on-call" registered nurse. This level of care does not cover room and board while a member resides in a skilled nursing facility, adult family home, or assisted living facility.
- **Inpatient Hospice care** is needed when care cannot be managed where the patient resides. The care will be provided at an inpatient facility until the patient's condition stabilizes. Coverage for room and board is covered at this level.
- **Respite Care**
  - **Continuous home care** is provided when a medical crisis occurs where the patient resides and care can be provided at the residence. During such periods, the hospice team can provide around-the-clock care.
  - **Inpatient respite care** is available to provide the patient's caregiver a rest. This acknowledges that caring for a dying person can be difficult.  Care for the patient is provided at an inpatient facility and includes room and board costs.

When provided within the above-defined levels of care, additional covered expenses include:

- Approved medications and infusion therapies furnished and billed by an approved hospice agency
- Durable Medical Equipment
- Supplies required for palliative care

If the patient exhausts the hospice benefit maximum, limited extensions may be granted if it is determined that the treatment is medically necessary. Any charges for hospice care that qualify under this benefit, and under any other benefit of this plan, will be covered under the most appropriate benefit as determined by FCH.

# Hospital Inpatient Medical and Surgical Care

Hospital inpatient and facility charges for medically necessary care are covered. **FCH pre-authorization is required** for all non-emergency inpatient admissions to a hospital or facility. Out-of-network maternity care require notification to FCH within 48 hours as described under Medical Management.

Covered inpatient care includes room and board, operating room and anesthesia, radiology, lab and pharmacy services furnished by and used while in the hospital.

Out-of-network inpatient admissions are limited to 10 admissions per calendar year. This applies to all out-of-network inpatient admissions combined, including all out-of-network inpatient hospital, residential treatment center, inpatient chemical dependency, chemical dependency residential treatment center, skilled nursing facility, inpatient rehabilitation and any other type of inpatient service.

# Hospital Outpatient Surgery and Services

Certain outpatient surgery/procedures require FCH pre-authorization; please refer to the list on page 4 for details. Covered outpatient care includes outpatient surgery, procedures and services, operating room and anesthesia, radiology, lab and pharmacy services furnished by and used while at a hospital or ambulatory surgical center.

# Infertility Diagnostic Services

All claims related to evaluation and diagnosis of infertility will be covered. Examples of covered items include endometrial biopsy, hysterosalpingography, reproductive screening services, sperm count, and other laboratory and radiology diagnostic testing even if performed after the diagnosis of infertility has been made. A pre-authorization must be obtained from FCH if care is provided inpatient. Treatments and procedures that induce pregnancy are not covered. Examples include in vitro fertilization and gamete intra-fallopian transplant (GIFT).

# Infusion Therapy

**FCH pre-authorization required for certain infusion therapy drugs**; please see *Pre-authorization Requirements* for details. Infusion therapy is the administration of medications using intravenous, subcutaneous, and epidural routes (into the bloodstream, under the skin, and into the membranes surrounding the spinal cord). Drug therapies commonly administered via infusion include, but are not limited to, antibiotics, chemotherapy, pain management, parenteral nutrition, and immune globulin. Diagnoses commonly requiring infusion therapy include infections that are unresponsive to oral antibiotics; cancer and cancer-related pain; gastrointestinal diseases or disorders which prevent normal functioning of the GI system; congestive heart failure; immune disorders; and more. Nursing visits associated with infusion therapy are covered under this benefit, regardless of whether the patient is home bound.

# Massage Therapy

Refer to *Alternative Care*.

# Maternity and Newborn Care

Coverage for pregnancy and childbirth, for employees or their spouse/domestic partner (not dependents), in a hospital, birthing center, or home, is provided on the same basis as any other medical condition, as are complications of pregnancy. Medically necessary prenatal diagnosis of congenital disorders of the fetus by means of screening and diagnostic procedures during pregnancy is covered. The services of a licensed physician (M.D. or D.O.), an advanced registered nurse practitioner (A.R.N.P.), a licensed midwife, or a certified nurse midwife (CNM) are covered under this benefit.

See the *Medical Management* section, specifically the subsections: *Pre-authorization Requirements and Notification for Emergency Admissions* for details.

## Coverage for Newborns

Newborn care includes inpatient hospital services and professional care (including circumcision) performed during the initial period of hospitalization immediately following birth. Any services performed after the baby is discharged from this level of care are covered under the benefit applicable to the services billed, and are not considered newborn care. Circumcisions are covered up to 28 days following birth. Circumcisions performed after 28 days must be medically necessary as determined by FCH.

*Newborns' and Mothers' Health Protection Act of 1996*

*This Act states that group health plans may not restrict benefits for any hospital length of stay in connection with childbirth for the mother or newborn child to less than 48 hours following a normal vaginal delivery or less than 96 hours following a cesarean section. However, federal law generally does not prohibit the mother's or newborn's attending provider, after consulting with the mother, from discharging the mother or newborn earlier than these periods. In any case, the Plan may not, under federal law, require that a provider obtain authorization from the Plan or the insurance issuer or TPA for prescribing a length of stay not in excess of these periods.*

If the subscriber or subscriber's spouse is not eligible for the maternity benefits under this Plan, the professional services and hospital services benefits of this Plan will be provided for routine care for her newborn child while hospitalized for the first 72 hours following birth.

*Note: Refer to the companion document MultiCare Health System Flexible Benefit Program SPD to details on eligibility and enrollment and to understand the plan's special enrollment limited period of time for adding a newborn to your coverage.*

# Medication Therapy Management

This benefit covers pharmacist consultations received for a covered medical condition. Benefits for pharmacist consultations are limited to MultiCare pharmacists. Benefits are provided at 100% of billed charges. Calendar deductibles, coinsurance and copays are waived for these services when billed as preventive.

# Mental Health Care

All inpatient admissions and partial hospitalizations **require FCH pre-authorization** by calling (800) 640-7682. The plan covers treatment of mental health or psychiatric conditions.

Care must be medically necessary and provided at the least restrictive level of care. Facilities offering inpatient level of care must have a medical model with physician and/or nursing staffing on site 24 hours each day.

Care may be received at a hospital or treatment facility, and/or received through residential treatment programs, partial hospital programs, and intensive outpatient programs or through group or individual outpatient services.

Family counseling is covered only if related to the treatment of an approved clinical mental health diagnosis, specifically, those noted in the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM).

*Pursuant to the Mental Health Parity Act of 1996 (MHPA) and the Mental Health Parity and Addiction Equity Act of 2008 (MHPAEA), collectively, the mental health parity provisions in Part 7 of ERISA, this Plan applies its terms uniformly and enforces parity between covered health care benefits and covered mental health and substance disorder benefits relating to financial cost sharing restrictions and treatment duration limitations. For further details, contact the Plan Administrator.*

# Nutritional Counseling

Coverage provided for health services rendered by a registered dietician or other licensed professional for individuals with medical conditions that require a special diet. Some examples of such medical conditions include coronary heart disease, congestive heart failure, severe obstructive airway disease, gout, renal failure, phenylketonuria and hyperlipidemias. Nutritional counseling for diabetes covered under *Diabetic Education & Diabetic Nutrition Education*.

# Nutritional and Dietary Formulas

Coverage for dietary formulas and nutritional supplements are covered when medically necessary. The following conditions must be met:

- The formula is a specialized formula for the treatment of a recognized life-threatening metabolic deficiency such as phenylketonuria **OR**
- The formula is the significant source of a patient's primary nutrition or is administered in conjunction with intravenous nutrition **AND**
- The formula is administered through a feeding tube (nasal, oral or gastrostomy).

Special diets, nutritional supplements and over-the-counter vitamins and minerals are not covered.

# Oral Surgery

Coverage for oral surgery is offered when a medical diagnosis is present. Oral Surgery required for a dental diagnosis such as periodontal disease is **not** covered. Examples of covered services include:

- The reduction or manipulation of fractures of facial bones;

- Excision of lesions, cysts, and tumors of the mandible, mouth, lip or tongue;
- Incision of accessory sinuses, mouth salivary glands or ducts; and,
- Extraction of teeth damaged due to radiation therapy that occurred while under this Plan.

# Plastic and Reconstructive Services

Reconstructive/plastic procedures require FCH pre-authorization and are covered when performed to correct or repair abnormal structures of the body caused by congenital defects, trauma, infection, tumors, disease, accidental injury or prior surgery (if the prior surgery would be covered under this Plan). Specific criteria follow:

- Services performed to correct congenital defects of a child must be completed before the child's 18th birthday
- In the case of accidental injury, services must be completed within 12 months of the initial injury

*Women's Health and Cancer Rights Act of 1998*

*The federal law titled "Women's Health and Cancer Rights Act of 1998" states group health plans that are providing medical and surgical benefits for mastectomy resulting from disease, illness or injury must also cover, for those affected participants:*

- *Reconstruction of the breast on which the mastectomy was performed*
- *Reconstruction of the other breast to produce a symmetrical appearance*
- *Internal or external prostheses*
- *Treatment of physical complications in all stages of post-mastectomy reconstruction, including lymphedema*

# Podiatric Care

Coverage is provided for certain surgical podiatric services, including incision and drainage of infected tissue of the foot, removal of lesions of the foot, removal or debridement of infected toenails, and treatment of fractures and dislocations of bones of the foot. Routine foot care, such as the treatment of corns, calluses, non-surgical care of toenails, fallen arches and other symptomatic complaints of the feet are not covered, except for members with peripheral vascular disease and diabetes.

# Preventive Care

Coverage is provided by or under the supervision of your physician, including:

- Routine physicals;
- Periodic examinations including the specific diagnostic testing/screening and laboratory services noted in the Summary of Benefits (the frequency of these examinations is determined by the age, gender, health status and medical needs of the participant);
- Adult, child and adolescent immunizations as recommended by the Centers for Disease (CDC). For more information visit the following website: www.healthcare.gov

Preventive care does not include diagnostic treatment, lab, x-ray, follow-up care, or maintenance care of existing conditions or chronic disease.

# Professional/Physician Services

These services refer to any professional, physician, provider or facility practicing medicine or providing health care within their lawful scope of practice as defined by the state from which their license was bestowed. This benefit applies to in-person, face to face office visits, e-visits and telemedicine consultation, and the following Telehealth visits: Virtual urgent care visits via a secure portal are covered when initiated by the member. Scheduling and medical record documentation of these visits follows the same standard as in-person visits.

Women's healthcare providers include any generally recognized medical specialty of licensed practitioners who provide women's healthcare services within their lawful scope of practice. They include, but are not limited to:

- An allopathic physician (M.D.) or osteopathic physician (D.O.) who is a family or general practitioner, internist, obstetrician or gynecologist;

- A licensed physician assistant;

- An advanced registered nurse practitioner (A.R.N.P.) who specializes in women's health, family practice or midwifery; or,

- A certified nurse midwife (CNM) or licensed midwife.

# Rehabilitation Therapy

Coverage is provided for inpatient and outpatient physical therapy, speech therapy, occupational therapy and cardiac therapy for disabling conditions. Examples of such therapies include, but are not limited to, physical therapy, speech therapy, and occupational therapy.  The following conditions must be met:

- Services are to restore and significantly improve function that was previously present but lost due to acute injury or illness;

- Services are not for palliative, recreational, relaxation or maintenance therapy;

- Loss of function was not the result of a work-related injury; and,

- Therapy is provided by, or prescribed by, your physician.

Coverage for cardiac rehabilitation requires that participants have experienced a cardiac event in the preceding twelve-month period, such as myocardial infarction, chronic stable angina, heart transplants or heart and lung transplants.

## Inpatient Rehabilitation

Inpatient rehabilitation **requires FCH pre-authorization** and must be furnished and billed by a rehabilitative unit of a hospital or by another approved rehabilitation facility. When rehabilitation follows acute care in a continuous inpatient stay, this benefit starts on the day the care becomes primarily rehabilitative. Inpatient care includes all room and board, services provided and billed by the inpatient facility and therapies performed during the rehabilitative stay.

## Outpatient Rehabilitation

Outpatient rehabilitation benefits are subject to the following provisions:

- You must not be confined in a hospital or other medical facility.
- The therapy must be part of a formal written treatment plan prescribed by your physician.
- Services must be billed by a hospital, physician or physical, occupational, or speech.

Speech therapy is covered only when required as a result of brain or nerve damage secondary to an accident, disease or stroke.

Once the benefits under this provision are exhausted, coverage may not be extended by using the benefits under any other provision.

# Skilled Nursing Facility

Inpatient skilled nursing facility care requires FCH pre-authorization. Benefits include room and board and ancillary services. The care must be therapeutic or restorative and require in-facility delivery by licensed professional medical personnel, under the direction of a physician, to obtain the desired medical outcome. Neither maintenance nor custodial care is covered.

# Temporomandibular Joint Syndrome (TMJ)

FCH pre-authorization is required for inpatient admissions related to TMJ. Medical, surgical, oral appliances and related hospital services are covered for the treatment of TMJ, *subject to the limits noted in the Summary of Medical Benefits*. Orthodontia for TMJ is not a covered benefit. Medical and surgical services are those that are:

- Oral appliances for the treatment of TMJ;
- Reasonable and appropriate for the treatment of a disorder of the Temporomandibular joint;
- Effective for the control or elimination of one or more of the following conditions caused by a disorder of the Temporomandibular joint: pain, infection, disease, difficulty in speaking, or difficulty in chewing or swallowing;
- Not experimental or investigational as determined by FCH; and,
- Not primarily for cosmetic purposes.

# Tobacco Cessation

Coverage is provided for the services of a physician, psychologist or other smoking cessation providers/programs. To find a program call the Washington State Tobacco Quit Line at (877) 270-STOP or your county health district, or check with your local FCHN preferred provider hospital.

No benefits will be provided under this benefit for inpatient services; vitamins, minerals and other supplements; acupuncture, hypnotherapy, book or tapes, or over-the-counter drugs to ease nicotine withdrawal. However, prescription drugs to ease nicotine withdrawal *are* covered under your Pharmacy benefit.

For reimbursement of smoking cessation programs, send receipt and claim form to FCH Claims Department, PO Box 12659, Seattle, WA 98111-4659.

# Transgender/Gender Affirming Services

FCH pre-authorization required for inpatient admissions and gender affirming surgery. These services are intended to provide treatment for patients with gender dysphoria. This assistance may include primary care, gynecologic and urologic care, reproductive options, mental health services (e.g., assessment, counseling, psychotherapy, psychotropic medication management), and hormonal and gender affirming surgical treatments. Gender affirming surgical treatments are limited to members age 18 and older. Transportation and lodging are not covered. FDA approved medications for support and treatment of transgender related services are covered through the Pharmacy Benefit.

# Transplants (Organ and Bone Marrow)

**FCH pre-authorization is required** for transplant service. Case Management services for Organ and Bone Marrow Transplants are provided by First Choice Health. There is a **6-month waiting period** for this benefit, meaning, services are not available to you until the first day of your seventh month of continuous coverage under this Plan. Services directly related to organ transplants must be coordinated by your participating provider. If a transplant is not successful (defined as the need for a retransplantation within 18 months of the original transplant), only one re-transplant will be covered. **Proposed transplants will not be covered if considered experimental or investigational for the participant's condition.**

FCH pre-authorization approval for transplants is based on these criteria:

- Your provider submits a written recommendation and supporting documentation.
- Your medical condition requires the requested transplant based on medical necessity.
- The requested procedure, and associated protocol, is not considered experimental or investigational treatment for your condition.
- The procedure is performed at a facility and by a provider approved by FCH.
- After an evaluation, you are accepted into the approved facility's transplant program and comply with all program requirements.

*Note: Corneal transplants are not considered an organ transplant and are covered under the medical-surgical benefits, and not under the transplant benefit.*

Have your provider send a request, prior to evaluation, to:

Email:
preauthorization@fchn.com

Written:
FCH Medical Management
600 University St., Suite 1400
Seattle, WA 98101

Alternatively, Fax:
(206) 268-2920 or (888) 272-3289

## Recipient Services

Covered transplant recipient services include:

- Medical and surgical services directly related to the transplant procedure and follow-up care.
- Diagnostic tests and exams directly related to the transplant procedure and follow-up care.
- Inpatient facility fees and pharmaceutical fees incurred while an inpatient.
- Pharmaceuticals administered in an outpatient setting (these are covered under the Prescription Drugs Benefit however, claims for such drugs will be applied to and are subject to the Transplants Benefit maximum of this Plan).
- Anti-rejection drugs.

## Donor Services

Donor expenses are covered if all criteria are met below:

- FCH approves the transplant procedure.
- The recipient is enrolled in this plan.
- Expenses are for services directly related to the transplant procedure.
- Donor services are not covered under any other health plan or government program.

Covered donor expenses include:

- Donor typing, testing and counseling.
- Donor organ selection, removal, storage and transportation of the surgical/harvesting team and/or the donor organ or bone marrow.

When both the recipient and the donor are participants under this Plan, covered charges up to the organ and bone marrow transplant lifetime maximum benefit for all covered services and supplies received by both the donor and the recipient will be payable. The covered donor and recipient will each be eligible to receive the organ and tissue transplant lifetime benefit maximum.

*Note: If you, as a participant, choose to donate an organ or bone marrow, donor expenses are not covered under this Plan unless the recipient is also enrolled in this Plan. However, complications arising from the donation would be covered as any other illness to the extent that they are not covered under the recipient's health plan.*

## Travel expenses

Travel and lodging expenses for approved transplants and associated pre-transplant evaluations are available for the recipient and his/her guardian/caregiver and the donor. **Travel and lodging expenses require FCH pre-authorization**; and if authorized, are paid up to a maximum of $2,500 per transplant episode, if the recipient is required to travel 75 miles or more from your residence for the medically necessary services related to an approved transplant, or if the transplant facility requires the participant to remain within a certain distance of the facility during the transplant process. The maximum applies to all associated transportation, lodging and meal expenses incurred by the transplant recipient and companion(s) and donor(s).

# Vision

## Eye Exam

Coverage is provided for one routine eye exam, including the necessary tests to evaluate and monitor visual wellness.

## Hardware

This benefit includes vision hardware needed to correct refractory vision problems. Frames, lenses and contact lenses needed to treat or as a result of a medical condition are covered under the Durable Medical Equipment benefit.

- **Elective Contact Lenses** - Coverage is provided for elective contact lenses that are worn instead of glasses as a personal choice, versus a medical condition that prevents you from wearing glasses. This benefit covers fitting subject to the hardware maximum.
- **Medically Necessary Contact Lenses** - Contact lenses are furnished when the participating provider secures prior approval for any of the following conditions: a) following cataract surgery; b) to correct extreme visual acuity problems that cannot be corrected with spectacle lenses; c) under certain conditions of Anisometropia and d) Keratoconus. If the request is approved, the contact lenses and the first intraocular lens fittings, are fully covered, after any applicable copays, when services are obtained from a participating provider. This benefit covers contact lens fitting.
- **Spectacle Lenses** - Several lens options are available under the Plan.

## Limitations

Benefits, for both eye exams and hardware, renew every January 1st. Hardware allowance can be used anywhere, however, FCHN contracted discounted amounts will apply if the provider (whether individual provider or optical hardware facility) is participating.

# Weight Management

FCH pre-authorization is required by calling 1-800-808-0450.  Benefits are provided for the surgical treatment of obesity, subject to the benefit eligibility and medical criteria, and other provisions described in this benefit. In order to be eligible for benefits, services must be received from either MCC or UWMC Weight Loss and Metabolic Surgery.

## Benefit Eligibility Criteria

Benefits for surgical treatment of obesity are available only for MultiCare Health System Plan participant dependents age 18 or older.

## Medical Criteria

Benefits for primary surgical obesity treatment and repair-revision surgical procedures are provided only for eligible participants and eligible adult dependents who meet medical necessity

criteria per the most current First Choice Health Bariatric Surgery Policy (FCH.MP.13.05 Bariatric Surgery).

Physicians of Southwest Washington provides Care Management services for MultiCare employees. PSW will provide written confirmation of a member meeting these program requirements to the requesting provider's office prior to surgery.

## Benefits

Non-surgical (visits 13-20) and surgical benefits are only available on the MyConnected Care Plan and the HDHP Plan. This is not a covered benefit for Standard PPO Plan participants. When enrollment and medical criteria have been met, benefits for surgical treatment of obesity will be provided for the services listed below. These services are subject to your copayments and coinsurance amounts as listed in the *summary of benefits* and must be rendered within the MCC provider network or at UWMC Weight Loss and Metabolic Surgery.

- Surgical services, including anesthesia
- Hospital services
- Medical necessary services provided before and after the surgery, including nutritional therapy, diagnostic services and rehabilitation services
- Benefits for treatment of complications of obesity surgery are provided on the same basis as any other medical care.
  - Treatment of complications of obesity surgery are covered for the Standard PPO plan if the initial surgery was performed at MultiCare and paid for under a prior MultiCare benefit plan.

## Surgical Services Include:

- Gastric Bypass (open or laparoscopic)
- Adjustable gastric band surgery
- Sleeve gastrectomy
- Duodenal Switch
- Gastric band adjustments (unlimited)
- Treatment of complications and surgical revisions

## This benefit does not cover:

- Diet programs that are not supervised by a physician (e.g. Weight Watchers, Jenny Craig, Nutrisystem).
- Mental health or psychiatric treatment, except as covered under the "Mental Health Care" benefit (covered if pre-authorized as part of bariatric surgery program).
- Gym or health club fees or equipment.
  Note: Weight management non-surgical (visits 13-20) **and** surgical benefits are not a covered benefit under the Standard PPO Plan.
- Complications resulting from bariatric surgery performed internationally.
- Complications arising from bariatric surgery performed at non-ASMBS centers after 2010 will not be covered. Prior to 2010, complications arising from bariatric surgery will

be covered if performed domestically, but not for bariatric surgery performed internationally.

# Wigs

Covered when needed as a result of chemotherapy, radiation therapy or surgery.

# Plan (Medical and Vision) Exclusions and Limitations

Covered services are limited to the diagnosis, therapeutic care or treatment, and prevention of disease, sickness or injury as described in this document. In addition to limits and exclusions stated elsewhere in this document, coverage is specifically excluded for each of the following items and any related services and charges.

- Abdominoplasty/panniculectomy
- Abortion (termination of pregnancy) for female dependent children
- Adoption expenses
- Amounts over and above UCR, as defined by the Plan
- Amounts for which the covered person has no obligation to pay
- Any condition resulting from declared or undeclared acts of terrorism, war, military service, participation in a riot or civil disobedience
- Any service not medically necessary for the diagnosis, treatment or prevention of injury or illness, even if it is not specifically listed as an exclusion (except for specific services offered through the Preventive Care benefit)
- Any service received before the participant's effective date of coverage or after the coverage termination date
- Applied Behavior Analysis (ABA) - the following are not covered:
  - Providers accompanying children or family members to health care appointments that are not part of the direct provision of ABA services
  - Services by more than one program manager for each child/family (program development, treatment planning, supervision)
  - Training of therapy assistants and family members (as distinct from supervision)
  - Parent training or classes, except for one-on-one or one-on-two direct training of the parents of one identified patient
  - Services provided in a home school, or public/private school environment that are part of a child's schooling as distinct from specific ABA treatment services (e.g. acting as the "Teacher's Aide," or helping a child with homework)
- Aromatherapy
- Athletic training, body-building, fitness training or related expenses
- Autopsies
- Bariatric surgery (except for specific services offered through the weight management benefit applicable to MCC and HDHP plans), prescription drugs for weight loss, gym memberships, prescription or non-prescription nutritional and/or food supplements including weight loss shakes, exercise programs and equipment, other surgical procedures primarily for reduction of adipose tissue, abdominoplasty and other cosmetic surgery/liposuction
- Benefits relating to any condition, illness, or injury for which the participant receives compensation or reimbursement through another contractual arrangement or benefit, other than employer-based disability payments, such as surrogate pregnancy.

- Biofeedback
- Botanical or herbal medicines, as well as other over-the-counter medications
- Charges by a facility owned or operated by the United States or any state or local government unless the participant is legally obligated to pay. This does not apply to covered expenses rendered by a medical facility owned or operated by the United States Veteran's Administration when the services are provided to a participant for a non-service related illness or injury. The exclusion also does not apply to covered expenses rendered by a United States military medical facility to participants who are not on active military duty
- Charges for failure to keep a scheduled visit, for the copying of medical records or for the completion of a claim or administrative forms
- Charges for textbooks, cookbooks, or any charges for documentation related to any classes taken as part of a Plan benefit, including but not limited to, diabetic education and/or tobacco cessation
- Chemical Dependency treatments listed below:
  - Alcoholics Anonymous or other similar chemical dependency programs or support groups
  - Any care necessary to obtain shelter, to deter antisocial behavior, to deter runaway or truant behavior
  - Biofeedback, pain management and/or stress reduction classes
  - Care necessary to obtain shelter, to deter antisocial behavior, to deter runaway or truant behavior
  - Court-ordered or other assessments to determine the medical necessity of court-ordered treatments
  - Court-ordered treatments or treatments related to deferral of prosecution, deferral of sentencing or suspended sentencing or treatments ordered as a condition of retaining driving rights, when no medical necessity exists
  - Custodial care, including housing that is not integral to a medically necessary level of care, such as care necessary to obtain shelter, to deter antisocial behavior, to deter runaway or truant behavior or to achieve family respite
  - Emergency patrol services
  - Housing for individuals in a Partial Hospital Program or Intensive Outpatient Program
  - Information or referral services
  - Information schools
  - Long-term or custodial care
  - Non-substance related disorders
  - Treatment without ongoing concurrent review to ensure that treatment is being provided in the least restrictive setting required
  - Therapeutic group homes, residential community homes, therapeutic schools, adventure-based and/or wilderness programs or other similar programs
- Claims for services that are the result of any injury or illness incurred by a participant while that participant is participating in the commission of a felony, unless the injury or illness is the result of domestic violence or a physical or mental health condition
- Cognitive therapy
- Corrective shoes
- Court ordered examinations or treatment of any kind, except when medically necessary

- Custodial care
- Day habilitation services designed to provide training, structured activities and specialized assistance to adults, chore services to assist with basic needs, vocational and custodial services are not covered
- Dental extractions, wisdom or otherwise, except as specifically covered under the Plan
- Dental services including but not limited to associated anesthesia or facility charges, except as covered by the Plan
- Dental implants or procedures in preparation for dental implants, except as covered by the Plan under the Dental Trauma benefits.
- DME and medical supply charges listed below:
  - Biofeedback equipment
  - Breastfeeding supplies including, but not limited to, nursing pads, nipple shields, nipple cream, and nursing bras.
  - Equipment or supplies whose primary purpose is preventing illness or injury
  - Exercise equipment
  - Items not manufactured exclusively for the direct therapeutic treatment of an illness or injured patient
  - Items used outside the home primarily for sports/recreational activities
  - Oral appliances except to treat obstructive sleep apnea (covered under the TMJ benefit)
  - Over-the-counter items (except medically necessary crutches, walkers, standard wheelchairs, diabetic supplies and ostomy supplies are covered)
  - Personal comfort items including but not limited to air conditioners, lumbar rolls, heating pads, diapers or personal hygiene items
  - Phototherapy devices related to seasonal affective disorder
  - Supportive equipment/environmental adaptive items including, but not limited to, hand rails, chair lifts, ramps, shower chairs, commodes, car lifts, elevators, and modifications made to the patient's home, place of work, or vehicle.
  - The following medical equipment/supplies: standard car seats or strollers, push chairs, air filtration/purifier systems or supplies, water purifiers, allergenic mattresses, orthopedic or other special chairs, pillows, bed wetting training equipment, corrective shoes, whirlpool baths, vaporizers, room humidifiers, hot tubs or other types of tubs, home UV or other light units (light boxes or specialized lamps or bulbs), home blood testing equipment and supplies (except diabetic equipment and supplies, and home anticoagulation meters)
  - Wigs, except as covered by Plan due to chemotherapy, radiation therapy or surgery
- Experimental or investigational services
- Eyeglasses or contact lenses, except as may be covered under the vision benefits.
- FDA-approved drugs, medications or other items for non-FDA approved indications, except when an FDA-approved drug has been proven clinically effective to treat such indication and is supported in peer-reviewed scientific medical literature
- First Responder User Fees
- Growth hormone treatment
- Hair analysis
- Home health care listed below:
  - Custodial care
  - Financial or legal counseling services
  - Housekeeping or meal services
  - Maintenance care

- – Private duty/hourly nursing charges
- – Services by a participant or the patient's family or volunteers
- – Services not specifically listed as covered home health services under the plan
- – Supportive equipment such as handrails or ramps
- – Shift or hourly care services
- Hospice care listed below:
  - – Custodial care or maintenance care, except palliative care to the terminally ill patient subject to the stated limits
  - – Bereavement or spiritual counseling
  - – Financial or legal counseling services
  - – Housekeeping or meal services
  - – Services by a participant or the patient's family or volunteers
  - – Services not specifically listed as covered hospice services under the plan
  - – Supportive equipment such as handrails or ramps
  - – Transportation
- Immunizations for travel or work, except those specifically noted as being covered.
- Implants including but not limited to penile implant prostheses, except as covered by the plan
- Infertility treatments to achieve pregnancy (regardless of the cause) including but not limited to:
  - – Artificial insemination
  - – In vitro fertilization (IVF)
  - – Gamete intra-fallopian transplant (GIFT)
- Injuries sustained while practicing for or competing in a professional or semiprofessional athletics contest. Semiprofessional athletics contest is defined as an athletic activity for gain or pay that requires an unusually high level of skill and a substantial time commitment from the participants, who are nevertheless not engaged in the activity as a full-time occupation
- Injuries while under the influence of a controlled substance and/or alcohol
- Laser Assisted Uvuloplasty (LAUP), Laser Assisted Uvulopalatoplasty (LAUPP) or somnoplasty
- Lab and/or radiology services not ordered by a qualified health care provider
- Learning disabilities and related services, educational testing or associated training
- Liposuction or other procedures for removal of adipose tissue
- Medication therapy management provided at Tier 2 or 3
- Mental health care listed below:
  - – Adventure-based and/or wilderness programs that focus primarily on education, socialization or delinquency
  - – Biofeedback, pain management, and stress reduction classes
  - – Court-ordered assessments
  - – Custodial care, including housing that is not integral to a medically necessary level of care, such as care necessary to obtain shelter, to deter antisocial behavior, to deter runaway or truant behavior or to achieve family respite
  - – Family therapy, in the absence of an approved mental health diagnosis
  - – Housing for individuals in a Partial Hospital Program or Intensive Outpatient Program
  - – Marriage and couples counseling

- Nontraditional, alternative therapies that are not based on American Psychiatric and American Psychological Association acceptable techniques and theories
- Sensitivity training
- Sexual dysfunctions, personality disorders, and paraphilic disorders
- Therapeutic group homes, residential community homes, therapeutic schools, adventure-based and/or wilderness programs or other similar programs

- Non-covered services or complications arising from non-covered services. Non-covered services include those services that would not have been covered by this Plan at the time the complication arose. This exclusion does not apply to services under the weight management benefit.

- Non-duplication of payment/coordination of benefits to prevent double coverage, benefits under this Plan will not be paid for expenses that are reimbursed by other insurance companies, medical plan, or subscriber contracts

- Non-emergent maternity services for dependent children, except as covered under the Patient Protection and Affordable Care Act (ACA)

- Obesity treatment or weight management programs are excluded, except for the weight management program at MultiCare. This exclusion does not apply to obesity-related services required under the Patient Protection and Affordable Care Act (PPACA) as part of the Preventive Care benefits.

- Occupational injuries or diseases
- Oral surgery services listed below:
  - care of the teeth or dental structures
  - dental implants
  - extractions of teeth, impacted or otherwise (except as necessary due to damage caused by radiation therapy treatment while under this Plan)
  - services to correct malposition of the teeth

- Orthodontic treatment, appliances or services; dentures or related services
- Over-the-counter products, except as covered by the plan
- Personal, convenience or comfort services, house cleaning, house call home visits from a doctor, supplies, or items including but not limited to phones, TVs, guest services, deluxe or suite hospital room, air conditioners, diapers or hygiene items

- Physical examinations, reports or related services for the purpose of obtaining or maintaining employment, insurance, or licenses or permits of any kind, school admission, school sports clearances, immigration, foreign travel, medical research, camps, or government licensure, or other reasons not related to medical needs.

- Physician services or professional services provided by fax, or e-mail are not covered. Follow- up phone calls from a provider after an in office visit within 7 days for test rests, referrals, prescriptions renewals, or reminders are not covered. Calls to nurse line or to obtain educational material are also not covered

- Phototherapy devices related to seasonal affective disorder
- Plastic and reconstructive services listed below:
  - Complications resulting from non-covered services
  - Cosmetic services, supplies or surgery to repair, modify or reshape a functioning body structure for improvement of the patient's appearance or self-esteem (except for gender affirmation surgery)
  - Dermabrasion, chemical peels or skin procedures to improve appearance or to remove scars or tattoos; or

- Breast implant removal when inserted for cosmetic purposes
- Preservation of tissue or cells, unless related to a covered illness or disease established while under this Plan
- Preventive care or screening that exceeds the benefit limits or is otherwise not covered by the plan
- Procedures, regardless of medical necessity, outside the scope of the provider's license, registration or certification
- Professional services listed below:
  - Professional services provided by fax or email.
  - Follow up phone calls from provider for test results, referrals, prescription refills or reminders that occur within 7 days of an in-person office visit
  - Calls to nurse line or to obtain educational material are also not covered
- Radial keratotomy, Lasik or any other refractive surgery, orthoptics, pleoptics, visual analysis therapy or training related to muscular imbalance of the eye; optometric therapy
- Repair or replacement of items not used in accordance with manufacturer's instructions or recommendations
- Replacement of lost or stolen items, such as but not limited to prescription drugs, prostheses or DME
- Respite care, except as covered by the plan
- Reversal of sterilization
- Routine foot care, except as covered by the plan for members with peripheral vascular disease and diabetes
- Services beyond the specified Plan Benefit Maximums
- Services for any condition, illness or injury that arises from or during the course of work for wages or profit that is covered by state insurance workers' compensation and federal act or similar law
- Services or supplies for the treatment of male or female sexual dysfunction such as, but not limited to, treatment of erectile dysfunction (including penile implants), anorgasmy, and premature ejaculation
- Services or supplies payable under a contract or insurance for uninsured or underinsured (UIM) coverage, motor vehicle, motor vehicle no-fault, or personal injury protection (PIP) coverage, commercial premises or homeowner's medical premise coverage or other similar type of contract or insurance
- Services or supplies received without charge from a medical department maintained by an employer, a mutual benefit association, labor union, trustee or similar group
- Services or supplies required by an employer as a condition of employment
- Services provided by a family member (spouse, parent or child)
- Services provided by a spa, health club or fitness center, except covered medically necessary services provided within the scope of the provider's license
- Services provided by clergy
- Services provided in a school setting (such as early learning and K-12)
- Smoking and Tobacco cessation programs except as covered by the Plan
- Snoring treatment (surgical or other)

- Special diets, nutritional supplements, vitamins and minerals or other dietary formulas or supplements except as covered by the Plan
- Special education for the developmentally disabled
- Specialized intraocular lenses associated with cataract surgery that correct vision disorders, such as Multifocal and Toric intraocular lenses
- Tooth damage due to biting or chewing
- Transplant services listed below (organ and bone marrow):
  - Animal-to-human transplants
  - Artificial or mechanical devices designed to replace human organs
  - Complications arising from the donation procedure if the donor is not a plan participant
  - Donor expenses for a plan participant who donates an organ or bone marrow (however, complications from the donation are covered as any other illness to the extent they're not covered under the recipient's health plan)
  - Donor procurement services and costs incurred outside the United States unless approved by the Plan
  - Expenses incurred when government funding of any kind is provided
  - Services in a facility not approved by the Plan
  - Transplants considered experimental and investigational, as defined by the Plan
- Transgender/gender affirming services
  - Services that are considered cosmetic including but not limited to:
    - Abdominoplasty
    - Blepharoplasty
    - Calf Implants
    - Cheek/malar implants
    - Chin augmentation (reshaping or enhancing the size of the chin)
    - Collagen injections
    - Cryothyroid approximations (voice modification surgery)
    - Face-lift
    - Facial bone reduction
    - Forehead lift
    - Hair transplantation
    - Laryngoplasty (reshaping of laryngeal framework/voice modification surgery)
    - Lip reductions/enhancement (decreasing/increase lip size)
    - Liposuction
    - Mastopexy (breast lift)
    - Neck tightening
    - Pectoral implants
    - Rhinoplasty
  - Travel and lodging
- Transportation for personal or convenience reasons is not a covered benefit and is excluded
- Treatment furnished without charge or paid directly or indirectly by any government or for which a government prohibits payment of benefits
- Viscosupplementation
- Vision, the following vision benefits are not covered:

- – Non-prescription or cosmetic contact lenses
- – Non-prescription sunglasses or safety glasses
- – Radial keratotomy, Lasik or any other refractive surgery, orthoptics, pleoptics, visual analysis therapy or training related to muscular imbalance of the eye; optometric therapy
- – Services or supplies received principally for cosmetic purposes other than contact lenses selected in place of eyeglasses

- Vitamin B-12 injections except to treat Vitamin B-12 deficiency
- Vocational rehabilitation, work hardening or training programs regardless of diagnosis or symptoms that may be present, or for non-medically necessary education

# Summary of Pharmacy Benefits

| | Applies to Deductible | | Applies to OOP Max | | Network Providers Member Coinsurance | | | |
|---|---|---|---|---|---|---|---|---|
| | MyConnected Care Plan* and Standard PPO Plan* | HDHP** | MyConnected Care Plan* and Standard PPO Plan* (Separate Rx OOP) | HDHP** Med OOP | MyConnected Care Plan* and Standard PPO Plan* | | HDHP** | |
| | | | | | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy |
| **Pharmacy – administered by Ventegra, Inc.** | **Standard PPO Plan**<br>Annual Pharmacy OOP of $1,500/individual; $3,000/family.<br>**MyConnected Care Plan**<br>Annual Pharmacy OOP of $1,500/individual; $3,000/family.<br>**HDHP Plan**<br>Pharmacy applies to Medical OOP of $3,500/individual; $6,850/family after the member deductible is satisfied (preventive medications are exempt from the deductible). | | | | | | | |
| **Retail** (up to a 34-day supply) | **Available at MultiCare pharmacies and Ventegra, Inc. Network pharmacies; examples noted on next page. This benefit available to all members.**<br>Refill of maintenance medications are required at a preferred pharmacy based on state of residence. Refer to the Maintenance Medication List. Visit fchn.com/multicare under the Pharmacy section.<br>- Members residing in Washington and Idaho will be required to refill maintenance medications at MultiCare Health System pharmacies.<br>- Members residing outside of Washington and Idaho will be required to refill maintenance medications at Costco Mail Order Pharmacy. | | | | | | | |
| • **Tier 0 – Formulary** | N/A | N/A | N/A | N/A | Covered at 100% ($0 copay) | Limited ACA list, $0 copay | Covered at 100% ($0 copay) | Limited ACA list, $0 copay |
| • **Tier 1 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($10 minimum) | 40% ($20 minimum) | 20% ($10 minimum) | 40% ($20 minimum) |

| | Applies to Deductible | | Applies to OOP Max | | Network Providers Member Coinsurance | | | |
| | | | | | MyConnected Care Plan* and Standard PPO Plan* | | HDHP** | |
| | MyConnected Care Plan* and Standard PPO Plan* | HDHP** | MyConnected Care Plan* and Standard PPO Plan* (Separate Rx OOP) | HDHP** Med OOP | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy |
|---|---|---|---|---|---|---|---|---|
| • **Tier 2 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($25 minimum) | 40% ($50 minimum) | 10% | 30% |
| • **Tier 3 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($40 minimum) | 40% ($80 minimum) | 10% | 30% |
| • **Tier 4 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% | Not Covered | 10% | Not Covered |
| **Mail Order** (91 day supply) - through MultiCare | **91-day supplies received through MultiCare pharmacies. This benefit available to all members. Costco Mail Order is available to members residing outside of Washington and Idaho.** | | | | | | | |
| • **Tier 0 – Formulary** | N/A | N/A | N/A | N/A | Covered at 100% ($0 copay) | Limited ACA list, $0 copay | Covered at 100% ($0 copay) | Limited ACA list, $0 copay |
| • **Tier 1 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($20 minimum) | N/A | 20% ($20 minimum) | N/A |
| • **Tier 2 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($50 minimum) | N/A | 10% | N/A |
| • **Tier 3 – Formulary** | N/A | ✓ | ✓ | ✓ | 20% ($80 minimum) | N/A | 10% | N/A |

| | Applies to Deductible | | Applies to OOP Max | | Network Providers Member Coinsurance | | | |
|---|---|---|---|---|---|---|---|---|
| | MyConnected Care Plan* and Standard PPO Plan* | HDHP** | MyConnected Care Plan* and Standard PPO Plan* (Separate Rx OOP) | HDHP** Med OOP | MyConnected Care Plan* and Standard PPO Plan* | | HDHP** | |
| | | | | | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy | MHS Pharmacy | Ventegra, Inc. Retail Pharmacy |
| • Tier 4 – Formulary | Specialty Medications are limited to a 30-day supply at MultiCare Pharmacies | | | | | | | |

*The cost sharing values provided in the plan design are True Out of Pocket amounts. To minimize the impact of the high cost of specialty drugs, members are able to enroll in the Benefits Preservation Program, which limits member out of pocket costs and helps support the use of patient assistance programs.  Any amounts paid by patient assistance programs and copay coupon programs will not apply to final patient out of pocket costs and will not be accumulated towards member maximum out of pocket values. Participation in available copay coupon programs or other forms of patient assistance programs are required when available and member is deemed eligible by the program and is supported by the Benefits Preservation Program.  Members needing assistance for determining eligibility and navigating such programs should call the Benefits Preservation Program at 877-393-0009.  Members who opt out of the Benefits Preservation Program will be subject to standard benefit design cost share parameters, with the value of coupons not counting towards member Maximum Out of Pocket values as defined by the plan.

**If a member participates in a high deductible health plan option and uses a patient assistance program or copay coupon program to offset the member's responsibility for the cost of a prescription medication prior to satisfying the annual deductible, the member may be ineligible to contribute to a Health Savings Account (HSA).

# The Ventegra, Inc. Drug Formulary:

Tier 0 – Formulary: Preventive Medications

Tier 1 – Formulary: Generic Medications

Tier 2 – Formulary: Preferred Brands and High-Cost Generics

Tier 3 – Formulary: Non-Preferred Brands

Tier 4* – Formulary: Specialty Medications

In addition to the applicable cost share, you are responsible for the cost of any prescription not covered under your pharmacy benefit and for any prescription purchased without presenting your Medical benefit ID card. Benefits are not available through out-of-network pharmacies.

See *Filling a Prescription* for details on where and how to obtain your prescription drugs whether through a retail pharmacy or mail order. Specialty medications are limited to dispensing only a 30-day supply at a MultiCare Pharmacy.

If a member is using a manufacturer copay coupon, copays may be adjusted to the maximum allowed by the manufacturer coupon. Only true out-of-pocket amounts will be applied to the maximum out-of-pocket. Copays paid by manufacturer coupons will not be applied to member maximum out-of-pocket.

Refill of maintenance medications are required at a preferred pharmacy based on state of residence. Refer to the Maintenance Medication List. Visit fchn.com/multicare under the Pharmacy section.

- Members residing in Washington and Idaho will be required to refill maintenance medications at MultiCare Health System pharmacies.
- Members residing outside of Washington and Idaho will be required to refill maintenance medications at Costco Mail Order Pharmacy.

# Pharmacy Benefits

Prescription drug benefits for Plan participants are administered by Ventegra, Inc., a separate provider not affiliated with FCH. Covered medications must meet these requirements:

- Prescribed by a licensed provider;
- Approved by the Food and Drug Administration (FDA); and,
- Must be warranted to treat a covered condition.

The *Summary of Pharmacy Benefits* notes the coinsurance amounts for which you are responsible. To assist in keeping your out-of-pocket costs down when purchasing a prescription, know that five tiers exist within the pharmacy structure:

- **Tier 0 – Formulary** – Preventive Medications
- **Tier 1 – Formulary** – Generic Medications
- **Tier 2 – Formulary** – Preferred Brands and High-Cost Generics
- **Tier 3 – Formulary** – Non-Preferred Brands
- **Tier 4 – Formulary –** Specialty Medications

If a brand name drug is prescribed by your provider because s/he feels it is medically necessary, or selected by you, when a generic formulary equivalent drug is available, you will be responsible for paying the difference in price between the brand name drug and the generic, plus the applicable coinsurance. This difference in price does not apply to the annual deductible and out-of-pocket maximum applicable to the plan in which you are enrolled. The difference will continue to apply even after you meet your annual out-of-pocket maximum.

If a member is using a manufacturer copay coupon, copays may be increased to the maximum allowed by the manufacturer coupon. Copays paid by manufacturer coupons will not be applied to member maximum out-of-pocket.

## Preventive Drug Pharmacy Benefit

The Plan offers members zero-dollar coverage on a limited list of preventive medications needed to manage conditions such as hypertension, high cholesterol, diabetes, asthma or osteoporosis. This benefit includes only generic or formulary brand drugs for which no generic equivalent is available. This means that, like other preventive benefits, members may receive coverage for these drugs before meeting their deductible. These medications must be filled at a MHS pharmacy.

## Growth Hormone

Growth hormones are covered as a Specialty Drug (30-day supply), when pre-authorized by Ventegra, Inc.

## Pre-Authorization and Step Therapy

Certain medications may require pre-authorization. You or your provider should contact Ventegra, Inc. at (833) 393-0445 for information on which medications require pre-authorization.

For certain conditions, the Pharmacy benefit requires participants to take part in "step therapy" prior to approving brand name medications. Step therapy means a generic (or preferred alternative) must first be tried, and determined by your provider to be a failure, prior to receiving approval for filling brand name medication prescriptions. Examples of conditions that may require step-therapy include, but are not limited to:

- Depression
- Digestive Aids
- Ophthalmics

Any compounded medication with total cost exceeding $400 requires prior authorization to determine its clinical appropriateness in order for it to be covered.

# Filling a Prescription

## Maintenance Medications

The plan requires members to refill maintenance medications at a preferred pharmacy based on your state of residence. For a list of maintenance medications, please visit fchn.com/MultiCare under the pharmacy section.

- MultiCare Employee Health Plan members residing in Washington and Idaho will be required to refill maintenance medications at MultiCare Health System pharmacies.
- MultiCare Employee Health Plan members residing outside of Washington and Idaho will be required to refill maintenance medications at the Costco Mail Order Pharmacy.

## MultiCare Pharmacy

If you reside in Washington or Idaho and you need assistance in refilling a maintenance medication a MultiCare System Pharmacy, contact:

1. MultiCare Covington Clinic Pharmacy at (253) 372-7220 to have your prescriptions mailed to you.
2. Spokane residents can also call Rockwood Clinic Pharmacy at (509) 530-5450.

If you reside outside of Washington and Idaho, maintenance medications are required to be refilled at Costco Mail Order Pharmacy. You can contact Costco Mail Order Pharmacy at (800) 607-6861 or visit www.costco.com/home-delivery.

MultiCare has outpatient pharmacies to offer convenient access and serve the needs of patients. MultiCare's pharmacies can dispense retail amounts (up to a 34-day supply) as well as a 91-day supply of maintenance medications.

Visit www.multicare.org/pharmacy-employees/ for more information about how to use MultiCare pharmacies, and the sites' hours of operation.

## Retail Network Pharmacy

Beyond MultiCare's pharmacies, Ventegra, Inc. has a retail pharmacy network. With the retail pharmacy program, you may receive up to a 34-day supply of medication. Refer to the website or contact customer service for a complete list of participating pharmacies.

Following are details for filling a prescription through the retail network pharmacy or mail order. Contact Ventegra, Inc. for any questions on filling a prescription. If you need assistance in determining if your local, independent pharmacy is part of the Ventegra, Inc. network of retail pharmacies, you may call Ventegra, Inc. directly at (833) 393-0445.

## Mail Order

**MultiCare Prescription Delivery**

Skip the trip to the pharmacy. Get medications delivered right to your door.

- Mail order deliver is free and arrives through the United States Postal Service or authorized carrier like UPS or FedEx within one to three days
- Same-day or next-day home delivery via courier costs $10 and is available within 40 miles of any MultiCare pharmacy, found at www.multicare.org/find-a-location
  – Home courier delivery orders received before the cutoff time are eligible for same-day delivery
  – Orders received after that time can be delivered the next business day
- Live outside of Washington or Idaho?
  – MultiCare Employee Health Plan members residing outside of WA and ID can use prescription delivery services via Costco Mail Order Pharmacy
  – Visit the Costco mail order page at www.costco.com/home-delivery or call (800) 607-6861

Visit MultiCare's prescription delivery and employee prescription benefits pages at www.multicare.org or call the MHS pharmacy directly to learn more. To view a list of MHS pharmacies, visit the pharmacy location finder at www.multicare.org/find-a-location

**Prescription Transfer**

Switch to MultiCare Pharmacy Services from another pharmacy easily by completing the form located here: www.multicare.org/services-and-departments/pharmacy/prescription-transfer/ or call the MHS pharmacy directly.

- Answer a few simple questions, then we'll start moving your medications over
- Most of the detail you need for this form is located on your prescription bottle
- If you live outside of WA or ID, reference the Costco mail order page at www.costco.com/home-delivery or call (800) 607-6861

For additional information, visit the pharmacy services page at www.multicare.org/services-and-departments/pharmacy/.

## Specialty Medications

Required to be filled at a MHS Pharmacy location. Due to significant cost savings to both the Plan and participants, certain specialty medications must be filled at a MHS Pharmacy location.

If a drug is limited distribution, and/or MHS Pharmacy is not able to provide it to the member, then it is allowed through Costco Specialty at 20% coinsurance for the member.

Contact Ventegra, Inc. at (833) 393-0445 for a complete list of Specialty medications.

*Exclusions specific to Pharmacy exist; see "Pharmacy Exclusions and Limitations" for details.*

# Pharmacy Exclusions and Limitations

The following items are not covered under the pharmacy benefit:

- Anti-obesity drugs (any drug for the purpose of weight loss)
- Anti-wrinkle agents, in all dosage forms, for cosmetic purposes (e.g. Retin A, Renova, tretinoin)
- Any prescription dispensed from a non-participating pharmacy unless dispensed resulting from an emergent condition
- Any prescription refilled in excess of the number of refills specified by the physician, or any refill dispensed after one year from the physician's original order
- Any prescription for which an over-the-counter equivalent exists.
- Botanicals and herbal medicines
- Charges for the administration or injection of any drug except for pharmacy-administered vaccines, biological sera, blood or blood plasma
- Diabetic supplies not considered either a therapeutic devices or appliances, for example, alcohol swabs and blood calibration solutions
- Infertility medications (e.g. Clomid, Metrodin, Pergonal, Profasi)
- Injectable drugs that are not normally self-administered
- Investigational or experimental drugs, including drugs labeled "Caution-limited by Federal law to investigational use", even if there is a retail or wholesale charge for such drugs
- Legend fluoride products, except as required by the Patient Protection and Affordable Care Act
- Legend homeopathic drugs
- Legend vitamins except prenatal agents and therapeutic agents used for specific deficiencies and conditions (for example, Rocaltrol, Calcitriol, Niacin, Potaba)
- Lost, stolen, spilled or replacement prescriptions
- Minoxidil (Rogaine) or any other medications used for cosmetic purposes and/or the treatment of alopecia (hair loss)
- Non-approved medications
- Non-Federal Legend Drugs and over-the-counter (OTC) products and/or drugs available without a prescription, except certain medications required by the Patient Protection and Affordable Care Act
- Prescription medications which may be obtained without charge under local, state or federal programs
- Prescription medications for the treatment of a non-covered condition
- Prescription medications to treat sexual dysfunction
- Prescription medications not approved by the FDA for any use/indication in the U.S.
- Prescription medications purchased outside the U.S. that are not legal in the U.S.
- Prescription medications dispensed or administered during an inpatient stay at an institution which dispenses drugs or medicines

- Products used for cosmetic purposes
- Therapeutic devices or appliances, including needles, syringes, support garments and other non-medicinal substances, regardless of intended use, unless covered as diabetic supplies

# Claim and Appeal Procedures

## Claim

A claim means any request for a Plan benefit made by you (claimant) or your authorized representative (an individual acting on behalf of the claimant in obtaining or appealing a benefit claim). The authorized representative must be designated as such in writing with an approved form signed by the claimant (except for urgent care benefits or urgent care appeals). Once an authorized representative is selected, all information and notifications should be directed to that representative until the claimant states otherwise.

*Note: This Plan does not consider an assignment of benefits to confer standing or assign any other rights afforded to a participant or beneficiary under ERISA, other than the payment of benefits. A Plan participant or beneficiary may not assign or transfer rights to a provider of services, other than assignment of benefit payment. A provider cannot be a designated authorized representative, but can submit additional information to support the member's appeal.*

## How to File a Claim for Plan Benefits

In most cases, network providers, hospitals and licensed vision providers submit claims for you, and there are no claim forms for you to complete. If you do receive a bill for services from a provider because the provider did not file your claim for you, write your name, participant ID number and group number on the bill and send a copy to the claim address on your ID card. (Your group number can also be found on your ID card.) Any bill you submit must contain:

- Provider name
- Provider tax ID information
- Specific dates of service
- Diagnosis codes (ICD-10 codes) or description of the symptoms or a diagnosis
- Specific procedure codes (CPT codes) or description of the medical service or procedure.
- Specific procedure codes (CDT codes) or description of the dental service or procedure.

It is best to submit charges as soon as possible. However, charges for covered services (submitted to FCH for medical claims and submitted to Ventegra for prescription claims) must be received within 12 months from the date the service or supply was rendered or received. Claims will *not* be considered for benefits if received after this timeframe. (See your ID card for the FCH claim address.) Claim forms are available from your Plan Administrator (MultiCare).

## Claim Types

- **Pre-service claim** means any claim for a Plan benefit for which the Plan requires approval before medical care is obtained.
- **Concurrent claim** means any claim reconsidered after initial approval for an ongoing course of treatment which results in a reduced or terminated benefit.

- **Post-service claim or Direct Member Reimbursement (DMR)** means any claim for a Plan benefit that is not a pre-service claim and is a request for payment or reimbursement for covered services already received.
- **Urgent care claim** means a claim for medical care or treatment that, if normal pre-service standards are applied, would in the opinion of a physician with knowledge of the claimant's medical condition:
  - Seriously jeopardize the claimant's life, health or ability to regain maximum function
  - Subject the claimant to severe pain that cannot be adequately managed without the care or treatment requested.

# Claim Procedure

The Plan Sponsor (MultiCare) has final authority over appeals as the appropriate named fiduciary, however the Plan delegates to FCH, as it relates to benefits issues, the authority, responsibility and discretion to:

- Interpret and construe Plan provisions, as necessary
- Reach factually supported conclusions
- Make a full and fair review of each denied claim under ERISA requirements, as amended.

Benefit issues include questions regarding medical necessity, health care setting, level or care, experimental or investigational treatment, cost-sharing requirements or imposition of pre-existing condition exclusions or other limits on otherwise covered benefits.

All claims for benefits are subject to a full and fair review within a reasonable time appropriate to the medical circumstances. Payment of any benefits will be subject to the applicable deductibles, coinsurance, copays and benefit maximums. FCH will notify the claimant in writing of the decision of claim review.

It is important to note the Plan Administrator itself holds the authority, responsibility and discretion to deny claims based on administrative issues such as questions of eligibility status for you, your spouse and your dependents; change in status; special enrollment; termination and continuation of coverage; and qualified medical child support orders. The same appeal process (an ERISA mandated process) described below applies to administrative issues; however, such appeals are handled by the Plan Administrator, not FCH.

# Adverse Benefit Determination

An adverse benefit determination means a denial, decrease or termination of a benefit. This includes a failure to provide or make payment (in whole or in part) for a benefit based on:

A determination that a benefit is not covered by the Plan;

A determination based on an individual's eligibility to participate in the Plan, or to receive plan benefits at time of service (these appeals are considered administrative and handled by the Plan Administrator, see *Claim Procedure* above);

A determination that a service is experimental, investigational or not medically necessary; and/or

A rescission of coverage (these appeals are considered administrative and handled by the Plan Administrator, see *Claim Procedure* above).

The different claim types have specific times for approval, payment, and request for information or denial, as shown below:

| Time Table for Adverse Benefit Determinations for Claim Procedures | | | |
|---|---|---|---|
| Type of Review | FCH Notice of Incorrectly Filed Claim – Notice to Claimant | FCH Notice of Incomplete Claim – Notice to Claimant | Initial Benefit Determination by FCH |
| **Pre-Service Claim** | 5 days | Not required (may be part of extension notice) | Reasonable period = 15 days<br>15-day extension with notice to claimant<br>Reasonable period suspended up to 45 days on incomplete claim |
| **Concurrent Claim** | n/a | n/a | In time to permit appeal and determination before treatment ends or is reduced |
| **Post-Service Claim** | n/a | Not required (may be part of extension notice) | Reasonable period = 30 days<br>15-day extension with notice to claimant<br>Reasonable period suspended up to 45 days on incomplete claim |
| **Urgent Care Claim** | 24 hours | 24 hours | 72 hours<br>No extensions from claimant |

If your claim is denied wholly or in part, you will receive a written notice of adverse benefit determination. For a denial of a pre-service claim, such notice will be in the form of a letter from FCH explaining the denial. For a post-service claim, your Explanation of Benefits (EOB) will serve as your notice of adverse benefit determination. Both will include information necessary to identify the claim, such as the date of service, provider name, amount billed, as well as the reason for the denial(s), which will include:

1. For pre-service claims, the standards for medical necessity relied upon in making the adverse benefit determination (denial) (for example, an explanation of the scientific or clinical judgment used in making the decision) if applicable;
2. Reference to the specific Plan provisions on which the determination is based;
3. Reference to any internal Plan rule, guideline, protocol or similar criterion relied upon in making the decision.

In addition to the above information, the notice of adverse benefit determination will also include:

1. A description of any additional material or information needed to support your claim and an explanation of why it is needed; and,
2. A description of the available appeal process (including both internal and external review processes, as also outlined below), as well as information about how to initiate the appeal process.

# Appeal Procedure

FCH performs functions associated with the internal review of medical appeals for this Plan. MultiCare has final authority over appeals as the appropriate named fiduciary. Pharmacy Appeals are handled by Ventegra, Inc.

If your medical claim is denied wholly or in part, you have the right to request an internal review of an adverse benefit determination (commonly referred to as an appeal). Upon request, you may obtain free of charge reasonable access to, and copies of, all documents, records and information relevant to your claim for benefits, and relied upon in making the adverse benefit determination. You may also request the name of the health care expert who reviewed your medical claim for medical necessity or experimental or investigational care or treatment.

If your situation is urgent, you may call the FCH Appeals Coordinator at (877) 749-2031. An urgent care situation is one in which, in the opinion of a physician with knowledge of the claimant's medical condition, the application of the time periods for making non-urgent care determinations could seriously jeopardize the claimant's life, health, or ability to regain maximum function; or would subject the claimant to severe pain that cannot be adequately managed without the care or treatment that is the subject of the claim.

For all other appeals, you may submit them in writing to the following address:

Medical Appeals:
First Choice Health
Attn: Appeals Coordinator
600 University Street, #1400
Seattle, WA 98101
Fax: (206) 268-2920

Pharmacy Appeals:
Ventegra, Inc.
Attn. Appeals Department
10400 W. Overland Rd, Box #353
Boise, ID 83709
Fax # (855) 336-6612
Phone # (833) 393-0445

## Internal Appeal Process

You, or your authorized representative, must file your appeal within 180 days of the date you receive the adverse benefit determination or else you lose the right of appeal. The appeal must be in writing and sent to the address noted above.

The appeal should include comments, documents, records and/or other information noting the reason you feel your claim should have been approved. FCH will send a letter acknowledging receipt of your appeal within five (5) business days.

FCH's designated Appeals Coordinator will prepare your documents and any applicable documentation from the Summary Plan Description for the review and discussion of the FCH Appeals Committee or Medical Director (the individual who made the original adverse benefit determination will not be involved in the internal appeal process). The committee or Medical Director will review the information and make a recommendation to the Plan Fiduciary to either uphold or overturn the original adverse benefit determination, and such recommendation will be sent to MultiCare for a final decision. FCH will provide you with any new or additional evidence or rationale and any other information and documents used in the appeal review of your claim without regard to whether such information was considered in the initial determination. Any such new or additional evidence or rationale and information will be provided to you sufficiently in advance of the date a final decision on appeal is made in order to give you a chance to respond. FCH will notify you in writing of the decision to either uphold the original denial or overturn it within 30 calendar days of pre-service claims or 60 calendar days if your appeal involves a post-

service claim. Ventegra, Inc. will notify you within 45 days in writing of the decision to either uphold the original denial or overturn your pharmacy appeal. If the determination is to uphold the original denial, the letter will also include information on how to initiate the next level of appeal (External Review) if the determination is based on medical judgment. If the determination is not based on medical judgment, the letter will advise you of your right to file a civil action for benefits under ERISA §502(a)(1)(b). **Note: A decision regarding an urgent care claim will be made as soon as possible, but not later than 72 hours after receipt of a request for internal review if a delay would jeopardize the member's or their dependent's health.**

## External Review

If the decision upon internal appeal review is to uphold the original denial, and such denial is based on medical judgment or rescission, this Plan offers an external review. Denials that do not involve rescission or medical judgment (i.e., denials that involve only contractual or legal interpretation without any use of medical judgment) are not eligible for external review. **You must first submit an internal appeal and receive a final internal adverse benefit determination before you may request external review.**

You are entitled to external review described in this section only if you receive a final internal adverse benefit determination for a claim covered by the protections of the No Surprises Act, including claims relating to (i) out-of-network emergency services; (ii) non-emergency services performed by out-of-network providers at in-network facilities; or (iii) air ambulance services furnished by out-of-network providers of air ambulance services.

Your request to FCH for external review must be received within 125 calendar days of receipt of the final internal adverse benefit determination. Your request to Ventegra, Inc. must be received within 180 days from the date of your Notice of Denial of Prescription Drug Coverage.

Within five (5) calendar days of the receipt of a request for external review, FCH will conduct a preliminary review to determine whether the claim is eligible for external review, and will send you notification of its decision within one business day thereafter. This notice will include:

- If your request is found ineligible for external review, the reason for its ineligibility;
- If your request is eligible for external review but not complete, a description of any additional information or materials required to complete your request;
- If your request is complete and eligible for external review, contact information for the Independent Review Organization (IRO) assigned by FCH, and details about your right to provide additional information.

If eligible for external review, FCH will forward your appeal (including all information and documentation considered in the both the original denial and the internal review, as well as any additional documentation you submit) to an Independent Review Organization (IRO) within six (6) business days of the receipt of a request for external review. The IRO consists of independent physicians or other specialists that are not associated with FCH or MultiCare. If applicable, they will also possess medical training specific to the appeal.

The IRO will notify you that your appeal has been received, and will allow you at least 10 business days to submit any additional information to the IRO that you wish to be considered in reviewing your appeal. The IRO will review all information submitted, make a determination, and notify both you and FCH of the results within 45 calendar days. **Note: A decision regarding an urgent care claim will be made as soon as possible, but not later than 72 hours after receipt of a request for external review if a delay would jeopardize the member or their dependent's health.**

Ventegra, Inc. will allow any additional information to be submitted to the IRO that you wish to be considered in reviewing your pharmacy appeal. The decision made by the IRO is the final decision of the Plan. If the IRO overturns the original adverse benefit determination, the Appeals Coordinator will forward that decision to the appropriate party for claim payment or, if a pre-service claim, approval of the request for authorization.

You have a right to file a civil action for benefits under ERISA §502(a)(1)(b) after you exhaust these claim procedures; the civil action must be filed within 180 days from your receipt of the Plan's final determination regarding your claim.

# Independent Dispute Resolution

If your Plan and an out-of-network provider or facility that provided an item or service to you cannot agree on how much the provider or facility will be paid by the Plan for the item or service, then the dispute may be submitted by either the Plan or the provider to Independent Dispute Resolution (IDR). As a Plan participant, you are not involved in the IDR process (though your medical information will be shared with the certified IDR entity). Regardless of what the certified IDR entity decides, you will not have any additional cost-sharing for the affected item or service under the Plan, as your cost-sharing is limited to the in-network costs for that item or service. To the extent that you have a dispute about any adverse benefit determination you received relating to the item or service, you can appeal that decision under the Plan's Claim and Appeal Procedures.

# Coordination of Benefits

This section describes how benefits are paid when you are covered by more than one plan. Coordination of Benefits (COB) means that, when you are covered by two or more plans, one plan pays its benefits first (the Primary Plan), and the other plan pays second (the Secondary Plan). If a third plan is involved (a Tertiary Plan), that plan would pay after both the primary and secondary plans have paid.

Coordination of Benefits ensures that you do not receive more in benefits than what you would otherwise be responsible to pay for the care or treatment you receive.

*Note: This Plan does not coordinate benefits with prescription drug card programs*

## Calculation of Benefit Payments

The Primary Plan always pays its benefits as if you were not covered under any other plan.

The Secondary Plan pays its benefits taking into account what the Primary Plan has already paid. Similarly, a Tertiary Plan pays benefits after taking into account what the primary and secondary plans have paid. When this Plan is secondary to another plan, benefits will be calculated according to the following steps:

1. This Plan will calculate the amount it would have paid if it were your Primary Plan.
2. Next, any payment made by your Primary Plan will be subtracted from this amount. The difference remaining (if any) will be the secondary payment made by this Plan.

### Example 1

| Allowed Amount | $150 |
|---|---|
| Amount this Plan would pay if primary | $135 |
| - (minus) amount paid by Primary Plan | $100 |
| = (equals) | $35  (this Plan's secondary payment) |

### Example 2

| Allowed Amount | $200 |
|---|---|
| Amount this Plan would pay if primary | $155 |
| - (minus) amount paid by Primary Plan | $185 |
| = (equals) | (-$30)  (no payment is made by this Plan) |

*Important note: in these examples, and in most other claim situations using this calculation method, there is still a balance owed to the provider. This balance is your responsibility.*

There are different ways in which a plan may calculate its benefit payment when it is the Secondary Plan.  If this Plan is your Primary Plan (as determined by the rules in the following paragraphs), refer to your Secondary Plan's Coordination of Benefits rules to find out how its benefits are calculated when secondary.

# How Do I Know Which Plan is my Primary Plan?

The rules in this section determine the order in which your plans pay benefits (i.e. which plan is your Primary Plan, and which is your Secondary Plan, also known as the order of benefits). **If you have Medicare coverage in addition to coverage under this Plan, refer to *What if I'm Covered By Medicare?* for more information.** These rules are intended to be applied in the order in which they are listed (i.e., if the order of benefits can be determined by Rule 1, but Rule 3 also speaks to your situation, Rule 1 will determine the order of benefits). If you are covered by more than one secondary plan, these rules also determine the order in which the secondary plans' benefits are determined in relation to each other.

1. **Dependent or non-dependent**: A plan covering a person as other than a dependent (i.e., as an active employee, retiree, member or subscriber) pays before a plan covering a person as a dependent.

    If you are a Medicare beneficiary, and Medicare is secondary to the plan covering the person as a dependent and primary to the plan covering the person as other than a dependent (according the rules under *What if I'm Covered by Medicare?*) then the order of benefits is reversed so that the plan covering the person as an employee, member, subscriber, policyholder or retiree is secondary to the plan covering the person as a dependent.

2. **Child covered under more than one plan:**

    A. For a dependent child whose parents are married or are living together, whether or not they have ever been married:

    1) The plan of the parent whose birthday falls earlier in the calendar year is the Primary Plan; or

    2) If both parents have the same birthday, the plan that has covered the parent longest is the Primary Plan.

    B. For a dependent child whose parents are divorced or separated or are not living together, whether or not they have ever been married:

    1) If a court decree states that one of the parents is responsible for the dependent child's health care expenses or health care coverage, that plan is primary. If the parent with responsibility has no health care coverage for the dependent child's health care expenses, but that parent's spouse does, that parent's spouse's plan is the primary plan. This does not apply to any plan year during which benefits are paid or provided before the plan has actual knowledge of the court decree provision.

    2) If a court decree states one parent is to assume primary financial responsibility for the dependent child but does not mention responsibility for health care expenses, the plan of the parent assuming financial responsibility is primary

    3) If a court decree states that both parents are responsible for the child's health care expenses or health care coverage, or that the parents have joint custody without mentioning financial responsibility or responsibility for health care expenses, the birthday rule of the policyholders determines the order of benefits.

4) If there is no court decree allocating responsibility for the child's health care expenses or health care coverage, the plans covering the child pay in the following order:

    a.  The plan covering the custodial parent

    b.  The plan covering the custodial parent's spouse

    c.  The plan covering the non-custodial parent

    d.  The plan covering the non-custodial parent's spouse

    For a dependent child covered under more than one plan of individuals who are not the parents of the child, the order of benefits is determined as if those individuals were parents of the child.

5) If there is no court decree that allocates responsibility for the child's health care expenses or that specifies a custody arrangement (for example, if the child is over 18), the birthday rule of the policyholders will determine the order of benefits.

**3.** **Active or inactive**: A plan covering a person as an active employee or dependent of an active employee pays before a plan covering a person as a retiree, laid-off or inactive employee or dependent of a retiree, laid-off or inactive employee.

This rule does not apply if Rule 1 can determine the order of benefits.

**4.** **COBRA or State Continuation Coverage:** If a person whose coverage is provided pursuant to COBRA or under a right of continuation pursuant to state or other federal law is covered under another plan, the plan covering the person as an employee, member, subscriber or retiree or covering the person as a dependent of an employee, member, subscriber or retiree is the primary plan and the plan covering that same person pursuant to COBRA or under a right of continuation pursuant to state or other federal law is the secondary plan.

If the other plan does not have this rule, and if, as a result, the plans do not agree on the order of benefits, this rule is ignored.

This rule does not apply if Rule 1 can determine the order of benefits.

**5.** **Length of coverage**: If none of the preceding rules establish which plan pays first, the plan that has covered the person the longest is primary. To determine the length of time a person has been covered under a plan, two successive plans are treated as one if the covered person was eligible under the second plan within twenty-four hours after coverage under the first plan ended. The start of a new plan does not include:

  A. A change in the amount or scope of a plan's benefits;

  B. A change in the entity that pays, provides or administers the plan's benefits; or

  C. A change from one type of plan to another, such as, from a single employer plan to a multiple employer plan.

A person's length of time covered under a plan is measured from the person's first date of coverage under that plan. If that date is not readily available, the date the person first became a member of the group must be used as the date to determine the length of time the person's coverage under the present plan has been in force.

*Note: this Plan is always primary to TRICARE, CHAMPVA, state Medicaid programs and the Indian Health Service (IHS).*

# What if I'm Covered by Medicare?

Federal rules govern coordination of benefits with Medicare. In most cases, Medicare is secondary to a plan that covers a person as an active employee or dependent of an active employee. Medicare is primary in most other circumstances.

If your Medicare entitlement is due to:

- **Age**:

  If you are covered under this Plan as an active employee or a dependent of an active employee (excluding Domestic Partners) and you become entitled to Medicare because of reaching age 65, this Plan will be primary.

  If you are covered under this Plan as a Domestic Partner or COBRA qualified beneficiary and are also entitled to Medicare based on age, Medicare is primary

- **Disability:**

  If you are covered under this Plan as an active employee or dependent of an active employee (including Domestic Partners) and become entitled to Medicare due to disability, this Plan will be primary. Once you or your dependent is declared disabled by Social Security, the individual who is disabled should apply for coverage under Medicare Parts A and B.

  If you are covered under this Plan as a COBRA qualified beneficiary and are also entitled to Medicare based on disability, Medicare is primary

- **End Stage Renal Disease (ESRD):**

  If you become entitled to Medicare on the basis of ESRD, this Plan will pay primary during the initial coordination period (refer to the Medicare Secondary Payer Manual at www.cms.gov/manuals/downloads/msp105c02.pdf for more information regarding the initial coordination period).  After this initial coordination period, this Plan will pay secondary to Medicare. This is true even if you are covered under this Plan as a Domestic Partner or COBRA qualified beneficiary.

In all cases, this Plan will act in accordance with federal law when determining its status as either primary or secondary when Medicare is the other plan. Visit the website of the Centers for Medicare and Medicaid Services at www.cms.gov for more information.

# Pre-authorization when this Plan is Secondary

With the exception of transplant services (which always require pre-authorization), pre-authorization is not required if this Plan is your secondary plan. First Choice Health will honor a determination of medical necessity made by your primary plan. This means that if your primary plan determines a service to be medically necessary, this Plan will apply its normal benefit, subject to all other Plan provisions and exclusions. If your primary plan determines a service to be not medically necessary, coverage under this Plan will be denied. Benefits that are excluded by your primary plan but payable under this Plan are subject to medical review by First Choice Health.

# Meaning of Plan for COB

For COB purposes, the term "plan" means any agreement for benefits or services from any of the following sources for medical or other covered health care services:

- This MultiCare Plan (the Plan with a capital "P")
- Group and non-group insurance contracts and subscriber contracts
- Uninsured arrangements of group or group-type coverage
- Group and non-group coverage through closed panel plans
- Group-type contracts ("group-type contract" means a contract that is not available to the general public and is obtained and maintained only because of membership in or a connection with a particular organization or group, including blanket coverage. It does not include an individually underwritten and issued guaranteed renewable policy even if the policy is purchased through payroll deduction at a premium savings to the insured since the insured would have the right to maintain or renew the policy independently of continued employment with the employer.)
- The medical care components of long-term care contracts, such as skilled nursing care
- The medical benefits coverage in automobile "no fault" and traditional automobile "fault" type contracts
- Medicare or other governmental benefits, as permitted by law

"Plan" does not include:

- Hospital indemnity coverage benefits or other fixed indemnity coverage
- Accident only coverage
- Specified disease or specified accident coverage
- School accident type coverages that cover students for accidents only, including athletic injuries, either on a twenty-four-hour basis or on a "to and from school" basis
- Benefits provided in long-term care insurance policies for non-medical service, for example, personal care, adult day care, homemaker services, assistance with activities of daily living, respite care and custodial care or for contracts that pay a fixed daily benefit without regard to expenses incurred or the receipt of services
- Medicare supplemental policies
- A state plan under Medicaid
- A governmental plan, which, by law, provides benefits that are in excess of those of any private insurance plan or other non-governmental plan.

*If in any situation the rules contained in this section cannot determine the order of benefits, this Plan will follow the NAIC Model COB Regulation as its basis for determining the order of benefits in these extenuating circumstances.*

# Claim Determination Period

The claim determination period used when applying this COB provision is the Plan year, January 1 through December 31.

# Right of Recovery

This provision does not reduce the benefits allowed under this agreement when this Plan is the primary plan. However, if the Plan pays in excess of the maximum necessary at the time to satisfy the intent of this COB provision, the Plan will exercise the right to recover the excess payments from any person(s), insurer(s) or other organizations, as the Plan deems appropriate.

This Plan will not seek to recover funds on any claim with a date of service that is more than 365 days prior to the date on which the Plan receives (receipt date) information regarding a participant's other coverage.

## Facility of Payment

When another plan makes payments that should have been made under this Plan and in accordance with this provision, the Plan may, at its sole discretion, elect to reimburse to the other plan the amount necessary to satisfy the intent of this COB provision. Any amount paid under this subsection will be considered benefits paid under this agreement, and the Plan will be fully discharged from liability under this agreement to the extent of those payments.

This Plan will not make any additional payment on any claim with a date of service that is more than 365 days prior to the date on which the Plan receives information regarding a participant's other coverage.

## Right to Receive and Release Information

The Plan Administrator and FCH may, with consent as required by law, receive or release to another insurer or organization any information concerning the participant and covered benefits deemed necessary to implement and determine the applicability of this COB provision.

The Plan Administrator and FCH have the right to require the participant to complete and return a Multiple Coverage Inquiry when primary liability is not clearly established or to verify that multiple coverage information on hand is accurate. Claim payment will be withheld until the Multiple Coverage Inquiry is complete and received by FCH.

# Consolidated Omnibus Budget Reconciliation Act of 1985 (COBRA)

If your coverage terminates under this group health plan, you may be eligible under COBRA to continue the same coverage you had when coverage ended, on a temporary self-pay basis. COBRA requires this continuation of coverage be made available to covered persons – called qualified beneficiaries under COBRA – on the occurrence of a qualifying event, described on the next page.

Continuation of coverage under COBRA is not automatic; you must elect COBRA by completing and properly providing an enrollment form to your Plan Administrator. You must contact your Plan Administrator and apply for continuation of your group health plan coverage within 60 days of the termination of coverage. You will also be required to pay applicable contributions for you and/or your dependent(s) directly to MultiCare.

This Plan provides no greater COBRA rights than what COBRA requires. Nothing in this Group Health Summary Plan Description is intended to expand your rights beyond COBRA's requirements.

This section describes your COBRA coverage rights; contact the Plan Administrator for more information.

## Who Is a COBRA Qualified Beneficiary?

Employees and covered dependents who participate in the Plan may be eligible for COBRA in the case of a qualifying event if they are also a qualified beneficiary. Qualified beneficiaries include:

- Employees enrolled in the Plan on or before the date of the event that causes them to lose that coverage (called the qualifying event);
- An employee's spouse enrolled in this Plan on the day before the qualifying event;
- The employee's dependent children enrolled in this Plan on the day before the qualifying event;
- Dependent children born to, or placed for adoption with, the employee while the employee has COBRA coverage;
- Dependent children acquired through legal guardianship while the employee has COBRA coverage; and,
- Dependent children covered under medical child support orders while the employee has COBRA coverage.

A qualified beneficiary may choose to continue any one benefit, or all of the benefits that s/he was enrolled in prior to the qualifying event.

Certain qualified beneficiaries may have additional COBRA rights and possible tax credits if they are certified by the Department of Labor or state labor agencies as eligible under the Trade Adjustment Assistance Reform Act of 2002. (Contact the Plan Administrator for more details.)

Domestic Partners are not eligible for COBRA coverage under federal law; however, MultiCare offers a similar extension of coverage for up to 18 months. Contact the Plan Administrator for more details.

# Qualifying Events and Continuation Periods

Qualifying events and continuation periods are explained below:

- If employment terminates (voluntary or involuntary), you and your covered dependents may continue coverage under this Plan for up to 18 months unless the cause is gross misconduct.
- If your work hours are reduced, resulting in loss of group coverage, you and your covered dependents may continue coverage under this Plan for up to 18 months.
- If you and your spouse legally divorce or are legally separated, your spouse and covered dependent children may continue coverage under this Plan for up to 36 months.
- When your covered dependent child no longer meets the Plan's definition of dependent child, the child may continue coverage under this Plan for up to 36 months.
- When you become Medicare eligible, your Medicare-ineligible covered dependents may continue coverage under this Plan for up to 36 months.
- If you die your spouse or covered dependents may continue coverage under this Plan for up to 36 months.
- If you enter into uniformed service, you may elect to continue Plan coverage for up to 24 months. See *Military Leave* under *Other Continuation of Coverage* section.
- If while covered under COBRA you (or a COBRA-eligible dependent) become disabled, you may be eligible for a coverage extension. The 18-month COBRA coverage period may be extended another 11 months for a total of 29 months COBRA coverage. To qualify for this disability extension, you must:
  - Meet the definition of disability under Title II or XVI of the Social Security Act at the time of the qualifying event or within the first 60 days of COBRA coverage.
  - Provide the Plan Administrator with notice of the disability determination (from Social Security) on a date that is both within 60 days after the determination date and before the original 18-month coverage ends. If the beneficiary who is disabled is later determined by Social Security to no longer be disabled, the Plan Administrator must receive notice within 31 days of that determination date.

# When COBRA Coverage Ends

COBRA coverage ends before the 18-, 29-, or 36-month period expires for any of these reasons:

- The Plan no longer provides group health coverage to any employees;
- The COBRA coverage premium is not paid within 31 days of the due date (the initial grace period is 45 days after the first COBRA election);
- The qualified beneficiary becomes covered under another group health plan with no applicable pre-existing condition exclusion or limit;
- The qualified beneficiary enrolls in Medicare; or,

- If an extension from 18 to 29 months was granted due to a disability and the individual receives a final determination from the Social Security Administration stating the individual is no longer disabled, the individual must notify the plan administrator within 30 days after the date of that determination. Coverage ends on the last day of the month through which contribution payments have been received, so long as that date is within the first month that begins within 30 days after the final determination date, and after the initial 18-month COBRA coverage period.

*Once COBRA coverage ends, it cannot be reinstated.*

# Contribution Payment Requirements

You are required to pay any and all applicable contributions for you and your covered dependents. You must pay the first contribution for continuation of coverage within 45 days of the date you elect COBRA coverage. Contributions consist of the full cost of coverage, plus 2% (a total of 102%).

If you are eligible and receive a disability extension under Title II or XVI of the Social Security Act, your contribution will be 150% of the full cost of coverage.

If the cost for similarly situated active employees or dependents changes, the COBRA coverage premium also changes (only once a year before the plan year begins).

Failure to make payments within the designated time frame will result in automatic termination of coverage to the last day of the month for which a complete payment was made. Payments need to be sent directly to FCH, One Union Square, 600 University St., Suite 1400, Seattle, WA 98101. If you have COBRA related questions, you may call (877) 749-2032 to speak with a COBRA representative.

# Election Requirements

At the time of a qualifying event, such as termination of employment or reduction in hours, the qualified beneficiary must be notified of the right to continue coverage within 14 days of FCH receiving notice of the qualifying event from the Plan Administrator.

In the case of divorce, legal separation or the ineligibility of a dependent child, the employee or qualified beneficiary is responsible for notifying the Plan Administrator within 61 days of the divorce, legal separation or ineligibility of a dependent child. The Plan is not obligated to offer COBRA benefits to beneficiaries if this notification is not received within the 61 days.

# What Coverage Must Be Offered When Electing COBRA?

The Plan is required to continue the following coverage for COBRA participants:

- **Identical coverage** – the qualified beneficiary must be offered the opportunity to continue the coverage received immediately before the qualifying event
- **Independent rights** – once a qualifying event occurs each qualified beneficiary has an independent right to elect continuation coverage. For example, if an employee and family are offered COBRA coverage, each individual can make an election. Although an active employee must be covered to cover a dependent, it is possible to have COBRA coverage for a dependent when the former employee does not elect to continue coverage

- **Open enrollment** – qualified beneficiaries must be notified of any benefit or carrier changes at open enrollment and be given the opportunity to change coverage just like active employees. Qualified beneficiaries have the same rights as active employees during open enrollment to add or drop family members, change coverages and change carriers, if available. However, if a qualified beneficiary adds a family member during open enrollment who was not previously covered, that added family member does not become a qualified beneficiary

- **Modification of coverage** – if an employer modifies coverage for similarly situated active employees; the coverage for qualified beneficiaries must be modified similarly. Some examples of modifications include benefit enhancements, elimination of coverage and changes in carriers.

# Subrogation, Reimbursement and Right of Recovery

By enrolling in the Plan and applying for benefits from the Plan, you and your covered dependents (including minor dependents), agree and acknowledge that benefits are not payable to or on behalf of a covered person or dependent when the injury or illness occurs through an act or omission of another person, party, or entity, and any such payments made or advanced by the Plan are subject to the following terms and conditions.

## No application of "make whole," "double recovery," and "common fund" rules

The Plan's provisions concerning subrogation/right of recovery, equitable liens, and other equitable remedies (outlined above and more fully below) supersede the applicability of the federal common law and equitable doctrines commonly referred to as the "make whole" rule, the "double-recovery" rule and the "common fund" rule. These doctrines have no applicability to the Plan's right of recovery hereunder.

## Assignment of Rights (Subrogation)

By accepting benefits from this Plan, you and your covered dependents automatically assign to the Plan any rights you or they may have to recover all or part of the same covered expenses of the benefits paid on behalf of you and/or your covered dependents from another source, including another group health plan, insurer or individual, limited, however, to the amount of covered expenses the Plan has paid on behalf of you and/or your covered dependents. This assignment also grants the Plan a right to recover from your no-fault auto insurance carrier in a situation where no third party may be liable, and from any uninsured or underinsured motorist coverage.

By virtue of this assignment, the Plan is entitled to recover 100% of the amounts paid, or to be paid, by the Plan on behalf of you or your covered dependents (including minor dependents) from all recoveries by you or your covered dependents from any other party (whether by lawsuit, mediation, arbitration, settlement, award, judgment, order, insurance or otherwise) ("Recovered Funds"). This assignment includes, without limitation, the assignment to the Plan of a right to any Recovered Funds paid by any other party to you or your covered dependents (including minor dependents and wrongful death beneficiaries) or paid on behalf of you or your covered dependents (including minor dependents and wrongful death beneficiaries), or on behalf of the estate of any covered person.

You and your covered dependents are required to reimburse the Plan on a first-dollar basis (which means that the Plan will have a first priority claim to any Recovered Funds), regardless of whether the Recovered Funds amount to a full or partial recovery. Further, the Plan is entitled to recovery regardless of how the Recovered Funds are characterized (*e.g.*, pain and suffering, punitive damages, benefits, lost wages, loss of future earnings, medical expenses, costs and/or expenses, attorneys' fees) and regardless of whether the recovery is designated as payment for medical services or expenses. The Plan's share of the recovery will not be reduced because

you or your covered dependent (including your minor dependent) has not received the full damages claimed, unless the Plan agrees in writing to a reduction.

Any reduction is subject to prior written approval by the Plan, or agent of the Plan who administers the Plan's subrogation, reimbursement recoveries.

This assignment also allows the Plan to pursue any claim that you or your covered dependent (including your minor dependent) may have against any third party, or its insurer, whether or not you or your covered dependent choose to pursue that claim. In the event you or your covered dependent elects not to pursue your claim(s) against a third party, the Plan shall be equitably subrogated to your (or your covered dependent's) right of recovery.

When you, or your covered dependent – and not the Plan – pursue and obtain any Recovered Funds, you or your covered dependent shall be responsible for all expenses involved in obtaining that recovery (whether obtained by lawsuit, mediation, arbitration, settlement or, award, judgment, order, insurance or otherwise), including but not limited to, all attorneys' fees, costs, and expenses; which fees, costs, and expenses shall not reduce the amount that you or your covered dependents (including minor independents) are required to reimburse the Plan, and the Plan's rights shall not be reduced due to covered person's own negligence. For purposes of clarity, the Plan is not subject to any state laws or equitable doctrine, and the Plan's first claim on the recovery operates on every dollar received from a third party, even those covering your or your covered dependent's litigation costs and attorneys' fees.

# Equitable Lien and Other Equitable Remedies

By accepting benefits from this Plan, you agree that the Plan has established an equitable lien against any money or property you or your covered dependents (or any individual or entity acting on your or their behalf such as a legal representative or agent) recover from any other party, including but not limited to, an insurer (including but not limited to third-party, no-fault, med-pay, uninsured, or underinsured motorist), another group health plan or another individual, sufficient to reimburse the Plan in full for benefits advanced. For purposes of clarity, this equitable lien also attaches to any payment received from workers' compensation, whether by judgment, award, settlement or otherwise, where the Plan has paid benefits prior to a determination that the covered expenses arose out of and in the course of employment. Payment by workers' compensation insurers will be deemed to mean that such a determination has been made.

The Plan's lien exists at the time the Plan pays benefits, and if you or your covered dependents file a petition for bankruptcy, you and your covered dependents agree that the Plan's lien existed prior to the creation of the bankruptcy estate.

You further agree to hold any reimbursement or recovery received by you or your covered dependents (or any legal representative or agent) in trust on behalf of the Plan to cover all benefits paid by the Plan.

The Plan reserves all rights to seek enforcement of its rights hereunder, including but not limited to, the right to file a lawsuit against you or your covered dependent or any other party possessing or controlling any Recovered Funds, and the right to recoup amounts owed in any other manner prescribed by law.

## Obligation to Assist in the Plan's Reimbursement Activities

As a participant in this plan, the covered person is required to cooperate with efforts to recover benefits paid under the Plan. The covered person must also notify the Plan Administrator within 45 days of the notice which is given to a third party of the intention to recover damages due to the covered person's illness or injury.

This cooperation includes providing the Plan with relevant information (including information concerning any other applicable insurance coverage that may be available such as automobile, home and other liability insurance coverage and coverage under another group health plan), providing the identity of any other person or entity and their insurers, if applicable) that may be obligated to provide payments or benefits on account of the same illness or injury for which the Plan made payments, signing and delivering documents the Plan reasonably requests, and obtaining the Plan's consent before releasing any party from liability. If you enter into litigation or settlement negotiations regarding the obligations of other parties, you must not prejudice, in any way, the Plan's subrogation and reimbursement rights.

Failure by you or your covered dependents to cooperate with the Plan in the exercise of these rights may result, at the discretion of the Plan or the Plan Administrator, in a denial or reduction of future benefit payments available to you or your covered dependents under the Plan by an amount, up to the aggregate amount paid by the Plan that was subject to the Plan's equitable lien, but for which the Plan was not reimbursed.

# Plan Definitions

**Adverse benefit determination** means a denial, decrease or ending of a benefit. This includes a failure to provide or make payment (in whole or in part) for a benefit including claims based on medical necessity or experimental and investigational exclusions.

**Allowed amount** means the maximum amount considered for payment by the Plan for a medically necessary covered service. This amount is equal to one of the following:

- The contracted amount agreed to by a FCHN participating provider or a First Health participating provider.
- The Usual, Customary and Reasonable (UCR) amount for services received from out-of-network providers (see related definition).
- For out-of-network emergency services, the Allowed Amount is determined annually by FCH based on federal guidelines stating the Allowed Amount must be equal to the greatest of the following amounts: 1) the median of the contracted amounts described above; 2) the Usual, Customary and Reasonable (UCR) amount (see related definition); or 3) the Medicare amount.

For Emergency Services provided by out-of-network emergency facilities and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances, the cost-sharing amount is determined by the Qualifying Payment Amount (see related definition).

**Ancillary Services** means services related to Emergency Services, such as radiology, anesthesiology, pathology, neonatology, laboratory, and specialty services needed to respond to unexpected complications (such as those delivered by a neonatologist or cardiologist) and also in situations where an in-network provider is not available at the in-network facility to provide the services.

**Applied Behavior Analysis (ABA)** is a term describing principles, techniques and interventions used in assessment and treatment to increase behaviors that are helpful, reduce behaviors that are harmful and demonstrate that the interventions employed are responsible for the improvement of behavior in individuals with autism. ABA incorporates many techniques for understanding and changing behavior and may involve a multi-disciplinary approach to increase language and communication skills, improve attention, focus, social skills and memory. ABA is flexible in that it can be adapted to meet the needs of each individual.

**Aural therapy** is a service provided to both children and adults who have been diagnosed with hearing loss. Typically, aural therapy is an intervention that takes place following hearing aid fitting or cochlear implant hook-up. It involves working with the hearing-impaired individual providing the patient with strategies to better utilize his or her listening skills. Aural therapy involves training the brain to process and understand auditory information, teaching how to monitor speech through listening, and learning to develop listening skills in each ear separately and integrated. Usually provided by a speech therapist.

**Authorized representative** means an individual acting on behalf of the participant or beneficiary claimant in obtaining or appealing a benefit claim. The authorized representative must have a signed form (specified by the Plan) by the claimant except for urgent care benefits or appeals. Once an authorized representative is selected, all information and notifications should be directed to that representative until the claimant states otherwise.

**Birthing center** means any freestanding licensed health facility, place, professional office or institution, that is not a hospital or in a hospital, where births occur in a home-like atmosphere. This facility must be licensed and operated in accordance with the laws pertaining to birthing centers in the jurisdiction where the facility is located. It must:

- Have facilities for obstetrical delivery and short-term recovery after delivery
- Provide care under the full-time supervision of a physician and either a registered nurse or a licensed nurse-midwife
- Have a written agreement with a hospital in the same locality for immediate acceptance of patients who develop complications or require pre- or post-delivery confinement.

**Calendar year** means the 12-month period beginning January 1 and ending December 31 of the same year.

**Chemical dependency** condition means a condition characterized by a physiological or psychological abuse/dependency of a controlled substance and/or alcohol that impairs or endangers the participant's or beneficiary's health. It must be listed in the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association. The following conditions are either not considered Chemical Dependency Conditions or are covered under other benefits offered by this Plan (subject to all terms, limitations and exclusions):

- Conditions related to Mental Health (see Mental Health Condition definition)
- Nicotine Related Disorders (see Tobacco Cessation, if applicable to this Plan)
- Non-substance related disorders.

**Claim** means any request for a Plan benefit made by you or your authorized representative. A participant making a claim for benefits is a claimant.

**Concurrent claim** means any claim that is reconsidered after an initial approval for ongoing treatment and results in a reduced or terminated benefit.

**COVID-19** is an infectious respiratory illness caused by the virus SARS-CoV-2.

**Developmental Disabilities** is an umbrella term that can include physical, cognitive and intellectual disability that are apparent during childhood.

Some developmental disabilities are largely physical issues, such as cerebral palsy or epilepsy. Some individuals may have a condition that includes a physical and intellectual disability, for example Down syndrome or fetal alcohol syndrome.

Intellectual disability encompasses the "cognitive" part of this definition, that is, a disability that is broadly related to thought processes. Because intellectual and other developmental disabilities often co-occur, intellectual disability professionals often work with people who have both types of disabilities.

**Domestic partners** mean 2 individuals, either opposite or same sex, who meet all the following criteria:

- Must be 18 or older
- Must have an intimate, committed relationship of mutual caring that has existed for at least 12 months
- Must be financially interdependent and share the same residence

- Neither partner can be married or legally separated from any other person or involved in another domestic partner relationship
- Partners must not be blood relatives of a degree of closeness that would prohibit marriage
- The partners must complete during the enrollment process the Affidavit of Domestic Partnership (and be responsible for keeping a copy of the original and providing copies when requested by the Plan Administrator).

**Emergency Department (ED)** is an emergency department of a hospital, or an Independent, Freestanding Emergency Department (or a hospital, with respect to services that are included in Emergency Services).

**Emergency Medical Condition** means a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in:

1. Jeopardy to the health of the individual (or with respect to a pregnant woman, the health of the woman or her unborn child);
2. Serious impairment to bodily functions; or
3. Serious dysfunction of any bodily organ or part.

**Emergency Services** means, with respect to an Emergency Medical Condition, a medical screening examination (as required under section 1867 of the Social Security Act) that is within the capability of the Emergency Department of a hospital or an <u>Independent, Freestanding Emergency Department</u>, including pre-stabilization services, post-stabilization services, and Ancillary Services to evaluate such an Emergency Medical Condition, and within the capabilities of the staff and facilities available at the hospital, to treat such an Emergency Medical Condition.

*Pre-stabilization services provided after the patient is moved out of the Emergency Department (ED) and admitted to a hospital, post-stabilization services and Emergency Services provided at an Independent, Freestanding Emergency Department. Emergency Service are subject to the protections of the No Surprises Act.*

*Post-Stabilization services are also subject to the protections of the No Surprises Act, unless the patient is able to travel to an in-network facility using non-medical transportation, but elects to stay at the out-of-network facility.*

**Employee contribution** is the employee portion of the costs for a benefit plan.

**ERISA** is the federal Employee Retirement Income Security Act of 1974, as amended, which governs plan administration, supervision and management.

**Essential Health Benefits** shall mean, under section 1302(b) of the Affordable Care Act, those health benefits to include at least the following general categories and the items and services covered within the categories: ambulatory patient services; Emergency Services; hospitalization; maternity and newborn care; mental health and Substance Abuse disorder services, including behavioral health treatment; prescription Drugs; rehabilitative and Habilitative Services and devices; laboratory services; preventive and wellness services and chronic disease management; and pediatric services, including oral and vision care.

The determination of which benefits provided under the plan are Essential Health Benefits shall be made in accordance with the benchmark plan of the State of Washington as permitted by the Departments of Labor, Treasury, and Health and Human Services.

**Experimental, investigational and unproven procedures** mean services determined to be either:

- Not in general use in the medical community,
- Not proven safe and effective or to show a demonstrable benefit for a particular illness or disease,
- Under continued scientific testing and research
- A significant risk to the health or safety of the patient, or,
- Not proven to result in greater benefits for a particular illness or disease than other generally available services.

**Family Member** means a person who is a spouse, former spouse, child, stepchild, grandchild, parent, stepparent, grandparent, niece, nephew, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother, sister, brother-in-law, or sister-in-law, including adoptive relationships.

**Fiduciary** means, under ERISA, a person who exercises discretionary authority or control over the management of an ERISA plan or its assets or has discretionary authority or responsibility in Plan administration.

**First Choice Health (FCH)** is the Third Party Administrator for this group health plan.

**First Choice Health Network, Inc. (FCHN)** is the network of providers that is used by FCH and defines the service area.

**First Responder User Fee** is a charge to patients who were treated or evaluated by a First Responder Unit of a municipality or other government agency that responded to a 9-1-1 call for medical services.

**Independent, Freestanding Emergency Department** is any health care facility that is geographically separate and distinct from a hospital, and that is licensed by a state to provide Emergency Services, even if the facility is not licensed under the term, "Independent, Freestanding Emergency Department."

**Legal Separation and/or Legally Separated** shall mean an arrangement under the applicable state laws to remain married but maintain separate lives, pursuant to a valid court order.

**Levels of Care** related to Mental Health and Chemical Dependency Conditions:

- **Intensive Outpatient Programs** provide services for Mental Health or Chemical Dependency Conditions on an outpatient basis through planned, structured services available at least two hours per day and three days per week. Services include group, individual and when indicated family or multi-family group treatment. Medical monitoring, evaluation and adjunctive services are available. Treatment must follow a written plan of care.
- **Inpatient Psychiatric Hospitalization Programs** provide around-the-clock psychiatric and nursing interventions in secure, State-licensed psychiatric facilities for individuals diagnosed with a mental health disorder. These facilities operate under the supervision of a licensed and Board eligible/certified psychiatrist who evaluates the patient within 24 hours of admission. Subsequent face-to-face visits with a psychiatrist or psychiatric ARNP occur at least once every 24 hours along with daily medication management. Treatment must follow a written plan of care and include psychosocial and substance

abuse evaluations. Individual, group, and/or family therapy occurs daily. The focus of the program is stabilization of client's psychiatric symptoms through the use of assessment, medication management, evidenced-based treatment strategies, group and individual therapy, behavior management, and active family engagement/therapy.

- **Partial Hospitalization Programs** provide multi-disciplinary care for Mental Health or Chemical Dependency Condition at least 6 hours a day, 5 days a week, and schedule at least three distinct services per day. Services include individual and group therapy, medication evaluation and management, family therapy, activity therapy, occupational therapy, and education training directed at treating the Condition. Services for Mental Health Conditions must include evaluation by a psychiatrist within 48 hours and weekly thereafter. All programs must include a substance abuse evaluation. Treatment must follow a written plan of care.

- **Mental Health Residential Treatment Program** provides around- the- clock behavioral health services that do not need the high level of physical security and psychiatric and nursing interventions that are available in an acute inpatient program. Care is medically monitored with on-site nursing and medical services. The focus of the program is an improvement of client's psychiatric symptoms through the use of assessment, evidenced-based treatment strategies, group and individual therapy, behavior management, medication management and active family engagement/therapy. Treatment must follow a written plan of care. The facility must be state licensed for residential treatment. Residential settings not meeting these criteria, such as group homes, halfway houses or adult/child foster homes, are not considered to be Mental Health Residential Treatment Programs.

- **Chemical Dependency Rehabilitation/Residential Programs** provide 24-hour rehabilitation treatment 7 days a week for Substance Related Conditions. Care is medically monitored, with 24-hour medical and/or nursing availability. Services include group, individual and when indicated family or multi-family group. The facility must offer sufficient availability of medical and nursing services to manage ancillary detoxification needs. Treatment must follow a written plan of care.

**Lifetime** is a reference to benefit maximums and limitations, understood to mean while covered under this Plan. Under no circumstances does lifetime mean during the lifetime of the participant.

**Medical group** means a group or association of providers, including hospital(s), listed in the provider directory.

**Medically necessary** is a medical service or supply that meets all the following criteria:

- It is required for the treatment or diagnosis of a covered medical condition
- It is the most appropriate supply or level of care that is essential for the diagnosis or treatment of the patient's covered medical condition
- It is known to be effective in improving health outcomes for the patient's medical condition in accordance with sufficient scientific evidence and professionally recognized standards
- It is not furnished primarily for the convenience of the patient or provider of services
- It represents the most economically efficient use of medical services and supplies that may be provided safely and effectively to the patient.

The fact that a service or supply is furnished, prescribed or recommended by a physician or other provider does not, of itself, make it medically necessary. A service or supply may be medically necessary in part only.

**Mental Health Condition** means a mental disorder listed in the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association. The following conditions, although considered mental health conditions under the DSM, are not included in the Mental Health Care benefit under this Plan, and are either excluded or are covered under other benefits offered by this Plan (subject to all terms, limitations and exclusions):

- Conditions related to Substance Related and Addictive Disorders (see Chemical Dependency definition)
- Relational, family, and lifestyle stressors absent a primary psychiatric diagnosis
- Sexual dysfunctions, personality disorders, paraphilic disorders.

**Network provider** means a contracted FCHN provider in Washington, Idaho, Montana, Oregon, Alaska, Wyoming, North Dakota and South Dakota that is listed in the provider directory. Outside these states, participants must use the First Health Network for network providers.

**No Surprises Act** holds patients harmless from surprise medical bills and pre-authorization requirements. See *Your Rights and Protections Against Surprise Medical Bills.* This act:

- Bans balance billing for Emergency Services.
- Requires that patient cost-sharing, such as copayments, co-insurance, or a deductible, for Emergency Services and certain non-emergency services provided by an out-of-network provider at an in-network facility cannot be higher than if such services were provided by an in-network provider, and any cost-sharing obligation must be based on in-network provider rates.
- Prohibits out-of-network charges for items or services provided by an out-of-network provider at an in-network facility, unless certain notice and consent is given. Providers and facilities must provide patients with a plain-language consumer notice explaining that patient consent is required to receive care on an out-of-network basis before that provider can bill the patient more than in-network cost-sharing rates.

**Open enrollment period** is a defined time when you are allowed to enroll yourself and/or your dependents for benefit coverage.

**Out of area/out of the service area** means outside the FCHN service area as described under network provider and out-of-network provider.

**Out-of-network provider** means a provider who delivers or furnishes health care services but is not a contracted FCHN provider in Washington, Idaho, Montana, Oregon, Alaska, Wyoming, North Dakota or South Dakota. Outside these states, an out-of-network provider means a provider who delivers or furnishes health care services but is not a contracted First Health Network provider.

**Participant** means any eligible employee or other eligible individual enrolled in the Plan, also referred to as covered member.

**Plan Administrator** means the department designated by an employer group to administer a plan on behalf of participants. Usually, the Plan Administrator is your Benefits Department. (The principal duty of the Plan Administrator is to see that the Plan is carried out, in accordance with its terms, for the exclusive benefit of eligible participants and beneficiaries, without

discrimination. The Plan Administrator has the power and exclusive authority necessary, at its discretion, to:

- Construe and interpret the Plan document and to decide all questions of eligibility and participation,
- Make all findings of fact for Plan administration, including payment of reimbursements,
- Prescribe procedures to be followed and forms to be used by participants and beneficiaries,
- Request and receive from all employees the information necessary for proper Plan administration, and,
- Appoint and employ the individuals or entities to assist in Plan administration as necessary or advisable, including benefit consultants and legal counsel.

**Plan Document** means the document that describes requirements for eligibility and enrollment, covered services, limitations and exclusions, and other terms and conditions that apply to participation in this Plan.

**Plan Year** means the twelve (12) month period beginning January 1 and ending December 31.

**Post-service claim** means any claim for a Plan benefit that is not a pre-service claim and is a request for payment or reimbursement for covered services already received.

**Pre-authorization** is the process of obtaining coverage determination from FCH before receiving inpatient and certain outpatient services, as specified in the component plans' benefit description booklets.

**Pre-service claim** means any claim for a Plan benefit for which the Plan requires approval before medical care is obtained.

**Primary Care Provider (PCP)** providers with the following specialties may commonly be considered PCPs as defined by the MultiCare Connected Care Network:

- Family Practice
- Family Practice with OB
- Internal Medicine
- General Practice
- Pediatrics
- Nurse Practitioner - Family Practice
- Nurse Practitioner - Pediatrics
- Nurse Practitioner - Adult
- Nurse Practitioner - Women's Health
- Nurse Practitioner - Geriatric Medicine
- Geriatric Medicine
- Obstetrics & Gynecology
- Gynecology
- Naturopathic Physicians
- Physician Assistants - designated at PCP

**Provider** means any person, organization, health facility or institution licensed to deliver or furnish health care services.

**Provider directory** is the listing of the network providers, hospitals, and other facilities that have agreed to provide covered services to participants or dependents of Plans contracted with FCHN and FCH for PPO and TPA services.

**Qualifying event** means, under COBRA, the triggering event that causes a loss of coverage under a group health plan, including termination of employment, reduction in hours, death or divorce. (See the COBRA section for more details.)

**Qualifying Payment Amount (QPA)** means consumer cost-sharing amounts for Emergency Services provided by out-of-network emergency facilities and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances that must be calculated based on one of the following amounts:

- An amount determined by an applicable All-Payer Model Agreement under section 1115A of the Social Security Act;
- If there is no such applicable All-Payer Model Agreement, an amount determined under a specified state law; or
- If neither of the above apply, the lesser amount of either the billed charge or the QPA, which is generally the plan's or issuer's median contracted rate.

**Recognized No Surprises Provider** is a provider acting within the scope of his/her license that the No Surprises Act applies to and whom: 1) FCH does not offer agreements to his/her category of providers, or 2) agreements are offered but do not cover the particular provider at issue or no written notice and consent was provided. This includes:

- Ambulance services
- Anesthesiologists services
- Assistant surgeon services
- Emergency services
- Hospital services
- Intensivist services
- Laboratory services
- Neonatology services
- Pathology services
- Radiology services
- Services of non-contracted providers when rendering care within an in-network facility, except a primary surgeon for a non-emergent admission

If you receive any of the services listed above, then those out-of-network providers cannot balance bill you, unless you are provided with written notice and give written consent to waive your protections against balance billing.

**Recognized Providers** are providers acting within the scope of his/her license but for whom: 1) FCHN does not offer agreements to his/her category of providers, or 2) agreements are offered but covered participant choice is not provided. Examples of both types are outlined below:

- Ambulance services
- Anesthesiologists
- Assistant surgeon

- Blood banks
- Dental services covered by the Plan; provider types may include:
  - Dentist
  - Oral and Maxillofacial Surgeon
  - Otolaryngologist (Ear, Nose & Throat specialist, or ENT)
- Non-contracted laboratories used by FCHN referring provider
- Ocular prosthetics (if covered by the Plan)
- PKU formula
- Services of non-contracted providers when rendering care within a network facility, except a primary surgeon for a non-emergent admission
- Suppliers of oral appliances (if covered by the Plan)
- Suppliers of wigs (if covered by the Plan)
- TMJ providers (if covered by the Plan)

For services received from out-of-network providers (not covered under *Recognized No Surprises Providers*), you are responsible to pay the difference between the Plan payment and the provider's actual charges.

**Skilled nursing facility** means a qualified facility that has the staff and equipment to provide skilled nursing care as well as other related services.

**Special enrollment** means, under HIPAA, special mid-year enrollment rights that group health plans must offer to certain unenrolled employees and dependents who experience a mid-year loss of other coverage or when there is a mid-year birth, adoption or marriage.

**Surrogacy** means a participant who bears a child for another person, often for pay, either through artificial insemination or by carrying until birth another participant's surgically implanted fertilized egg.

**Telemedicine Services** include three types of visits: Scheduled Telephone Visits (STV), Electronic Visits (e-visits), and videoconference.

- **Scheduled Telephone Visit (STV)** means a telephonic visit initiated by patient and scheduled for a specific time with a designated provider, and not related to any previous visits within 7 days.
- **Electronic Visit (e-visit)** means a visit of non-urgent clinical information between a provider and a patient conducted over a secure encrypted web portal. E-visits must be scheduled with a designated provider and not be related to any visit within the last 7 days.
- **Videoconference Consultation** means the use of medical information exchanged from one site to another via electronic communications.

**Temporomandibular Joint (TMJ) Disorders** mean disorders that have one or more of the following characteristics:

- Pain in the musculature associated with the temporomandibular joint
- Internal derangement of the temporomandibular joint
- Arthritic problems with the temporomandibular joint
- An abnormal range of motion or limited motion of the temporomandibular joint.

**Third Party Administrator (TPA)** is the organization providing services to this Plan's Administrator and Sponsor, including processing and payment of claims. FCH is the Third Party Administrator for this Plan.

**Urgent care** means services that are medically necessary and immediately required as a result of an unforeseen illness, injury or condition that is not an emergency, but it was not reasonable given the circumstances to wait for a routine appointment.

**Urgent care claim** means a claim for medical care or treatment that, if normal pre-service standards are applied:

- Would seriously jeopardize the claimant's life, health or ability to regain maximum function
- In the opinion of a physician with knowledge of the claimant's medical condition, would subject the claimant to severe pain that cannot be adequately managed without the care or treatment requested.

**Usual, customary and reasonable (UCR)** is the maximum amount that the Plan will consider for a covered health care service received from an out-of-network provider (outside of the Recognized No Surprises Providers), that is consistent with and based upon what providers in a given particular geographic area charge for a same or similar medical procedure.

The Plan's UCR calculation is based upon the 25th percentile of the market rate for identical and similar services within a particular geographic area that has been obtained from a commercially-reasonable, independent third-party source, which is updated semi-annually. If the third party source does not have enough data to establish a UCR amount for a given medical procedure, the UCR will be calculated as a multiple of Medicare, specifically 300% of Medicare. If there is no value from the third-party source, and there is no Medicare allowed amount, and the service is deemed payable, the Plan will allow 50% of billed charges. Coinsurance, copayments, deductible or non-covered services are applied against UCR amount as patient responsibility. The provider can balance bill the member the difference between the Plan payment and provider's actual charges.

# Exhibit 2

**⦂ First Choice Health.**

**Medical Management**
One Union Square
600 University Street, Suite 1400
Seattle, WA 98101
(800) 808-0450
Fax: (833) 227-4256
www.fchn.com

# Pre-Authorization Request Form

Please include supporting clinical documentation with your request. Submissions without clinical documentation will be considered incomplete. Submit completed forms via fax at (833) 227-4256. Questions? Contact FCH Medical Management at (800) 808-0450 or preauthorization@fchn.com.

**Expedited Requests:** For expedited processing, please submit your Pre-Authorization Request online at www.fchn.com/TPAProviders.

*Please note: Pre-authorization is not a guarantee of payment; payment is subject to member eligibility and benefits at the time of service.*

| 1. MEMBER/PATIENT INFORMATION | | | |
|---|---|---|---|
| First Name<br>Oak | Last Name<br>Francis | Middle Name<br>Faye | Date of Birth<br>1981 |
| Member ID<br>7620-01 | Group ID<br>5230 | Group Name<br>MultiCare Heath System - MCC | |

| 2. PROVIDER INFORMATION | |
|---|---|
| Referring Provider Name<br>Toby Mayer, MD | Address<br>436 N Bedford Dr Ste 202, Beverly Hills, CA 90210 |
| NPI<br>1831254846 | Specialty<br>Facial Plastic Surgery |
| Office Contact Name<br>Keely Rivera | Phone Number<br>424-245-4156 · Fax Number<br>323-338-7939 |
| Servicing Provider Name<br>Toby Mayer, MD | Address<br>436 N Bedford Dr Ste 202, Beverly Hills, CA 90210 |
| NPI<br>1831254846 | Phone Number<br>424-245-4156 · Fax Number<br>323-338-7939 |
| Specialty<br>Facial Plastic Surgery | |
| Facility Name<br>Institue of Surgical Arts | Facility Address<br>436 N Bedford Dr Ste 210, Beverly Hills, CA 90210 |
| Tax ID<br>208556964 | Phone Number<br>310-385-0000 · Fax Number<br>310-385-0001 |

| 3. SERVICE REQUESTED | |
|---|---|
| ◯ Inpatient  ⦿ Outpatient    Clinical Urgency: ⦿ Standard  ◯ Urgent  ◯ Emergent Inpatient Admission | |
| **Primary Diagnosis** | |
| Code/Description   F64.0 / Gender Identity Disorder | Date of Service   03/13/2024 |
| **Services Requested** | |
| Code/Description<br>99244 IFO search, 00160 Anesthesia, 15824 Forehead lift, 21270 Cheek Implants, 15773 Grafting of Fat, 21137 Orbital bony contour, 21120 Chin Implant | Number of Units<br>1 |
| Code/Description<br>31599 Voice Feminization, 30420 Septorhinoplasty, 21209 Chin Reduction and Contour, 31899 Thyroid Cartilage Shave, 11951 Filler (over 1 cc), 40799 Lip Lift, 15769 Soft Tissue Harvesting | Duration<br>9 hours |

©2021 First Choice Heath

# TOBY MAYER MD

January 30, 2024

RE: **Francis Faye Oak**     I.D. #: ████ **7620-01**

Dear Pre-certification Department,

I am writing on behalf of my patient, **Francis Faye, to request a Negotiated Agreement (Letter of Agreement), Pre-authorization and an In for Out Exception (Gap Exception).**

Please let me know what additional information is needed.

Provider:

Toby G. Mayer MD
436 N Bedford Dr #202, Beverly Hills, CA 90210
P: 424-245-4156
F: 323-338-7939
NPI#18-31254846
Tax ID: 95-3169580

Facility location:

IOSA
436 N Bedford Dr #210, Beverly Hills, CA 90210
P: 310-385-0000
F: 310-385-0001
NPI# 16-19186251
Tax ID: 20-8556964
Type: Ambulatory Surgery Center

Anesthesia Provider:

Laura Alexander MD
PO BOX 7001 Tarzana, CA 91357
P: (818) 888-7815 ext 100
NPI#1558519280
Tax ID: 20-4363133

Very truly yours,

Toby G. Mayer, M.D., F.A.C.S
TGM: nd

**Toby G Mayer, MD, APC**
*436 N. Bedford Drive, Ste 202*
*Beverly Hills, CA 90210*
*(424) 245-4156 Tel*
*(323) 338-7939 Fax*
*www.drtobymayer.com*

# TOBY MAYER MD

January 30, 2024

**MultiCare**
**PO Box 12659**
**Seattle, WA 98111-4659**

RE: **Francis Faye Oak**　　　I.D. #:　　7620-01

Dear Pre-certification Department,

I am writing on behalf of my patient, **Francis Faye** to document the medical necessity of facial feminization surgery for the treatment of **Gender Identity Disorder**. I am a cosmetic and reconstructive plastic surgeon; 95% of my practice is devoted to transgender patients.

I saw the above referenced patient for initial evaluation on **August 22, 2022**. The patient is a male to female transgender diagnosed with **GID (F64.0)** and is beginning the process of transition. This letter provides information about the patients medical history and diagnosis and a statement summarizing my treatment rationale.

**Patient's History and Diagnosis:**
**Francis Faye** has been on hormones for 3 years. **She** is now seeking **Facial Feminization** to aid in **her** medical transition. **She** was entered into therapy in **2021.** At this time, **she** presents with no apparent residual psychiatric symptoms and is quite stable. **Francis Faye** intends to continue their therapy regime which they believes has been helpful.

**Assessment and Plan:**
**Francis Faye** is certainly an excellent candidate for male to female facial feminization surgery as part of their transition. The risks and benefits were discussed extensively with the patient. She had a significant amount of excellent questions regarding the procedures and these questions were all addressed. The risks, benefits, incisions, possible complications, tradeoffs, recovery, and alternatives were all discussed extensively with the patient.

**Francis Faye** stated she has been misgendered due to her masculine features and her voice. **Francis Faye** has typically masculine features including a high hairline, male pattern baldness, temporal recessions, low eyebrows, a large supraorbital rim, small or sunken cheeks, a large nose, a long upper lip, thin lips, a large/square chin, a prominent Adam's Apple, and a deep masculine voice. The following list of procedures will change **Francis Faye's** typically masculine features in the ways described below:

* **99244**　**Search for In Network Provider** - We are requesting a negotiated agreement there are no in network providers in the patients area.
* **00160**　**Anesthesia Services** - The anesthesia provider is not an employee of the facility and requires a separate LOA for their services.
* **15824**　**Forehead lift** - This procedure is used to raise the eyebrows into a feminine position.
* **21137**　**Orbital bony contour** - This procedure removes the prominent male brow bone so that the forehead is smooth and appears female.
* **30420**　**Septorhinoplasty** - This procedure will reshape and feminize the nose and add balance to the overall feminine appearance.
* **21270**　**Cheek Implants** - Cheek implants will provide the patient higher cheekbones and more fullness to the mid face.

Toby G Mayer, MD, APC
436 N. Bedford Drive, Ste 202
Beverly Hills, CA 90210
(424) 245-4156 Tel
(323) 338-7939 Fax
www.drtobymayer.com

- **21120   Chin Implant** - A chin implant is used when the patient's chin is too receded. When the implant is used with contour and reduction, Dr. Mayer can create a well balanced, female chin.
- **21209   Chin Reduction and Contour** - This surgery will decrease the width of the chin and narrow the chin to appear more feminine.
- **40799   Lip Lift** - This procedure shortens the distance between the upper lip and base of nose giving the upper lip more turn out like women have.
- **15773   Grafting of Fat** - Once the fat is grafted is it injected into the lips to provide fuller, more feminine lips.
- **15769   Soft Tissue Harvesting** - The soft tissue will be placed in the nasolabial folds to provide a younger, smoother, more feminine appearance.
- **31599   Voice Feminization** - This procedure will change the pitch of a person's voice from male to female allowing the patient to speak freely without the conscious effort to control their voice.
- **31899   Thyroid Cartilage Shave** - The thyroid cartilage shave is performed when a patient has a prominent Thyroid Cartilage or Adam's Apple. This surgery removed the cartilage so that it is undetectable.
- **11951   Filler (over 1 cc)** - Filler is used to fill in wrinkles throughout the face giving the patient a more smooth and feminine appearance. Fillers are also used to give patients higher cheekbones which appear more feminine or fuller lips to appear more feminine.

In summary, the procedures listed above are medically necessary for this patient's medical condition and quality of life. Having facial feminization will allow **Francis Faye** to live life as her true self without the fear of being misgendered.   Please contact me if any additional information is required to ensure the prompt approval of her facial feminization procedures.


Provider:                         Toby G. Mayer MD
                                  436 N Bedford Dr #202, Beverly Hills, CA 90210
                                  P: 424-245-4156
                                  F: 323-338-7939
                                  Tax ID: 95-3169580
Facility location:                IOSA
                                  436 N Bedford Dr #210, Beverly Hills, CA 90210
                                  P: 310-860-0000
                                  F: 310-385-0001
                                  Tax ID: 20-8556964
Type:                             Ambulatory Surgery Center


Very truly yours,

*Toby G. Mayer, M.D., F.A.C.S*
Office: nd

Letter by Pekar, Felix Samuel Evans, LICSW on 5/23/2023

 KAISER PERMANENTE.

5/23/2023

RE: Letter of Support for Gender-Affirming Facial Feminization Surgery, Breast Augmentation and Vaginoplasty Surgery

Dear Medical Case Review Professional:

I am a Licensed Clinical Social Worker in Washington State (LW60376199). I am employed by Kaiser Permanente of Washington in the Gender Health Case Management Department. Regarding my training, I have a master's degree in Social Work obtained in 2009 with licensure in 2013. I have over ten years of experience working in clinical social work in a medical setting.

Francis Faye Oak (DOB: ▮▮▮1981, KPWA▮▮▮0933) has been a client of mine enrolled in the Gender Health Program since August 2021. Though assigned male at birth, Francis identifies as female, and uses she/her pronouns. Francis notes that she first knew her gender identity differed from her assigned sex since a young age, but did not have a fuller sense of what this meant to her until a little over two years ago. She started HRT in September of 2021.   She has been living in her affirmed gender over two years.  She underwent orchiectomy in May of 2023.

Despite all these interventions, Francis reports significant distress due to long-standing dysphoria directly caused by some of her facial features, specifically her hairline, brow, chin, nose, large upper lip area and Adam's apple. She notes that she dislikes looking in the mirror and cannot wait to look in the mirror and "finally see myself," and "to undo 40 years of testosterone damage." Francis also voices significant distress around her genitals, although a great deal of this discomfort has been alleviated with her recent orchiectomy.  At this point she is not entirely sure if it will be necessary to move forward with bottom surgery, but she plans to move forward with her consultation with Dr. Meltzer later this year.  She continues to weigh the pros and cons of breast augmentation surgery.  While she feels she would like to do this, she is concerned about the need to potentially require replacements ten years from now and she is not certain if the politics of this country will be supportive of trans healthcare at that time.

By my independent evaluation of Francis, she meets all criteria for Gender Dysphoria (ICD 10, F64.1). She has expressed a persistent and consistent desire for FFS, BA and bottom surgery for at least two years.  While she remains uncertain as to whether or not she will move forward with top/bottom surgery, she has demonstrated the capacity to make an informed decision for herself.

Francis is physically healthy to undergo this surgery and is under consistent and regular care of a gender-affirming primary care physician. She has no physical or mental health diagnoses that would negatively impact their experience of, or results from surgery; in fact, it is highly likely that any symptoms of anxiety, depression, and/or distress Francis has experienced over the last several years would significantly decrease with this gender-affirming surgery. Francis is stably housed and is well-prepared for her post-op recovery with her support system, which includes a network of friends and her partner. Francis has no issues with illicit drug or substance use or abuse.

Francis has more than met the WPATH criteria for FFS, BA and vaginoplasty (persistent and well-documented gender dysphoria, capacity to make a fully informed decision and to consent for treatment, age of majority, and no other significant medical or mental health concerns that would pose any risk or contraindication).

This letter represents appropriate documentation for Francis to pursue facial feminization surgery, breast augmentation and vaginoplasty as a necessary gender-affirming surgery, as explicated in the most recent version of the World Professional Association for Transgender Health (WPATH)

Standards of Care. It confirms that this client has been evaluated for the presence of coexisting behavioral health conditions and while she has current diagnoses of Depression, Anxiety and CPTSD these are currently adequately managed. She is a good candidate for these gender-affirming surgeries.

Francis is fully aware of the risks, benefits, and alternatives for these surgeries, and has discussed these risks, benefits, and alternatives in session with me. I believe that Francis is fully capable of making an informed decision about undergoing these surgeries. I have assessed Francis' readiness for surgery and fully support her decision to move forward. Therefore, it is my strong recommendation that Francis be granted authorization to undergo this life-saving surgery; it is the only appropriate next step.

Thank you for your time, and please do not hesitate to contact me if you have any questions or concerns.

Sincerely,

Felix Pekar

Felix Pekar, MSW, LICSW
Gender Health Care- Social Worker
Pronouns: He/Him/His
(509) 389-3463
5615 W Sunset Highway, Spokane, WA 99224

# Toby G. Mayer, M.D., APC

## HISTORY

Date: _____01/15/24_____   Name: ___Francis Fa eOak_____

Occupation: ___Bereavement Counselor_____

Facebook/Instagram handle(s): _____

Are you interested in being filmed for social media purposes? __No_____

How did you hear about Dr. Mayer? _Reddit_____

City: ___Tacoma_____ State: _____WA_____   Date of Birth: _____ 1981

Age: __42____ Height: ____5'11__ Weight: ____155____ Sex: Male ☐   Female ☐   TG ☒

Chief Complaints: __Male presenting face_____

Family Doctor: Dr. Tara Olson (Kaiser Permanente)

Have you ever had any of the following? Bleeding ☐   Scarring ☐   Keloids ☐   None ☒

Are you currently taking any Medications and or OTC/Homeopathics? __Yes (150mg/day Bupro pion)_____

Hormones? Yes ☒   No ☐   For how long? _Since 11/2021_____

Any Allergies to Medications? _Bandage Adhesive_____

Operations (including- wisdom teeth, tonsils, appendix): _____

_Wisdom teeth removal, 1996; Ruptured appendix removal 2014; Ort bpedic surgery 201 7_

Operations- Cosmetic Surgery (with surgeon name and dates): _N..on_____

Injuries: Hip fract re; broken collar bone; separated shoulder

Smoker: Cigarettes? Yes ☐   No ☒   Marijuana? Yes ☒ No ☐   Drinker: (more than occasional)? Yes ☐ No ☒

Serious Illnesses: _Vitiligo_____

Family History: ___Heart disease, cancer_____

Any problems with Anesthesia? Yes ☐   No ☒

Ever seen a Psychologist, Therapist or Psychiatrist? Yes ☒   No ☐

Who did you see? _LMHC_____

How long? _3+ years____

# Exhibit 3



**Medical Management**
PO Box 12659
Seattle, WA 98111-4659
(800) 808-0450
UM Fax: (833) 227-4256

February 27, 2024

FRANCIS F OAK



TACOMA, WA

| | |
|---|---|
| **Patient Name:** | FRANCIS F OAK |
| **Patient ID:** | 7620-01 |
| **Patient DOB:** | 1981 |
| **Group:** | 5230 MultiCare Health System - MCC |

Dear FRANCIS,

We reviewed your authorization request. Below you will find important information about our decision, as well as your options.

**What was requested.**
Authorization: 2024169828-199214
Service: See specific services that are denied later in this letter
Dates: 2/15/2024 - 5/15/2024
Provider: Toby Mayer
Facility: Institute of Surgical Arts

**Our decision.**
This request was denied, but you have the right to appeal.

**Why the request was denied.**
This request was denied for the reason(s) below:

Please Note: Not all services requested are included in this denial letter. Other services are still pending review and require additional information. A determination will be made for those services once all information has been received from your provider.

Denial Benefit Exclusion

Your doctor requested authorization of health plan coverage for facial feminization surgery as part of gender affirming care. As stated in your Summary Plan Document, coverage is specifically excluded for cosmetic services. Based on the clinical information provided, the procedures being requested include: forehead lift, removal of the male brow bone, reshaping your nose, cheek implants, chin implant, chin reduction, lip lift, fat injections to your lips, soft tissue harvesting that is put into your nasolabial folds to provide a feminine appearance and filler for facial feminization are considered cosmetic when performed to improve your gender specific appearance. Therefore, the requested procedures included above for facial feminization surgery is a Health Plan exclusion and Not a Covered Benefit. This determination is based on the specific benefit exclusion and is not based on the medical necessity of the service requested.

**Next steps.**
You may decide to pay for this service yourself, or you can appeal. If you want to learn more about appeals, please see the last page of this letter. The ultimate decision to proceed with the treatment/service is the responsibility of you and your provider.

**Other important information.**
- **It's a good idea to verify the network status of the provider and/or facility treating you or your family.** Using wrap network or out-of-network providers may cost you more out-of-pocket.

- **You can get copies of the information we used to make our decision.** That includes diagnosis and procedure codes and what the codes mean. It also includes the criteria or benefit provision upon which we based our decision. We will provide this information at no cost and upon request.

- **Your provider was sent a copy of this letter.** Please connect with your provider to talk about next steps.

**Questions?**
If you have questions about this letter, please call Medical Management at **(800) 808-0450**.

If you have questions about benefits or network, please call Customer Care at **(888) 889-1112**.

We are available Monday through Friday from 8:00 AM to 5:00 PM PST.

You have the right to appeal this decision. The appeal must be submitted in writing 180 days from the date of this notice. The request should include the patient's name, subscriber's ID or plan identifier, and any information and comments you would like to have considered. You have the right to bring a civil action if you file an appeal and your request for coverage or benefits is denied following review. Failure to file a timely appeal will bar you from any further review of this benefit denial under these procedures or in a court of law.

Please submit your appeal to:

Medical Management Appeals
PO Box 12659
Seattle, WA 98111-4659

Sincerely,
Medical Management

CC: Toby Mayer

**Enclosure(s):**   Appeal Rights

**For Provider billing purposes:**

| <u>Units</u> | <u>Denied procedure code(s)</u> |
|---|---|
| 1 Visits | 00160 - ANESTHESIA NOSE & ACCESSORY SINUSES NOS |
| 1 Visits | 15824 - RHYTIDECTOMY FOREHEAD |
| 1 Visits | 21270 - MALAR AUGMENTATION PROSTHETIC MATERIAL |
| 1 Visits | 15773 - GRAFTING OF AUTOLOGOUS FAT BY LIPO 25 CC OR LESS |
| 1 Visits | 21137 - REDUCTION FOREHEAD CONTOURING ONLY |
| 1 Visits | 21120 - GENIOPLASTY AUGMENTATION |
| 1 Visits | 30420 - RHINOPLASTY PRIMARY W/MAJOR SEPTAL REPAIR |
| 1 Visits | 21209 - OSTEOPLASTY FACIAL BONES REDUCTION |
| 1 Visits | 11951 - SUBCUTANEOUS INJECTION FILLING MATRL 1.1-5.0 CC |
| 1 Visits | 40799 - UNLISTED PROCEDURE LIPS |
| 1 Visits | 15769 - GRAFTING OF AUTOLOGOUS SOFT TISS BY DIRECT EXC |

# Exhibit 4

# : First Choice Health.

## APPEAL FILING FORM

*(You may use this form or submit your own letter)*

Patient Name:    Francis Faye Oak                          Member ID:    ███ 7620-01

Name of Person Filing Appeal:    Francis Faye Oak

**Please Note: A provider cannot be**    ☒ Patient    ☐ Designated Authorized Representative (DAR)
a DAR, but can submit information to support the appeal.

Mailing Address:    ████████

*Street Address*

Tacoma                          WA                                    ████

*City*                          *State*                              *Zip*

Contact Phone:    ████████        *Email:    ████████

You have the right to choose a person to represent you in your appeal. If you choose to have someone serve as your representative, you must complete and sign the Designated Authorized Representative form found at the end of this information packet. A Plan participant or beneficiary may not assign or transfer rights to a provider of services, other than the assignment of benefit payment.

**Reference Number or Claim Number:**    Authorization: 2024169828-199214

**Reason for Appeal:** Tell us why you are appealing this denial. Include any claim numbers, dates of service, provider names, and any/all relevant information you would like us to review. Additional pages may be attached.

I am writing to appeal the above pre-authorization denial on three grounds: 1) your decision does not align with industry standards

of other top-tier employers in the Pacific Northwest; 2) adverse benefit determinations must be reviewed by a health provider

experienced in gender affirming treatment; 3) facial feminization is a standard practice of care for transgender patients. See attached.

**Additional Information:** You may choose to include additional information in your appeal to support your case. Please check one of the following:

☒ I am including additional information.          ☐ I am not including additional information.

☐ Please consider any information from my provider.

☐ I am interested in attending a meeting by phone to provide additional information about my case. I understand there are no decisions made during the meeting.

**Signature and Release:**
I promise that all of the information on this form is true to the best of my knowledge.

_____                              March 2, 2024
Patient or Designated Authorized Representative Signature        Date

**Send to:**

**Appeals Coordinator | First Choice Health | P.O. Box 12659 | Seattle, WA 98111-4659**
**(877) 749-2031 | FAX: (888) 400-1654 | Appeals@fchn.com**

*\* First Choice Health utilizes encryption to secure your Protected Health Information (PHI). If you do not want to receive encrypted emails, you may ask FCH to communicate with you by regular e-mail (e-mail that is not secured by a technical process called encryption). However, there may be some level of risk that your Protected Health Information (PHI) could be read by someone besides you in an Unencrypted Electronic Transmission (such as an Unencrypted Email or Unencrypted Text Message).*

Appeal Filing Form 10/2023

Denial Benefit Exclusion

**Situation:**

On February 27, 2024 my prior authorization request for facial feminization procedures with Dr. Toby Mayer were denied based on specific benefit exclusions for these procedures because they are currently classified as "cosmetic services" in the Summary Plan Document of my MultiCare employee health plan (MultiCare MyConnected Care).

---

Francis Faye Oak

█████████████

Tacoma, WA ███████

March 5, 2024

Medical Management Appeals
PO Box 12659
Seattle, WA 98111-4659

To whom it may concern:

I am enrolled in the MultiCare MyConnected Plan administered by First Choice Health, policy number ██████ 7620-01. I'm appealing a prior authorization denial for FACIAL FEMINIZATION SURGERY to treat gender dysphoria with the following facial feminization procedures as a standard practice of care for transgender women as outlined by the World Professional Association for Transgender Health (WPATH):

    00160 - ANESTHESIA NOSE & ACCESSORY SINUSES NOS
    15824 - RHYTIDECTOMY FOREHEAD
    21270 - MALAR AUGMENTATION PROSTHETIC MATERIAL
    15773 - GRAFTING OF AUTOLOGOUS FAT BY LIPO 25 CC OR LESS
    21137 - REDUCTION FOREHEAD CONTOURING ONLY
    21120 - GENIOPLASTY AUGMENTATION
    30420 - RHINOPLASTY PRIMARY W/MAJOR SEPTAL REPAIR
    21209 - OSTEOPLASTY FACIAL BONES REDUCTION
    11951 - SUBCUTANEOUS INJECTION FILLING MATRL 1.1-5.0 CC
    40799 - UNLISTED PROCEDURE LIPS
    15769 - GRAFTING OF AUTOLOGOUS SOFT TISS BY DIRECT EXC

The attached prior authorization denial letter from MEDICAL MANAGEMENT provided the following reasoning to support your denial of these procedures:

*Based on the clinical information provided, the procedures being requested include: forehead lift, removal of the male brow bone, reshaping your nose, cheek implants, chin implant, chin reduction, lip lift, fat injections to your lips, soft tissue harvesting that is put into your nasolabial folds to provide a feminine appearance and filler for facial feminization are considered cosmetic when performed to improve your gender specific appearance. Therefore, the requested procedures included above for facial feminization surgery is a Health Plan exclusion and Not a*

*Covered Benefit. This determination is based on the specific benefit exclusion and is not based on the medical necessity of the service requested.*

In my appeal, I intend to make three interconnected arguments for why this denial should be overturned and all procedures covered to the full extent afforded to Dr. Toby Mayer as an out-of-network provider and specialist in gender affirming facial feminization with thirty years of experience performing these procedures.

I will first address the legal landscape in Washington State and federal courts with regards to transgender care and will argue that, even for "self-funded" health plans, MultiCare is out of step with the industry standards of leading companies headquartered in the Pacific Northwest.

Then, I will show that my prior authorization request was denied without input from a medical provider with adequate experience in gender affirming treatment and without adequate knowledge of WPATH Standards of Care for transgender patients. I will share with you some of the information your team is missing as a result of this oversight; and I am requesting that a medical provider with demonstrated expertise in this area be consulted as part of this appeal review.

I will conclude with a personal appeal that highlights for you the life-changing, health-improving impact that facial feminization surgery will have for me personally and for all transgender women in general. I believe that when taken all together you will agree that this denial should be overturned without delay.

My surgery with Dr. Toby Mayer is scheduled for May 21, 2024, and the full appeal process must be completed no later than April 30, 2024 to avoid any further delay in my receiving appropriate and adequate treatment for gender dysphoria.

**Legal Landscape & Industry Standards**

To begin, under Washington state law (RCW 74.09.675 – Gender affirming care services, prohibited discrimination) a health insurer generally cannot exclude, deny, or limit medically necessary gender-affirming treatment; and, adverse benefit determinations must be reviewed by a health provider experienced in gender-affirming treatment. In particular, this law prohibits health insurers from excluding gender-affirming treatments such as facial feminization surgeries as *cosmetic*. I have attached RCW 74.09.675 for your further review, and draw your attention to the following two provisions specifically related to your prior authorization denial:

> *(a) The authority and any managed care plans delivering or administering services purchased or contracted for by the authority may not apply categorical cosmetic or blanket exclusions to gender-affirming treatment.*

2

*(b) Facial feminization surgeries and facial gender-affirming treatment, such as tracheal shaves, hair electrolysis, and other care such as mastectomies, breast reductions, breast implants, or any combination of gender-affirming procedures, including revisions to prior treatment, when prescribed as gender-affirming treatment, may not be excluded as cosmetic.*

*(c) The authority and managed care plans administering services purchased or contracted for by the authority may not issue an adverse benefit determination denying or limiting access to gender-affirming treatment, unless a health care provider with experience prescribing or delivering gender-affirming treatment has reviewed and confirmed the appropriateness of the adverse benefit determination.*

The World Professional Association for Transgender Health (WPATH) issued guidance to WA State lawmakers on the medical necessity for gender affirming care, including facial feminization surgeries, under WAC 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, thus insurers' utilization review criteria must be evidencee-based.

Technically, the MultiCare MyConnected health plan is not subject to the above law because it is a *self-funded* plan that does not receive any State support. This should not, however, exclude MultiCare from covering gender-affirming facial feminization procedures. In fact, as one of Pierce Counties largest private employers, with ambitious growth throughout the Pacific Northwest, MultiCare is out of step with other leading employers in the area. For example, other leading employers with self-funded health plans such as Amazon, Microsoft, and T-Mobile have robust private health plans that follow WA State and WPATH guidelines. Please find the details of these three plans, respectfully managed by Premera and Aetna, attached for review and guidance.

What each of these companies share in common with MultiCare is a fervent desire to attract and retain the most qualified and diverse workforce in their industries. I know firsthand that this is MultiCare's desire as well. MultiCare's Chief Belonging Officer, Shareka Fortier, has personally informed me that our Company's leadership is committed to being recognized by leading agencies such as the Human Rights Campaign's (HRC) Foundation of Corporate Equality Index that serves as the national benchmarking tool on corporate policies, practices and benefits pertinent to lesbian, gay, bisexual, transgender and queer employees.

In fact, the HRC Foundation of Corporate Equality Index lists MultiCare as a corporation that offers "transgender inclusive benefits." Please see the attached document for reference. The denial that I have received for multiple facial feminization surgery procedures seems to contradict MultiCare's own reporting to the HRC Foundation of Corporate Equality Index. It is clear to me that our health benefit managers and our human potential leaders are not adequately informed of each other's priorities.

My decision to accept an employment offer as a Grief Counselor with MultiCare Home Health & Hospice was greatly influenced by the HRC's endorsement and MultiCare's own statements about prioritizing LGBTQ+ equity in healthcare. Please see the attached statement from

3

MultiCare's website for reference. It is beyond disappointing to discover that transgender health is not prioritized and the MultiCare MyConnected Health Plan is not inclusive for transgender patients as evidenced by your enclosed denial. I am experiencing this denial as a betrayal of the promises that were made to me by human potential leadership and hiring managers at MultiCare who convinced me that MultiCare understands the historic mistreatment of LGBTQ+ individuals in health care, and that my twelve (12) years of professional experience in grief and death care would be honored by MultiCare assuring that my health as a transgender woman would be prioritized and guaranteed.

This is obviously not the case, and thankfully there is an appeal process that can adequately and appropriately reverse this discriminatory decision to deny medically necessary, life-saving care. My case is a chance for MultiCare to align itself with its own stated priorities and set a leading precedent in a region with one of the highest rates of transgender individuals (i.e. potential patients, caregivers, and business leaders) in the entire country.

In addition to attracting and retaining talent, many other local companies with self-funded health plans are making benefits decisions to stay ahead of the law on this matter. In a recent decision U.S. District Court Judge Robert Bryan (U.S. District Court for the Western District of Washington) ordered Blue Cross Blue Shield of Illinois (BCBSIL) to cease imposing discriminatory exclusions on gendering affirming care in all of its health plans across the country. The court's Order forbids BCBSIL from applying such discriminatory exclusions even when requested to do so by an employer.

This ground-breaking decision in *C.P. et al., v. Blue Cross Blue Shield of Illinois*, is the first in the country to order a third-party administrator, like BCBSIL, to refrain from administering discriminatory exclusions at the behest of employers. Millions of Americans receive their health coverage in self-funded plans that are managed by third-party administrators, like First Choice Health, which are subject to anti-discrimination laws.

In the decision, U.S. District Judge Robert J. Bryan stated:

> *"Blue Cross violated Section 1557. Blue Cross as a third-party administrator is a covered entity under section 1557 and has discriminated on the basis of sex against the Plaintiffs and the class Plaintiffs by denying them services for gender affirming health care under individual and class Plaintiffs' insurance policies. Classwide declaratory and injunctive relief is necessary to ensure that class members have their past, present and future claims for gender affirming health care adjudicated without discrimination."*

The Court also ordered BCBSIL to reprocess claims for gender-affirming care that it previously denied, going back to October 30, 2014. The court was unequivocal about categorical exclusions for coverage of gender-affirming care being unlawful discrimination and that health insurers who receive federal funds and act as third-party administrators have an independent duty not to administer discriminatory ERISA health plans. BCBSIL must now stop enforcing such exclusions, and process or reprocess claims accordingly.

4

The legal precedent and leading industry standards are clear. Transgender health care cannot and must not be categorically denied even if instructed to do so by a discriminatory employer. For this reason alone, your denial of my pre-authorization requests for facial feminization surgery should be immediately overturned.

**Professional Review & Medical Standards of Care**

If my arguments above are not enough to reverse this discriminatory decision to deny gender-affirming facial feminization procedures then I respectfully request that a medical provider with demonstrated and documented experience providing transgender care in accordance with WPATH standards be assigned immediately to the team reviewing this appeal.

My understanding, from personal conversations with First Choice case managers, social workers, and leadership is that neither First Choice nor MultiCare have consulted with medical providers with adequate demonstrated and/or documented experience in transgender care. Instead, this decision was made categorically and without reference to the highest standards of care for transgender patients as determined by those in the medical community who research best practices and treat transgender patients based upon WPATH standards of care. This is an oversight causing a detrimental impact to my legal rights and my physical and mental health as transgender caregiver and patient at MultiCare.

If an expert in transgender care were to be consulted they would undoubtedly educate your team on the comprehensive *Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People* (attached) published by WPATH that reflects the highest, evidence-based standards for transgender individuals around the world. WPATH,

> *"recognizes that health is dependent upon not only good clinical care but also social and political climates that provide and ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that promote tolerance and equity for gender and sexual diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these changes in public policies and legal reforms."* (7)

To this end, WPATH recommends that gender-affirming treatment for male-to-female (MtF) patients may necessitate surgical procedures including the following:

1. Breast/chest surgery: augmentation mammoplasty (implants/lipofilling);
2. Genital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty;
3. Non-genital, non-breast surgical interventions: **facial feminization surgery**, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and **various aesthetic procedures.** (54)

WPATH also addressed the debate between medically necessary care and aesthetic surgery. In their own words,

> *While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive. Although it may be much easier to see a phalloplasty or a vaginoplasty as an intervention to end lifelong suffering, for certain patients an intervention like a reduction rhinoplasty can have a radical and permanent effect on their quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria.* (58)

A study titled *Facial Feminization Surgery: The Ethics of Gatekeeping in Transgender Health* (Dubov & Fraenkel 2018) published in The American Journal of Bioethics highlights this point even further. These researchers found that the demarcation between 'necessity' and 'cosmetic' in transgender healthcare based on specific body parts is in direct opposition to the scientific community's understanding of gender dysphoria and professional guidelines for transgender health. Facial feminization surgery (FFS), they write, "is an important component in the treatment of gender dysphoria and it can be more important than genital reassignment surgery in alleviating symptoms of gender dysphoria."

The idea of gender-affirming transition being "cosmetic" or "unnecessary" is echoed in historical misrepresentations of transgender surgeries as unsafe, experimental, radical, and mutilating, which in turn inform political efforts to block access to transition-related care and undermine existing protections and opportunities. Facial feminization surgery is especially vulnerable to this false image; it is easy to frame as an act of indulgence, waste, or vanity — cosmetic, unworthy of support. To quote researchers:

> *The medical consensus and published standards of practice (Deutsch and Feldman 2013) explain that medical procedures related to sex reassignment (including FFS) are not 'cosmetic' or performed for the mere convenience of the patient. Transgender people do not seek these procedures due to their personal preference, but rather to change sex characteristics as treatment for their gender dysphoria (Rosh 2017). Therefore, FFS is not cosmetic or optional, but needs to be understood as medically necessary for the treatment of gender dysphoria.* (Dubov & Fraenkel 2018)

Among transgender women and our health care providers, FFS is considered a matter of life or death, or, at least, a gateway to a much better quality of life. The procedure makes the difference between me being able to safely be myself and me being targeted for anti-trans harassment, and it helps alleviate the dysphoric harm associated with being violently scrutinized and humiliatingly misgendered.

**Personal Statement of Need & Benefit**

6

I hope that you are beginning to understand just how important facial feminization procedures, such as those you have denied in my pre-authorization request, are to my personal health and safety as a public-facing MultiCare caregiver. The decision to pursue gender-affirming treatment is not a cosmetic attempt to adhere to cultural beauty standards. Though I know that the one of the most healthful results of facial feminization surgery is to finally see an accurate image of myself projected into the world, and that is a beautiful example of successful treatment. I seek facial feminization surgery because it is scientifically proven as one of the most effective treatments for gender dysphoria. The decision to follow medical advice and completely uproot my middle-aged life by medically transitioning under the care of professional guidance has not been taken lightly in the least. It has made my daily life exponentially harder than before my transition.

I am choosing to follow the best practices and care that is professionally recommended to treat gender dysphoria because of the well-documented detrimental impact that untreated gender dysphoria continues to have on my body and psyche. I am an artist. I am a writer. I am a friend. I am a mother to a ten-year old child; and I am a vulnerable member of the MultiCare workforce who supports some of the most vulnerable members of our community. My life matters to me a lot. Transitioning is allowing me to recognize that my life is worth living and worth taking good care of myself. Recognizing and being diagnosed with gender dysphoria was the best thing that has ever happened to me. I love being trans. Please read that as many times as it takes for it to sink in.

I am a transgender woman, proudly. Discovering this phenomenological reality in myself and deciding to listen to the expert advice of medical providers by seeking all of the available and appropriate treatments to improve my health, and thus my quality of life, has been the most important and practical decision I have ever made. My gender transition is health care; and, my child, my friends, the families I work with on a daily basis as a hospice grief counselor, and my community depend on me to be as healthy as I can possibly be. This is why I do not intend to cut any corners when it comes to my health. This is why transgender people, like myself, deserve equality in access to the best healthcare available to us.

The only viable reason to continue denying facial feminization surgeries is that MultiCare has a discriminatory bias against providing healthcare to transgender caregivers and patients. The only reason for discriminatory policies to exist are to uphold discriminatory beliefs. In this case, the only reason to continue denying the industry standards and scientifically proven results of transgender care is to uphold the discriminatory logic of transphobia. It is not a decision about cost efficiency. The most practical business response to transgender health care is capitalize on it. There is simply no good professional reason to deny me the transgender care that I need and deserve as transgender human being.

My quality of life matters to me. The decision to apply for pre-authorization for facial feminization surgery was made in consultation and agreement with my healthcare providers. I have lived publicly and full-time as a transitioning transgender woman for three years. In that time, I have made some of the most difficult and painful decisions of my entire life. My decision to pursue scientifically proven medical treatment for gender dysphoria has cost me

lifelong relationships, employment opportunities, and put me squarely in the crosshairs of politically charged harassment and social ostracization.

My healthcare necessitates facial feminization surgery. This is not a matter of personal opinion. This is a matter of scientific and medical fact. It is a necessary, safe, and efficacious treatment; and it is a legal right as such. I want to live a long and healthy life. MultiCare as my employer and medical provider is who I depend upon on to provide affordable access to the care necessary for me to do so. I am requesting facial feminization surgery in spite of the personal risk, the social costs, the financial liability, and the difficulty of recovery because these procedures are proven to improve the quality of my life and my capacity to reach my full human potential. I chose to work at MultiCare because I was told that this Company had the same goals for me.

For First Choice and MultiCare to continue considering medically necessary, life-saving care to improve the gender specific appearance of their transgender employees and patients as "cosmetic" is neither economically viable, legal, or humane. Thus, it is incumbent upon First Choice and MultiCare to reverse their denial of the efficacy and need of treating transgender care and cover the facial feminization procerdures listed above to the fullest extent afforded to an out-of-network provider.

Facial feminization surgery is the next logical and necessary step in my ongoing transition to treat gender dysphoria. I have been on hormone replacement therapy for over two (2) years prior to this pre-authorization request. I had an orchiectomy in May 2023. I had breast augmentation surgery in October of 2023; and a necessary revision in January 2024. All of these decisions to pursue ongoing treatment for gender dysphoria have been made with a measure of caution and discernment that is appropriate for the kind of transformation of body and mind that these interventions provide.

I am pleased to share that every single one of these treatments has exponentially improved my quality of life and shaped me into the woman who is writing you today. I am a proud transgender woman who is capable of expertly articulating that transgender health care is not a cosmetic choice for transgender people. It is a medical necessity and a human right. Facial feminization surgery is not a choice. Facial feminization surgery is a necessity and life-saving. Every transgender woman knows this. Every health care professional committed to improving the quality of life of transgender patients knows this. The State of Washington knows this. Premera and Aetna and BCBSIL know this. Companies like Amazon, Microsoft, and T-Mobile know this. U.S. District Judges know this. And, now, MultiCare and First Choice know this.

My appeal is not asking you to step outside of industry standards or established medical norms. My appeal is imploring MultiCare and First Choice Health to align your decision-making policies with the industry standards and established medical norms. My appeal is also requesting that MultiCare aligns itself with its own stated values and goals. I am asking that you align Company policies and decision-making practices to actually reflect the inclusive standards of care you report to offer when seeking recognition from organizations like the Human Rights Campaign Foundation of Corporate Equality Index. I ask that you provide

transgender caregivers and patients the inclusive benefits you advertise providing when you are attempting to attract quality healthcare professionals, like myself. I am asking that you approve my appeal and overturn your denial of my pre-authorization for facial feminization procedures because it is the right decision to make: economically, legally, and medically.

The decision you are making is profound and has a profound impact on my wellbeing and the wellbeing of others well beyond this one particular case. Together we have an opportunity to set an important and necessary precedent. I hope that you will take the enormity of this responsibility into consideration. I would be happy to address any of your questions that remain unanswered.

Please find enclosed letters from my health care providers and additional resources which provide further support and documentation of the legal right and medical necessity of this treatment.

Respectfully,



Francis Faye Oak (she/her)



**Medical Management**
PO Box 12659
Seattle, WA 98111-4659
(800) 808-0450
UM Fax: (833) 227-4256

February 27, 2024

FRANCIS F OAK



TACOMA, WA

| | |
|---|---|
| **Patient Name:** | FRANCIS F OAK |
| **Patient ID:** | 7620-01 |
| **Patient DOB:** | 1981 |
| **Group:** | 5230 MultiCare Health System - MCC |

Dear FRANCIS,

We reviewed your authorization request. Below you will find important information about our decision, as well as your options.

**What was requested.**
Authorization: 2024169828-199214
Service: See specific services that are denied later in this letter
Dates: 2/15/2024 - 5/15/2024
Provider: Toby Mayer
Facility: Institute of Surgical Arts

**Our decision.**
This request was denied, but you have the right to appeal.

**Why the request was denied.**
This request was denied for the reason(s) below:

Please Note: Not all services requested are included in this denial letter. Other services are still pending review and require additional information. A determination will be made for those services once all information has been received from your provider.

Denial Benefit Exclusion

Your doctor requested authorization of health plan coverage for facial feminization surgery as part of gender affirming care. As stated in your Summary Plan Document, coverage is specifically excluded for cosmetic services. Based on the clinical information provided, the procedures being requested include: forehead lift, removal of the male brow bone, reshaping your nose, cheek implants, chin implant, chin reduction, lip lift, fat injections to your lips, soft tissue harvesting that is put into your nasolabial folds to provide a feminine appearance and filler for facial feminization are considered cosmetic when performed to improve your gender specific appearance. Therefore, the requested procedures included above for facial feminization surgery is a Health Plan exclusion and Not a Covered Benefit. This determination is based on the specific benefit exclusion and is not based on the medical necessity of the service requested.

**Next steps.**
You may decide to pay for this service yourself, or you can appeal. If you want to learn more about appeals, please see the last page of this letter. The ultimate decision to proceed with the treatment/service is the responsibility of you and your provider.

**Other important information.**
- **It's a good idea to verify the network status of the provider and/or facility treating you or your family.** Using wrap network or out-of-network providers may cost you more out-of-pocket.

- **You can get copies of the information we used to make our decision.** That includes diagnosis and procedure codes and what the codes mean. It also includes the criteria or benefit provision upon which we based our decision. We will provide this information at no cost and upon request.

- **Your provider was sent a copy of this letter.** Please connect with your provider to talk about next steps.

**Questions?**
If you have questions about this letter, please call Medical Management at **(800) 808-0450**.

If you have questions about benefits or network, please call Customer Care at **(888) 889-1112**.

We are available Monday through Friday from 8:00 AM to 5:00 PM PST.

You have the right to appeal this decision. The appeal must be submitted in writing 180 days from the date of this notice. The request should include the patient's name, subscriber's ID or plan identifier, and any information and comments you would like to have considered. You have the right to bring a civil action if you file an appeal and your request for coverage or benefits is denied following review. Failure to file a timely appeal will bar you from any further review of this benefit denial under these procedures or in a court of law.

Please submit your appeal to:

Medical Management Appeals
PO Box 12659
Seattle, WA 98111-4659


Sincerely,
Medical Management

CC: Toby Mayer


**Enclosure(s):**   Appeal Rights


**For Provider billing purposes:**

| <u>Units</u> | <u>Denied procedure code(s)</u> |
| --- | --- |
| 1 Visits | 00160 - ANESTHESIA NOSE & ACCESSORY SINUSES NOS |
| 1 Visits | 15824 - RHYTIDECTOMY FOREHEAD |
| 1 Visits | 21270 - MALAR AUGMENTATION PROSTHETIC MATERIAL |
| 1 Visits | 15773 - GRAFTING OF AUTOLOGOUS FAT BY LIPO 25 CC OR LESS |
| 1 Visits | 21137 - REDUCTION FOREHEAD CONTOURING ONLY |
| 1 Visits | 21120 - GENIOPLASTY AUGMENTATION |
| 1 Visits | 30420 - RHINOPLASTY PRIMARY W/MAJOR SEPTAL REPAIR |
| 1 Visits | 21209 - OSTEOPLASTY FACIAL BONES REDUCTION |
| 1 Visits | 11951 - SUBCUTANEOUS INJECTION FILLING MATRL 1.1-5.0 CC |
| 1 Visits | 40799 - UNLISTED PROCEDURE LIPS |
| 1 Visits | 15769 - GRAFTING OF AUTOLOGOUS SOFT TISS BY DIRECT EXC |

**RCW 74.09.675  Gender-affirming care services—Prohibited discrimination.**  (1) In the provision of gender-affirming care services through programs under this chapter, the authority, managed care plans, and providers that administer or deliver such services may not discriminate in the delivery of a service provided through a program of the authority based on the covered person's gender identity or expression.

(2) Beginning January 1, 2022:

(a) The authority and any managed care plans delivering or administering services purchased or contracted for by the authority may not apply categorical cosmetic or blanket exclusions to gender-affirming treatment.

(b) Facial feminization surgeries and facial gender-affirming treatment, such as tracheal shaves, hair electrolysis, and other care such as mastectomies, breast reductions, breast implants, or any combination of gender-affirming procedures, including revisions to prior treatment, when prescribed as gender-affirming treatment, may not be excluded as cosmetic.

(c) The authority and managed care plans administering services purchased or contracted for by the authority may not issue an adverse benefit determination denying or limiting access to gender-affirming treatment, unless a health care provider with experience prescribing or delivering gender-affirming treatment has reviewed and confirmed the appropriateness of the adverse benefit determination.

(d) If the authority and managed care plans administering services purchased or contracted for by the authority do not have an adequate network for gender-affirming treatment, they shall ensure the delivery of timely and geographically accessible medically necessary gender-affirming treatment at no greater expense than if they had an in-network, geographically accessible provider available. This includes, but is not limited to, providing case management services to secure out-of-network gender-affirming treatment options that are available to the enrollee in a timely manner within their geographic region. The enrollee shall pay no more than the same cost sharing that the enrollee would pay for the same covered services received from an in-network provider.

(3) For the purposes of this section, "gender-affirming treatment" means a service or product that a health care provider, as defined in RCW 70.02.010, prescribes to an individual to support and affirm the individual's gender identity. Gender-affirming treatment includes, but is not limited to, treatment for gender dysphoria. Gender-affirming treatment can be prescribed to two spirit, transgender, nonbinary, and other gender diverse individuals.

(4) Nothing in this section may be construed to mandate coverage of a service that is not medically necessary.

(5) The authority shall adopt rules necessary to implement this section.  [2021 c 280 § 4.]

**Short title—2021 c 280:** See note following RCW 49.60.178.



# Be yourself

## Amazon transgender benefits

Amazon.Aetna.com





Your Aetna® medical plan covers medically necessary services for gender dysphoria. Coverage is based on the Standards of Care published by the World Professional Association for Transgender Health (WPATH).

This flyer can help you understand your benefits and how to use them. It also includes information on how to access doctors, hospitals and other services, and receive reimbursement for your treatment costs. Share this information with your doctors so they are aware of your coverage.

## Tips to get the most from your benefits

1. **Ask questions.** If you have any questions about transgender services, claims or the precertification process, call your Aetna Concierge at **1-866-574-9124 (TTY: 711)**. Or contact us through your member website at **Amazon.Aetna.com > Already a Member?**

2. **Know the steps.** Some services require recommendations from mental health professionals, which you will need to get before you contact a surgeon. See Eligibility to learn more.

3. **Stay in the network and save.** In-network sex reassignment surgery (SRS) providers can help you save on your share of the costs. You can ask your doctor to recommend an SRS provider. Use our provider search tool to confirm that the doctor and hospital are in the network. Or call your Aetna Concierge at **1-866-574-9124 (TTY: 711)** if you need help finding network SRS providers.

4. **Ask about costs if you go outside the network.** If you prefer to use an out-of-network SRS provider, ask about costs so you can estimate your share up front. You can also call your Aetna Concierge for help in getting cost information. Please do not sign any private payment forms, or we will not be able to help you with pricing. Even with our help, you may still pay more if you go outside the network.

5. **Get plan approvals when required.** Be sure to have Aetna precertify the services before you receive care. This is required whether you receive services in or outside the United States. Network doctors will precertify services for you. If you go outside the network, call the precertification number on your Aetna ID card to begin the process.

6. **Get to know WPATH at WPATH.org.** It's also a good idea to become familiar with WPATH medically necessary services before getting any planned services or procedures.

Policies and plans are insured and/or administered by Aetna Life Insurance Company or its affiliates (Aetna).

## Eligibility

Surgical gender reassignment services are considered medically necessary and are covered for employees, spouses/domestic partners and dependents enrolled in an Aetna® medical plan, as long as you meet the following criteria:

**For genital surgery:** Benefits are available if you are at least 18 years old and diagnosed as having gender identity disorder. You must also have:

• Two letters of recommendation or support for surgery, dated within the last six months, from two separate mental health professionals. At least one of these letters must include an extensive report. One master's degree-level professional is acceptable if the second letter is from a psychiatrist or PhD/PsyD clinical psychologist.

• The evaluations and recommendations must show persistent, well-documented gender identity disorder or gender dysphoria and indicate no medical contraindications to surgery.

• Each recommendation must state that the surgery is medically necessary according to the most current Standards of Care published by WPATH.

**For breast/chest surgery:** Benefits are available if you are at least 18 years old and diagnosed as having gender identity disorder. You must also have one letter of recommendation for surgery from a mental health professional.

**For surgical procedures other than genital and breast/chest surgery:** Benefits are available if you are at least 18 years old and diagnosed as having gender identity disorder. Also see precertification requirements on page 6.

For the transgender services benefit, a mental health professional is defined as any master's degree-level or above mental health practitioner.



## Covered services

All services must be medically necessary and follow plan requirements.

### Transgender medical treatment for children

The plan will cover non-surgical medical treatment (such as hormone therapy and mental health) for minors with gender dysphoria. Surgical interventions are considered when individuals reach age 18.

### Transgender surgical services

This benefit covers transgender surgical services, including facility and anesthesia charges related to the surgery. The following is a partial list of covered services. Review your plan documents for details.

| Specialized surgical procedures | | | |
|---|---|---|---|
| **Breast/chest** | | | |
| • Breast augmentation | • Mastectomy | • Nipple reconstruction | • Rib excision |
| **Genital** | | | |
| • Clitoroplasty | • Metaoidioplasty/ Metodioplasty | • Penectomy | • Vaginectomy |
| • Labiaplasty | • Orchiectomy | • Phalloplasty | • Vaginoplasty |
| | | • Scrotoplasty | • Vulvectomy |

| General surgical procedures | | | |
|---|---|---|---|
| • Blepharoplasty | • Hair removal | • Lip reduction | • Rhinoplasty |
| • Face lift | • Laryngoplasty | • Liposuction | • Tracheal shave |
| • Facial bone reduction | | | |

### Mental health services

Aetna® medical plans cover associated mental health visits the same as any other service under the medical plan.

### Hair removal and restoration services

Aetna medical plans cover hair removal and restoration services the same as any other service under the medical plan.

### Prescription drugs and hormone therapy

Coverage for estrogen patches, testosterone therapy and other prescription drugs associated with gender reassignment surgery is available under your Express Scripts prescription drug benefits. Visit **Express-Scripts.com/Amazon** or call **1-844-626-9387**.

## Non-covered services

Procedures that are not specifically listed in the current version of the WPATH Standards of Care document found on **WPATH.org** will be reviewed for medical necessity based on clinical information sent by your doctor for precertification.



## You will share in the costs

Here's what you will pay for transgender services:

| Shared Deductible Plan, Standard Plan and Health Savings Plan | |
| --- | --- |
| **In network** | **Out of network** |
| 10% after deductible | 30% of recognized or allowed charges, after deductible |

### Out-of-network doctors and hospitals usually cost more
That's because out-of-network doctors and hospitals set their own rates to charge you. Those rates may be higher — sometimes much higher — than what your Aetna® plan recognizes or allows. Your doctor may bill you for the dollar amount the plan doesn't recognize. You'll also pay a higher coinsurance percentage and a higher deductible than with network providers. No dollar amount above the recognized charge counts toward your deductible or out-of-pocket limits. This means you are fully responsible for paying everything above the amount the plan allows for a service or procedure.

## Going in network makes sense

- **Value:** The plan includes negotiated discounted rates. Plus, network doctors and hospitals won't bill you for costs above the plan's recognized or allowed amounts for covered services.
- **Confidence:** You get access to quality care from the Aetna network.
- **Simplicity:** Your network doctor takes care of the paperwork for you, such as getting plan approvals and submitting claims.

### How to look up network doctors
- **Use our online search tool**
  1. Log in at **Amazon.Aetna.com** > Already a Member? If this is your first visit, complete the one-time registration process to get your user name and password.
  2. From your member website home page, select Find Care & Pricing.
  3. Follow the prompts to complete your search. To find a surgeon experienced in SRS, type "gender identity" in the search box and then click on the Gender Reassignment Surgery Designated Surgeons link. Be sure to check that the facility where you're having the surgery (hospital, ambulatory/outpatient surgical center) is also in network.

- **Contact your Aetna Concierge for help**
  Call **1-866-574-9124 (TTY: 711)**.

## You may go outside the United States for services

The plan covers medically necessary services received outside the United States. Benefits are not provided for services, drugs or supplies that are unapproved or deemed experimental or investigational based on the terms of this plan, or medical standards in the United States.

You must receive services, supplies or drugs from a health care provider licensed by the appropriate jurisdiction, and performing services within the scope of their license and practice.

When submitting claims, clearly detail the services received, diagnosis (including standard medical procedure and diagnosis code, or English nomenclature), dates of service, and the names and credentials for the attending provider.



## Get plan approvals when required

The plan will cover certain transgender services, such as surgery, only if it has approved the service up front. This approval is called "precertification." Your plan documents list all the services that require this approval.

**Here's what we look for when reviewing a request**

First, we check to see that you are still a member and make sure the service is considered medically necessary. We also make sure the service and place requested to perform the service are a reasonable cost.

Our decisions are based entirely on appropriateness of care and service and the existence of coverage, using nationally recognized guidelines and resources. We may suggest a different treatment or place of service that is just as effective but costs less.

We also look to see if you qualify for one of our care management programs. If so, an Aetna® nurse may contact you.

Precertification does not verify if you have reached any plan dollar limits or visit maximums for the service requested. So, even if you get approval, it is not a guarantee of coverage.

**What you need for your precertification request**

For surgical procedures other than genital and breast/chest surgery:

- The surgical procedure(s) for which coverage is being requested
- The date the procedure will be performed
- Information that confirms services are recognized as medically necessary in the most current Standards of Care published by WPATH based on the surgery being requested
- Required letter(s) of recommendation from mental health professionals

| How to request precertification | |
| --- | --- |
| **In network** | Your network doctor or specialist will take care of this for you. Please give the required mental health professional letters to your doctor at the time of your consultation. |
| **Out of network** | If you go outside the network, you must request precertification yourself. Call your Aetna Concierge at **1-866-574-9124 (TTY: 711)** to get started. You will need to provide certain required information when you submit your request. |



## How to file a claim for payment

**In network:** Your network doctor or specialist will submit any claims for you. After we process the claim, we will send you an Explanation of Benefits (EOB) statement. Your doctor may also send you confirmation of our payment along with any outstanding amount due from you, such as your deductible.

**Out of network:** Out-of-network doctors are not obligated to submit a claim for you, so you may have to do so yourself. After we process the claim, we will send you an EOB statement. Your doctor may also send you confirmation of our payment along with any outstanding amount due from you, such as your deductible, your percent share of the costs, and the difference between the plan's allowed or recognized amount and the provider's actual charge.

If you need to submit the claim yourself, you can download a claim form from your member website:

1. Log in at **Amazon.Aetna.com** > Already a Member?
2. Click on Documents & Forms under your name at the top of the page to access the claim form.
3. Download, print and complete the form.

Or call your Aetna Concierge at **1-866-574-9124 (TTY: 711)**. The representative can mail you a claim form.

**We accept claim forms by mail, fax and email:**

• Mail: If there is no mailing address on the form itself, you can send it to us at the address shown on your Aetna® ID card.

• Fax: Use the fax number shown on the form.

• Email:

1. Scan the completed claim form and save to your computer.
2. Log in to your member website at **Amazon.Aetna.com** > Already a Member?
3. Click Help to begin an email.
4. Attach the claim form to the email.

## Mental health support

Resources For Living® is here to support your mental health. Whether you're looking to manage everyday life or overcome a major challenge, a care partner can guide you through your options and connect you to services that work for you. To connect with a care partner, call **1-833-721-2323 (TTY: 711)** or chat live at **ResourcesForLiving.com/Amazon**.

You and all members of your household have free, 24/7 access to:

• **Confidential counseling.** Three free phone, video or text therapy sessions per issue each year.

• **Self-paced support.** Sign up for myStrength™ (access code: Amazon) for tools to manage stress, anxiety, depression, relationships, parenting and more.

• **Online resources and access to financial and legal advice.** Find support for life changes and daily life challenges.



Need help? Call your 24/7 Aetna Concierge at
**1-866-574-9124 (TTY: 711)**.

Providers are independent contractors and are not agents of Aetna. Provider participation may change without notice. Health information programs provide general health information and are not a substitute for diagnosis or treatment by a health care professional. Refer to **Aetna.com** for more information about Aetna plans.

Amazon.Aetna.com



©2021 Aetna Inc.
CCG AMAZON-0080 (3/21)

# Microsoft Gender Affirming Benefit Information

## PREMERA BLUE CROSS ADMINISTERS THE GENDER AFFIRMING BENEFIT FOR ELIGIBLE MICROSOFT MEMBERS.

This benefit provides medically necessary coverage for gender dysphoria based on the *Standards of Care* published by the World Professional Association for Transgender Health (WPATH).

To help you understand this benefit and how to use it to manage your care, we're providing you with a description of the benefit's eligibility and coverage. We also include information on how to access providers and services and receive reimbursement for your treatment costs.

Make sure to bring this information to appointments with your providers so they are aware of your coverage.

### Tips for gender affirming benefit access

- **Understanding your benefits and coverage.** In addition to the benefit information presented here, review your **Summary Plan Description** to better understand your benefit coverage and eligibility requirements.

- **For assistance on finding a provider in your plan's network,** call Premera customer service at **800-676-1411 (TTY: 711).** and they will assist you in finding a provider in your plan's network. We encourage you to use a provider in your plan's network to help protect yourself against high, unexpected out-of-pocket costs while still receiving the highest level of coverage.

- **Using an out-of-network provider.** When using an out-of-network provider, be sure to advocate for yourself. Ask the provider for pricing and any estimated out-of-pocket costs up front. Do not sign private payment forms or Premera will not be able to assist you with pricing. Call Premera customer service if the provider will not provide you with pricing for services. We may be able to help you reduce your out-of-pocket costs when using an out-of-network provider.

- **Acquiring prior authorization for treatment.** Prior authorization is strongly recommended for some planned services and procedures before you get them. Most health care providers are familiar with this review process, so your provider should contact Premera on your behalf.

When consulting a surgeon for surgical services, provide your surgeon with copies of this tip sheet that provides a summary of the WPATH criteria below. If you plan to receive services outside of the United States, we strongly recommend that your provider request prior authorization from Premera.

It's also a good idea to become familiar with WPATH medically necessary services before getting any planned services and procedures.

- **Getting reimbursed and claims processing.** You or your provider will need to complete and submit claim forms to Premera. If you are using coordination of benefits (that's where you use another health plan as your primary coverage and your Microsoft plan as secondary coverage), you will need to provide either an explanation of benefits (EOB) statement or a denial from your primary health insurance company if they don't cover gender affirming services. This will allow Premera to process your claims as your secondary health plan.

To submit your own claims for the services received outside the United States, be sure to include your chart notes and operative reports. These should be submitted with your claim form and all the necessary requirements of the benefit.

## Description of the gender affirming benefit

This benefit covers medically necessary gender affirming surgical services, including facility and anesthesia charges related to the surgery. Coverage on prescription drugs and mental health treatment associated with gender affirming surgery is available under the Prescription Drugs and Mental Health benefits.

## Gender affirming surgical services

To view your **Summary Plan Description** for benefit coverage for the plan you are enrolled in, visit **aka.ms/benefits**.

## When services are covered

Surgical gender affirming services will be considered medically necessary and covered if you are diagnosed as having gender dysphoria or gender incongruence, and the following criteria are met:

### Surgery criteria for adults[1]:

- Gender incongruence is marked and sustained

- Meets diagnostic criteria for gender incongruence prior to gender affirming surgical intervention in regions where a diagnosis is necessary to access health care

- Demonstrates capacity to consent for the specific gender affirming surgical intervention

- Understands the effect of gender affirming surgical intervention on reproduction and they have explored reproductive options

- Other possible causes of apparent gender incongruence have been identified and excluded

- Mental health and physical conditions that could negatively impact the outcome of gender affirming surgical intervention have been assessed leading to a discussion about the risks and benefits of the surgical intervention

### Surgery criteria for Adolescents[1]:

- A comprehensive biopsychosocial assessment including relevant mental health and medical professionals

- Involvement of parent(s)/guardian(s) in the assessment process, unless their involvement is determined to be harmful to the adolescent or not feasible

- Gender incongruence is marked and sustained

- Meets diagnostic criteria for gender incongruence in situations where a diagnosis is necessary to access health care

- Demonstrates the emotional and cognitive maturity required to provide informed consent/assent for treatment

- Mental health concerns (if any) that may interfere with diagnostic clarity, capacity to consent, and gender affirming medical treatments have been addressed; sufficiently so that gender affirming medical treatment can be provided optimally

- Informed of the reproductive effects, including the potential loss of fertility and the available options to preserve fertility

- At least 12 months of gender affirming hormone therapy or longer, if required, to achieve the desired surgical result for gender affirming procedures, including breast augmentation, orchiectomy, vaginoplasty, hysterectomy, phalloplasty, metoidioplasty, and facial surgery as part of gender affirming treatment unless hormone therapy is either not desired or is not medically advised

[1]Criteria is listed on page S256 of the Standards of Care WPATH version 8 document.

## Prior authorization

Prior authorization, also referred to as a pre-service review, is strongly recommended for coverage to be made available for gender affirming surgical services. Either the member or the provider may contact Premera for prior authorization.

Prior authorization confirms that the treatment plan submitted by the treating provider is medically necessary for the condition based on national, evidence-based guidelines. Premera and Microsoft reserve the right to have appropriate medical professionals review current treatment at any time to determine if medical necessity criteria continue to be met.

**For gender affirming services, the prior authorization should include:**

- The surgical procedure(s) for which coverage is being requested

- The date the procedure will be performed

- Information supporting the criteria listed above has been met, based on the surgery being requested

Your physician can fax this information to **800-843-1114,** or mail it to:

**Premera Blue Cross**
**Attn: Integrated Health Management**
**PO Box 91059**
**Seattle, WA 98111-9159**

> A prior authorization is an advance determination by Premera that the service is medically necessary and that the member's plan has benefits available for the service being requested. This determination gives claimants an opportunity to submit medical records in advance. This can help establish medical necessity and determine the member's potential financial responsibility, before the service is provided. Services are subject to eligibility and benefits at the time of service.

## Eligible services

Examples of covered gender affirming surgical services include, but are not limited to the following:

| Chest/Breast | Genital | | Other | |
|---|---|---|---|---|
| Breast augmentation | Clitoroplasty | Phalloplasty | Blepharoplasty | Lip reduction |
| Mastectomy | Hysterectomy | Scrotoplasty | Chin augmentation | Liposuction |
| Nipple reconstruction | Labiaplasty | Vaginectomy | Face lift | Rhinoplasty |
| Rib excision | Metodioplasty/ | Vaginoplasty | Facial bone reduction | Tracheal shave |
| | Metaoidioplasty | Vulvectomy | Hair removal | |
| | Penectomy | | Laryngoplasty | |

Additional surgical services would be considered through prior authorization review using the most current *Standards of Care* by WPATH.

## Eligible providers

To receive the highest benefit, it is recommended that you use a provider in your plan's network. Search your plan's providers by visiting **aka.ms/benefits**, or by calling Premera customer service at **800-676-1411 (TTY: 711).**

**Note:** This is only intended to serve as a guide and is not a guarantee for payment or coverage; refer to the **Summary Plan Description** for benefit and coverage information.

# Commonly asked questions

### Which providers are in my plan's network? How do I find out if a provider is in my plan's network?

Call Premera customer service at **800-676-1411 (TTY: 711)** to request a list of approved Premera in-network providers. If you already found a provider, visit **aka.ms/benefits** to confirm the provider is contracted.

Many providers are out of network. In those cases, the medical plan would pay at the out-of-network benefit level. Out-of-network providers may require up-front payment for their services. Premera may be able to work with the provider on a Letter of Agreement, stating the intent to pay for the services up to the benefit limit covered under the prior authorization.

Premera recommends knowing the requirements of the benefit when seeking surgical services. Take copies of the benefit language and this tip sheet when you see the surgeon so that he or she can submit them with the clinical information.

### Is gender affirming medical treatment for children covered?

Yes. The plan will cover non-surgical medical treatment (such as hormone therapy and mental health treatment) for minors with gender dysphoria or gender incongruence. Surgical interventions are considered when appropriate as outlined per WPATH.

### Are the mental health visits covered by the plan?

Yes. The plan covers any of the associated mental health visits the same as any other service under the benefits of the medical plan. When seeing an out-of-network provider, you are also responsible for the difference between the amount the plan pays and the billed charges.

### What procedures are specifically excluded under this benefit?

Procedures requested that are not specifically listed in the current version of WPATH will be reviewed for medical necessity based on clinical information sent by your provider for prior authorization.

### Are estrogen patches covered for hormone replacement therapy?

Yes. This benefit will be covered under the Prescription Drugs benefit.

### Will hair removal be covered for male to female transition?

Yes. See your **Summary Plan Description** at **aka.ms/benefits** for plan-specific coverage information. When seeing an out-of-network provider, you are also responsible for the difference between the amount the plan pays and the billed charges.

### Will testosterone replacement be covered?

Yes. See your **Summary Plan Description** at **aka.ms/benefits** for plan-specific coverage information. When seeing an out-of-network provider, you are also responsible for the difference between the amount the plan pays and the billed charges.

# Resources

**Submit claims form to:**

Premera Blue Cross
PO Box 91059
Seattle, WA 98111-9159
Fax: 425-918-5231
claims.microsoft@premera.com

**Submit prior authorization physician forms to:**

Premera Blue Cross
Attn: Integrated Health Management
PO Box 91059
Seattle, WA 98111-9159
Fax: 800-843-1114

**Premera customer service:**

microsoft@premera.com
800-676-1411 (TTY: 711)
Fax: 800-676-1477

**Microsoft resources:**

Microsoft GLEAM Sharepoint
http://www.microsoft.com/en-us/diversity/default.aspx

**World Professional Association for Transgender Health (WPATH):**

https://www.wpath.org/

This guide provides highlights of Microsoft's benefit plans. For full information on your benefits, including any limitations that may apply to you, please see the official Summary Plan Description. Microsoft reserves the right to change or terminate the benefits described in this guide at any time.



031800 (02-02-2022)



## Discrimination is Against the Law

Premera Blue Cross (Premera) complies with applicable Federal and Washington state civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation. Premera does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, gender identity, or sexual orientation. Premera provides free aids and services to people with disabilities to communicate effectively with us, such as qualified sign language interpreters and written information in other formats (large print, audio, accessible electronic formats, other formats). Premera provides free language services to people whose primary language is not English, such as qualified interpreters and information written in other languages. If you need these services, contact the Civil Rights Coordinator. If you believe that Premera has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation, you can file a grievance with: **Civil Rights Coordinator — Complaints and Appeals**, PO Box 91102, Seattle, WA 98111, Toll free: 855-332-4535, Fax: 425-918-5592, TTY: 711, Email AppealsDepartmentInquiries@Premera.com. You can file a grievance in person or by mail, fax, or email. If you need help filing a grievance, the Civil Rights Coordinator is available to help you. You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf, or by mail or phone at: U.S. Department of Health and Human Services, 200 Independence Ave SW, Room 509F, HHH Building, Washington, D.C. 20201, 1-800-368-1019, 800-537-7697 (TDD). Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html. You can also file a civil rights complaint with the Washington State Office of the Insurance Commissioner, electronically through the Office of the Insurance Commissioner Complaint Portal available at https://www.insurance.wa.gov/file-complaint-or-check-your-complaint-status, or by phone at 800-562-6900, 360-586-0241 (TDD). Complaint forms are available at https://fortress.wa.gov/oic/onlineservices/cc/pub/complaintinformation.aspx.

## Language Assistance

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 800-722-1471 (TTY: 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 800-722-1471（TTY：711）。

CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 800-722-1471 (TTY: 711).

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 800-722-1471 (TTY: 711) 번으로 전화해 주십시오.

ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 800-722-1471 (телетайп: 711).

PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 800-722-1471 (TTY: 711).

УВАГА! Якщо ви розмовляєте українською мовою, ви можете звернутися до безкоштовної служби мовної підтримки. Телефонуйте за номером 800-722-1471 (телетайп: 711).

ប្រយ័ត្ន៖ បើសិនជាអ្នកនិយាយ ភាសាខ្មែរ, សេវាជំនួយផ្នែកភាសា ដោយមិនគិតឈ្នួល គឺអាចមានសំរាប់បំរើអ្នក។ ចូរ ទូរស័ព្ទ 800-722-1471 (TTY: 711)។

注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。800-722-1471（TTY:711）まで、お電話にてご連絡ください。

ማስታወሻ: የሚናገሩት ቋንቋ ኣማርኛ ከሆነ የትርጉም እርዳታ ድርጅቶች፣ በነጻ ሊያግዝዎት ተዘጋጀተዋል፡ ወደ ሚከተለው ቁጥር ይደውሉ 800-722-1471 (መስማት ለተሳናቸው: 711).

XIYYEEFFANNAA: Afaan dubbattu Oroomiffa, tajaajila gargaarsa afaanii, kanfaltiidhaan ala, ni argama. Bilbilaa 800-722-1471 (TTY: 711).

ملحوظة: إذا كنت تتحدث اذكر اللغة، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان.  اتصل برقم 800-722-1471 (رقم هاتف الصم والبكم: 711).

ਧਿਆਨ ਦਿਓ: ਜੇ ਤੁਸੀਂ ਪੰਜਾਬੀ ਬੋਲਦੇ ਹੋ, ਤਾਂ ਭਾਸ਼ਾ ਵਿੱਚ ਸਹਾਇਤਾ ਸੇਵਾ ਤੁਹਾਡੇ ਲਈ ਮੁਫਤ ਉਪਲਬਧ ਹੈ। 800-722-1471 (TTY: 711) 'ਤੇ ਕਾਲ ਕਰੋ।

ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 800-722-1471 (TTY: 711).

ໂປດຊາບ: ຖ້າວ່າ ທ່ານເວົ້າພາສາ ລາວ, ການບໍລິການຊ່ວຍເຫຼືອດ້ານພາສາ, ໂດຍບໍ່ເສັງຄ່າ, ແມ່ນມີພ້ອມໃຫ້ທ່ານ. ໂທຣ 800-722-1471 (TTY: 711).

ATANSYON: Si w pale Kreyòl Ayisyen, gen sèvis èd pou lang ki disponib gratis pou ou. Rele 800-722-1471 (TTY: 711).

ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 800-722-1471 (ATS : 711).

UWAGA: Jeżeli mówisz po polsku, możesz skorzystać z bezpłatnej pomocy językowej. Zadzwoń pod numer 800-722-1471 (TTY: 711).

ATENÇÃO: Se fala português, encontram-se disponíveis serviços linguísticos, grátis. Ligue para 800-722-1471 (TTY: 711).

ATTENZIONE: In caso la lingua parlata sia l'italiano, sono disponibili servizi di assistenza linguistica gratuiti. Chiamare il numero 800-722-1471 (TTY: 711).

توجه: اگر به زبان فارسی گفتگو می کنید، تسهیلات زبانی بصورت رایگان برای شما فراهم می باشد. با (711 :TTY) 800-722-1471 تماس بگیرید.

    An independent licensee of the Blue Cross Blue Shield Association

# T-Mobile Gender-Affirming Benefit information

## PREMERA BLUE CROSS ADMINISTERS THE GENDER-AFFIRMING BENEFIT FOR ELIGIBLE T-MOBILE MEMBERS.

This benefit provides medically necessary coverage for gender affirmation only when certain criteria are met. This document provides you with a general description of benefit eligibility and coverage. We also include information on how to access doctors and services, and how to receive reimbursement for your treatment cost.

The criteria are outlined in Premera's Gender Transition/ Affirmation Surgery medical policy available on **premera.com/t-mobile**

Gender-Affirming benefits may change based on the most current clinical guidelines.

**We're here to help!** If you have any questions about gender-affirming services, claims, or the pre-approval process, call Premera customer service at **866-358-2300.**

Make sure to bring this information to appointments with your providers so they are aware of your coverage.



059641 (05-16-2023)

## Description of the gender-affirming benefit

This benefit covers medically necessary gender-affirming surgical services, including facility and anesthesia charges related to the surgery. Coverage for mental health treatment associated with gender reassignment surgery is also available. Prescription drugs are available through your prescription drug plan with CVS Caremark.

### Health Reimbursement Account (HRA) Plan

- In network: The plan pays 80% once you meet your deductible.
  - $35 copayment for primary care provider (PCP) office visits and mental health visits
  - $50 copayment for specialist office visits
- Out of network: Once you meet the deductible, the plan pays 60% of allowable charges.*

### Exclusive Provider Organization (EPO)

- In network: The plan pays 80% once you meet your deductible.
  - $20 copayment for primary care provider (PCP) office visits and mental health visits
  - $30 copayment for specialist office visits
- Out of network: There is no out-of-network coverage on the EPO plan except for hair removal. Out-of-network hair removal services are covered at the in-network benefit level. For all other out-of-network services, you will be responsible for 100% of the cost.

### Health Savings Account (HSA) Plan

- In network: The plan pays 80% once you meet your deductible.
- Out of network: Once you meet the deductible, the plan pays 60% of allowable charges.*

### Who is eligible?

- Surgical gender reassignment services are considered medically necessary and are covered for employees, spouses/domestic partners, and dependents enrolled in a Premera medical plan if they meet the criteria for the procedure outlined in the Gender Transition/Affirmation Surgery medical policy.

**Mental health professional:**

A mental health professional is a psychiatrist, PhD/PsyD clinical psychologist, or a master's level mental health clinician who is licensed by the state in which they provide services.

**The required minimum content of the mental health evaluation and recommendation is as follows:**

- Confirmation of the diagnosis of gender dysphoria or gender identity disorder
- Recommendation or support for surgery and the rationale for the recommendation
- Confirmation of the member's capacity to make a fully informed decision and to consent to treatment
- Verification that the decision is current, well thought out, not impulsive, and not due to any other treatable mental disorder. Refer to the medical policy for the complete requirements.

**Note:**

- The mental health evaluation and recommendation letters are required at the beginning of the gender reassignment surgical process. If the surgery is not performed within six months, then a new mental health evaluation and recommendation letter will be required.
- Also, if the first surgical procedure is not genital surgery, then a second mental health evaluation and recommendation letter is required prior to genital surgery. Otherwise, additional mental health evaluation and recommendation letters are not required for all subsequent gender affirming surgeries that are done within two years of when the first surgery is approved.

*You may be billed for costs exceeding the allowable charges when using an out-of- network provider. Any amounts you pay for services in excess of allowable charges will not count toward satisfying any deductible requirements or out-of-pocket maximums on this plan.

# Covered procedures

___

**Examples of covered services include, but are not limited to, the following when medical necessity and plan requirements are met. A pre-approval is recommended for a majority of the procedures. Letters of recommendation from mental health professionals as noted on page two are required for procedures including but not limited to:**

### Breast/Chest

Mastectomy

Nipple reconstruction

Breast augmentation

Rib excision

### Genital

Scrotoplasty

Penectomy

Vulvectomy

Orchiectomy

Vaginectomy

Clitoroplasty

Labiaplasty

Phalloplasty

Vaginoplasty

Metoidioplasty

### General surgical procedures

Chin augmentation

Laryngoplasty

Liposuction

Tracheal shave

Hair removal

Facial bone reduction

Rhinoplasty

Face lift

Lip reduction

Blepharoplasty

Additional surgical services may be considered for pre-approval, using the most current Gender Transition/ Affirmation Surgery medical policy and chart notes from your provider.

## Pre-approval (prior authorization) process

It is strongly recommended that your provider submits a pre-approval request to Premera to find out if your plan will cover your surgery. A pre-approval is recommended to determine whether benefits are available before the service occurs.

A pre-approval confirms that the treatment plan submitted by the treating provider is medically necessary for the condition based on the criteria outlined in the Gender Transition/Affirmation Surgery medical policy. Premera and T-Mobile reserve the right to have appropriate medical professionals review current treatment at any time to determine if medical necessity criteria continue to be met.

These reviews take up to 15 days to be completed. The pre-approval should be submitted by the physician who is performing the service(s).

## When services are covered

Surgical gender reassignment services for breast/chest ("top") and genital ("bottom") surgery, will be considered medically necessary and covered if you are diagnosed as having gender dysphoria, are 18 years of age or older, and the following criteria are met:

> A pre-approval is an advance determination by Premera that the service is medically necessary and that the member's plan has benefits available for the service being requested. This determination is offered in certain situations where medical records must be provided to establish medical necessity before the plan will pay for the service. Services are subject to eligibility and benefits at the time of service.

### For genital surgery:

- Provide at least one pre-surgery evaluation by the surgeon (in-person or virtual) with no documentation of any medical contraindications to surgery within the last six months.

- Two separate pre-surgery letters of recommendation from two different licensed mental health professionals, based on either evaluations within the last six months or psychotherapy or mental health treatment within the last six months.

- Each recommendation must state that the surgery is medically necessary according to the most current Premera medical policy.

### For other procedures:

- The surgery is medically necessary according to the most current Premera medical policy.

> Your provider can submit prior authorization online through Availity or fax to 800-843-1114.

### Female-to-male breast/chest surgery:

- Provide at least one pre-surgery evaluation by the surgeon (in-person or virtual) with no documentation of any medical contraindications to surgery within the last six months.

- One letter of recommendation from a licensed mental health professional based on either a pre-surgery evaluation conducted within the last six months, or pre-surgery psychotherapy or mental health treatment within the last six months.

### Male-to-female breast/chest surgery:

- The same criteria apply as above. In addition, the below criteria would need to be met.

- Documentation of failure of breast growth stimulation or progression after 12 continuous months of feminizing hormone therapy, or documentation of serious or intolerable adverse effects during feminizing hormone administration, or medical contraindication to use of feminizing hormone therapy, or documentation of risk-benefit analyses determined that surgery is preferable to feminizing hormone therapy.

# In-network vs. out-of-network providers

—

**Use in-network providers when possible to maximize your benefits.**

### In network

We encourage you to use an in-network provider to help protect yourself against high, unexpected, out-of-pocket costs while receiving the highest level of coverage.

Premera network providers can be found online at **premera.com/t-mobile** using the Find a Doctor tool. Or you can call Premera customer service at **866-358-2300** for help. If you have already found a provider, visit **premera.com/t-mobile** to confirm the provider is in network. Remember, you have access to the entire Blue Cross Blue Shield national network of providers.

### Out of network

Many gender reassignment surgery doctors are out of network. In those cases, the medical plan would pay at the out-of-network benefit level up to the allowable amount. When you use an out-of-network provider, you may be responsible for the difference between the allowed charge and the provider's billed amount—this is referred to as balance billing.

Out-of-network providers may require up-front payment for their services. Premera may be able to work with the provider on a Letter of Agreement. A Letter of Agreement will state the intent to pay for the mutually agreed upon charges covered under the pre-approval.

When using an out-of-network provider, be sure to advocate for yourself. Ask the provider for pricing and any estimated out-of-pocket costs up front. Do not sign private payment forms or else Premera will not be able to assist you with pricing. Call Premera customer service if the provider will not provide you with pricing for services. We may be able to help you reduce your out-of-pocket costs when using an out-of-network provider.

Premera recommends knowing the requirements of the benefit when seeking surgical services. Take copies of the benefit language and required letters from the mental health professionals when you see the surgeon so that they can submit them with the clinical information.

# Claims processing and reimbursement

You or your provider will need to complete and submit claim forms to Premera. Claims are processed differently if you are using coordination of benefits (that's where you use another health plan as your primary coverage and want to use your T- Mobile plan as your secondary coverage). You will need to provide either an explanation of benefits (EOB) statement or a denial from your primary health insurance company if they don't cover gender-affirming services. This will allow Premera to process your claims as your secondary health plan.

To submit your own claims for services received by an out- of- network provider, be sure to include your chart notes and operative reports with your claim form, as well as all the necessary requirements of the benefit including mental health letters.



**Submit claims securely on premera.com/t-mobile:**
Sign in to your account on **premera.com/t-mobile**

**Select Secure Inbox**
Complete  he requested information and submit.

**Or, complete a <u>claim reimbursement form</u>**
and mail it to:
Premera Blue Cross
PO Box 91059
Seattle, WA 98111-9159

# Commonly asked questions

—

**What procedures are excluded under this benefit?**

Requests for procedures that are not specifically listed in the current version of the Gender Transition/Affirmation Surgery medical policy will be reviewed for medical necessity based on clinical information sent by your provider during the pre-approval process.

**Does my plan cover gender-affirming treatment for children?**

Yes, the plan will cover non-surgical medical treatment, such as mental health care, for minors seeking gender affirming services. Surgical interventions are considered when individuals reach age 18.

**Is hormone therapy covered?**

Yes, some hormone therapy is covered subject to the plan's pharmacy benefit administered by CVS Caremark. Please contact CVS for therapy-specific coverage information.

The Premera medical necessity criteria will be applied to two types of hormones that are administered in a provider's office:

- Gonadotropin releasing hormone analogs, which are used to suppress puberty in adolescents
- Testosterone formulations other than gels

Please review the medical policy for the complete criteria.

**What does Premera consider to be a mental health professional?**

For the gender-affirming services benefit, a mental health professional is defined as any mental health practitioner with a master's degree or higher level of education. Evaluations and recommendations must be performed by professionals who are licensed by the state in which they provide services as master's level mental health clinicians, doctoral level mental health clinicians, psychiatric nurse practitioners, or physicians (in which case they must also be board-eligible or board-certified in psychiatry).

**Are the mental health visits covered by the plan?**

Yes, the plan covers any of the associated mental health visits. Please refer to page two of this document for Mental Health visit cost share information for the plan you are enrolled in.

CVS Caremark is an independent provider of pharmacy benefits that does not provide Blue Cross Blue Shield products or services. CVS Caremark is solely responsible for their products and services.

This document represents a summary of the T-Mobile gender-affirming benefit. It is not intended to provide a complete description. For full information on your benefits, including any limitations that may apply, please see the official Summary Plan Description (SPD).

Although every effort has been made to ensure information in this document is accurate, the provisions of the official SPD will govern in case of any discrepancy.



## Discrimination is Against the Law

Premera Blue Cross (Premera) complies with applicable Federal and Washington state civil rights laws and does not discriminate on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation. Premera does not exclude people or treat them differently because of race, color, national origin, age, disability, sex, gender identity, or sexual orientation. Premera provides free aids and services to people with disabilities to communicate effectively with us, such as qualified sign language interpreters and written information in other formats (large print, audio, accessible electronic formats, other formats). Premera provides free language services to people whose primary language is not English, such as qualified interpreters and information written in other languages. If you need these services, contact the Civil Rights Coordinator. If you believe that Premera has failed to provide these services or discriminated in another way on the basis of race, color, national origin, age, disability, sex, gender identity, or sexual orientation, you can file a grievance with:

**Civil Rights Coordinator — Complaints and Appeals**, PO Box 91102, Seattle, WA 98111, Toll free: 855-332-4535, Fax: 425-918-5592, TTY: 711, Email AppealsDepartmentInquiries@Premera.com. You can file a grievance in person or by mail, fax, or email. If you need help filing a grievance, the Civil Rights Coordinator is available to help you. You can also file a civil rights complaint with the U.S. Department of Health and Human Services, Office for Civil Rights, electronically through the Office for Civil Rights Complaint Portal, available at https://ocrportal.hhs.gov/ocr/portal/lobby.jsf, or by mail or phone at: U.S. Department of Health and Human Services, 200 Independence Ave SW, Room 509F, HHH Building, Washington, D.C. 20201, 1-800-368-1019, 800-537-7697 (TDD). Complaint forms are available at http://www.hhs.gov/ocr/office/file/index.html. You can also file a civil rights complaint with the Washington State Office of the Insurance Commissioner, electronically through the Office of the Insurance Commissioner Complaint Portal available at https://www.insurance.wa.gov/file-complaint-or-check-your-complaint-status, or by phone at 800-562-6900, 360-586-0241 (TDD). Complaint forms are available at https://fortress.wa.gov/oic/onlineservices/cc/pub/complaintinformation.aspx.

## Language Assistance

ATENCIÓN: si habla español, tiene a su disposición servicios gratuitos de asistencia lingüística. Llame al 800-722-1471 (TTY: 711).

注意：如果您使用繁體中文，您可以免費獲得語言援助服務。請致電 800-722-1471（TTY：711）。

CHÚ Ý: Nếu bạn nói Tiếng Việt, có các dịch vụ hỗ trợ ngôn ngữ miễn phí dành cho bạn. Gọi số 800-722-1471 (TTY: 711).

주의: 한국어를 사용하시는 경우, 언어 지원 서비스를 무료로 이용하실 수 있습니다. 800-722-1471 (TTY: 711) 번으로 전화해 주십시오.

ВНИМАНИЕ: Если вы говорите на русском языке, то вам доступны бесплатные услуги перевода. Звоните 800-722-1471 (телетайп: 711).

PAUNAWA: Kung nagsasalita ka ng Tagalog, maaari kang gumamit ng mga serbisyo ng tulong sa wika nang walang bayad. Tumawag sa 800-722-1471 (TTY: 711).

УВАГА! Якщо ви розмовляєте українською мовою, ви можете звернутися до безкоштовної служби мовної підтримки.
Телефонуйте за номером 800-722-1471 (телетайп: 711).

ប្រយ័ត្ន៖ បើសិនជាអ្នកនិយាយ ភាសាខ្មែរ, សេវាជំនួយផ្នែកភាសា ដោយមិនគិតឈ្នួល គឺអាចមានសំរាប់បំរើអ្នក។ ចូរ ទូរស័ព្ទ 800-722-1471 (TTY: 711)។

注意事項：日本語を話される場合、無料の言語支援をご利用いただけます。800-722-1471（TTY:711）まで、お電話にてご連絡ください。

ማስታወሻ: የሚናገሩት ቋንቋ ኣማርኛ ከሆነ የትርጉም እርዳታ ድርጅቶች፣ በነጻ ሊያግዝዎት ተዘጋጀተዋል፡ ወደ ሚከተለው ቁጥር ይደውሉ 800-722-1471 (መስማት ለተሳናቸው: 711).

XIYYEEFFANNAA: Afaan dubbattu Oroomiffa, tajaajila gargaarsa afaanii, kanfaltiidhaan ala, ni argama. Bilbilaa 800-722-1471 (TTY: 711).

ملحوظة: إذا كنت تتحدث اذكر اللغة، فإن خدمات المساعدة اللغوية تتوافر لك بالمجان. اتصل برقم 1471-722-800 (رقم هاتف الصم والبكم: 711).

ਧਿਆਨ ਦਿਓ: ਜੇ ਤੁਸੀਂ ਪੰਜਾਬੀ ਬੋਲਦੇ ਹੋ, ਤਾਂ ਭਾਸ਼ਾ ਵਿੱਚ ਸਹਾਇਤਾ ਸੇਵਾ ਤੁਹਾਡੇ ਲਈ ਮੁਫਤ ਉਪਲਬਧ ਹੈ। 800-722-1471 (TTY: 711) 'ਤੇ ਕਾਲ ਕਰੋ।

ACHTUNG: Wenn Sie Deutsch sprechen, stehen Ihnen kostenlos sprachliche Hilfsdienstleistungen zur Verfügung. Rufnummer: 800-722-1471 (TTY: 711).

ໂປດຊາບ: ຖ້າວ່າ ທ່ານເວົ້າພາສາ ລາວ, ການບໍລິການຊ່ວຍເຫຼືອດ້ານພາສາ, ໂດຍບໍ່ເສັ້ງຄ່າ, ແມ່ນມີພ້ອມໃຫ້ທ່ານ. ໂທຣ 800-722-1471 (TTY: 711).

ATANSYON: Si w pale Kreyòl Ayisyen, gen sèvis èd pou lang ki disponib gratis pou ou. Rele 800-722-1471 (TTY: 711).

ATTENTION : Si vous parlez français, des services d'aide linguistique vous sont proposés gratuitement. Appelez le 800-722-1471 (ATS : 711).

UWAGA: Jeżeli mówisz po polsku, możesz skorzystać z bezpłatnej pomocy językowej. Zadzwoń pod numer 800-722-1471 (TTY: 711).

ATENÇÃO: Se fala português, encontram-se disponíveis serviços linguísticos, grátis. Ligue para 800-722-1471 (TTY: 711).

ATTENZIONE: In caso la lingua parlata sia l'italiano, sono disponibili servizi di assistenza linguistica gratuiti. Chiamare il numero 800-722-1471 (TTY: 711).

توجه: اگر به زبان فارسی گفتگو می کنید، تسهیلات زبانی بصورت رایگان برای شما فراهم می باشد. با (711 :TTY) 1471-722-800 تماس بگیرید.

An independent licensee of the Blue Cross Blue Shield Association

## ✦ EMPLOYER SEARCH

# Results for "MultiCare"

**Edit Search**

SORT BY

**A-Z**    Z-A

*Your search returned 9 results*



*Equality Leader*

## MultiCare Allenmore Hospital

Tacoma, WA

✓ Non-Discrimination in Employment          ✓ Transgender Inclusive Healthcare Benefits

✓ Employee Benefits & Policies

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

**Accept**

More Information



*Equality Leader*

## Multicare Auburn Medical Center

Auburn, WA

- Non-Discrimination in Employment
- Transgender Inclusive Healthcare Benefits
- Employee Benefits & Policies

Healthcare Provider

*View detail* →



*Equality Leader*

## MultiCare Covington Medical Center

Covington, WA

- Non-Discrimination in Employment
- Transgender Inclusive Healthcare Benefits
- Employee Benefits & Policies

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information



Spokane, WA

✓ Non-Discrimination in Employment        ✓ Transgender Inclusive Healthcare Benefits

◐ Employee Benefits & Policies

Healthcare Provider

*View detail* →



*Equality Leader*

## MultiCare Good Samaritan Hospital

Puyallup, WA

✓ Non-Discrimination in Employment        ✓ Transgender Inclusive Healthcare Benefits

✓ Employee Benefits & Policies

Healthcare Provider

*View detail* →

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information



✔ Employee Benefits & Policies

Healthcare Provider

View detail →



*Equality Leader*

## MultiCare Tacoma General Hospital

Tacoma, WA

✔ Non-Discrimination in Employment        ✔ Transgender Inclusive Healthcare Benefits

✔ Employee Benefits & Policies

Healthcare Provider

View detail →

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information



**Healthcare Provider**

*View detail* →

---

## MultiCare Yakima Memorial Hospital

Yakima, WA

⭕ Non-Discrimination in Employment          ❓ Transgender Inclusive Healthcare Benefits

❓ Employee Benefits & Policies



**Healthcare Provider**

*View detail* →

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information

**Human Rights Campaign Foundation Overview**

**Debunking the Myths: Transgender Health and Well-Being**

**Standards for Credit on the MEI**

# Love conquers hate.

**Donate Today**

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information

100% of every HRC merchandise purchase fuels the fight for equality.

**Shop Now**

## Cookies in use

The Human Rights Campaign uses cookies to improve your site experience. By using this site, you agree to our use of cookies. To learn more, please read our Privacy Policy.

More Information

 MultiCare Vitals

Topics ▼          Enter search term...          Search          MultiCare.org ⧉

# LGBTQ+ health equity should be the rule, not the exception

June 21, 2023 | By Samantha Malott



The LGBTQ+ community has long faced a variety of health disparities, rooted in discrimination based on their gender identity and sexual orientation. But there are steps we can take to ensure equitable, compassionate care for all.

---

🔖 **At a glance**

- Unique disparities include discrimination, physical and mental health conditions, poverty and reproductive health challenges
- Health care systems should engage in diversity, equity and inclusion work to combat biases
- Growing access to affirming providers and care spaces is key to reducing LGBTQ+ health disparities

---

Over the past few years, the COVID-19 pandemic and social justice movements across the nation have highlighted an important fact — not everyone has the same chance to be healthy. Longstanding biases and barriers embedded in the health care system, and our society, can prevent people from accessing the care they need.

At MultiCare, we are committed to working toward health equity — ensuring all people have access to quality health care regardless of age, race, ethnicity, gender identity, religion, sexual orientation, ability, socioeconomic status or location.

In this series, we take a deeper look at the disparities that impact our patients and how we as health care providers and community members can reduce those disparities and improve the health and well-being of all.

## Maternity care for bisexual women of color

Bisexual women and women of color have long experienced challenges in maternal and perinatal health care.

From bi negativity and bisexual erasure to racial stereotypes and adverse health outcomes, this is a reality Deana Williams, (she/her), PhD, MPH, has found in her work as a research investigator at the <u>MultiCare Institute for Research and Innovation</u>.

What she doesn't know, though, is what bisexual women of color experience when seeking and accessing this type of care. And that's largely because the research community isn't doing enough to accurately represent them.

"In current research, bisexual women of color are vastly underrepresented and often aggregated with other sexual minority women," Williams says. "Women of color who are bisexual are experiencing disparities at even greater levels than their white queer counterparts."

Dr. Williams is leading a study funded by the National Institutes of Health to capture the voices and lived experiences of these patients. She hopes to spark changes that will result in affirming, culturally conscious care for all birthing people.

## Health care disparities come in many forms

This case study is just one example of the health disparities faced by the LGBTQ+ community. Discrimination based on gender identity and sexual orientation — especially when coupled with race, age and socio-economic status — can play a significant role in equitable access to care.

For example, LGBTQ+ adolescents are more likely to experience bullying, and without access to affirming and culturally competent intervention and treatment, the risk of suicide increases, according to the U.S. Department of Health and Human Services.

<u>The Trevor Project</u>    reports LGBTQ+ youth are more than four times likely to attempt suicide than their peers.

"Queer people don't genetically have predispositions that lead to things like substance abuse or suicidality," says Joseph Angel, MD, (he/him), a family medicine/obstetrics and LGBTQ+ care provider at MultiCare Tacoma Family Medicine. "It stems from society and the unwelcoming spaces."

Sometimes these health disparities come from simpler things, such as patient forms with only two gender options, a receptionist refusing to use a chosen name, or a health care provider making assumptions about a patient's sexual health.

Other times, disparities are based on decades-long systemic issues that have been ingrained in health care education and operations.

> "We are skin before we are gender, and skin changes so much over a lifetime. If that's always shifting, we should have the ability to shift in other ways."

LGBTQ+ health care has long been dictated by gay white men and focused on sexual health. Although it's a necessary group to care for, others have been left out, Dr. Angel explains.

Women who have sex with women, for example, have higher rates of reproductive cancer, he says. They're more likely to miss cancer screenings and less likely to be pregnant and/or breastfeed, which is thought to provide beneficial hormones that reduce the risk of many cancers.

Gay men also have higher rates of HPV-related cancers, which they don't typically get screened for, Dr. Angel adds.

Many of these challenges come from a lack of LGBTQ+ competency, says Esteban Herevia (he/him), former <u>Spokane Pride</u>   president/CEO. Doctors and other health care providers have good intentions, but may not understand the impact enough.

An organization could update its intake process to gather sexual orientation, gender identity and pronoun (SOGI-P) information but may not do so in a respectful manner, such as asking in front of others in the waiting room. It's not meant to be intrusive, but it doesn't create a respectful space, Herevia says.

## Unique issues for older LGBTQ+ adults and youth

Health disparities are a longstanding issue for the LGBTQ+ community.

As a group, older LGBTQ+ patients experience unique economic and health disparities, including poverty and physical and mental health conditions from a lifetime of stressors. They're less open with providers about their sexual and gender identity because they feel unsafe, and are more likely to live in isolation, according to the American Psychological Association.

Queer youth face mental health challenges not only from discrimination and societal pressure — but also the struggle to receive affirming and appropriate care due to a lack of transportation, financial resources or parental support.

"In general, there are misconceptions that queer youth are confused," says Daniel Ensley (he/him), development and partnerships specialist at <u>Oasis Youth Center</u>   in Tacoma.

It's easy for people to focus on struggles like suicidal ideation, substance use and sexual assault, he explains.

"It's extremely sexualized because when people think about those who are not straight, for some reason all they can focus on is that single difference and kind of forget we are whole people," Ensley says. "[Sex education] is not talking about

consent, boundaries and communication enough, so when youth are put in situations because of discrimination, stigma and lack of support, they're at risk for victimization."

## Room for improvement in LGBTQ+ care

Health care organizations should be engaging in diversity, equity and inclusion (DEI) work, says Dr. Angel. On a social level, we should all work to break down our biases. But providers often want to believe they have no biases without putting in the work, he adds.

"It's really the responsibility of the provider to educate themselves on the disparities that exist in different populations," he says. "Sometimes they expect their patients to do that for them, but that's not their role."

The LGBTQ+ community has made great strides in equality over the past few decades, so it's easy for people to assume the work is done, Dr. Angel says. With that mindset, patients can struggle to find affirming, reliable providers. Plus, many LGBTQ+ individuals distrust health care spaces and hesitate to seek care because of negative experiences they'd had.

During Herevia's time with Spokane Pride, he was brought into the Washington State University College of Medicine to lead a competency course with second-year medical students and faculty. The most productive conversation that day came out of a disagreement.

People mistakenly think LGBTQ+ health care providers are trying to change a person's genetic makeup, he explains. But that's not possible and isn't necessary to affirm someone's gender identity.

"We are skin before we are gender, and skin changes so much over a lifetime," Herevia says. "If that's always shifting, we should have the ability to shift in other ways."

# What MultiCare is doing for the LGBTQ+ community

While we have more to do, MultiCare has made strides in underlined improving the care and experience of LGBTQ+ patients.

In 2019, MultiCare began collecting SOGI-P information during intake, says Jennifer Vigil (she/her), MultiCare Inland Northwest health equity and outreach program manager.

Staff are still perfecting the process, she says, such as when and where to ask such questions, and addressing some people's frustration about why they or their children are being asked.

> "Being an LGBTQ+ competent provider should be the rule, not the exception. Every single person who is interacting with patients should understand a queer or gender-expansive person might be in the room."

It's important to acknowledge those feelings, Vigil says, but also teach people that these questions go beyond a federal mandate — they're rooted in providing an affirming space, especially for those at higher risk for suicide.

MultiCare is also developing a directory of LGBTQ+ affirming doctors and other health care providers so patients can more easily identify those who specialize in their specific health needs.

MultiCare has also:

- Created all-gender bathrooms in our hospitals
- Developed inclusive policies and procedures for LGBTQ+ patients and staff

- Sponsored and participated in regional Pride celebrations
- Updated electronic medical records systems to be trans inclusive
- Established the MultiCare Rockwood HIV Critical Care Clinic
- Expanded access to gender-affirming surgery at MultiCare Deaconess Hospital through community provider partnerships
- Grown gender-affirming services and access at the Mary Bridge Children's Gender Health Clinic

## Achieving health equity is a group effort

Uncertainty is one of the biggest things faced by Oasis Youth Center's members, who are 11- to 24-year-olds, Ensley says. They ask, "Is my clinic LGBTQ+ competent or a safe place to disclose my gender?"

Navigating health care systems is challenging enough as adults, he says. Youth may not know what's covered or where to look, especially if they don't have support at home.

This needs to be a priority on the personal, organizational and community level, Dr. Angel says. We need to make time for education and hold one another accountable.

Advancing an organization's stance on things like anti-racism and queer equity — and transparency around how they're achieving such goals — is key, adds researcher Dr. Williams.

"Being an LGBTQ+ competent provider should be the rule, not the exception. Every single person who is interacting with patients should understand a queer or gender-expansive person might be in the room," she says. "I think there's a lot of people willing and wanting to learn but don't know how to go about it."

The National LGBTQIA+ Health Education Center outlines 10 strategies organizations can follow to create inclusive health care environments, such as inclusive forms, partnering with LGBTQ+ organizations and providing and following up on

training.

The community can also play a role    by supporting equitable access to quality, affordable care and providing access to reliable, easy-to-read information.

## Equity impacts everyone

As Dr. Williams digs into her research, she reminds herself that LGBTQ+ health is not just about disparities.

"It's important to research the disparities to address them, but also, queer people are thriving and resilient," she says. "They also have these positive ways they've learned to navigate health care systems and cultivate joy. I want to bring that joy to the forefront."

Whether that's celebrating a bisexual woman of color as she welcomes her first child into the world, ensuring a queer teen has access to a provider who affirms and understands their specific needs, or providing a safe place for an older LGBTQ+ adult to receive care, there are many ways our community can come together for healing and a healthy future.

## What's next

Find an LGBTQ+ affirming provider near you

Learn more about the advancements in PrEP availability and effectiveness

How we use your preferred identifiers to improve your care

Community Support & Partnerships    Health Equity    Research & Innovation



**About the Author**

# Samantha Malott

Samantha Malott is an editorial content specialist and brings her love for storytelling to the MultiCare Inland Northwest region to shine a spotlight on the excellent staff, providers, patients and community partners in our community.

More Stories By This Author

# Related Articles



**February 28, 2024**

Tackling ageism in health care, part 2

**February 5, 2024**

The gift of blood: How it saves lives and the journey from donation to transfusion

**January 26, 2024**

Ageism in health care: Improving the health and well-being of older adults

Case 3:25-cv-05913-DGE          Document 1-1          Filed 10/09/25          Page 224 of 389



MultiCare Newsroom          In the News          Media Contacts

Patient Resources

MultiCare does not discriminate. Read our patient nondiscrimination policy . | Language assistance is available. |

Website Privacy | Terms of use | Notice of Privacy Practices

© 2024 MultiCare Vitals. Website Design and Development by SiteCrafting .



www.wpath.org

# Standards of Care

for the Health of Transsexual,
Transgender, and Gender
Nonconforming People

The World Professional Association for Transgender Health

7th Version





# Standards of Care

for the Health of Transsexual, Transgender, and Gender Nonconforming People

The World Professiona Association for Transgender Health

7th Version[1] | www.wpath.org

1  This is the seventh version of the Standards of Care. The original SOC were published in 1979. Previous revisions were in 1980, 1981, 1990, 1998, and 2001.

# Table of Contents

I. Purpose and Use of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .1

II. Global Applicability of the Standards of Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .3

III. The Difference between Gender Nonconformity and Gender Dysphoria . . . . . . . . . . . . .4

IV. Epidemiologic Considerations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .6

V. Overview of Therapeutic Approaches for Gender Dysphoria . . . . . . . . . . . . . . . . . . . . . . .8

VI. Assessment and Treatment of Children and Adolescents with Gender Dysphoria . . . . .10

VII. Mental Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .21

VIII. Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .33

IX. Reproductive Health . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .50

X. Voice and Communication Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .52

XI. Surgery . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .54

XII. Postoperative Care and Follow-Up . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .64

XIII. Lifelong Preventive and Primary Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .65

XIV. Applicability of the *Standards of Care* to People Living in Institutional Environments . . .67

XV. Applicability of the *Standards of Care* to People With Disorders of Sex Development . . .69

**References** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .72

**Appendices:**

A. Glossary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .*95*

B. Overview of Medical Risks of Hormone Therapy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .97

C. Summary of Criteria for Hormone Therapy and Surgeries . . . . . . . . . . . . . . . . . . . . . . . . .104

D. Evidence for Clinical Outcomes of Therapeutic Approaches . . . . . . . . . . . . . . . . . . . . . . .107

E. Development Process for the *Standards of Care, Version 7* . . . . . . . . . . . . . . . . . . . . . . . . .109

# Purpose and Use of the Standards of Care

The World Professional Association for Transgender Health (WPATH)[1] is an international, multidisciplinary, professional association whose mission is to promote evidence-based care, education, research, advocacy, public policy, and respect for transgender health. The vision of WPATH is to bring together diverse professionals dedicated to developing best practices and supportive policies worldwide that promote health, research, education, respect, dignity, and equality for transsexual, transgender, and gender nonconforming people in all cultural settings.

One of the main functions of WPATH is to promote the highest standards of health care for individuals through the articulation of *Standards of Care (SOC) for the Health of Transsexual, Transgender, and Gender Nonconforming People*. The *SOC* are based on the best available science and expert professional consensus.[2] Most of the research and experience in this field comes from a North American and Western European perspective; thus, adaptations of the *SOC* to other parts of the world are necessary. Suggestions for ways of thinking about cultural relativity and cultural competence are included in this version of the *SOC*.

The overall goal of the *SOC* is to provide clinical guidance for health professionals to assist transsexual, transgender, and gender nonconforming people with safe and effective pathways to achieving lasting personal comfort with their gendered selves, in order to maximize their overall health, psychological well-being, and self-fulfillment. This assistance may include primary care, gynecologic and urologic care, reproductive options, voice and communication therapy, mental health services (e.g., assessment, counseling, psychotherapy), and hormonal and surgical treatments. While this is primarily a document for health professionals, the *SOC* may also be used by individuals, their families, and social institutions to understand how they can assist with promoting optimal health for members of this diverse population.

WPATH recognizes that health is dependent upon not only good clinical care but also social and political climates that provide and ensure social tolerance, equality, and the full rights of citizenship. Health is promoted through public policies and legal reforms that promote tolerance and equity

---

1  Formerly the Harry Benjamin International Gender Dysphoria Association

2  *Standards of Care (SOC), Version 7* represents a significant departure from previous versions. Changes in this version are based upon significant cultural shifts, advances in clinical knowledge, and appreciation of the many health care issues that can arise for transsexual, transgender, and gender nonconforming people beyond hormone therapy and surgery (Coleman, 2009a, b, c, d).

for gender and sexual diversity and that eliminate prejudice, discrimination, and stigma. WPATH is committed to advocacy for these changes in public policies and legal reforms.

## The Standards of Care Are Flexible Clinical Guidelines

The *SOC* are intended to be flexible in order to meet the diverse health care needs of transsexual, transgender, and gender nonconforming people. While flexible, they offer standards for promoting optimal health care and guiding the treatment of people experiencing gender dysphoria – broadly defined as discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

As for all previous versions of the *SOC*, the criteria put forth in this document for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the *SOC* may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable for the accumulation of new data, which can be retrospectively examined to allow for health care – and the *SOC* – to evolve.

The *SOC* articulate standards of care but also acknowledge the role of making informed choices and the value of harm reduction approaches. In addition, this version of the *SOC* recognizes and validates various expressions of gender that may not necessitate psychological, hormonal, or surgical treatments. Some patients who present for care will have made significant self-directed progress towards gender role changes, transition, or other resolutions regarding their gender identity or gender dysphoria. Other patients will require more intensive services. Health professionals can use the *SOC* to help patients consider the full range of health services open to them, in accordance with their clinical needs and goals for gender expression.

# II

# Global Applicability of the Standards of Care

While the *SOC* are intended for worldwide use, WPATH acknowledges that much of the recorded clinical experience and knowledge in this area of health care is derived from North American and Western European sources. From place to place, both across and within nations, there are differences in all of the following: social attitudes towards transsexual, transgender, and gender nonconforming people; constructions of gender roles and identities; language used to describe different gender identities; epidemiology of gender dysphoria; access to and cost of treatment; therapies offered; number and type of professionals who provide care; and legal and policy issues related to this area of health care (Winter, 2009).

It is impossible for the *SOC* to reflect all of these differences. In applying these standards to other cultural contexts, health professionals must be sensitive to these differences and adapt the *SOC* according to local realities. For example, in a number of cultures, gender nonconforming people are found in such numbers and living in such ways as to make them highly socially visible (Peletz, 2006). In settings such as these, it is common for people to initiate a change in their gender expression and physical characteristics while in their teens, or even earlier. Many grow up and live in a social, cultural, and even linguistic context quite unlike that of Western cultures. Yet almost all experience prejudice (Peletz, 2006; Winter, 2009). In many cultures, social stigma towards gender nonconformity is widespread and gender roles are highly prescriptive (Winter et al., 2009). Gender nonconforming people in these settings are forced to be hidden, and therefore may lack opportunities for adequate health care (Winter, 2009).

The *SOC* are not intended to limit efforts to provide the best available care to all individuals. Health professionals throughout the world – even in areas with limited resources and training opportunities – can apply the many core principles that undergird the *SOC*. These principles include the following: Exhibit respect for patients with nonconforming gender identities (do not pathologize differences in gender identity or expression); provide care (or refer to knowledgeable colleagues) that affirms patients' gender identities and reduces the distress of gender dysphoria, when present; become knowledgeable about the health care needs of transsexual, transgender, and gender nonconforming people, including the benefits and risks of treatment options for gender dysphoria; match the treatment approach to the specific needs of patients, particularly their goals for gender expression and need for relief from gender dysphoria; facilitate access to appropriate care; seek patients' informed consent before providing treatment; offer continuity of care; and be prepared to support and advocate for patients within their families and communities (schools, workplaces, and other settings).

Terminology is culturally and time-dependent and is rapidly evolving. It is important to use respectful language in different places and times, and among different people. As the *SOC* are translated into other languages, great care must be taken to ensure that the meanings of terms are accurately translated. Terminology in English may not be easily translated into other languages, and vice versa. Some languages do not have equivalent words to describe the various terms within this document; hence, translators should be cognizant of the underlying goals of treatment and articulate culturally applicable guidance for reaching those goals.



# III

# The Difference Between Gender Nonconformity and Gender Dysphoria

## Being Transsexual, Transgender, or Gender Nonconforming Is a Matter of Diversity, Not Pathology

WPATH released a statement in May 2010 urging the de-psychopathologization of gender nonconformity worldwide (WPATH Board of Directors, 2010). This statement noted that "the expression of gender characteristics, including identities, that are not stereotypically associated with one's assigned sex at birth is a common and culturally-diverse human phenomenon [that] should not be judged as inherently pathological or negative."

Unfortunately, there is stigma attached to gender nonconformity in many societies around the world. Such stigma can lead to prejudice and discrimination, resulting in "minority stress" (I. H. Meyer, 2003). Minority stress is unique (additive to general stressors experienced by all people), socially based, and chronic, and may make transsexual, transgender, and gender nonconforming individuals more vulnerable to developing mental health concerns such as anxiety and depression (Institute of Medicine, 2011). In addition to prejudice and discrimination in society at large, stigma can contribute to abuse and neglect in one's relationships with peers and family members, which in turn can lead to psychological distress. However, these symptoms are socially induced and are not inherent to being transsexual, transgender, or gender nonconforming.

# Gender Nonconformity Is Not the Same as Gender Dysphoria

*Gender nonconformity* refers to the extent to which a person's gender identity, role, or expression differs from the cultural norms prescribed for people of a particular sex (Institute of Medicine, 2011). *Gender dysphoria* refers to discomfort or distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b). Only *some* gender nonconforming people experience gender dysphoria at *some* point in their lives.

Treatment is available to assist people with such distress to explore their gender identity and find a gender role that is comfortable for them (Bockting & Goldberg, 2006). Treatment is individualized: What helps one person alleviate gender dysphoria might be very different from what helps another person. This process may or may not involve a change in gender expression or body modifications. Medical treatment options include, for example, feminization or masculinization of the body through hormone therapy and/or surgery, which are effective in alleviating gender dysphoria and are medically necessary for many people. Gender identities and expressions are diverse, and hormones and surgery are just two of many options available to assist people with achieving comfort with self and identity.

Gender dysphoria can in large part be alleviated through treatment (Murad et al., 2010). Hence, while transsexual, transgender, and gender nonconforming people may experience gender dysphoria at some point in their lives, many individuals who receive treatment will find a gender role and expression that is comfortable for them, even if these differ from those associated with their sex assigned at birth, or from prevailing gender norms and expectations.

# Diagnoses Related to Gender Dysphoria

Some people experience gender dysphoria at such a level that the distress meets criteria for a formal diagnosis that might be classified as a mental disorder. Such a diagnosis is not a license for stigmatization or for the deprivation of civil and human rights. Existing classification systems such as the *Diagnostic Statistical Manual of Mental Disorders (DSM)* (American Psychiatric Association, 2000) and the *International Classification of Diseases (ICD)* (World Health Organization, 2007) define hundreds of mental disorders that vary in onset, duration, pathogenesis, functional disability, and treatability. All of these systems attempt to classify clusters of symptoms and conditions, not the individuals themselves. A disorder is a description of something with which a person might struggle, not a description of the person or the person's identity.

Thus, transsexual, transgender, and gender nonconforming individuals are not inherently disordered. Rather, the distress of gender dysphoria, when present, is the concern that might be diagnosable and for which various treatment options are available. The existence of a diagnosis for such dysphoria often facilitates access to health care and can guide further research into effective treatments.

Research is leading to new diagnostic nomenclatures, and terms are changing in both the *DSM* (Cohen-Kettenis & Pfäfflin, 2010; Knudson, De Cuypere, & Bockting, 2010b; Meyer-Bahlburg, 2010; Zucker, 2010) and the *ICD*. For this reason, familiar terms are employed in the *SOC* and definitions are provided for terms that may be emerging. Health professionals should refer to the most current diagnostic criteria and appropriate codes to apply in their practice areas.



# IV

# Epidemiologic Considerations

Formal epidemiologic studies on the incidence[3] and prevalence[4] of transsexualism specifically or transgender and gender nonconforming identities in general have not been conducted, and efforts to achieve realistic estimates are fraught with enormous difficulties (Institute of Medicine, 2011; Zucker & Lawrence, 2009). Even if epidemiologic studies established that a similar proportion of transsexual, transgender, or gender nonconforming people existed all over the world, it is likely that cultural differences from one country to another would alter both the behavioral expressions of different gender identities and the extent to which gender dysphoria – distinct from one's gender identity – is actually occurring in a population. While in most countries, crossing normative gender boundaries generates moral censure rather than compassion, there are examples in certain cultures of gender nonconforming behaviors (e.g., in spiritual leaders) that are less stigmatized and even revered (Besnier, 1994; Bolin, 1988; Chiñas, 1995; Coleman, Colgan, & Gooren, 1992; Costa & Matzner, 2007; Jackson & Sullivan, 1999; Nanda, 1998; Taywaditep, Coleman, & Dumronggittigule, 1997).

For various reasons, researchers who have studied incidence and prevalence have tended to focus on the most easily counted subgroup of gender nonconforming individuals: transsexual individuals who experience gender dysphoria and who present for gender-transition-related care at specialist gender clinics (Zucker & Lawrence, 2009). Most studies have been conducted in European

---

3 **incidence**—the number of new cases arising in a given period (e.g., a year)
4 **prevalence**—the number of individuals having a condition, divided by the number of people in the general population

countries such as Sweden (Wålinder, 1968, 1971), the United Kingdom (Hoenig & Kenna, 1974), the Netherlands (Bakker, Van Kesteren, Gooren, & Bezemer, 1993; Eklund, Gooren, & Bezemer, 1988; van Kesteren, Gooren, & Megens, 1996), Germany (Weitze & Osburg, 1996), and Belgium (De Cuypere et al., 2007). One was conducted in Singapore (Tsoi, 1988).

De Cuypere and colleagues (2007) reviewed such studies, as well as conducted their own. Together, those studies span 39 years. Leaving aside two outlier findings from Pauly in 1968 and Tsoi in 1988, ten studies involving eight countries remain. The prevalence figures reported in these ten studies range from 1:11,900 to 1:45,000 for male-to-female individuals (MtF) and 1:30,400 to 1:200,000 for female-to-male (FtM) individuals. Some scholars have suggested that the prevalence is much higher, depending on the methodology used in the research (for example, Olyslager & Conway, 2007).

Direct comparisons across studies are impossible, as each differed in their data collection methods and in their criteria for documenting a person as transsexual (e.g., whether or not a person had undergone genital reconstruction, versus had initiated hormone therapy, versus had come to the clinic seeking medically-supervised transition services). The trend appears to be towards higher prevalence rates in the more recent studies, possibly indicating increasing numbers of people seeking clinical care. Support for this interpretation comes from research by Reed and colleagues (2009), who reported a doubling of the numbers of people accessing care at gender clinics in the United Kingdom every five or six years. Similarly, Zucker and colleagues (2008) reported a four- to five-fold increase in child and adolescent referrals to their Toronto, Canada clinic over a 30-year period.

The numbers yielded by studies such as these can be considered minimum estimates at best. The published figures are mostly derived from clinics where patients met criteria for severe gender dysphoria and had access to health care at those clinics. These estimates do not take into account that treatments offered in a particular clinic setting might not be perceived as affordable, useful, or acceptable by all self-identified gender dysphoric individuals in a given area. By counting only those people who present at clinics for a specific type of treatment, an unspecified number of gender dysphoric individuals are overlooked.

Other clinical observations (not yet firmly supported by systematic study) support the likelihood of a higher prevalence of gender dysphoria: (i) Previously unrecognized gender dysphoria is occasionally diagnosed when patients are seen with anxiety, depression, conduct disorder, substance abuse, dissociative identity disorders, borderline personality disorder, sexual disorders, and disorders of sex development (Cole, O'Boyle, Emory, & Meyer III, 1997). (ii) Some crossdressers, drag queens/kings or female/male impersonators, and gay and lesbian individuals may be experiencing gender dysphoria (Bullough & Bullough, 1993). (iii) The intensity of some people's gender dysphoria fluctuates below and above a clinical threshold (Docter, 1988). (iv) Gender nonconformity among FtM individuals tends to be relatively invisible in many cultures, particularly to Western health

professionals and researchers who have conducted most of the studies on which the current estimates of prevalence and incidence are based (Winter, 2009).

Overall, the existing data should be considered a starting point, and health care would benefit from more rigorous epidemiologic study in different locations worldwide.

# V

# Overview of Therapeutic Approaches for Gender Dysphoria

## Advancements in the Knowledge and Treatment of Gender Dysphoria

In the second half of the 20th century, awareness of the phenomenon of gender dysphoria increased when health professionals began to provide assistance to alleviate gender dysphoria by supporting changes in primary and secondary sex characteristics through hormone therapy and surgery, along with a change in gender role. Although Harry Benjamin already acknowledged a spectrum of gender nonconformity (Benjamin, 1966), the initial clinical approach largely focused on identifying who was an appropriate candidate for sex reassignment to facilitate a physical change from male to female or female to male as completely as possible (e.g., Green & Fleming, 1990; Hastings, 1974). This approach was extensively evaluated and proved to be highly effective. Satisfaction rates across studies ranged from 87% of MtF patients to 97% of FtM patients (Green & Fleming, 1990), and regrets were extremely rare (1-1.5% of MtF patients and <1% of FtM patients; Pfäfflin, 1993). Indeed, hormone therapy and surgery have been found to be medically necessary to alleviate gender dysphoria in many people (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

As the field matured, health professionals recognized that while many individuals need both hormone therapy and surgery to alleviate their gender dysphoria, others need only one of these treatment options and some need neither (Bockting & Goldberg, 2006; Bockting, 2008; Lev, 2004). Often with the help of psychotherapy, some individuals integrate their trans- or cross-gender feelings into the gender role they were assigned at birth and do not feel the need to feminize or masculinize their body. For others, changes in gender role and expression are sufficient to alleviate

gender dysphoria. Some patients may need hormones, a possible change in gender role, but not surgery; others may need a change in gender role along with surgery, but not hormones. In other words, treatment for gender dysphoria has become more individualized.

As a generation of transsexual, transgender, and gender nonconforming individuals has come of age – many of whom have benefitted from different therapeutic approaches – they have become more visible as a community and demonstrated considerable diversity in their gender identities, roles, and expressions. Some individuals describe themselves not as gender nonconforming but as unambiguously cross-sexed (i.e., as a member of the other sex; Bockting, 2008). Other individuals affirm their unique gender identity and no longer consider themselves either male or female (Bornstein, 1994; Kimberly, 1997; Stone, 1991; Warren, 1993). Instead, they may describe their gender identity in specific terms such as transgender, bigender, or genderqueer, affirming their unique gender experience that may transcend a male/female binary understanding of gender (Bockting, 2008; Ekins & King, 2006; Nestle, Wilchins, & Howell, 2002). They may not experience their process of identity affirmation as a "transition," because they never fully embraced the gender role they were assigned at birth or because they actualize their gender identity, role, and expression in a way that does not involve a change from one gender role to another. For example, some youth identifying as genderqueer have always experienced their gender identity and role as such (genderqueer). Greater public visibility and awareness of gender diversity (Feinberg, 1996) has further expanded options for people with gender dysphoria to actualize an identity and find a gender role and expression that is comfortable for them.

Health professionals can assist gender dysphoric individuals with affirming their gender identity, exploring different options for expression of that identity, and making decisions about medical treatment options for alleviating gender dysphoria.

## Options for Psychological and Medical Treatment of Gender Dysphoria

For individuals seeking care for gender dysphoria, a variety of therapeutic options can be considered. The number and type of interventions applied and the order in which these take place may differ from person to person (e.g., Bockting, Knudson, & Goldberg, 2006; Bolin, 1994; Rachlin, 1999; Rachlin, Green, & Lombardi, 2008; Rachlin, Hansbury, & Pardo, 2010). Treatments options include the following:

- Changes in gender expression and role (which may involve living part time or full time in another gender role, consistent with one's gender identity);

- Hormone therapy to feminize or masculinize the body;

- Surgery to change primary and/or secondary sex characteristics (e.g., breasts/chest, external and/or internal genitalia, facial features, body contouring);

- Psychotherapy (individual, couple, family, or group) for purposes such as exploring gender identity, role, and expression; addressing the negative impact of gender dysphoria and stigma on mental health; alleviating internalized transphobia; enhancing social and peer support; improving body image; or promoting resilience.

## Options for Social Support and Changes in Gender Expression

In addition (or as an alternative) to the psychological and medical treatment options described above, other options can be considered to help alleviate gender dysphoria, for example:

- Offline and online peer support resources, groups, or community organizations that provide avenues for social support and advocacy;

- Offline and online support resources for families and friends;

- Voice and communication therapy to help individuals develop verbal and non-verbal communication skills that facilitate comfort with their gender identity;

- Hair removal through electrolysis, laser treatment, or waxing;

- Breast binding or padding, genital tucking or penile prostheses, padding of hips or buttocks;

- Changes in name and gender marker on identity documents.

# VI

# Assessment and Treatment of Children and Adolescents with Gender Dysphoria

There are a number of differences in the phenomenology, developmental course, and treatment approaches for gender dysphoria in children, adolescents, and adults. In children and adolescents, a rapid and dramatic developmental process (physical, psychological, and sexual) is involved and

there is greater fluidity and variability in outcomes, particular in prepubertal children. Accordingly, this section of the *SOC* offers specific clinical guidelines for the assessment and treatment of gender dysphoric children and adolescents.

## Differences between Children and Adolescents with Gender Dysphoria

An important difference between gender dysphoric children and adolescents is in the proportion for whom dysphoria persists into adulthood. Gender dysphoria during childhood does not inevitably continue into adulthood.[5] Rather, in follow-up studies of prepubertal children (mainly boys) who were referred to clinics for assessment of gender dysphoria, the dysphoria persisted into adulthood for only 6-23% of children (Cohen-Kettenis, 2001; Zucker & Bradley, 1995). Boys in these studies were more likely to identify as gay in adulthood than as transgender (Green, 1987; Money & Russo, 1979; Zucker & Bradley, 1995; Zuger, 1984). Newer studies, also including girls, showed a 12-27% persistence rate of gender dysphoria into adulthood (Drummond, Bradley, Peterson-Badali, & Zucker, 2008; Wallien & Cohen-Kettenis, 2008).

In contrast, the persistence of gender dysphoria into adulthood appears to be much higher for adolescents. No formal prospective studies exist. However, in a follow-up study of 70 adolescents who were diagnosed with gender dysphoria and given puberty suppressing hormones, all continued with the actual sex reassignment, beginning with feminizing/masculinizing hormone therapy (de Vries, Steensma, Doreleijers, & Cohen-Kettenis, 2010).

Another difference between gender dysphoric children and adolescents is in the sex ratios for each age group. In clinically referred, gender dysphoric children under age 12, the male/female ratio ranges from 6:1 to 3:1 (Zucker, 2004). In clinically referred, gender dysphoric adolescents older than age 12, the male/female ratio is close to 1:1 (Cohen-Kettenis & Pfäfflin, 2003).

As discussed in section IV and by Zucker and Lawrence (2009), formal epidemiologic studies on gender dysphoria – in children, adolescents, and adults – are lacking. Additional research is needed to refine estimates of its prevalence and persistence in different populations worldwide.

---

5 Gender nonconforming behaviors in children may continue into adulthood, but such behaviors are not necessarily indicative of gender dysphoria and a need for treatment. As described in section III, gender dysphoria is not synonymous with diversity in gender expression.

# Phenomenology in Children

Children as young as age two may show features that could indicate gender dysphoria. They may express a wish to be of the other sex and be unhappy about their physical sex characteristics and functions. In addition, they may prefer clothes, toys, and games that are commonly associated with the other sex and prefer playing with other-sex peers. There appears to be heterogeneity in these features: Some children demonstrate extremely gender nonconforming behavior and wishes, accompanied by persistent and severe discomfort with their primary sex characteristics. In other children, these characteristics are less intense or only partially present (Cohen-Kettenis et al., 2006; Knudson, De Cuypere, & Bockting, 2010a).

It is relatively common for gender dysphoric children to have co-existing internalizing disorders such as anxiety and depression (Cohen-Kettenis, Owen, Kaijser, Bradley, & Zucker, 2003; Wallien, Swaab, & Cohen-Kettenis, 2007; Zucker, Owen, Bradley, & Ameeriar, 2002). The prevalence of autistic spectrum disorders seems to be higher in clinically referred, gender dysphoric children than in the general population (de Vries, Noens, Cohen-Kettenis, van Berckelaer-Onnes, & Doreleijers, 2010).

# Phenomenology in Adolescents

In most children, gender dysphoria will disappear before or early in puberty. However, in some children these feelings will intensify and body aversion will develop or increase as they become adolescents and their secondary sex characteristics develop (Cohen-Kettenis, 2001; Cohen-Kettenis & Pfäfflin, 2003; Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008; Zucker & Bradley, 1995). Data from one study suggest that more extreme gender nonconformity in childhood is associated with persistence of gender dysphoria into late adolescence and early adulthood (Wallien & Cohen-Kettenis, 2008). Yet many adolescents and adults presenting with gender dysphoria do not report a history of childhood gender nonconforming behaviors (Docter, 1988; Landén, Wålinder, & Lundström, 1998). Therefore, it may come as a surprise to others (parents, other family members, friends, and community members) when a youth's gender dysphoria first becomes evident in adolescence.

Adolescents who experience their primary and/or secondary sex characteristics and their sex assigned at birth as inconsistent with their gender identity may be intensely distressed about it. Many, but not all, gender dysphoric adolescents have a strong wish for hormones and surgery. Increasing numbers of adolescents have already started living in their desired gender role upon entering high school (Cohen-Kettenis & Pfäfflin, 2003).

Among adolescents who are referred to gender identity clinics, the number considered eligible for early medical treatment – starting with GnRH analogues to suppress puberty in the first Tanner stages – differs among countries and centers. Not all clinics offer puberty suppression. If such treatment is offered, the pubertal stage at which adolescents are allowed to start varies from Tanner stage 2 to stage 4 (Delemarre-van de Waal & Cohen-Kettenis, 2006; Zucker et al., in press). The percentages of treated adolescents are likely influenced by the organization of health care, insurance aspects, cultural differences, opinions of health professionals, and diagnostic procedures offered in different settings.

Inexperienced clinicians may mistake indications of gender dysphoria for delusions. Phenomenologically, there is a qualitative difference between the presentation of gender dysphoria and the presentation of delusions or other psychotic symptoms. The vast majority of children and adolescents with gender dysphoria are not suffering from underlying severe psychiatric illness such as psychotic disorders (Steensma, Biemond, de Boer, & Cohen-Kettenis, published online ahead of print January 7, 2011).

It is more common for adolescents with gender dysphoria to have co-existing internalizing disorders such as anxiety and depression, and/or externalizing disorders such as oppositional defiant disorder (de Vries et al., 2010). As in children, there seems to be a higher prevalence of autistic spectrum disorders in clinically referred, gender dysphoric adolescents than in the general adolescent population (de Vries et al., 2010).

## Competency of Mental Health Professionals Working with Children or Adolescents with Gender Dysphoria

The following are recommended minimum credentials for mental health professionals who assess, refer, and offer therapy to children and adolescents presenting with gender dysphoria:

1. Meet the competency requirements for mental health professionals working with adults, as outlined in section VII;

2. Trained in childhood and adolescent developmental psychopathology;

3. Competent in diagnosing and treating the ordinary problems of children and adolescents.

# Roles of Mental Health Professionals Working with Children and Adolescents with Gender Dysphoria

The roles of mental health professionals working with gender dysphoric children and adolescents may include the following:

1. Directly assess gender dysphoria in children and adolescents (see general guidelines for assessment, below).

2. Provide family counseling and supportive psychotherapy to assist children and adolescents with exploring their gender identity, alleviating distress related to their gender dysphoria, and ameliorating any other psychosocial difficulties.

3. Assess and treat any co-existing mental health concerns of children or adolescents (or refer to another mental health professional for treatment). Such concerns should be addressed as part of the overall treatment plan.

4. Refer adolescents for additional physical interventions (such as puberty suppressing hormones) to alleviate gender dysphoria. The referral should include documentation of an assessment of gender dysphoria and mental health, the adolescent's eligibility for physical interventions (outlined below), the mental health professional's relevant expertise, and any other information pertinent to the youth's health and referral for specific treatments.

5. Educate and advocate on behalf of gender dysphoric children, adolescents, and their families in their community (e.g., day care centers, schools, camps, other organizations). This is particularly important in light of evidence that children and adolescents who do not conform to socially prescribed gender norms may experience harassment in school (Grossman, D'Augelli, & Salter, 2006; Grossman, D'Augelli, Howell, & Hubbard, 2006; Sausa, 2005), putting them at risk for social isolation, depression, and other negative sequelae (Nuttbrock et al., 2010).

6. Provide children, youth, and their families with information and referral for peer support, such as support groups for parents of gender nonconforming and transgender children (Gold & MacNish, 2011; Pleak, 1999; Rosenberg, 2002).

Assessment and psychosocial interventions for children and adolescents are often provided within a multi-disciplinary gender identity specialty service. If such a multidisciplinary service is not available, a mental health professional should provide consultation and liaison arrangements with a pediatric endocrinologist for the purpose of assessment, education, and involvement in any decisions about physical interventions.

# Psychological Assessment of Children and Adolescents

When assessing children and adolescents who present with gender dysphoria, mental health professionals should broadly conform to the following guidelines:

1. Mental health professionals should not dismiss or express a negative attitude towards nonconforming gender identities or indications of gender dysphoria. Rather, they should acknowledge the presenting concerns of children, adolescents, and their families; offer a thorough assessment for gender dysphoria and any co-existing mental health concerns; and educate clients and their families about therapeutic options, if needed. Acceptance and removal of secrecy can bring considerable relief to gender dysphoric children/adolescents and their families.

2. Assessment of gender dysphoria and mental health should explore the nature and characteristics of a child's or adolescent's gender identity. A psychodiagnostic and psychiatric assessment – covering the areas of emotional functioning, peer and other social relationships, and intellectual functioning/school achievement – should be performed. Assessment should include an evaluation of the strengths and weaknesses of family functioning. Emotional and behavioral problems are relatively common, and unresolved issues in a child's or youth's environment may be present (de Vries, Doreleijers, Steensma, & Cohen-Kettenis, 2011; Di Ceglie & Thümmel, 2006; Wallien et al., 2007).

3. For adolescents, the assessment phase should also be used to inform youth and their families about the possibilities and limitations of different treatments. This is necessary for informed consent, but also important for assessment. The way that adolescents respond to information about the reality of sex reassignment can be diagnostically informative. Correct information may alter a youth's desire for certain treatment, if the desire was based on unrealistic expectations of its possibilities.

# Psychological and Social Interventions
# for Children and Adolescents

When supporting and treating children and adolescents with gender dysphoria, health professionals should broadly conform to the following guidelines:

1. Mental health professionals should help families to have an accepting and nurturing response to the concerns of their gender dysphoric child or adolescent. Families play an important role in the psychological health and well-being of youth (Brill & Pepper, 2008; Lev, 2004). This also applies to peers and mentors from the community, who can be another source of social support.

2. Psychotherapy should focus on reducing a child's or adolescent's distress related to the gender dysphoria and on ameliorating any other psychosocial difficulties. For youth pursuing sex reassignment, psychotherapy may focus on supporting them before, during, and after reassignment. Formal evaluations of different psychotherapeutic approaches for this situation have not been published, but several counseling methods have been described (Cohen-Kettenis, 2006; de Vries, Cohen-Kettenis, & Delemarre-van de Waal, 2006; Di Ceglie & Thümmel, 2006; Hill, Menvielle, Sica, & Johnson, 2010; Malpas, in press; Menvielle & Tuerk, 2002; Rosenberg, 2002; Vanderburgh, 2009; Zucker, 2006).

Treatment aimed at trying to change a person's gender identity and expression to become more congruent with sex assigned at birth has been attempted in the past without success (Gelder & Marks, 1969; Greenson, 1964), particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

1. Families should be supported in managing uncertainty and anxiety about their child's or adolescent's psychosexual outcomes and in helping youth to develop a positive self-concept.

2. Mental health professionals should not impose a binary view of gender. They should give ample room for clients to explore different options for gender expression. Hormonal or surgical interventions are appropriate for some adolescents, but not for others.

3. Clients and their families should be supported in making difficult decisions regarding the extent to which clients are allowed to express a gender role that is consistent with their gender identity, as well as the timing of changes in gender role and possible social transition. For example, a client might attend school while undergoing social transition only partly (e.g., by wearing clothing and having a hairstyle that reflects gender identity) or completely (e.g., by also using a name and pronouns congruent with gender identity). Difficult issues include whether and when to inform other people of the client's situation, and how others in their lives should respond.

4. Health professionals should support clients and their families as educators and advocates in their interactions with community members and authorities such as teachers, school boards, and courts.

5. Mental health professionals should strive to maintain a therapeutic relationship with gender nonconforming children/adolescents and their families throughout any subsequent social changes or physical interventions. This ensures that decisions about gender expression and the treatment of gender dysphoria are thoughtfully and recurrently considered. The same reasoning applies if a child or adolescent has already socially changed gender role prior to being seen by a mental health professional.

## Social Transition in Early Childhood

Some children state that they want to make a social transition to a different gender role long before puberty. For some children, this may reflect an expression of their gender identity. For others, this could be motivated by other forces. Families vary in the extent to which they allow their young children to make a social transition to another gender role. Social transitions in early childhood do occur within some families with early success. This is a controversial issue, and divergent views are held by health professionals. The current evidence base is insufficient to predict the long-term outcomes of completing a gender role transition during early childhood. Outcomes research with children who completed early social transitions would greatly inform future clinical recommendations.

Mental health professionals can help families to make decisions regarding the timing and process of any gender role changes for their young children. They should provide information and help parents to weigh the potential benefits and challenges of particular choices. Relevant in this respect are the previously described relatively low persistence rates of childhood gender dysphoria (Drummond et al., 2008; Wallien & Cohen-Kettenis, 2008). A change back to the original gender role can be highly distressing and even result in postponement of this second social transition on the child's part (Steensma & Cohen-Kettenis, 2011). For reasons such as these, parents may want to present this role change as an exploration of living in another gender role, rather than an irreversible situation. Mental health professionals can assist parents in identifying potential in-between solutions or compromises (e.g., only when on vacation). It is also important that parents explicitly let the child know that there is a way back.

Regardless of a family's decisions regarding transition (timing, extent), professionals should counsel and support them as they work through the options and implications. If parents do not allow their young child to make a gender role transition, they may need counseling to assist them with meeting their child's needs in a sensitive and nurturing way, ensuring that the child has ample possibilities to explore gender feelings and behavior in a safe environment. If parents do allow their young child to make a gender role transition, they may need counseling to facilitate a positive experience for their child. For example, they may need support in using correct pronouns, maintaining a safe and supportive environment for their transitioning child (e.g., in school, peer group settings), and communicating with other people in their child's life. In either case, as a child nears puberty, further assessment may be needed as options for physical interventions become relevant.

# Physical Interventions for Adolescents

Before any physical interventions are considered for adolescents, extensive exploration of psychological, family, and social issues should be undertaken, as outlined above. The duration of this exploration may vary considerably depending on the complexity of the situation.

Physical interventions should be addressed in the context of adolescent development. Some identity beliefs in adolescents may become firmly held and strongly expressed, giving a false impression of irreversibility. An adolescent's shift towards gender conformity can occur primarily to please the parents and may not persist or reflect a permanent change in gender dysphoria (Hembree et al., 2009; Steensma et al., published online ahead of print January 7, 2011).

Physical interventions for adolescents fall into three categories or stages (Hembree et al., 2009):

1. *Fully reversible interventions*. These involve the use of GnRH analogues to suppress estrogen or testosterone production and consequently delay the physical changes of puberty. Alternative treatment options include progestins (most commonly medroxyprogesterone) or other medications (such as spironolactone) that decrease the effects of androgens secreted by the testicles of adolescents who are not receiving GnRH analogues. Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses.

2. *Partially reversible interventions*. These include hormone therapy to masculinize or feminize the body. Some hormone-induced changes may need reconstructive surgery to reverse the effect (e.g., gynecomastia caused by estrogens), while other changes are not reversible (e.g., deepening of the voice caused by testosterone).

3. *Irreversible interventions*. These are surgical procedures.

A staged process is recommended to keep options open through the first two stages. Moving from one stage to another should not occur until there has been adequate time for adolescents and their parents to assimilate fully the effects of earlier interventions.

# Fully Reversible Interventions

Adolescents may be eligible for puberty suppressing hormones as soon as pubertal changes have begun. In order for adolescents and their parents to make an informed decision about pubertal delay, it is recommended that adolescents experience the onset of puberty to at least Tanner Stage 2. Some children may arrive at this stage at very young ages (e.g., 9 years of age). Studies

evaluating this approach only included children who were at least 12 years of age (Cohen-Kettenis, Schagen, Steensma, de Vries, & Delemarre-van de Waal, 2011; de Vries, Steensma et al., 2010; Delemarre-van de Waal, van Weissenbruch, & Cohen Kettenis, 2004; Delemarre-van de Waal & Cohen-Kettenis, 2006).

Two goals justify intervention with puberty suppressing hormones: (i) their use gives adolescents more time to explore their gender nonconformity and other developmental issues; and (ii) their use may facilitate transition by preventing the development of sex characteristics that are difficult or impossible to reverse if adolescents continue on to pursue sex reassignment.

Puberty suppression may continue for a few years, at which time a decision is made to either discontinue all hormone therapy or transition to a feminizing/masculinizing hormone regimen. Pubertal suppression does not inevitably lead to social transition or to sex reassignment.

### Criteria for puberty suppressing hormones

In order for adolescents to receive puberty suppressing hormones, the following minimum criteria must be met:

1. The adolescent has demonstrated a long-lasting and intense pattern of gender nonconformity or gender dysphoria (whether suppressed or expressed);

2. Gender dysphoria emerged or worsened with the onset of puberty;

3. Any co-existing psychological, medical, or social problems that could interfere with treatment (e.g., that may compromise treatment adherence) have been addressed, such that the adolescent's situation and functioning are stable enough to start treatment;

4. The adolescent has given informed consent and, particularly when the adolescent has not reached the age of medical consent, the parents or other caretakers or guardians have consented to the treatment and are involved in supporting the adolescent throughout the treatment process.

### Regimens, monitoring, and risks for puberty suppression

For puberty suppression, adolescents with male genitalia should be treated with GnRH analogues, which stop luteinizing hormone secretion and therefore testosterone secretion. Alternatively, they may be treated with progestins (such as medroxyprogesterone) or with other medications that block testosterone secretion and/or neutralize testosterone action. Adolescents with female genitalia should be treated with GnRH analogues, which stop the production of estrogens and

progesterone. Alternatively, they may be treated with progestins (such as medroxyprogesterone). Continuous oral contraceptives (or depot medroxyprogesterone) may be used to suppress menses. In both groups of adolescents, use of GnRH analogues is the preferred treatment (Hembree et al., 2009), but their high cost is prohibitive for some patients

During pubertal suppression, an adolescent's physical development should be carefully monitored – preferably by a pediatric endocrinologist – so that any necessary interventions can occur (e.g., to establish an adequate gender appropriate height, to improve iatrogenic low bone marrow density) (Hembree et al., 2009).

Early use of puberty suppressing hormones may avert negative social and emotional consequences of gender dysphoria more effectively than their later use would. Intervention in early adolescence should be managed with pediatric endocrinological advice, when available. Adolescents with male genitalia who start GnRH analogues early in puberty should be informed that this could result in insufficient penile tissue for penile inversion vaginoplasty techniques (alternative techniques, such as the use of a skin graft or colon tissue, are available).

Neither puberty suppression nor allowing puberty to occur is a neutral act. On the one hand, functioning in later life can be compromised by the development of irreversible secondary sex characteristics during puberty and by years spent experiencing intense gender dysphoria. On the other hand, there are concerns about negative physical side effects of GnRH analog use (e.g., on bone development and height). Although the very first results of this approach (as assessed for adolescents followed over 10 years) are promising (Cohen-Kettenis et al., 2011; Delemarre-van de Waal & Cohen-Kettenis, 2006), the long-term effects can only be determined when the earliest treated patients reach the appropriate age.

## Partially Reversible Interventions

Adolescents may be eligible to begin feminizing/masculinizing hormone therapy, preferably with parental consent. In many countries, 16-year-olds are legal adults for medical decision-making and do not require parental consent. Ideally, treatment decisions should be made among the adolescent, the family, and the treatment team.

Regimens for hormone therapy in gender dysphoric adolescents differ substantially from those used in adults (Hembree et al., 2009). The hormone regimens for youth are adapted to account for the somatic, emotional, and mental development that occurs throughout adolescence (Hembree et al., 2009).

## Irreversible Interventions

Genital surgery should not be carried out until (i) patients reach the legal age of majority in a given country, and (ii) patients have lived continuously for at least 12 months in the gender role that is congruent with their gender identity. The age threshold should be seen as a minimum criterion and not an indication in and of itself for active intervention.

Chest surgery in FtM patients could be carried out earlier, preferably after ample time of living in the desired gender role and after one year of testosterone treatment. The intent of this suggested sequence is to give adolescents sufficient opportunity to experience and socially adjust in a more masculine gender role, before undergoing irreversible surgery. However, different approaches may be more suitable, depending on an adolescent's specific clinical situation and goals for gender identity expression.

## Risks of Withholding Medical Treatment for Adolescents

Refusing timely medical interventions for adolescents might prolong gender dysphoria and contribute to an appearance that could provoke abuse and stigmatization. As the level of gender-related abuse is strongly associated with the degree of psychiatric distress during adolescence (Nuttbrock et al., 2010), withholding puberty suppression and subsequent feminizing or masculinizing hormone therapy is not a neutral option for adolescents.

#  VII
# Mental Health

Transsexual, transgender, and gender nonconforming people might seek the assistance of a mental health professional for any number of reasons. Regardless of a person's reason for seeking care, mental health professionals should have familiarity with gender nonconformity, act with appropriate cultural competence, and exhibit sensitivity in providing care.

This section of the *SOC* focuses on the role of mental health professionals in the care of adults seeking help for gender dysphoria and related concerns. Professionals working with gender dysphoric children, adolescents, and their families should consult section VI.

# Competency of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

The training of mental health professionals competent to work with gender dysphoric adults rests upon basic general clinical competence in the assessment, diagnosis, and treatment of mental health concerns. Clinical training may occur within any discipline that prepares mental health professionals for clinical practice, such as psychology, psychiatry, social work, mental health counseling, marriage and family therapy, nursing, or family medicine with specific training in behavioral health and counseling. The following are recommended minimum credentials for mental health professionals who work with adults presenting with gender dysphoria:

1. A master's degree or its equivalent in a clinical behavioral science field. This degree or a more advanced one should be granted by an institution accredited by the appropriate national or regional accrediting board. The mental health professional should have documented credentials from a relevant licensing board or equivalent for that country.

2. Competence in using the *Diagnostic Statistical Manual of Mental Disorders* and/or the *International Classification of Diseases* for diagnostic purposes.

3. Ability to recognize and diagnose co-existing mental health concerns and to distinguish these from gender dysphoria.

4. Documented supervised training and competence in psychotherapy or counseling.

5. Knowledgeable about gender nonconforming identities and expressions, and the assessment and treatment of gender dysphoria.

6. Continuing education in the assessment and treatment of gender dysphoria. This may include attending relevant professional meetings, workshops, or seminars; obtaining supervision from a mental health professional with relevant experience; or participating in research related to gender nonconformity and gender dysphoria.

In addition to the minimum credentials above, it is recommended that mental health professionals develop and maintain cultural competence to facilitate their work with transsexual, transgender, and gender nonconforming clients. This may involve, for example, becoming knowledgeable about current community, advocacy, and public policy issues relevant to these clients and their families. Additionally, knowledge about sexuality, sexual health concerns, and the assessment and treatment of sexual disorders is preferred.

Mental health professionals who are new to the field (irrespective of their level of training and other experience) should work under the supervision of a mental health professional with established competence in the assessment and treatment of gender dysphoria.

## Tasks of Mental Health Professionals Working with Adults Who Present with Gender Dysphoria

Mental health professionals may serve transsexual, transgender, and gender nonconforming individuals and their families in many ways, depending on a client's needs. For example, mental health professionals may serve as a psychotherapist, counselor, or family therapist, or as a diagnostician/assessor, advocate, or educator.

Mental health professionals should determine a client's reasons for seeking professional assistance. For example, a client may be presenting for any combination of the following health care services: psychotherapeutic assistance to explore gender identity and expression or to facilitate a coming out process; assessment and referral for feminizing/masculinizing medical interventions; psychological support for family members (partners, children, extended family); or psychotherapy unrelated to gender concerns or other professional services.

Below are general guidelines for common tasks that mental health professionals may fulfill in working with adults who present with gender dysphoria.

## Tasks Related to Assessment and Referral

### 1. Assess gender dysphoria

Mental health professionals assess clients' gender dysphoria in the context of an evaluation of their psychosocial adjustment (Bockting et al., 2006; Lev, 2004, 2009). The evaluation includes, at a minimum, assessment of gender identity and gender dysphoria, history and development of gender dysphoric feelings, the impact of stigma attached to gender nonconformity on mental health, and the availability of support from family, friends, and peers (for example, in person or online contact with other transsexual, transgender, or gender nonconforming individuals or groups). The evaluation may result in no diagnosis, in a formal diagnosis related to gender dysphoria, and/or in other diagnoses that describe aspects of the client's health and psychosocial adjustment. The role

of mental health professionals includes making reasonably sure that the gender dysphoria is not secondary to or better accounted for by other diagnoses.

Mental health professionals with the competencies described above (hereafter called "a qualified mental health professional") are best prepared to conduct this assessment of gender dysphoria. However, this task may instead be conducted by another type of health professional who has appropriate training in behavioral health and is competent in the assessment of gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy. This professional may be the prescribing hormone therapy provider or a member of that provider's health care team.

### 2. Provide information regarding options for gender identity and expression and possible medical interventions

An important task of mental health professionals is to educate clients regarding the diversity of gender identities and expressions and the various options available to alleviate gender dysphoria. Mental health professionals then may facilitate a process (or refer elsewhere) in which clients explore these various options, with the goals of finding a comfortable gender role and expression and becoming prepared to make a fully informed decision about available medical interventions, if needed. This process may include referral for individual, family, and group therapy and/or to community resources and avenues for peer support. The professional and the client discuss the implications, both short- and long-term, of any changes in gender role and use of medical interventions. These implications can be psychological, social, physical, sexual, occupational, financial, and legal (Bockting et al., 2006; Lev, 2004).

This task is also best conducted by a qualified mental health professional, but may be conducted by another health professional with appropriate training in behavioral health and with sufficient knowledge about gender nonconforming identities and expressions and about possible medical interventions for gender dysphoria, particularly when functioning as part of a multidisciplinary specialty team that provides access to feminizing/masculinizing hormone therapy.

### 3. Assess, diagnose, and discuss treatment options for co-existing mental health concerns

Clients presenting with gender dysphoria may struggle with a range of mental health concerns (Gómez-Gil, Trilla, Salamero, Godás, & Valdés, 2009; Murad et al., 2010) whether related or unrelated to what is often a long history of gender dysphoria and/or chronic minority stress. Possible concerns include anxiety, depression, self-harm, a history of abuse and neglect, compulsivity, substance abuse, sexual concerns, personality disorders, eating disorders, psychotic disorders, and autistic spectrum disorders (Bockting et al., 2006; Nuttbrock et al., 2010; Robinow, 2009). Mental health professionals should screen for these and other mental health concerns and incorporate

the identified concerns into the overall treatment plan. These concerns can be significant sources of distress and, if left untreated, can complicate the process of gender identity exploration and resolution of gender dysphoria (Bockting et al., 2006; Fraser, 2009a; Lev, 2009). Addressing these concerns can greatly facilitate the resolution of gender dysphoria, possible changes in gender role, the making of informed decisions about medical interventions, and improvements in quality of life.

Some clients may benefit from psychotropic medications to alleviate symptoms or treat co-existing mental health concerns. Mental health professionals are expected to recognize this and either provide pharmacotherapy or refer to a colleague who is qualified to do so. The presence of co-existing mental health concerns does not necessarily preclude possible changes in gender role or access to feminizing/masculinizing hormones or surgery; rather, these concerns need to be optimally managed prior to or concurrent with treatment of gender dysphoria. In addition, clients should be assessed for their ability to provide educated and informed consent for medical treatments.

Qualified mental health professionals are specifically trained to assess, diagnose, and treat (or refer to treatment for) these co-existing mental health concerns. Other health professionals with appropriate training in behavioral health, particularly when functioning as part of a multidisciplinary specialty team providing access to feminizing/masculinizing hormone therapy, may also screen for mental health concerns and, if indicated, provide referral for comprehensive assessment and treatment by a qualified mental health professional.

## 4. If applicable, assess eligibility, prepare, and refer for hormone therapy

The *SOC* provide criteria to guide decisions regarding feminizing/masculinizing hormone therapy (outlined in section VIII and Appendix C). Mental health professionals can help clients who are considering hormone therapy to be both psychologically prepared (for example, has made a fully informed decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has been evaluated by a physician to rule out or address medical contraindications to hormone use; has considered the psychosocial implications). If clients are of childbearing age, reproductive options (section IX) should be explored before initiating hormone therapy.

It is important for mental health professionals to recognize that decisions about hormones are first and foremost the client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

Referral for feminizing/masculinizing hormone therapy

People may approach a specialized provider in any discipline to pursue feminizing/masculinizing hormone therapy. However, transgender health care is an interdisciplinary field, and coordination of care and referral among a client's overall care team is recommended.

Hormone therapy can be initiated with a referral from a qualified mental health professional. Alternatively, a health professional who is appropriately trained in behavioral health and competent in the assessment of gender dysphoria may assess eligibility, prepare, and refer the patient for hormone therapy, particularly in the absence of significant co-existing mental health concerns and when working in the context of a multidisciplinary specialty team. The referring health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Health professionals who recommend hormone therapy share the ethical and legal responsibility for that decision with the physician who provides the service.

The recommended content of the referral letter for feminizing/masculinizing hormone therapy is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the referring health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for hormone therapy have been met, and a brief description of the clinical rationale for supporting the client's request for hormone therapy;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the referring health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

**5. If applicable, assess eligibility, prepare, and refer for surgery**

The *SOC* also provide criteria to guide decisions regarding breast/chest surgery and genital surgery (outlined in section XI and Appendix C). Mental health professionals can help clients who are considering surgery to be both psychologically prepared (for example, has made a fully informed

decision with clear and realistic expectations; is ready to receive the service in line with the overall treatment plan; has included family and community as appropriate) and practically prepared (for example, has made an informed choice about a surgeon to perform the procedure; has arranged aftercare). If clients are of childbearing age, reproductive options (section IX) should be explored before undergoing genital surgery.

The *SOC* do not state criteria for other surgical procedures, such as feminizing or masculinizing facial surgery; however, mental health professionals can play an important role in helping their clients to make fully informed decisions about the timing and implications of such procedures in the context of the overall coming out or transition process.

It is important for mental health professionals to recognize that decisions about surgery are first and foremost a client's decisions – as are all decisions regarding healthcare. However, mental health professionals have a responsibility to encourage, guide, and assist clients with making fully informed decisions and becoming adequately prepared. To best support their clients' decisions, mental health professionals need to have functioning working relationships with their clients and sufficient information about them. Clients should receive prompt and attentive evaluation, with the goal of alleviating their gender dysphoria and providing them with appropriate medical services.

Referral for surgery

Surgical treatments for gender dysphoria can be initiated with a referral (one or two, depending on the type of surgery) from a qualified mental health professional. The mental health professional provides documentation – in the chart and/or referral letter – of the patient's personal and treatment history, progress, and eligibility. Mental health professionals who recommend surgery share the ethical and legal responsibility for that decision with the surgeon.

- One referral from a qualified mental health professional is needed for breast/chest surgery (e.g., mastectomy, chest reconstruction, or augmentation mammoplasty).

- Two referrals – from qualified mental health professionals who have independently assessed the patient – are needed for genital surgery (i.e., hysterectomy/salpingo-oophorectomy, orchi-ectomy, genital reconstructive surgeries). If the first referral is from the patient's psychothera-pist, the second referral should be from a person who has only had an evaluative role with the patient. Two separate letters, or one letter signed by both (e.g., if practicing within the same clinic) may be sent. Each referral letter, however, is expected to cover the same topics in the areas outlined below.

The recommended content of the referral letters for surgery is as follows:

1. The client's general identifying characteristics;

2. Results of the client's psychosocial assessment, including any diagnoses;

3. The duration of the mental health professional's relationship with the client, including the type of evaluation and therapy or counseling to date;

4. An explanation that the criteria for surgery have been met, and a brief description of the clinical rationale for supporting the patient's request for surgery;

5. A statement about the fact that informed consent has been obtained from the patient;

6. A statement that the mental health professional is available for coordination of care and welcomes a phone call to establish this.

For providers working within a multidisciplinary specialty team, a letter may not be necessary, rather, the assessment and recommendation can be documented in the patient's chart.

**Relationship of Mental Health Professionals with Hormone-Prescribing Physicians, Surgeons, and other Health Professionals**

It is ideal for mental health professionals to perform their work and periodically discuss progress and obtain peer consultation from other professionals (both in mental health care and other health disciplines) who are competent in the assessment and treatment of gender dysphoria. The relationship among professionals involved in a client's health care should remain collaborative, with coordination and clinical dialogue taking place as needed. Open and consistent communication may be necessary for consultation, referral, and management of postoperative concerns.

# Tasks Related to Psychotherapy

**1. Psychotherapy is not an absolute requirement for hormone therapy and surgery**

A mental health screening and/or assessment as outlined above is needed for referral to hormonal and surgical treatments for gender dysphoria. In contrast, psychotherapy – although highly recommended – is not a requirement.

The *SOC* do not recommend a minimum number of psychotherapy sessions prior to hormone therapy or surgery. The reasons for this are multifaceted (Lev, 2009). First, a minimum number of sessions tends to be construed as a hurdle, which discourages the genuine opportunity for personal growth. Second, mental health professionals can offer important support to clients throughout all

phases of exploration of gender identity, gender expression, and possible transition – not just prior to any possible medical interventions. Third, clients differ in their abilities to attain similar goals in a specified time period.

**2. Goals of psychotherapy for adults with gender concerns**

The general goal of psychotherapy is to find ways to maximize a person's overall psychological well-being, quality of life, and self-fulfillment. Psychotherapy is not intended to alter a person's gender identity; rather, psychotherapy can help an individual to explore gender concerns and find ways to alleviate gender dysphoria, if present (Bockting et al., 2006; Bockting & Coleman, 2007; Fraser, 2009a; Lev, 2004). Typically, the overarching treatment goal is to help transsexual, transgender, and gender nonconforming individuals achieve long-term comfort in their gender identity expression, with realistic chances for success in their relationships, education, and work. For additional details, see Fraser (Fraser, 2009c).

Therapy may consist of individual, couple, family, or group psychotherapy, the latter being particularly important to foster peer support.

**3. Psychotherapy for transsexual, transgender, and gender nonconforming clients, including counseling and support for changes in gender role**

Finding a comfortable gender role is, first and foremost, a psychosocial process. Psychotherapy can be invaluable in assisting transsexual, transgender, and gender nonconforming individuals with all of the following: (i) clarifying and exploring gender identity and role, (ii) addressing the impact of stigma and minority stress on one's mental health and human development, and (iii) facilitating a coming out process (Bockting & Coleman, 2007; Devor, 2004; Lev, 2004), which for some individuals may include changes in gender role expression and the use of feminizing/masculinizing medical interventions.

Mental health professionals can provide support and promote interpersonal skills and resilience in individuals and their families as they navigate a world that often is ill prepared to accommodate and respect transgender, transsexual, and gender nonconforming people. Psychotherapy can also aid in alleviating any co-existing mental health concerns (e.g., anxiety, depression) identified during screening and assessment.

For transsexual, transgender, and gender nonconforming individuals who plan to change gender roles permanently and make a social gender role transition, mental health professionals can facilitate the development of an individualized plan with specific goals and timelines. While the experience of changing one's gender role differs from person to person, the social aspects of the experience are usually challenging – often more so than the physical aspects. Because changing

gender role can have profound personal and social consequences, the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role.

Many transsexual, transgender, and gender nonconforming people will present for care without ever having been related to or accepted in the gender role that is most congruent with their gender identity. Mental health professionals can help these clients to explore and anticipate the implications of changes in gender role, and to pace the process of implementing these changes. Psychotherapy can provide a space for clients to begin to express themselves in ways that are congruent with their gender identity and, for some clients, overcome fear about changes in gender expression. Calculated risks can be taken outside of therapy to gain experience and build confidence in the new role. Assistance with coming out to family and community (friends, school, workplace) can be provided.

Other transsexual, transgender, and gender nonconforming individuals will present for care already having acquired experience (minimal, moderate, or extensive) living in a gender role that differs from that associated with their birth-assigned sex. Mental health professionals can help these clients to identify and work through potential challenges and foster optimal adjustment as they continue to express changes in their gender role.

### 4. Family therapy or support for family members

Decisions about changes in gender role and medical interventions for gender dysphoria have implications for not only clients, but also their families (Emerson & Rosenfeld, 1996; Fraser, 2009a; Lev, 2004). Mental health professionals can assist clients with making thoughtful decisions about communicating with family members and others about their gender identity and treatment decisions. Family therapy may include work with spouses or partners, as well as with children and other members of a client's extended family.

Clients may also request assistance with their relationships and sexual health. For example, they may want to explore their sexuality and intimacy related concerns.

Family therapy might be offered as part of the client's individual therapy and, if clinically appropriate, by the same provider. Alternatively, referrals can be made to other therapists with relevant expertise to work with family members, or to sources of peer support (e.g., online or offline support networks of partners or families).

**5. Follow-up care throughout life**

Mental health professionals may work with clients and their families at many stages of their lives. Psychotherapy may be helpful at different times and for various issues throughout the life cycle.

**6. Etherapy, online counseling, or distance counseling**

Online or etherapy has been shown to be particularly useful for people who have difficulty accessing competent psychotherapeutic treatment and who may experience isolation and stigma (Derrig-Palumbo & Zeine, 2005; Fenichel et al., 2004; Fraser, 2009b). By extrapolation, etherapy may be a useful modality for psychotherapy with transsexual, transgender, and gender nonconforming people. Etherapy offers opportunities for potentially enhanced, expanded, creative, and tailored delivery of services; however, as a developing modality it may also carry unexpected risk. Telemedicine guidelines are clear in some disciplines in some parts of the United States (Fraser, 2009b; Maheu, Pulier, Wilhelm, McMenamin, & Brown-Connolly, 2005) but not all; the international situation is even less defined (Maheu et al., 2005). Until sufficient evidence-based data on this use of etherapy is available, caution in its use is advised.

Mental health professionals engaging in etherapy are advised to stay current with their particular licensing board, professional association, and country's regulations, as well as the most recent literature pertaining to this rapidly evolving medium. A more thorough description of the potential uses, processes, and ethical concerns related to etherapy has been published (Fraser, 2009b).

## Other Tasks of the Mental Health Professional

**1. Educate and advocate on behalf of clients within their community (schools, workplaces, other organizations) and assist clients with making changes in identity documents**

Transsexual, transgender, and gender nonconforming people may face challenges in their professional, educational, and other types of settings as they actualize their gender identity and expression (Lev, 2004, 2009). Mental health professionals can play an important role by educating people in these settings regarding gender nonconformity and by advocating on behalf of their clients (Currah, Juang, & Minter, 2006) (Currah & Minter, 2000). This role may involve consultation with school counselors, teachers, and administrators, human resources staff, personnel managers and employers, and representatives from other organizations and institutions. In addition, health providers may be called upon to support changes in a client's name and/or gender marker on identity documents such as passports, driver's licenses, birth certificates, and diplomas.

**2. Provide information and referral for peer support**

For some transsexual, transgender, and gender nonconforming people, an experience in peer support groups may be more instructive regarding options for gender expression than anything individual psychotherapy could offer (Rachlin, 2002). Both experiences are potentially valuable, and all people exploring gender issues should be encouraged to participate in community activities, if possible. Resources for peer support and information should be made available.

## Culture and its Ramifications for Assessment and Psychotherapy

Health professionals work in enormously different environments across the world. Forms of distress that cause people to seek professional assistance in any culture are understood and classified by people in terms that are products of their own cultures (Frank & Frank, 1993). Cultural settings also largely determine how such conditions are understood by mental health professionals. Cultural differences related to gender identity and expression can affect patients, mental health professionals, and accepted psychotherapy practice. WPATH recognizes that the *SOC* have grown out of a Western tradition and may need to be adapted depending on the cultural context.

## Ethical Guidelines Related to Mental Health Care

Mental health professionals need to be certified or licensed to practice in a given country according to that country's professional regulations (Fraser, 2009b; Pope & Vasquez, 2011). Professionals must adhere to the ethical codes of their professional licensing or certifying organizations in all of their work with transsexual, transgender, and gender nonconforming clients.

Treatment aimed at trying to change a person's gender identity and lived gender expression to become more congruent with sex assigned at birth has been attempted in the past (Gelder & Marks, 1969; Greenson, 1964), yet without success, particularly in the long term (Cohen-Kettenis & Kuiper, 1984; Pauly, 1965). Such treatment is no longer considered ethical.

If mental health professionals are uncomfortable with or inexperienced in working with transsexual, transgender, and gender nonconforming individuals and their families, they should refer clients to a competent provider or, at minimum, consult with an expert peer. If no local practitioners are available, consultation may be done via telehealth methods, assuming local requirements for distance consultation are met.

## Issues of Access to Care

Qualified mental health professionals are not universally available; thus, access to quality care might be limited. WPATH aims to improve access and provides regular continuing education opportunities to train professionals from various disciplines to provide quality, transgender-specific health care. Providing mental health care from a distance through the use of technology may be one way to improve access (Fraser, 2009b).

In many places around the world, access to health care for transsexual, transgender, and gender nonconforming people is also limited by a lack of health insurance or other means to pay for needed care. WPATH urges health insurance companies and other third-party payers to cover the medically necessary treatment to alleviate gender dysphoria (American Medical Association, 2008; Anton, 2009; The World Professional Association for Transgender Health, 2008).

When faced with a client who is unable to access services, referral to available peer support resources (offline and online) is recommended. Finally, harm reduction approaches might be indicated to assist clients with making healthy decisions to improve their lives.



# Hormone Therapy

**Medical Necessity of Hormone Therapy**

Feminizing/masculinizing hormone therapy – the administration of exogenous endocrine agents to induce feminizing or masculinizing changes – is a medically necessary intervention for many transsexual, transgender, and gender nonconforming individuals with gender dysphoria (Newfield, Hart, Dibble, & Kohler, 2006; Pfäfflin & Junge, 1998). Some people seek maximum feminization/masculinization, while others experience relief with an androgynous presentation resulting from hormonal minimization of existing secondary sex characteristics (Factor & Rothblum, 2008). Evidence for the psychosocial outcomes of hormone therapy is summarized in Appendix D.

Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Hormone therapy can provide significant comfort to patients who do not wish to make a social gender role transition or undergo surgery, or who are unable to do so (Meyer III, 2009).

Hormone therapy is a recommended criterion for some, but not all, surgical treatments for gender dysphoria (see section XI and Appendix C).

**Criteria for Hormone Therapy**

Initiation of hormone therapy may be undertaken after a psychosocial assessment has been conducted and informed consent has been obtained by a qualified health professional, as outlined in section VII of the *SOC*. A referral is required from the mental health professional who performed the assessment, unless the assessment was done by a hormone provider who is also qualified in this area.

The criteria for hormone therapy are as follows:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *Standards of Care* outlined in section VI);

4. If significant medical or mental health concerns are present, they must be reasonably well-controlled.

As noted in section VII of the *SOC*, the presence of co-existing mental health concerns does not necessarily preclude access to feminizing/masculinizing hormones; rather, these concerns need to be managed prior to or concurrent with treatment of gender dysphoria.

In selected circumstances, it can be acceptable practice to provide hormones to patients who have not fulfilled these criteria. Examples include facilitating the provision of monitored therapy using hormones of known quality as an alternative to illicit or unsupervised hormone use or to patients who have already established themselves in their affirmed gender and who have a history of prior hormone use. It is unethical to deny availability or eligibility for hormone therapy solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis B or C.

In rare cases, hormone therapy may be contraindicated due to serious individual health conditions. Health professionals should assist these patients with accessing non-hormonal interventions for gender dysphoria. A qualified mental health professional familiar with the patient is an excellent resource in these circumstances.

**Informed Consent**

Feminizing/masculinizing hormone therapy may lead to irreversible physical changes. Thus, hormone therapy should be provided only to those who are legally able to provide informed consent. This includes people who have been declared by a court to be emancipated minors, incarcerated people, and cognitively impaired people who are considered competent to participate in their medical decisions (see also Bockting et al., 2006). Providers should document in the medical record that comprehensive information has been provided and understood about all relevant aspects of the hormone therapy, including both possible benefits and risks and the impact on reproductive capacity.

**Relationship between the Standards of Care and Informed Consent Model Protocols**

A number of community health centers in the United States have developed protocols for providing hormone therapy based on an approach that has become known as the Informed Consent Model (Callen Lorde Community Health Center, 2000, 2011; Fenway Community Health Transgender Health Program, 2007; Tom Waddell Health Center, 2006). These protocols are consistent with the guidelines presented in the WPATH *Standards of Care, Version 7*. The *SOC* are flexible clinical guidelines; they allow for tailoring of interventions to the needs of the individual receiving services and for tailoring of protocols to the approach and setting in which these services are provided (Ehrbar & Gorton, 2010).

Obtaining informed consent for hormone therapy is an important task of providers to ensure that patients understand the psychological and physical benefits and risks of hormone therapy, as well as its psychosocial implications. Providers prescribing the hormones or health professionals recommending the hormones should have the knowledge and experience to assess gender dysphoria. They should inform individuals of the particular benefits, limitations, and risks of hormones, given the patient's age, previous experience with hormones, and concurrent physical or mental health concerns.

Screening for and addressing acute or current mental health concerns is an important part of the informed consent process. This may be done by a mental health professional or by an appropriately trained prescribing provider (see section VII of the *SOC*). The same provider or another appropriately trained member of the health care team (e.g., a nurse) can address the psychosocial implications of taking hormones when necessary (e.g., the impact of masculinization/feminization on how one is perceived and its potential impact on relationships with family, friends, and coworkers). If indicated, these providers will make referrals for psychotherapy and for the assessment and treatment of co-existing mental health concerns such as anxiety or depression.

The difference between the Informed Consent Model and *SOC, Version 7* is that the *SOC* puts greater emphasis on the important role that mental health professionals can play in alleviating gender dysphoria and facilitating changes in gender role and psychosocial adjustment. This may include a comprehensive mental health assessment and psychotherapy, when indicated. In the Informed Consent Model, the focus is on obtaining informed consent as the threshold for the initiation of hormone therapy in a multidisciplinary, harm-reduction environment. Less emphasis is placed on the provision of mental health care until the patient requests it, unless significant mental health concerns are identified that would need to be addressed before hormone prescription.

## Physical Effects of Hormone Therapy

Feminizing/masculinizing hormone therapy will induce physical changes that are more congruent with a patient's gender identity.

- In FtM patients, the following physical changes are expected to occur: deepened voice, clitoral enlargement (variable), growth in facial and body hair, cessation of menses, atrophy of breast tissue, increased libido, and decreased percentage of body fat compared to muscle mass.

- In MtF patients, the following physical changes are expected to occur: breast growth (variable), decreased libido and erections, decreased testicular size, and increased percentage of body fact compared to muscle mass.

Most physical changes, whether feminizing or masculinizing, occur over the course of two years. The amount of physical change and the exact timeline of effects can be highly variable. Tables 1a and 1b outline the approximate time course of these physical changes.

**TABLE 1A:  EFFECTS AND EXPECTED TIME COURSE OF MASCULINIZING HORMONES** [A]

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Skin oiliness/acne | 1-6 months | 1-2 years |
| Facial/body hair growth | 3-6 months | 3-5 years |
| Scalp hair loss | >12 months[C] | variable |
| Increased muscle mass/strength | 6-12 months | 2-5 years[D] |
| Body fat redistribution | 3-6 months | 2-5 years |
| Cessation of menses | 2-6 months | n/a |
| Clitoral enlargement | 3-6 months | 1-2 years |
| Vaginal atrophy | 3-6 months | 1-2 years |
| Deepened voice | 3-12 months | 1-2 years |

[A]  Adapted with permission from Hembree et al.(2009). *Copyright 2009, The Endocrine Society.*
[B]  Estimates represent published and unpublished clinical observations.
[C]  Highly dependent on age and inheritance; may be minimal.
[D]  Significantly dependent on amount of exercise.

**TABLE 1B:  EFFECTS AND EXPECTED TIME COURSE OF FEMINIZING HORMONES** [A]

| Effect | Expected Onset[B] | Expected Maximum Effect[B] |
|---|---|---|
| Body fat redistribution | 3-6 months | 2-5 years |
| Decreased muscle mass/ strength | 3-6 months | 1-2 years[C] |
| Softening of skin/decreased oiliness | 3-6 months | unknown |
| Decreased libido | 1-3 months | 1-2 years |
| Decreased spontaneous erections | 1-3 months | 3-6 months |
| Male sexual dysfunction | variable | variable |
| Breast growth | 3-6 months | 2-3 years |
| Decreased testicular volume | 3-6 months | 2-3 years |
| Decreased sperm production | variable | variable |
| Thinning and slowed growth of body and facial hair | 6-12 months | > 3 years[D] |
| Male pattern baldness | No regrowth, loss stops 1-3 months | 1-2 years |

[A]  Adapted with permission from Hembree et al. (2009). *Copyright 2009, The Endocrine Society.*
[B]  Estimates represent published and unpublished clinical observations.
[C]  Significantly dependent on amount of exercise.
[D]  Complete removal of male facial and body hair requires electrolysis, laser treatment, or both.

The degree and rate of physical effects depends in part on the dose, route of administration, and medications used, which are selected in accordance with a patient's specific medical goals (e.g., changes in gender role expression, plans for sex reassignment) and medical risk profile. There is no current evidence that response to hormone therapy – with the possible exception of voice deepening in FtM persons – can be reliably predicted based on age, body habitus, ethnicity, or family appearance. All other factors being equal, there is no evidence to suggest that any medically approved type or method of administering hormones is more effective than any other in producing the desired physical changes.

# Risks of Hormone Therapy

All medical interventions carry risks. The likelihood of a serious adverse event is dependent on numerous factors: the medication itself, dose, route of administration, and a patient's clinical characteristics (age, co-morbidities, family history, health habits). It is thus impossible to predict whether a given adverse effect will happen in an individual patient.

The risks associated with feminizing/masculinizing hormone therapy for the transsexual, transgender, and gender nonconforming population as a whole are summarized in Table 2. Based on the level of evidence, risks are categorized as follows: (i) likely increased risk with hormone therapy, (ii) possibly increased risk with hormone therapy, or (iii) inconclusive or no increased risk. Items in the last category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Additional detail about these risks can be found in Appendix B, which is based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (Dahl, Feldman, Goldberg, & Jaberi, 2006; Ettner, Monstrey, & Eyler, 2007).

TABLE 2: RISKS ASSOCIATED WITH HORMONE THERAPY. BOLDED ITEMS ARE CLINICALLY SIGNIFICANT

| Risk Level | Feminizing hormones | Masculinizing hormones |
|---|---|---|
| Likely increased risk | **Venous thromboembolic disease**[A] <br><br> Gallstones <br><br> Elevated liver enzymes <br><br> Weight gain <br><br> **Hypertriglyceridemia** | **Polycythemia** <br><br> **Weight gain** <br><br> **Acne** <br><br> **Androgenic alopecia (balding)** <br><br> **Sleep apnea** |
| Likely increased risk with presence of additional risk factors[B] | Cardiovascular disease | |
| Possible increased risk | **Hypertension** <br><br> Hyperprolactinemia or prolactinom[A] | Elevated liver enzymes <br><br> **Hyperlipidemia** |
| Possible increased risk with presence of additional risk factors[B] | Type 2 diabetes[A] | Destabilization of certain psychiatric disorders[C] <br><br> Cardiovascular disease <br><br> Hypertension <br><br> Type 2 diabetes |
| No increased risk or inconclusive | Breast cancer | Loss of bone density <br><br> **Breast cancer** <br><br> Cervical cancer <br><br> Ovarian cancer <br><br> Uterine cancer |

[A]  Risk is greater with oral estrogen administration than with transdermal estrogen administration.
[B]  Additional risk factors include age.
[C]  Includes bipolar, schizoaffective, and other disorders that may include manic or psychotic symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone.

# Competency of Hormone-Prescribing Physicians, Relationship with Other Health Professionals

Feminizing/masculinizing hormone therapy is best undertaken in the context of a complete approach to health care that includes comprehensive primary care and a coordinated approach to psychosocial issues (Feldman & Safer, 2009). While psychotherapy or ongoing counseling is not required for the initiation of hormone therapy, if a therapist is involved, then regular communication among health professionals is advised (with the patient's consent) to ensure that the transition process is going well, both physically and psychosocially.

With appropriate training, feminizing/masculinizing hormone therapy can be managed by a variety of providers, including nurse practitioners and primary care physicians (Dahl et al., 2006). Medical visits relating to hormone maintenance provide an opportunity to deliver broader care to a population that is often medically underserved (Clements, Wilkinson, Kitano, & Marx, 1999; Feldman, 2007; Xavier, 2000). Many of the screening tasks and management of co-morbidities associated with long-term hormone use, such as cardiovascular risk factors and cancer screening, fall more uniformly within the scope of primary care rather than specialist care (American Academy of Family Physicians, 2005; Eyler, 2007; World Health Organization, 2008), particularly in locations where dedicated gender teams or specialized physicians are not available.

Given the multidisciplinary needs of transsexual, transgender, and gender nonconforming people seeking hormone therapy, as well as the difficulties associated with fragmentation of care in general (World Health Organization, 2008), WPATH strongly encourages the increased training and involvement of primary care providers in the area of feminizing/masculinizing hormone therapy. If hormones are prescribed by a specialist, there should be close communication with the patient's primary care provider. Conversely, an experienced hormone provider or endocrinologist should be involved if the primary care physician has no experience with this type of hormone therapy, or if the patient has a pre-existing metabolic or endocrine disorder that could be affected by endocrine therapy.

While formal training programs in transgender medicine do not yet exist, hormone providers have a responsibility to obtain appropriate knowledge and experience in this field. Clinicians can increase their experience and comfort in providing feminizing/masculinizing hormone therapy by co-managing care or consulting with a more experienced provider, or by providing more limited types of hormone therapy before progressing to initiation of hormone therapy. Because this field of medicine is evolving, clinicians should become familiar and keep current with the medical literature, and discuss emerging issues with colleagues. Such discussions might occur through networks established by WPATH and other national/local organizations.

# Responsibilities of Hormone-Prescribing Physicians

In general, clinicians who prescribe hormone therapy should engage in the following tasks:

1. Perform an initial evaluation that includes discussion of a patient's physical transition goals, health history, physical examination, risk assessment, and relevant laboratory tests.

2. Discuss with patients the expected effects of feminizing/masculinizing medications and the possible adverse health effects. These effects can include a reduction in fertility (Feldman & Safer, 2009; Hembree et al., 2009). Therefore, reproductive options should be discussed with patients before starting hormone therapy (see section IX).

3. Confirm that patients have the capacity to understand the risks and benefits of treatment and are capable of making an informed decision about medical care.

4. Provide ongoing medical monitoring, including regular physical and laboratory examination to monitor hormone effectiveness and side effects.

5. Communicate as needed with a patient's primary care provider, mental health professional, and surgeon.

6. If needed, provide patients with a brief written statement indicating that they are under medical supervision and care that includes feminizing/masculinizing hormone therapy. Particularly during the early phases of hormone treatment, a patient may wish to carry this statement at all times to help prevent difficulties with the police and other authorities.

Depending on the clinical situation for providing hormones (see below), some of these responsibilities are less relevant. Thus, the degree of counseling, physical examinations, and laboratory evaluations should be individualized to a patient's needs.

# Clinical Situations for Hormone Therapy

There are circumstances in which clinicians may be called upon to provide hormones without necessarily initiating or maintaining long-term feminizing/masculinizing hormone therapy. By acknowledging these different clinical situations (see below, from least to highest level of complexity), it may be possible to involve clinicians in feminizing/masculinizing hormone therapy who might not otherwise feel able to offer this treatment.

**1. Bridging**

Whether prescribed by another clinician or obtained through other means (e.g., purchased over the internet), patients may present for care already on hormone therapy. Clinicians can provide a limited (1-6 month) prescription for hormones while helping patients find a provider who can prescribe long-term hormone therapy. Providers should assess a patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated (Dahl et al., 2006; Feldman & Safer, 2009). If hormones were previously prescribed, medical records should be requested (with the patient's permission) to obtain the results of baseline examinations and laboratory tests and any adverse events. Hormone providers should also communicate with any mental health professional who is currently involved in a patient's care. If a patient has never had a psychosocial assessment as recommended by the *SOC* (see section VII), clinicians should refer the patient to a qualified mental health professional if appropriate and feasible (Feldman & Safer, 2009). Providers who prescribe bridging hormones need to work with patients to establish limits as to the duration of bridging therapy.

**2. Hormone therapy following gonad removal**

Hormone replacement with estrogen or testosterone is usually continued lifelong after an oophorectomy or orchiectomy, unless medical contraindications arise. Because hormone doses are often decreased after these surgeries (Basson, 2001; Levy, Crown, & Reid, 2003; Moore, Wisniewski, & Dobs, 2003) and only adjusted for age and co-morbid health concerns, hormone management in this situation is quite similar to hormone replacement in any hypogonadal patient.

**3. Hormone maintenance prior to gonad removal**

Once patients have achieved maximal feminizing/masculinizing benefits from hormones (typically two or more years), they remain on a maintenance dose. The maintenance dose is then adjusted for changes in health conditions, aging, or other considerations such as lifestyle changes (Dahl et al., 2006). When a patient on maintenance hormones presents for care, the provider should assess the patient's current regimen for safety and drug interactions and substitute safer medications or doses when indicated. The patient should continue to be monitored by physical examinations and laboratory testing on a regular basis, as outlined in the literature (Feldman & Safer, 2009; Hembree et al., 2009). The dose and form of hormones should be revisited regularly with any changes in the patient's health status and available evidence on the potential long-term risks of hormones (See *Hormone Regimens,* below).

**4. Initiating hormonal feminization/masculinization**

This clinical situation requires the greatest commitment in terms of provider time and expertise. Hormone therapy must be individualized based on a patient's goals, the risk/benefit ratio of medications, the presence of other medical conditions, and consideration of social and economic issues. Although a wide variety of hormone regimens have been published (Dahl et al., 2006; Hembree et al., 2009; Moore et al., 2003), there are no published reports of randomized clinical trials comparing safety and efficacy. Despite this variation, a reasonable framework for initial risk assessment and ongoing monitoring of hormone therapy can be constructed, based on the efficacy and safety evidence presented above.

# Risk Assessment and Modification for Initiating Hormone Therapy

The initial evaluation for hormone therapy assesses a patient's clinical goals and risk factors for hormone-related adverse events. During the risk assessment, the patient and clinician should develop a plan for reducing risks wherever possible, either prior to initiating therapy or as part of ongoing harm reduction.

All assessments should include a thorough physical exam, including weight, height, and blood pressure. The need for breast, genital, and rectal exams, which are sensitive issues for most transsexual, transgender, and gender nonconforming patients, should be based on individual risks and preventive health care needs (Feldman & Goldberg, 2006; Feldman, 2007).

**Preventive care**

Hormone providers should address preventive health care with patients, particularly if a patient does not have a primary care provider. Depending on a patient's age and risk profile, there may be appropriate screening tests or exams for conditions affected by hormone therapy. Ideally, these screening tests should be carried out prior to the start of hormone therapy.

**Risk assessment and modification for feminizing hormone therapy (MtF)**

There are no absolute contraindications to feminizing therapy *per se*, but absolute contraindications exist for the different feminizing agents, particularly estrogen. These include previous venous thrombotic events related to an underlying hypercoagulable condition, history of estrogen-sensitive neoplasm, and end-stage chronic liver disease (Gharib et al., 2005).

Other medical conditions, as noted in Table 2 and Appendix B, can be exacerbated by estrogen or androgen blockade, and therefore should be evaluated and reasonably well controlled prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Clinicians should particularly attend to tobacco use, as it is associated with increased risk of venous thrombosis, which is further increased with estrogen use. Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of feminizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

### Risk assessment and modification for masculinizing hormone therapy (FtM)

Absolute contraindications to testosterone therapy include pregnancy, unstable coronary artery disease, and untreated polycythemia with a hematocrit of 55% or higher (Carnegie, 2004). Because the aromatization of testosterone to estrogen may increase risk in patients with a history of breast or other estrogen dependent cancers (Moore et al., 2003), consultation with an oncologist may be indicated prior to hormone use. Co-morbid conditions likely to be exacerbated by testosterone use should be evaluated and treated, ideally prior to starting hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009). Consultation with a cardiologist may be advisable for patients with known cardio- or cerebrovascular disease.

An increased prevalence of polycystic ovarian syndrome (PCOS) has been noted among FtM patients even in the absence of testosterone use (Baba et al., 2007; Balen, Schachter, Montgomery, Reid, & Jacobs, 1993; Bosinski et al., 1997). While there is no evidence that PCOS is related to the development of a transsexual, transgender, or gender nonconforming identity, PCOS is associated with increased risk of diabetes, cardiac disease, high blood pressure, and ovarian and endometrial cancers (Cattrall & Healy, 2004). Signs and symptoms of PCOS should be evaluated prior to initiating testosterone therapy, as testosterone may affect many of these conditions. Testosterone can affect the developing fetus (Physicians' Desk Reference, 2011), and patients at risk of becoming pregnant require highly effective birth control.

Baseline laboratory values are important to both assess initial risk and evaluate possible future adverse events. Initial labs should be based on the risks of masculinizing hormone therapy outlined in Table 2, as well as individual patient risk factors, including family history. Suggested initial lab panels have been published (Feldman & Safer, 2009; Hembree et al., 2009). These can be modified for patients or health care systems with limited resources, and in otherwise healthy patients.

# Clinical Monitoring during Hormone Therapy for Efficacy and Adverse Events

The purpose of clinical monitoring during hormone use is to assess the degree of feminization/masculinization and the possible presence of adverse effects of medication. However, as with the monitoring of any long-term medication, monitoring should take place in the context of comprehensive health care. Suggested clinical monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009). Patients with co-morbid medical conditions may need to be monitored more frequently. Healthy patients in geographically remote or resource-poor areas may be able to use alternative strategies, such as telehealth, or cooperation with local providers such as nurses and physician assistants. In the absence of other indications, health professionals may prioritize monitoring for those risks that are either likely to be increased by hormone therapy or possibly increased by hormone therapy but clinically serious in nature.

**Efficacy and risk monitoring during feminizing hormone therapy (MtF)**

The best assessment of hormone efficacy is clinical response: Is a patient developing a feminized body while minimizing masculine characteristics, consistent with that patient's gender goals? In order to more rapidly predict the hormone dosages that will achieve clinical response, one can measure testosterone levels for suppression below the upper limit of the normal female range, and estradiol levels within a premenopausal female range but well below supraphysiologic levels (Feldman & Safer, 2009; Hembree et al., 2009).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs of cardiovascular impairment and venous thromboembolism (VTE) through measurement of blood pressure, weight, and pulse; heart and lung exams; and examination of the extremities for peripheral edema, localized swelling, or pain (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

**Efficacy and risk monitoring during masculinizing hormone therapy (FtM)**

The best assessment of hormone efficacy is clinical response: Is a patient developing a masculinized body while minimizing feminine characteristics, consistent with that patient's gender goals? Clinicians can achieve a good clinical response with the least likelihood of adverse events by maintaining testosterone levels within the normal male range while avoiding supraphysiological

levels (Dahl et al., 2006; Hembree et al., 2009). For patients using intramuscular (IM) testosterone cypionate or enanthate, some clinicians check trough levels while others prefer midcycle levels (Dahl et al., 2006; Hembree et al., 2009; Tangpricha, Turner, Malabanan, & Holick, 2001; Tangpricha, Ducharme, Barber, & Chipkin, 2003).

Monitoring for adverse events should include both clinical and laboratory evaluation. Follow-up should include careful assessment for signs and symptoms of excessive weight gain, acne, uterine break-through bleeding, and cardiovascular impairment, as well as psychiatric symptoms in at-risk patients. Physical examinations should include measurement of pressure, weight, pulse, and skin; and heart and lung exams (Feldman & Safer, 2009). Laboratory monitoring should be based on the risks of hormone therapy described above, a patient's individual co-morbidities and risk factors, and the specific hormone regimen itself. Specific lab monitoring protocols have been published (Feldman & Safer, 2009; Hembree et al., 2009).

## Hormone Regimens

To date, no controlled clinical trials of any feminizing/masculinizing hormone regimen have been conducted to evaluate safety or efficacy in producing physical transition. As a result, wide variation in doses and types of hormones have been published in the medical literature (Moore et al., 2003; Tangpricha et al., 2003; van Kesteren, Asscheman, Megens, & Gooren, 1997). In addition, access to particular medications may be limited by a patient's geographical location and/or social or econonomic situations. For these reasons, WPATH does not describe or endorse a particular feminizing/masculinizing hormone regimen. Rather, the medication classes and routes of administration used in most published regimens are broadly reviewed.

As outlined above, there are demonstrated safety differences in individual elements of various regimens. The Endocrine Society Guidelines (Hembree et al., 2009) and Feldman and Safer (2009) provide specific guidance regarding the types of hormones and suggested dosing to maintain levels within physiologic ranges for a patient's desired gender expression (based on goals of full feminization/masculinization). It is strongly recommend that hormone providers regularly review the literature for new information and use those medications that safely meet individual patient needs with available local resources.

**Regimens for feminizing hormone therapy (MtF)**

Estrogen

Use of oral estrogen, and specifically ethinyl estradiol, appears to increase the risk of VTE. Because of this safety concern, ethinyl estradiol is not recommended for feminizing hormone therapy. Transdermal estrogen is recommended for those patients with risks factors for VTE. The risk of adverse events increases with higher doses, particular those resulting in supraphysiologic levels (Hembree et al., 2009). Patients with co-morbid conditions that can be affected by estrogen should avoid oral estrogen if possible and be started at lower levels. Some patients may not be able to safely use the levels of estrogen needed to get the desired results. This possibility needs to be discussed with patients well in advance of starting hormone therapy.

Androgen reducing medications ("anti-androgens")

A combination of estrogen and "anti-androgens" is the most commonly studied regimen for feminization. Androgen reducing medications, from a variety of classes of drugs, have the effect of reducing either endogenous testosterone levels or testosterone activity, and thus diminishing masculine characteristics such as body hair. They minimize the dosage of estrogen needed to suppress testosterone, thereby reducing the risks associated with high-dose exogenous estrogen (Prior, Vigna, Watson, Diewold, & Robinow, 1986; Prior, Vigna, & Watson, 1989).

Common anti-androgens include the following:

- Spironolactone, an antihypertensive agent, directly inhibits testosterone secretion and androgen binding to the androgen receptor. Blood pressure and electrolytes need to be monitored because of the potential for hyperkalemia.

- Cyproterone acetate is a progestational compound with anti-androgenic properties. This medication is not approved in the United States because of concerns over potential hepatotoxicity, but it is widely used elsewhere (De Cuypere et al., 2005).

- GnRH agonists (e.g., goserelin, buserelin, triptorelin) are neurohormones that block the gonadtropin releasing hormone receptor, thus blocking the release of follicle stimulating hormone and luteinizing hormone. This leads to highly effective gonadal blockade. However, these medications are expensive and only available as injectables or implants.

- 5-alpha reductase inhibitors (finasteride and dutasteride) block the conversion of testosterone to the more active agent, 5-alpha-dihydrotestosterone. These medications have beneficial effects on scalp hair loss, body hair growth, sebaceous glands, and skin consistency.

Cyproterone and spironolactone are the most commonly used anti-androgens and are likely the most cost-effective.

Progestins

With the exception of cyproterone, the inclusion of progestins in feminizing hormone therapy is controversial (Oriel, 2000). Because progestins play a role in mammary development on a cellular level, some clinicians believe that these agents are necessary for full breast development (Basson & Prior, 1998; Oriel, 2000). However, a clinical comparison of feminization regimens with and without progestins found that the addition of progestins neither enhanced breast growth nor lowered serum levels of free testosterone (Meyer III et al., 1986). There are concerns regarding potential adverse effects of progestins, including depression, weight gain, and lipid changes (Meyer III et al., 1986; Tangpricha et al., 2003). Progestins (especially medroxyprogesterone) are also suspected to increase breast cancer risk and cardiovascular risk in women (Rossouw et al., 2002). Micronized progesterone may be better tolerated and have a more favorable impact on the lipid profile than medroxyprogesterone does (de Lignières, 1999; Fitzpatrick, Pace, & Wiita, 2000).

**Regimens for masculinizing hormone therapy (FtM)**

Testosterone

Testosterone generally can be given orally, transdermally, or parenterally (IM), although buccal and implantable preparations are also available. Oral testosterone undecenoate, available outside the United States, results in lower serum testosterone levels than non-oral preparations and has limited efficacy in suppressing menses (Feldman, 2005, April; Moore et al., 2003). Because intramuscular testosterone cypionate or enanthate are often administered every 2-4 weeks, some patients may notice cyclic variation in effects (e.g., fatigue and irritability at the end of the injection cycle, aggression or expansive mood at the beginning of the injection cycle), as well as more time outside the normal physiologic levels (Jockenhövel, 2004). This may be mitigated by using a lower but more frequent dosage schedule or by using a daily transdermal preparation (Dobs et al., 1999; Jockenhövel, 2004; Nieschlag et al., 2004). Intramuscular testosterone undecenoate (not currently available in the United States) maintains stable, physiologic testosterone levels over approximately 12 weeks and has been effective in both the setting of hypogonadism and in FtM individuals (Mueller, Kiesewetter, Binder, Beckmann, & Dittrich, 2007; Zitzmann, Saad, & Nieschlag, 2006). There is evidence that transdermal and intramuscular testosterone achieve similar masculinizing results, although the timeframe may be somewhat slower with transdermal preparations (Feldman, 2005, April). Especially as patients age, the goal is to use the lowest dose needed to maintain the desired clinical result, with appropriate precautions being made to maintain bone density.

<u>Other agents</u>

Progestins, most commonly medroxyprogesterone, can be used for a short period of time to assist with menstrual cessation early in hormone therapy. GnRH agonists can be used similarly, as well as for refractory uterine bleeding in patients without an underlying gynecological abnormality.

**Bioidentical and compounded hormones**

As discussion surrounding the use of bioidentical hormones in postmenopausal hormone replacement has heightened, interest has also increased in the use of similar compounds in feminizing/masculinizing hormone therapy. There is no evidence that custom compounded bioidentical hormones are safer or more effective than government agency-approved bioidentical hormones (Sood, Shuster, Smith, Vincent, & Jatoi, 2011). Therefore, it has been advised by the North American Menopause Society (2010) and others to assume that, whether the hormone is from a compounding pharmacy or not, if the active ingredients are similar, it should have a similar side-effect profile. WPATH concurs with this assessment.



# IX

# Reproductive Health

Many transgender, transsexual, and gender nonconforming people will want to have children. Because feminizing/masculinizing hormone therapy limits fertility (Darney, 2008; Zhang, Gu, Wang, Cui, & Bremner, 1999), it is desirable for patients to make decisions concerning fertility before starting hormone therapy or undergoing surgery to remove/alter their reproductive organs. Cases are known of people who received hormone therapy and genital surgery and later regretted their inability to parent genetically related children (De Sutter, Kira, Verschoor, & Hotimsky, 2002).

Health care professionals – including mental health professionals recommending hormone therapy or surgery, hormone-prescribing physicians, and surgeons – should discuss reproductive options with patients prior to initiation of these medical treatments for gender dysphoria. These discussions should occur even if patients are not interested in these issues at the time of treatment, which may be more common for younger patients (De Sutter, 2009). Early discussions are desirable, but not always possible. If an individual has not had complete sex reassignment surgery, it may be possible to stop hormones long enough for natal hormones to recover, allowing the production of mature

gametes (Payer, Meyer III, & Walker, 1979; Van den Broecke, Van der Elst, Liu, Hovatta, & Dhont, 2001).

Besides debate and opinion papers, very few research papers have been published on the reproductive health issues of individuals receiving different medical treatments for gender dysphoria. Another group who faces the need to preserve reproductive function in light of loss or damage to their gonads are people with malignances that require removal of reproductive organs or use of damaging radiation or chemotherapy. Lessons learned from that group can be applied to people treated for gender dysphoria.

MtF patients, especially those who have not already reproduced, should be informed about sperm preservation options and encouraged to consider banking their sperm prior to hormone therapy. In a study examining testes that were exposed to high-dose estrogen (Payer et al., 1979), findings suggest that stopping estrogen may allow the testes to recover. In an article reporting on the opinions of MtF individuals towards sperm freezing (De Sutter et al., 2002), the vast majority of 121 survey respondents felt that the availability of freezing sperm should be discussed and offered by the medical world. Sperm should be collected before hormone therapy or after stopping the therapy until the sperm count rises again. Cryopreservation should be discussed even if there is poor semen quality. In adults with azoospermia, a testicular biopsy with subsequent cryopreservation of biopsied material for sperm is possible, but may not be successful.

Reproductive options for FtM patients might include oocyte (egg) or embryo freezing. The frozen gametes and embryo could later be used with a surrogate woman to carry to pregnancy. Studies of women with polycystic ovarian disease suggest that the ovary can recover in part from the effects of high testosterone levels (Hunter & Sterrett, 2000). Stopping the testosterone briefly might allow for ovaries to recover enough to make eggs; success likely depends on the patient's age and duration of testosterone treatment. While not systematically studied, some FtM individuals are doing exactly that, and some have been able to become pregnant and deliver children (More, 1998).

Patients should be advised that these techniques are not available everywhere and can be very costly. Transsexual, transgender, and gender nonconforming people should not be refused reproductive options for any reason.

A special group of individuals are prepubertal or pubertal adolescents who will never develop reproductive function in their natal sex due to blockers or cross gender hormones. At this time there is no technique for preserving function from the gonads of these individuals.



# Voice and Communication Therapy

Communication, both verbal and nonverbal, is an important aspect of human behavior and gender expression. Transsexual, transgender, and gender nonconforming people might seek the assistance of a voice and communication specialist to develop vocal characteristics (e.g., pitch, intonation, resonance, speech rate, phrasing patterns) and non-verbal communication patterns (e.g., gestures, posture/movement, facial expressions) that facilitate comfort with their gender identity. Voice and communication therapy may help to alleviate gender dysphoria and be a positive and motivating step towards achieving one's goals for gender role expression.

## Competency of Voice and Communication Specialists Working with Transsexual, Transgender, and Gender Nonconforming Clients

Specialists may include speech-language pathologists, speech therapists, and speech-voice clinicians. In most countries the professional association for speech-language pathologists requires specific qualifications and credentials for membership. In some countries the government regulates practice through licensing, certification, or registration processes (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada).

The following are recommended minimum credentials for voice and communication specialists working with transsexual, transgender, and gender nonconforming clients:

1. Specialized training and competence in the assessment and development of communication skills in transsexual, transgender, and gender nonconforming clients.

2. A basic understanding of transgender health, including hormonal and surgical treatments for feminization/masculinization and trans-specific psychosocial issues as outlined in the *SOC*; and familiarity with basic sensitivity protocols such as the use of preferred gender pronoun and name (Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

3. Continuing education in the assessment and development of communication skills in transsexual, transgender, and gender nonconforming clients. This may include attendance at professional meetings, workshops, or seminars; participation in research related to gender identity issues; independent study; or mentoring from an experienced, certified clinician.

Other professionals such as vocal coaches, theatre professionals, singing teachers, and movement experts may play a valuable adjunct role. Such professionals will ideally have experience working with, or be actively collaborating with, speech-language pathologists.

## Assessment and Treatment Considerations

The overall purpose of voice and communication therapy is to help clients adapt their voice and communication in a way that is both safe and authentic, resulting in communication patterns that clients feel are congruent with their gender identity and that reflect their sense of self (Adler, Hirsch, & Mordaunt, 2006). It is essential that voice and communication specialists be sensitive to individual communication preferences. Communication – style, voice, choice of language, etc. – is personal. Individuals should not be counseled to adopt behaviors with which they are not comfortable or which do not feel authentic. Specialists can best serve their clients by taking the time to understand a person's gender concerns and goals for gender role expression (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia).

Individuals may choose the communication behaviors that they wish to acquire in accordance with their gender identity. These decisions are also informed and supported by the knowledge of the voice and communication specialist and by the assessment data for a specific client (Hancock, Krissinger, & Owen, 2010). Assessment includes a client's self-evaluation and a specialist's evaluation of voice, resonance, articulation, spoken language, and non-verbal communication (Adler et al., 2006; Hancock et al., 2010).

Voice and communication treatment plans are developed by considering the available research evidence, the clinical knowledge and experience of the specialist, and the client's own goals and values (American Speech-Language-Hearing Association, 2011; Canadian Association of Speech-Language Pathologists and Audiologists; Royal College of Speech Therapists, United Kingdom; Speech Pathology Australia; Vancouver Coastal Health, Vancouver, British Columbia, Canada). Targets of treatment typically include pitch, intonation, loudness and stress patterns, voice quality, resonance, articulation, speech rate and phrasing, language, and non-verbal communication (Adler et al., 2006; Davies & Goldberg, 2006; de Bruin, Coerts, & Greven, 2000; Gelfer, 1999; McNeill, 2006; Oates & Dacakis, 1983). Treatment may involve individual and/or group sessions. The frequency and duration of treatment will vary according to a client's needs. Existing protocols for voice and

communication treatment can be considered in developing an individualized therapy plan (Carew, Dacakis, & Oates, 2007; Dacakis, 2000; Davies & Goldberg, 2006; Gelfer, 1999; McNeill, Wilson, Clark, & Deakin, 2008; Mount & Salmon, 1988).

Feminizing or masculinizing the voice involves non-habitual use of the voice production mechanism. Prevention measures are necessary to avoid the possibility of vocal misuse and long-term vocal damage. All voice and communication therapy services should therefore include a vocal health component (Adler et al., 2006).

## Vocal Health Considerations after Voice Feminization Surgery

As noted in section XI, some transsexual, transgender, and gender nonconforming people will undergo voice feminization surgery. (Voice deepening can be achieved through masculinizing hormone therapy, but feminizing hormones do not have an impact on the adult MtF voice.) There are varying degrees of satisfaction, safety, and long-term improvement in patients who have had such surgery. It is recommended that individuals undergoing voice feminization surgery also consult a voice and communication specialist to maximize the surgical outcome, help protect vocal health, and learn non-pitch related aspects of communication. Voice surgery procedures should include follow-up sessions with a voice and communication specialist who is licensed and/or credentialed by the board responsible for speech therapists/speech-language pathologists in that country (Kanagalingam et al., 2005; Neumann & Welzel, 2004).



# XI

# Surgery_

## Sex Reassignment Surgery Is Effective and Medically Necessary

Surgery – particularly genital surgery – is often the last and the most considered step in the treatment process for gender dysphoria. While many transsexual, transgender, and gender nonconforming individuals find comfort with their gender identity, role, and expression without surgery, for many others surgery is essential and medically necessary to alleviate their gender dysphoria (Hage

& Karim, 2000). For the latter group, relief from gender dysphoria cannot be achieved without modification of their primary and/or secondary sex characteristics to establish greater congruence with their gender identity. Moreover, surgery can help patients feel more at ease in the presence of sex partners or in venues such as physicians' offices, swimming pools, or health clubs. In some settings, surgery might reduce risk of harm in the event of arrest or search by police or other authorities.

Follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Gijs & Brewaeys, 2007; Klein & Gorzalka, 2009; Pfäfflin & Junge, 1998). Additional information on the outcomes of surgical treatments are summarized in Appendix D.

## Ethical Questions Regarding Sex Reassignment Surgery

In ordinary surgical practice, pathological tissues are removed to restore disturbed functions, or alterations are made to body features to improve a patient's self image. Some people, including some health professionals, object on ethical grounds to surgery as a treatment for gender dysphoria, because these conditions are thought not to apply.

It is important that health professionals caring for patients with gender dysphoria feel comfortable about altering anatomically normal structures. In order to understand how surgery can alleviate the psychological discomfort and distress of individuals with gender dysphoria, professionals need to listen to these patients discuss their symptoms, dilemmas, and life histories. The resistance against performing surgery on the ethical basis of "above all do no harm" should be respected, discussed, and met with the opportunity to learn from patients themselves about the psychological distress of having gender dysphoria and the potential for harm caused by denying access to appropriate treatments.

Genital and breast/chest surgical treatments for gender dysphoria are not merely another set of elective procedures. Typical elective procedures involve only a private mutually consenting contract between a patient and a surgeon. Genital and breast/chest surgeries as medically necessary treatments for gender dysphoria are to be undertaken only after assessment of the patient by qualified mental health professionals, as outlined in section VII of the *SOC*. These surgeries may be performed once there is written documentation that this assessment has occurred and that the person has met the criteria for a specific surgical treatment. By following this procedure, mental health professionals, surgeons, and of course patients, share responsibility for the decision to make irreversible changes to the body.

It is unethical to deny availability or eligibility for sex reassignment surgeries solely on the basis of blood seropositivity for blood-borne infections such as HIV or hepatitis C or B.

# Relationship of Surgeons with Mental Health Professionals, Hormone-Prescribing Physicians (if Applicable), and Patients (Informed Consent)

The role of a surgeon in the treatment of gender dysphoria is not that of a mere technician. Rather, conscientious surgeons will have insight into each patient's history and the rationale that led to the referral for surgery. To that end, surgeons must talk at length with their patients and have close working relationships with other health professionals who have been actively involved in their clinical care.

Consultation is readily accomplished when a surgeon practices as part of an interdisciplinary health care team. In the absence of this, a surgeon must be confident that the referring mental health professional(s), and if applicable the physician who prescribes hormones, are competent in the assessment and treatment of gender dysphoria, because the surgeon is relying heavily on their expertise.

Once a surgeon is satisfied that the criteria for specific surgeries have been met (as outlined below), surgical treatment should be considered and a preoperative surgical consultation should take place. During this consultation, the procedure and postoperative course should be extensively discussed with the patient. Surgeons are responsible for discussing all of the following with patients seeking surgical treatments for gender dysphoria:

- The different surgical techniques available (with referral to colleagues who provide alternative options);

- The advantages and disadvantages of each technique;

- The limitations of a procedure to achieve "ideal" results; surgeons should provide a full range of before-and-after photographs of their own patients, including both successful and unsuccessful outcomes;

- The inherent risks and possible complications of the various techniques; surgeons should inform patients of their own complication rates with each procedure.

These discussions are the core of the informed consent process, which is both an ethical and legal requirement for any surgical procedure. Ensuring that patients have a realistic expectation of outcomes is important in achieving a result that will alleviate their gender dysphoria.

All of this information should be provided to patients in writing, in a language in which they are fluent, and in graphic illustrations. Patients should receive the information in advance (possibly via the internet) and given ample time to review it carefully. The elements of informed consent should always be discussed face-to-face prior to the surgical intervention. Questions can then be answered and written informed consent can be provided by the patient. Because these surgeries are irreversibile, care should be taken to ensure that patients have sufficient time to absorb information fully before they are asked to provide informed consent. A minimum of 24 hours is suggested.

Surgeons should provide immediate aftercare and consultation with other physicians serving the patient in the future. Patients should work with their surgeon to develop an adequate aftercare plan for the surgery.

## Overview of Surgical Procedures for the Treatment of Patients with Gender Dysphoria

**For the male-to-female (MtF) patient, surgical procedures may include the following:**

1. Breast/chest surgery: augmentation mammoplasty (implants/lipofilling);

2. Genital surgery: penectomy, orchiectomy, vaginoplasty, clitoroplasty, vulvoplasty;

3. Non-genital, non-breast surgical interventions: facial feminization surgery, liposuction, lipofilling, voice surgery, thyroid cartilage reduction, gluteal augmentation (implants/lipofilling), hair reconstruction, and various aesthetic procedures.

**For the female-to-male (FtM) patient, surgical procedures may include the following:**

1. Breast/chest surgery: subcutaneous mastectomy, creation of a male chest;

2. Genital surgery: hysterectomy/ovariectomy, reconstruction of the fixed part of the urethra, which can be combined with a metoidioplasty or with a phalloplasty (employing a pedicled or free vascularized flap), vaginectomy, scrotoplasty, and implantation of erection and/or testicular prostheses;

3. Non-genital, non-breast surgical interventions: voice surgery (rare), liposuction, lipofilling, pectoral implants, and various aesthetic procedures.

## Reconstructive Versus Aesthetic Surgery

The question of whether sex reassignment surgery should be considered "aesthetic" surgery or "reconstructive" surgery is pertinent not only from a philosophical point of view, but also from a financial point of view. Aesthetic or cosmetic surgery is mostly regarded as not medically necessary and therefore is typically paid for entirely by the patient. In contrast, reconstructive procedures are considered medically necessary – with unquestionable therapeutic results – and thus paid for partially or entirely by national health systems or insurance companies.

Unfortunately, in the field of plastic and reconstructive surgery (both in general and specifically for gender-related surgeries), there is no clear distinction between what is purely reconstructive and what is purely cosmetic. Most plastic surgery procedures actually are a mixture of both reconstructive and cosmetic components.

While most professionals agree that genital surgery and mastectomy cannot be considered purely cosmetic, opinions diverge as to what degree other surgical procedures (e.g., breast augmentation, facial feminization surgery) can be considered purely reconstructive. Although it may be much easier to see a phalloplasty or a vaginoplasty as an intervention to end lifelong suffering, for certain patients an intervention like a reduction rhinoplasty can have a radical and permanent effect on their quality of life, and therefore is much more medically necessary than for somebody without gender dysphoria.

## Criteria for Surgeries

As for all of the *SOC*, the criteria for initiation of surgical treatments for gender dysphoria were developed to promote optimal patient care. While the *SOC* allow for an individualized approach to best meet a patient's health care needs, a criterion for all breast/chest and genital surgeries is documentation of persistent gender dysphoria by a qualified mental health professional. For some surgeries, additional criteria include preparation and treatment consisting of feminizing/masculinizing hormone therapy and one year of continuous living in a gender role that is congruent with one's gender identity.

These criteria are outlined below. Based on the available evidence and expert clinical consensus, different recommendations are made for different surgeries.

The *SOC* do not specify an order in which different surgeries should occur. The number and sequence of surgical procedures may vary from patient to patient, according to their clinical needs.

**Criteria for breast/chest surgery (one referral)**

Criteria for mastectomy and creation of a male chest in FtM patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a pre-requisite.

Criteria for breast augmentation (implants/lipofilling) in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

# Criteria for genital surgery (two referrals)

The criteria for genital surgery are specific to the type of surgery being requested.

Criteria for hysterectomy and ovariectomy in FtM patients and for orchiectomy in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled.

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before the patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these procedures for medical indications other than gender dysphoria.

Criteria for metoidioplasty or phalloplasty in FtM patients and for vaginoplasty in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

6. 12 continuous months of living in a gender role that is congruent with their gender identity;

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

Rationale for a preoperative, 12-month experience of living in an identity-congruent gender role:

The criterion noted above for some types of genital surgeries – i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity – is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery. As noted in section VII, the social aspects of changing one's gender role are usually challenging – often more so than the physical aspects. Changing gender role can have profound personal and social consequences, and the decision to do so should include an awareness of what the familial, interpersonal, educational, vocational, economic, and legal challenges are likely to be, so that people can function successfully in their gender role. Support from a qualified mental health professional and from peers can be invaluable in ensuring a successful gender role adaptation (Bockting, 2008).

The duration of 12 months allows for a range of different life experiences and events that may occur throughout the year (e.g., family events, holidays, vacations, season-specific work or school experiences). During this time, patients should present consistently, on a day-to-day basis and across all settings of life, in their desired gender role. This includes coming out to partners, family, friends, and community members (e.g., at school, work, other settings).

Health professionals should clearly document a patient's experience in the gender role in the medical chart, including the start date of living full time for those who are preparing for genital surgery. In some situations, if needed, health professionals may request verification that this criterion has been fulfilled: They may communicate with individuals who have related to the patient in an identity-congruent gender role, or request documentation of a legal name and/or gender marker change, if applicable.

# Surgery for Persons with Psychotic Conditions and Other Serious Mental Illnesses

When patients with gender dysphoria are also diagnosed with severe psychiatric disorders and impaired reality testing (e.g., psychotic episodes, bipolar disorder, dissociative identity disorder, borderline personality disorder), an effort must be made to improve these conditions with psychotropic medications and/or psychotherapy before surgery is contemplated. Reevaluation by a mental health professional qualified to assess and manage psychotic conditions should be

conducted prior to surgery, describing the patient's mental status and readiness for surgery. It is preferable that this mental health professional be familiar with the patient. No surgery should be performed while a patient is actively psychotic (De Cuypere & Vercruysse, 2009).

## Competency of Surgeons Performing Breast/Chest or Genital Surgery

Physicians who perform surgical treatments for gender dysphoria should be urologists, gynecologists, plastic surgeons, or general surgeons, and board-certified as such by the relevant national and/or regional association. Surgeons should have specialized competence in genital reconstructive techniques as indicated by documented supervised training with a more experienced surgeon. Even experienced surgeons must be willing to have their surgical skills reviewed by their peers. An official audit of surgical outcomes and publication of these results would be greatly reassuring to both referring health professionals and patients. Surgeons should regularly attend professional meetings where new techniques are presented. The internet is often effectively used by patients to share information on their experience with surgeons and their teams.

Ideally, surgeons should be knowledgeable about more than one surgical technique for genital reconstruction so that they, in consultation with patients, can choose the ideal technique for each individual. Alternatively, if a surgeon is skilled in a single technique and this procedure is either not suitable for or desired by a patient, the surgeon should inform the patient about other procedures and offer referral to another appropriately skilled surgeon.

## Breast/Chest Surgery Techniques and Complications

Although breast/chest appearance is an important secondary sex characteristic, breast presence or size is not involved in the legal definitions of sex and gender and is not necessary for reproduction. The performance of breast/chest operations for treatment of gender dysphoria should be considered with the same care as beginning hormone therapy, as both produce relatively irreversible changes to the body.

For the MtF patient, a breast augmentation (sometimes called "chest reconstruction") is not different from the procedure in a natal female patient. It is usually performed through implantation of breast prostheses and occasionally with the lipofilling technique. Infections and capsular fibrosis are rare complications of augmentation mammoplasty in MtF patients (Kanhai, Hage, Karim, & Mulder, 1999).

For the FtM patient, a mastectomy or "male chest contouring" procedure is available. For many FtM patients, this is the only surgery undertaken. When the amount of breast tissue removed requires skin removal, a scar will result and the patient should be so informed. Complications of subcutaneous mastectomy can include nipple necrosis, contour irregularities, and unsightly scarring (Monstrey et al., 2008).

## Genital Surgery Techniques and Complications

Genital surgical procedures for the MtF patient may include orchiectomy, penectomy, vaginoplasty, clitoroplasty, and labiaplasty. Techniques include penile skin inversion, pedicled colosigmoid transplant, and free skin grafts to line the neovagina. Sexual sensation is an important objective in vaginoplasty, along with creation of a functional vagina and acceptable cosmesis.

Surgical complications of MtF genital surgery may include complete or partial necrosis of the vagina and labia, fistulas from the bladder or bowel into the vagina, stenosis of the urethra, and vaginas that are either too short or too small for coitus. While the surgical techniques for creating a neovagina are functionally and aesthetically excellent, anorgasmia following the procedure has been reported, and a second stage labiaplasty may be needed for cosmesis (Klein & Gorzalka, 2009; Lawrence, 2006).

Genital surgical procedures for FtM patients may include hysterectomy, ovariectomy (salpingo-oophorectomy), vaginectomy, metoidioplasty, scrotoplasty, urethroplasty, placement of testicular prostheses, and phalloplasty. For patients without former abdominal surgery, the laparoscopic technique for hysterectomy and salpingo-oophorectomy is recommended to avoid a lower-abdominal scar. Vaginal access may be difficult as most patients are nulliparous and have often not experienced penetrative intercourse. Current operative techniques for phalloplasty are varied. The choice of techniques may be restricted by anatomical or surgical considerations and by a client's financial considerations. If the objectives of phalloplasty are a neophallus of good appearance, standing micturition, sexual sensation, and/or coital ability, patients should be clearly informed that there are several separate stages of surgery and frequent technical difficulties, which may require additional operations. Even metoidioplasty, which in theory is a one-stage procedure for construction of a microphallus, often requires more than one operation. The objective of standing micturition with this technique can not always be ensured (Monstrey et al., 2009).

Complications of phalloplasty in FtMs may include frequent urinary tract stenoses and fistulas, and occasionally necrosis of the neophallus. Metoidioplasty results in a micropenis, without the capacity for standing urination. Phalloplasty, using a pedicled or a free vascularized flap, is a lengthy, multi-stage procedure with significant morbidity that includes frequent urinary complications and

unavoidable donor site scarring. For this reason, many FtM patients never undergo genital surgery other than hysterectomy and salpingo-oophorectomy (Hage & De Graaf, 1993).

Even patients who develop severe surgical complications seldom regret having undergone surgery. The importance of surgery can be appreciated by the repeated finding that quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2006).

## Other Surgeries

Other surgeries for assisting in body feminization include reduction thyroid chondroplasty (reduction of the Adam's apple), voice modification surgery, suction-assisted lipoplasty (contour modeling) of the waist, rhinoplasty (nose correction), facial bone reduction, face-lift, and blepharoplasty (rejuvenation of the eyelid). Other surgeries for assisting in body masculinization include liposuction, lipofilling, and pectoral implants. Voice surgery to obtain a deeper voice is rare but may be recommended in some cases, such as when hormone therapy has been ineffective.

Although these surgeries do not require referral by mental health professionals, such professionals can play an important role in assisting clients in making a fully informed decision about the timing and implications of such procedures in the context of the social transition.

Although most of these procedures are generally labeled "purely aesthetic," these same operations in an individual with severe gender dysphoria can be considered medically necessary, depending on the unique clinical situation of a given patient's condition and life situation. This ambiguity reflects reality in clinical situations, and allows for individual decisions as to the need and desirability of these procedures.



XII

# Postoperative Care and Follow-up

Long-term postoperative care and follow-up after surgical treatments for gender dysphoria are associated with good surgical and psychosocial outcomes (Monstrey et al., 2009). Follow-up is important to a patient's subsequent physical and mental health and to a surgeon's knowledge about the benefits and limitations of surgery. Surgeons who operate on patients coming from long

distances should include personal follow-up in their care plan and attempt to ensure affordable local long-term aftercare in their patients' geographic region.

Postoperative patients may sometimes exclude themselves from follow-up by specialty providers, including the hormone-prescribing physician (for patients receiving hormones), not recognizing that these providers are often best able to prevent, diagnose, and treat medical conditions that are unique to hormonally and surgically treated patients. The need for follow-up equally extends to mental health professionals, who may have spent a longer period of time with the patient than any other professional and therefore are in an excellent position to assist in any postoperative adjustment difficulties. Health professionals should stress the importance of postoperative follow-up care with their patients and offer continuity of care.

Postoperative patients should undergo regular medical screening according to recommended guidelines for their age. This is discussed more in the next section.

# XIII

# Lifelong Preventive and Primary Care

Transsexual, transgender, and gender nonconforming people need health care throughout their lives. For example, to avoid the negative secondary effects of having a gonadectomy at a relatively young age and/or receiving long-term, high-dose hormone therapy, patients need thorough medical care by providers experienced in primary care and transgender health. If one provider is not able to provide all services, ongoing communication among providers is essential.

Primary care and health maintenance issues should be addressed before, during, and after any possible changes in gender role and medical interventions to alleviate gender dysphoria. While hormone providers and surgeons play important roles in preventive care, every transsexual, transgender, and gender nonconforming person should partner with a primary care provider for overall health care needs (Feldman, 2007).

## General Preventive Health Care

Screening guidelines developed for the general population are appropriate for organ systems that are unlikely to be affected by feminizing/masculinizing hormone therapy. However, in areas such

as cardiovascular risk factors, osteoporosis, and some cancers (breast, cervical, ovarian, uterine, and prostate), such general guidelines may either over- or underestimate the cost-effectiveness of screening individuals who are receiving hormone therapy.

Several resources provide detailed protocols for the primary care of patients undergoing feminizing/masculinizing hormone therapy, including therapy that is provided after sex reassignment surgeries (Center of Excellence for Transgender Health, UCSF, 2011; Feldman & Goldberg, 2006; Feldman, 2007; Gorton, Buth, & Spade, 2005). Clinicians should consult their national evidence-based guidelines and discuss screening with their patients in light of the effects of hormone therapy on their baseline risk.

## Cancer Screening

Cancer screening of organ systems that are associated with sex can present particular medical and psychosocial challenges for transsexual, transgender, and gender nonconforming patients and their health care providers. In the absence of large-scale prospective studies, providers are unlikely to have enough evidence to determine the appropriate type and frequency of cancer screenings for this population. Over-screening results in higher health care costs, high false positive rates, and often unnecessary exposure to radiation and/or diagnostic interventions such as biopsies. Under-screening results in diagnostic delay for potentially treatable cancers. Patients may find cancer screening gender affirming (such as mammograms for MtF patients) or both physically and emotionally painful (such as Pap smears offer continuity of care for FtM patients).

## Urogenital Care

Gynecologic care may be necessary for transsexual, transgender, and gender nonconforming people of both sexes. For FtM patients, such care is needed predominantly for individuals who have not had genital surgery. For MtF patients, such care is needed after genital surgery. While many surgeons counsel patients regarding postoperative urogenital care, primary care clinicians and gynecologists should also be familiar with the special genital concerns of this population.

All MtF patients should receive counseling regarding genital hygiene, sexuality, and prevention of sexually transmitted infections; those who have had genital surgery should also be counseled on the need for regular vaginal dilation or penetrative intercourse in order to maintain vaginal depth and width (van Trotsenburg, 2009). Due to the anatomy of the male pelvis, the axis and the dimensions

of the neovagina differ substantially from those of a biologic vagina. This anatomic difference can affect intercourse if not understood by MtF patients and their partners (van Trotsenburg, 2009).

Lower urinary tract infections occur frequently in MtF patients who have had surgery because of the reconstructive requirements of the shortened urethra. In addition, these patients may suffer from functional disorders of the lower urinary tract; such disorders may be caused by damage of the autonomous nerve supply of the bladder floor during dissection between the rectum and the bladder, and by a change of the position of the bladder itself. A dysfunctional bladder (e.g., overactive bladder, stress or urge urinary incontinence) may occur after sex reassignment surgery (Hoebeke et al., 2005; Kuhn, Hiltebrand, & Birkhauser, 2007).

Most FtM patients do not undergo vaginectomy (colpectomy). For patients who take masculinizing hormones, despite considerable conversion of testosterone to estrogens, atrophic changes of the vaginal lining can be observed regularly and may lead to pruritus or burning. Examination can be both physically and emotionally painful, but lack of treatment can seriously aggravate the situation. Gynecologists treating the genital complaints of FtM patients should be aware of the sensitivity that patients with a male gender identity and masculine gender expression might have around having genitals typically associated with the female sex.



# XIV

# Applicability of the Standards of Care to People Living in Institutional Environments

The *SOC* in their entirety apply to all transsexual, transgender, and gender nonconforming people, irrespective of their housing situation. People should not be discriminated against in their access to appropriate health care based on where they live, including institutional environments such as prisons or long-/intermediate-term health care facilities (Brown, 2009). Health care for transsexual, transgender, and gender nonconforming people living in an institutional environment should mirror that which would be available to them if they were living in a non-institutional setting within the same community.

All elements of assessment and treatment as described in the *SOC* can be provided to people living in institutions (Brown, 2009). Access to these medically necessary treatments should not be denied on the basis of institutionalization or housing arrangements. If the in-house expertise of health professionals in the direct or indirect employ of the institution does not exist to assess

and/or treat people with gender dysphoria, it is appropriate to obtain outside consultation from professionals who are knowledgeable about this specialized area of health care.

People with gender dysphoria in institutions may also have co-existing mental health conditions (Cole et al., 1997). These conditions should be evaluated and treated appropriately.

People who enter an institution on an appropriate regimen of hormone therapy should be continued on the same, or similar, therapies and monitored according to the *SOC*. A "freeze frame" approach is not considered appropriate care in most situations (Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92-12820-MLW, 2002). People with gender dysphoria who are deemed appropriate for hormone therapy (following the *SOC*) should be started on such therapy. The consequences of abrupt withdrawal of hormones or lack of initiation of hormone therapy when medically necessary include a high likelihood of negative outcomes such as surgical self-treatment by autocastration, depressed mood, dysphoria, and/or suicidality (Brown, 2010).

Reasonable accommodations to the institutional environment can be made in the delivery of care consistent with the *SOC*, if such accommodations do not jeopardize the delivery of medically necessary care to people with gender dysphoria. An example of a reasonable accommodation is the use of injectable hormones, if not medically contraindicated, in an environment where diversion of oral preparations is highly likely (Brown, 2009). Denial of needed changes in gender role or access to treatments, including sex reassignment surgery, on the basis of residence in an institution are not reasonable accommodations under the *SOC* (Brown, 2010).

Housing and shower/bathroom facilities for transsexual, transgender, and gender nonconforming people living in institutions should take into account their gender identity and role, physical status, dignity, and personal safety. Placement in a single-sex housing unit, ward, or pod on the sole basis of the appearance of the external genitalia may not be appropriate and may place the individual at risk for victimization (Brown, 2009).

Institutions where transsexual, transgender, and gender nonconforming people reside and receive health care should monitor for a tolerant and positive climate to ensure that residents are not under attack by staff or other residents.

# XV

# Applicability of the Standards of Care to People With Disorders of Sex Development

## Terminology

The term *disorder of sex development* (DSD) refers to a somatic condition of atypical development of the reproductive tract (Hughes, Houk, Ahmed, Lee, & LWPES1/ESPE2 Consensus Group, 2006). DSDs include the condition that used to be called *intersexuality*. Although the terminology was changed to *DSD* during an international consensus conference in 2005 (Hughes et al., 2006), disagreement about language use remains. Some people object strongly to the "disorder" label, preferring instead to view these congenital conditions as a matter of diversity (Diamond, 2009) and to continue using the terms *intersex* or *intersexuality*. In the *SOC*, WPATH uses the term *DSD* in an objective and value-free manner, with the goal of ensuring that health professionals recognize this medical term and use it to access relevant literature as the field progresses. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

## Rationale for Addition to the SOC

Previously, individuals with a DSD who also met the *DSM-IV-TR's* behavioral criteria for Gender Identity Disorder (American Psychiatric Association, 2000) were excluded from that general diagnosis. Instead, they were categorized as having a "Gender Identity Disorder - Not Otherwise Specified." They were also excluded from the WPATH *Standards of Care*.

The current proposal for *DSM-5* (www.dsm5.org) is to replace the term *gender identity disorder* with *gender dysphoria*. Moreover, the proposed changes to the *DSM* consider gender dysphoric people with a DSD to have a subtype of gender dysphoria. This proposed categorization – which explicitly differentiates between gender dysphoric individuals with and without a DSD – is justified: In people with a DSD, gender dysphoria differs in its phenomenological presentation, epidemiology, life trajectories, and etiology (Meyer-Bahlburg, 2009).

Adults with a DSD and gender dysphoria have increasingly come to the attention of health professionals. Accordingly, a brief discussion of their care is included in this version of the *SOC*.

## Health History Considerations

Health professionals assisting patients with both a DSD and gender dysphoria need to be aware that the medical context in which such patients have grown up is typically very different from that of people without a DSD.

Some people are recognized as having a DSD through the observation of gender-atypical genitals at birth. (Increasingly this observation is made during the prenatal period by way of imaging procedures such as ultrasound.) These infants then undergo extensive medical diagnostic procedures. After consultation among the family and health professionals – during which the specific diagnosis, physical and hormonal findings, and feedback from long-term outcome studies (Cohen-Kettenis, 2005; Dessens, Slijper, & Drop, 2005; Jurgensen, Hiort, Holterhus, & Thyen, 2007; Mazur, 2005; Meyer-Bahlburg, 2005; Stikkelbroeck et al., 2003; Wisniewski, Migeon, Malouf, & Gearhart, 2004) are considered – the newborn is assigned a sex, either male or female.

Other individuals with a DSD come to the attention of health professionals around the age of puberty through the observation of atypical development of secondary sex characteristics. This observation also leads to a specific medical evaluation.

The type of DSD and severity of the condition has significant implications for decisions about a patient's initial sex assignment, subsequent genital surgery, and other medical and psychosocial care (Meyer-Bahlburg, 2009). For instance, the degree of prenatal androgen exposure in individuals with a DSD has been correlated with the degree of masculinization of gender-related *behavior* (that is, *gender role and expression*); however, the correlation is only moderate, and considerable behavioral variability remains unaccounted for by prenatal androgen exposure (Jurgensen et al., 2007; Meyer-Bahlburg, Dolezal, Baker, Ehrhardt, & New, 2006). Notably, a similar correlation of prenatal hormone exposure with gender *identity* has not been demonstrated (e.g., Meyer-Bahlburg et al., 2004). This is underlined by the fact that people with the same (core) gender identity can vary widely in the degree of masculinization of their gender-related behavior.

# Assessment and Treatment of Gender Dysphoria in People with Disorders of Sex Development

Very rarely are individuals with a DSD identified as having gender dysphoria *before* a DSD diagnosis has been made. Even so, a DSD diagnosis is typically apparent with an appropriate history and basic physical exam – both of which are part of a medical evaluation for the appropriateness of hormone therapy or surgical interventions for gender dysphoria. Mental health professionals should ask their clients presenting with gender dysphoria to have a physical exam, particularly if they are not currently seeing a primary care (or other health care) provider.

Most people with a DSD who are born with genital ambiguity do not develop gender dysphoria (e.g., Meyer-Bahlburg et al., 2004; Wisniewski et al., 2004). However, some people with a DSD will develop chronic gender dysphoria and even undergo a change in their birth-assigned sex and/ or their gender role (Meyer-Bahlburg, 2005; Wilson, 1999; Zucker, 1999). If there are persistent and strong indications that gender dysphoria is present, a comprehensive evaluation by clinicians skilled in the assessment and treatment of gender dysphoria is essential, irrespective of the patient's age. Detailed recommendations have been published for conducting such an assessment and for making treatment decisions to address gender dysphoria in the context of a DSD (Meyer-Bahlburg, in press). Only after thorough assessment should steps be taken in the direction of changing a patient's birth-assigned sex or gender role.

Clinicians assisting these patients with treatment options to alleviate gender dysphoria may profit from the insights gained from providing care to patients without a DSD (Cohen-Kettenis, 2010). However, certain criteria for treatment (e.g., age, duration of experience with living in the desired gender role) are usually not routinely applied to people with a DSD; rather, the criteria are interpreted in light of a patient's specific situation (Meyer-Bahlburg, in press). In the context of a DSD, changes in birth-assigned sex and gender role have been made at any age between early elementary-school age and middle adulthood. Even genital surgery may be performed much earlier in these patients than in gender dysphoric individuals without a DSD if the surgery is well justified by the diagnosis, by the evidence-based gender-identity prognosis for the given syndrome and syndrome severity, and by the patient's wishes.

One reason for these treatment differences is that genital surgery in individuals with a DSD is quite common in infancy and adolescence. Infertility may already be present due to either early gonadal failure or to gonadectomy because of a malignancy risk. Even so, it is advisable for patients with a DSD to undergo a full social transition to another gender role only if there is a long-standing history of gender-atypical behavior, and if gender dysphoria and/or the desire to change one's gender role has been strong and persistent for a considerable period of time. Six months is the time period of full symptom expression required for the application of the gender dysphoria diagnosis proposed for *DSM-5* (Meyer-Bahlburg, in press).

## Additional Resources

The gender-relevant medical histories of people with a DSD are often complex. Their histories may include a great variety of inborn genetic, endocrine, and somatic atypicalities, as well as various hormonal, surgical, and other medical treatments. For this reason, many additional issues need to be considered in the psychosocial and medical care of such patients, regardless of the presence of gender dysphoria. Consideration of these issues is beyond what can be covered in the *SOC*. The interested reader is referred to existing publications (e.g., Cohen-Kettenis & Pfäfflin, 2003; Meyer-Bahlburg, 2002, 2008). Some families and patients also find it useful to consult or work with community support groups.

There is a very substantial medical literature on the medical management of patients with a DSD. Much of this literature has been produced by high-level specialists in pediatric endocrinology and urology, with input from specialized mental health professionals, especially in the area of gender. Recent international consensus conferences have addressed evidence-based care guidelines (including issues of gender and of genital surgery) for DSD in general (Hughes et al., 2006) and specifically for Congenital Adrenal Hyperplasia (Joint LWPES/ESPE CAH Working Group et al., 2002; Speiser et al., 2010). Others have addressed the research needs for DSD in general (Meyer-Bahlburg & Blizzard, 2004) and for selected syndromes such as 46,XXY (Simpson et al., 2003).

●　　●　　●

# References

Abramowitz, S. I. (1986). Psychosocial outcomes of sex reassignment surgery. *Journal of Consulting and Clinical Psychology, 54*(2), 183-189. doi:10.1037/0022-006X.54.2.183

ACOG Committee of Gynecologic Practice. (2005). Committee opinion #322: Compounded bioidentical hormones. *Obstetrics & Gynecology, 106*(5), 139-140.

Adler, R. K., Hirsch, S., & Mordaunt, M. (2006). *Voice and communication therapy for the transgender/transsexual client: A comprehensive clinical guide*. San Diego, CA: Plural Pub.

American Academy of Family Physicians. (2005). *Definition of family medicine*. Retrieved August 10, 2009, from http://www.aafp.org/online/en/home/policy/policies/f/fammeddef.html

American Medical Association. (2008). *Resolution 122 (A-08)*. Retrieved from http://www.ama-assn.org/ama1/pub/upload/mm/471/122.doc

American Psychiatric Association. (2000). *Diagnostic and statistical manual of mental disorders DSM-IV-TR* (4th ed., text rev.). Washington, DC: Author.

American Speech-Language-Hearing Association. (2011). *Scope of practice.* Retrieved from www.asha.org

Anton, B. S. (2009). Proceedings of the American Psychological Association for the legislative year 2008: Minutes of the annual meeting of the council of representatives, February 22-24, 2008, Washington, DC, and August 13 and 17, 2008, Boston, MA, and minutes of the February, June, August, and December 2008 meetings of the board of directors. *American Psychologist, 64*, 372-453. doi:10.1037/a0015932

Asscheman, H., Giltay, E. J., Megens, J. A. J., de Ronde, W., van Trotsenburg, M. A. A., & Gooren, L. J. G. (2011). A long-term follow-up study of mortality in transsexuals receiving treatment with cross-sex hormones. *European Journal of Endocrinology, 164*(4), 635-642. doi:10.1530/EJE-10-1038

Baba, T., Endo, T., Honnma, H., Kitajima, Y., Hayashi, T., Ikeda, H., . . . Saito, T. (2007). Association between polycystic ovary syndrome and female-to-male transsexuality. *Human Reproduction, 22*(4), 1011-1016. doi:10.1093/humrep/del474

Bakker, A., Van Kesteren, P. J., Gooren, L. J., & Bezemer, P. D. (1993). The prevalence of transsexualism in the Netherlands. *Acta Psychiatrica Scandinavica, 87*(4), 237-238. doi:10.1111/j.1600-0447.1993.tb03364.x

Balen, A. H., Schachter, M. E., Montgomery, D., Reid, R. W., & Jacobs, H. S. (1993). Polycystic ovaries are a common finding in untreated female to male transsexuals. *Clinical Endocrinology, 38*(3), 325-329. doi:10.1111/j.1365-2265.1993.tb01013.x

Basson, R. (2001). Towards optimal hormonal treatment of male to female gender identity disorder. *Journal of Sexual and Reproductive Medicine, 1*(1), 45-51.

Basson, R., & Prior, J. C. (1998). Hormonal therapy of gender dysphoria: The male-to-female transsexual. In D. Denny (Ed.), *Current concepts in transgender identity* (pp. 277-296). New York: Garland Publishing, Inc.

Benjamin, H. (1966). *The transsexual phenomenon*. New York: Julian Press.

Besnier, N. (1994). Polynesian gender liminality through time and space. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 285-328). New York: Zone Books.

Bockting, W. O. (1999). From construction to context: Gender through the eyes of the transgendered. *Siecus Report, 28*(1), 3-7.

Bockting, W. O. (2008). Psychotherapy and the real-life experience: From gender dichotomy to gender diversity. *Sexologies, 17*(4), 211-224. doi:10.1016/j.sexol.2008.08.001

Bockting, W. O., & Coleman, E. (2007). Developmental stages of the transgender coming out process: Toward an integrated identity. In R. Ettner, S. Monstrey & A. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 185-208). New York: The Haworth Press.

Bockting, W. O., & Goldberg, J. M. (2006). Guidelines for transgender care (special issue). *International Journal of Transgenderism, 9*(3/4).

Bockting, W. O., Knudson, G., & Goldberg, J. M. (2006). Counseling and mental health care for transgender adults and loved ones. *International Journal of Transgenderism, 9*(3/4), 35-82. doi:10.1300/J485v09n03_03

Bolin, A. (1988). *In search of Eve* (pp. 189-192). New York: Bergin & Garvey.

Bolin, A. (1994). Transcending and transgendering: Male-to-female transsexuals, dichotomy and diversity. In G. Herdt (Ed.), *Third sex, third gender: Beyond sexual dimorphism in culture and history* (pp. 447-486). New York: Zone Books.

Bornstein, K. (1994). *Gender outlaw: On men, women, and the rest of us.* New York: Routledge.

Bosinski, H. A. G., Peter, M., Bonatz, G., Arndt, R., Heidenreich, M., Sippell, W. G., & Wille, R. (1997). A higher rate of hyperandrogenic disorders in female-to-male transsexuals. *Psychoneuroendocrinology, 22*(5), 361-380. doi:10.1016/S0306-4530(97)00033-4

Brill, S. A., & Pepper, R. (2008). *The transgender child: A handbook for families and professionals.* Berkeley, CA: Cleis Press.

Brown, G. R. (2009). Recommended revisions to The World Professional Association for Transgender Health's Standards of Care section on medical care for incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 11*(2), 133-139. doi:10.1080/15532730903008073

Brown, G. R. (2010). Autocastration and autopenectomy as surgical self-treatment in incarcerated persons with gender identity disorder. *International Journal of Transgenderism, 12*(1), 31-39. doi:10.1080/15532731003688970

Bullough, V. L., & Bullough, B. (1993). *Cross dressing, sex, and gender.* Philadelphia, PA: University of Pennsylvania Press.

Callen Lorde Community Health Center. (2000). *Transgender health program protocols.* Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Callen Lorde Community Health Center. (2011). *Transgender health program protocols.* Retrieved from http://www.callen-lorde.org/documents/TG_Protocol_Request_Form2.pdf

Canadian Association of Speech-Language Pathologists and Audiologists. http://www.caslpa.ca/

Carew, L., Dacakis, G., & Oates, J. (2007). The effectiveness of oral resonance therapy on the perception of femininity of voice in male-to-female transsexuals. *Journal of Voice, 21*(5), 591-603. doi:10.1016/j.jvoice.2006.05.005

Carnegie, C. (2004). Diagnosis of hypogonadism: Clinical assessments and laboratory tests. *Reviews in Urology, 6*(Suppl 6), S3-8.

Cattrall, F. R., & Healy, D. L. (2004). Long-term metabolic, cardiovascular and neoplastic risks with polycystic ovary syndrome. *Best Practice & Research Clinical Obstetrics & Gynaecology, 18*(5), 803-812. doi:10.1016/j.bpobgyn.2004.05.005

Center of Excellence for Transgender Health, UCSF. (2011). *Primary care protocol for transgender health care.* Retrieved from http://transhealth.ucsf.edu/trans?page=protocol-00-00

Chiñas, B. (1995). Isthmus Zapotec attitudes toward sex and gender anomalies. In S. O. Murray (Ed.), *Latin American male homosexualities* (pp. 293-302). Albuquerque, NM: University of New Mexico Press.

Clements, K., Wilkinson, W., Kitano, K., & Marx, R. (1999). HIV prevention and health service needs of the transgender community in San Francisco. *International Journal of Transgenderism, 3*(1), 2-17.

Cohen-Kettenis, P. T. (2001). Gender identity disorder in DSM? *Journal of the American Academy of Child & Adolescent Psychiatry, 40*(4), 391-391. doi:10.1097/00004583-200104000-00006

Cohen-Kettenis, P. T. (2005). Gender change in 46,XY persons with 5 -reductase-2 deficiency and 17 -hydroxysteroid dehydrogenase-3 deficiency. *Archives of Sexual Behavior, 34*(4), 399-410. doi:10.1007/s10508-005-4339-4

Cohen-Kettenis, P. T. (2006). Gender identity disorders. In C. Gillberg, R. Harrington & H. C. Steinhausen (Eds.), *A clinician's handbook of child and adolescent psychiatry* (pp. 695-725). New York: Cambridge University Press.

Cohen-Kettenis, P. T. (2010). Psychosocial and psychosexual aspects of disorders of sex development. *Best Practice & Research Clinical Endocrinology & Metabolism, 24*(2), 325-334. doi:10.1016/j.beem.2009.11.005

Cohen-Kettenis, P. T., & Kuiper, A. J. (1984). Transseksualiteit en psychothérapie. *Tijdschrift Voor Psychotherapie, 10*, 153-166.

Cohen-Kettenis, P. T., Owen, A., Kaijser, V. G., Bradley, S. J., & Zucker, K. J. (2003). Demographic characteristics, social competence, and behavior problems in children with gender identity disorder: A cross-national, cross-clinic comparative analysis. *Journal of Abnormal Child Psychology, 31*(1), 41-53. doi:10.1023/A:1021769215342

Cohen-Kettenis, P. T., & Pfäfflin, F. (2003). *Transgenderism and intersexuality in childhood and adolescence: Making choices*. Thousand Oaks, CA: Sage Publications, Inc.

Cohen-Kettenis, P. T., & Pfäfflin, F. (2010). The DSM diagnostic criteria for gender identity disorder in adolescents and adults. *Archives of Sexual Behavior, 39*(2), 499-513. doi:10.1007/s10508-009-9562-y

Cohen-Kettenis, P. T., Schagen, S. E. E., Steensma, T. D., de Vries, A. L. C., & Delemarre-van de Waal, H. A. (2011). Puberty suppression in a gender-dysphoric adolescent: A 22-year follow-up. *Archives of Sexual Behavior, 40*(4), 843-847. doi:0.1007/s10508-011-9758-9

Cohen-Kettenis, P. T., Wallien, M., Johnson, L. L., Owen-Anderson, A. F. H., Bradley, S. J., & Zucker, K. J. (2006). A parent-report gender identity questionnaire for children: A cross-national, cross-clinic comparative analysis. *Clinical Child Psychology and Psychiatry, 11*(3), 397-405. doi:10.1177/1359104506059135

Cole, C. M., O'Boyle, M., Emory, L. E., & Meyer III, W. J. (1997). Comorbidity of gender dysphoria and other major psychiatric diagnoses. *Archives of Sexual Behavior, 26*(1), 13-26.

Coleman, E., Colgan, P., & Gooren, L. (1992). Male cross-gender behavior in Myanmar (Burma): A description of the acault. *Archives of Sexual Behavior, 21*(3), 313-321.

Costa, L. M., & Matzner, A. (2007). *Male bodies, women's souls: Personal narratives of Thailand's transgendered youth*. Binghamton, NY: Haworth Press.

Currah, P., Juang, R. M., & Minter, S. (2006). *Transgender rights*. Minneapolis, MN: University of Minnesota Press.

Currah, P., & Minter, S. (2000). Unprincipled exclusions: The struggle to achieve judicial and legislative equality for transgender people. *William and Mary Journal of Women and Law, 7*, 37-60.

Dacakis, G. (2000). Long-term maintenance of fundamental frequency increases in male-to-female transsexuals. *Journal of Voice, 14*(4), 549-556. doi:10.1016/S0892-1997(00)80010-7

Dahl, M., Feldman, J. L., Goldberg, J. M., & Jaberi, A. (2006). Physical aspects of transgender endocrine therapy. *International Journal of Transgenderism, 9*(3), 111-134. doi:10.1300/J485v09n03_06

Darney, P. D. (2008). Hormonal contraception. In H. M. Kronenberg, S. Melmer, K. S. Polonsky & P. R. Larsen (Eds.), *Williams textbook of endocrinology* (11th ed., pp. 615-644). Philadelphia: Saunders.

Davies, S., & Goldberg, J. M. (2006). Clinical aspects of transgender speech feminization and masculinization. *International Journal of Transgenderism, 9*(3-4), 167-196. doi:10.1300/J485v09n03_08

de Bruin, M. D., Coerts, M. J., & Greven, A. J. (2000). Speech therapy in the management of male-to-female transsexuals. *Folia Phoniatrica Et Logopaedica, 52*(5), 220-227.

De Cuypere, G., T'Sjoen, G., Beerten, R., Selvaggi, G., De Sutter, P., Hoebeke, P., . . . Rubens, R. (2005). Sexual and physical health after sex reassignment surgery. *Archives of Sexual Behavior, 34*(6), 679-690. doi:10.1007/s10508-005-7926-5

De Cuypere, G., Van Hemelrijck, M., Michel, A., Carael, B., Heylens, G., Rubens, R., . . . Monstrey, S. (2007). Prevalence and demography of transsexualism in Belgium. *European Psychiatry, 22*(3), 137-141. doi:10.1016/j.eurpsy.2006.10.002

De Cuypere, G., & Vercruysse, H. (2009). Eligibility and readiness criteria for sex reassignment surgery: Recommendations for revision of the WPATH standards of care. *International Journal of Transgenderism, 11*(3), 194-205. doi:10.1080/15532730903383781

de Lignières, B. (1999). Oral micronized progesterone. *Clinical Therapeutics, 21*(1), 41-60. doi:10.1016/S0149-2918(00)88267-3

De Sutter, P. (2009). Reproductive options for transpeople: Recommendations for revision of the WPATH's standards of care. *International Journal of Transgenderism, 11*(3), 183-185. doi:10.1080/15532730903383765

De Sutter, P., Kira, K., Verschoor, A., & Hotimsky, A. (2002). The desire to have children and the preservation of fertility in transsexual women: A survey. *International Journal of Transgenderism, 6*(3), retrieved from http://www.wpath.org/journal/www. iiav.nl/ezines /web/IJT/97-03/numbers/symposion/ ijtvo06no03_02.htm

de Vries, A. L. C., Cohen-Kettenis, P. T., & Delemarre-van de Waal, H. A. (2006). Clinical management of gender dysphoria in adolescents. *International Journal of Transgenderism, 9*(3-4), 83-94. doi:10.1300/ J485v09n03_04

de Vries, A. L. C., Doreleijers, T. A. H., Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Psychiatric comorbidity in gender dysphoric adolescents. *Journal of Child Psychology and Psychiatry.* Advance online publication. doi:10.1111/j.1469-7610.2011.02426.x

de Vries, A. L. C., Noens, I. L. J., Cohen-Kettenis, P. T., van Berckelaer-Onnes, I. A., & Doreleijers, T. A. (2010). Autism spectrum disorders in gender dysphoric children and adolescents. *Journal of Autism and Developmental Disorders, 40*(8), 930-936. doi:10.1007/s10803-010-0935-9

de Vries, A. L. C., Steensma, T. D., Doreleijers, T. A. H., & Cohen-Kettenis, P. T. (2010). Puberty suppression in adolescents with gender identity disorder: A prospective follow-up study. *The Journal of Sexual Medicine.* Advance online publication. doi:10.1111/j.1743-6109.2010.01943.x

Delemarre-van de Waal, H. A., & Cohen-Kettenis, P. T. (2006). Clinical management of gender identity disorder in adolescents: A protocol on psychological and paediatric endocrinology aspects. *European Journal of Endocrinology, 155*(suppl 1), S131-S137. doi:10.1530/eje.1.02231

Delemarre-van de Waal, H. A., van Weissenbruch, M. M., & Cohen Kettenis, P. T. (2004). Management of puberty in transsexual boys and girls. *Hormone Research in Paediatrics, 62*(suppl 2), 75-75. doi:10.1159/000081145

Derrig-Palumbo, K., & Zeine, F. (2005). *Online therapy: A therapist's guide to expanding your practice.* New York: W.W. Norton & Co.

Dessens, A. B., Slijper, F. M. E., & Drop, S. L. S. (2005). Gender dysphoria and gender change in chromosomal females with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 34*(4), 389-397. doi:10.1007/s10508-005-4338-5

Devor, A. H. (2004). Witnessing and mirroring: A fourteen stage model. *Journal of Gay and Lesbian Psychotherapy, 8*(1/2), 41-67.

Di Ceglie, D., & Thümmel, E. C. (2006). An experience of group work with parents of children and adolescents with gender identity disorder. *Clinical Child Psychology and Psychiatry, 11*(3), 387-396. doi:10.1177/1359104506064983

Diamond, M. (2009). Human intersexuality: Difference or disorder? *Archives of Sexual Behavior, 38*(2), 172-172. doi:10.1007/s10508-008-9438-6

Dobs, A. S., Meikle, A. W., Arver, S., Sanders, S. W., Caramelli, K. E., & Mazer, N. A. (1999). Pharmacokinetics, efficacy, and safety of a permeation-enhanced testosterone transdermal system in comparison with bi-weekly injections of testosterone enanthate for the treatment of hypogonadal men. *Journal of Clinical Endocrinology & Metabolism, 84*(10), 3469-3478. doi:10.1210/jc.84.10.3469

Docter, R. F. (1988). *Transvestites and transsexuals: Toward a theory of cross-gender behavior.* New York: Plenum Press.

Drummond, K. D., Bradley, S. J., Peterson-Badali, M., & Zucker, K. J. (2008). A follow-up study of girls with gender identity disorder. *Developmental Psychology, 44*(1), 34-45. doi:10.1037/0012-1649.44.1.34

Ehrbar, R. D., & Gorton, R. N. (2010). Exploring provider treatment models in interpreting the standards of care. *International Journal of Transgenderism, 12*(4), 198-2010. doi:10.1080/15532739.2010.544235

Ekins, R., & King, D. (2006). *The transgender phenomenon*. Thousand Oaks, CA: SAGE Publications Ltd.

Eklund, P. L., Gooren, L. J., & Bezemer, P. D. (1988). Prevalence of transsexualism in the Netherlands. *British Journal of Psychiatry, 152*(5), 638-640.

Eldh, J., Berg, A., & Gustafsson, M. (1997). Long-term follow up after sex reassignment surgery. *Scandinavian Journal of Plastic and Reconstructive Surgery and Hand Surgery, 31*(1), 39-45.

Emerson, S., & Rosenfeld, C. (1996). Stages of adjustment in family members of transgender individuals. *Journal of Family Psychotherapy, 7*(3), 1-12. doi:10.1300/J085V07N03_01

Emory, L. E., Cole, C. M., Avery, E., Meyer, O., & Meyer III, W. J. (2003). Client's view of gender identity: Life, treatment status and outcome. *18th Biennial Harry Benjamin Symposium,* Gent, Belgium.

Ettner, R., Monstrey, S., & Eyler, A. (Eds.) (2007). *Principles of transgender medicine and surgery*. Binghamton, NY: The Haworth Press.

Eyler, A. E. (2007). Primary medical care of the gender-variant patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender medicine and surgery* (pp. 15-32). Binghamton, NY: The Haworth Press.

Factor, R. J., & Rothblum, E. (2008). Exploring gender identity and community among three groups of transgender individuals in the United States: MTFs, FTMs, and genderqueers. *Health Sociology Review, 17*(3), 235-253.

Feinberg, L. (1996). *Transgender warriors: Making history from Joan of Arc to Dennis Rodman*. Boston, MA: Beacon Press.

Feldman, J. (2005, April). *Masculinizing hormone therapy with testosterone 1% topical gel*. Paper presented at the 19th Biennial Symposium of the Harry Benjamin International Gender Dysphoria Association, Bologna, Italy.

Feldman, J. (2007). Preventive care of the transgendered patient. In R. Ettner, S. Monstrey & E. Eyler (Eds.), *Principles of transgender surgery and medicine* (pp. 33-72). Binghamton, NY: The Haworth Press.

Feldman, J., & Goldberg, J. (2006). Transgender primary medical care. *International Journal of Transgenderism, 9*(3), 3-34. doi:10.1300/J485v09n03_02

Feldman, J., & Safer, J. (2009). Hormone therapy in adults: Suggested revisions to the sixth version of the standards of care. *International Journal of Transgenderism, 11*(3), 146-182. doi:10.1080/15532730903383757

Fenichel, M., Suler, J., Barak, A., Zelvin, E., Jones, G., Munro, K., . . . Walker-Schmucker, W. (2004). *Myths and realities of online clinical work, observations on the phenomena of online behavior, experience, and therapeutic relationships. A 3rd-year report from ISMHO's clinical case study group.* Retrieved May 24, 2011, from https://www.ismho.org/myths_n_realities.asp

Fenway Community Health Transgender Health Program. (2007). *Protocol for hormone therapy.* Retrieved from http://www.fenwayhealth.org/site/DocServer/Fenway_Protocols.pdf?docID=2181

Fisk, N. M. (1974). Editorial: Gender dysphoria syndrome--the conceptualization that liberalizes indications for total gender reorientation and implies a broadly based multi-dimensional rehabilitative regimen. *Western Journal of Medicine, 120*(5), 386-391.

Fitzpatrick, L. A., Pace, C., & Wiita, B. (2000). Comparison of regimens containing oral micronized progesterone or medroxyprogesterone acetate on quality of life in postmenopausal women: A cross-sectional survey. *Journal of Women's Health & Gender-Based Medicine, 9*(4), 381-387.

Frank, J. D., & Frank, J. B. (1993). *Persuasion and healing: A comparative study of psychotherapy* (Third ed.). Baltimore, MD: Johns Hopkins University Press.

Fraser, L. (2009a). Depth psychotherapy with transgender people. *Sexual and Relationship Therapy, 24*(2), 126-142. doi:10.1080/14681990903003878

Fraser, L. (2009b). Etherapy: Ethical and clinical considerations for version 7 of The World Professional Association for Transgender Health's standards of care. *International Journal of Transgenderism, 11*(4), 247-263. doi:10.1080/15532730903439492

Fraser, L. (2009c). Psychotherapy in The World Professional Association for Transgender Health's standards of care: Background and recommendations. *International Journal of Transgenderism, 11*(2), 110-126. doi:10.1080/15532730903008057

Garaffa, G., Christopher, N. A., & Ralph, D. J. (2010). Total phallic reconstruction in female-to-male transsexuals. *European Urology, 57*(4), 715-722. doi:10.1016/j.eururo.2009.05.018

Gelder, M. G., & Marks, I. M. (1969). Aversion treatment in transvestism and transsexualism. In R. Green, & J. Money (Eds.), *Transsexualism and sex reassignment* (pp. 383-413). Baltimore, MD: Johns Hopkins Press.

Gelfer, M. P. (1999). Voice treatment for the male-to-female transgendered client. *American Journal of Speech-Language Pathology, 8*(3), 201-208.

Gharib, S., Bigby, J., Chapin, M., Ginsburg, E., Johnson, P., Manson, J., & Solomon, C. (2005). *Menopause: A guide to management.* Boston, MA: Brigham and Women's Hospital.

Gijs, L., & Brewaeys, A. (2007). Surgical treatment of gender dysphoria in adults and adolescents: Recent developments, effectiveness, and challenges. *Annual Review of Sex Research, 18*, 178-224.

Gold, M., & MacNish, M. (2011). *Adjustment and resiliency following disclosure of transgender identity in families of adolescents and young adults: Themes and clinical implications*. Washington, DC: American Family Therapy Academy.

Gómez-Gil, E., Trilla, A., Salamero, M., Godás, T., & Valdés, M. (2009). Sociodemographic, clinical, and psychiatric characteristics of transsexuals from Spain. *Archives of Sexual Behavior, 38*(3), 378-392. doi:10.1007/s10508-007-9307-8

Gooren, L. (2005). Hormone treatment of the adult transsexual patient. *Hormone Research in Paediatrics, 64*(Suppl 2), 31-36. doi:10.1159/000087751

Gorton, R. N., Buth, J., & Spade, D. (2005). *Medical therapy and health maintenance for transgender men: A guide for health care providers*. San Francisco, CA: Lyon-Martin Women's Health Services.

Green, R. (1987). *The"sissy boy syndrome" and the development of homosexuality*. New Haven, CT: Yale University Press.

Green, R., & Fleming, D. (1990). Transsexual surgery follow-up: Status in the 1990s. *Annual Review of Sex Research, 1*(1), 163-174.

Greenson, R. R. (1964). On homosexuality and gender identity. *International Journal of Psycho-Analysis, 45*, 217-219.

Grossman, A. H., D'Augelli, A. R., Howell, T. J., & Hubbard, S. (2006). Parent's reactions to transgender youth's gender nonconforming expression and identity. *Journal of Gay & Lesbian Social Services, 18*(1), 3-16. doi:10.1300/J041v18n01_02

Grossman, A. H., D'Augelli, A. R., & Salter, N. P. (2006). Male-to-female transgender youth: Gender expression milestones, gender atypicality, victimization, and parents' responses. *Journal of GLBT Family Studies, 2*(1), 71-92.

Grumbach, M. M., Hughes, I. A., & Conte, F. A. (2003). Disorders of sex differentiation. In P. R. Larsen, H. M. Kronenberg, S. Melmed & K. S. Polonsky (Eds.), *Williams textbook of endocrinology* (10th ed., pp. 842-1002). Philadelphia, PA: Saunders.

Hage, J. J., & De Graaf, F. H. (1993). Addressing the ideal requirements by free flap phalloplasty: Some reflections on refinements of technique. *Microsurgery, 14*(9), 592-598. doi:10.1002/micr.1920140910

Hage, J. J., & Karim, R. B. (2000). Ought GIDNOS get nought? Treatment options for nontranssexual gender dysphoria. *Plastic and Reconstructive Surgery, 105*(3), 1222-1227.

Hancock, A. B., Krissinger, J., & Owen, K. (2010). Voice perceptions and quality of life of transgender people. *Journal of Voice*. Advance online publication. doi:10.1016/j.jvoice.2010.07.013

Hastings, D. W. (1974). Postsurgical adjustment of male transsexual patients. *Clinics in Plastic Surgery, 1*(2), 335-344.

Hembree, W. C., Cohen-Kettenis, P., Delemarre-van de Waal, H. A., Gooren, L. J., Meyer III, W. J., Spack, N. P., . . . Montori, V. M. (2009). Endocrine treatment of transsexual persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 94*(9), 3132-3154. doi:10.1210/jc.2009-0345

Hill, D. B., Menvielle, E., Sica, K. M., & Johnson, A. (2010). An affirmative intervention for families with gender-variant children: Parental ratings of child mental health and gender. *Journal of Sex and Marital Therapy, 36*(1), 6-23. doi:10.1080/00926230903375560

Hoebeke, P., Selvaggi, G., Ceulemans, P., De Cuypere, G. D., T'Sjoen, G., Weyers, S., . . . Monstrey, S. (2005). Impact of sex reassignment surgery on lower urinary tract function. *European Urology, 47*(3), 398-402. doi:10.1016/j.eururo.2004.10.008

Hoenig, J., & Kenna, J. C. (1974). The prevalence of transsexualism in England and Wales. *British Journal of Psychiatry, 124*(579), 181-190. doi:10.1192/bjp.124.2.181

Hughes, I. A., Houk, C. P., Ahmed, S. F., Lee, P. A., & LWPES1/ESPE2 Consensus Group. (2006). Consensus statement on management of intersex disorders. *Archives of Disease in Childhood, 91*(7), 554-563. doi:10.1136/adc.2006.098319

Hunter, M. H., & Sterrett, J. J. (2000). Polycystic ovary syndrome: It's not just infertility. *American Family Physician, 62*(5), 1079-1095.

Institute of Medicine. (2011). *The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding.* Washington, DC: The National Academies Press.

Jackson, P. A., & Sullivan, G. (Eds.). (1999). *Lady boys, tom boys, rent boys: Male and female homosexualities in contemporary Thailand.* Binghamton, NY: The Haworth Press.

Jockenhövel, F. (2004). Testosterone therapy-what, when and to whom? *The Aging Male, 7*(4), 319-324. doi:10.1080/13685530400016557

Johansson, A., Sundbom, E., Höjerback, T., & Bodlund, O. (2010). A five-year follow-up study of Swedish adults with gender identity disorder. *Archives of Sexual Behavior, 39*(6), 1429-1437. doi:10.1007/s10508-009-9551-1

Joint LWPES/ESPE CAH Working Group, Clayton, P. E., Miller, W. L., Oberfield, S. E., Ritzen, E. M., Sippell, W. G., & Speiser, P. W. (2002). Consensus statement on 21-hydroxylase deficiency from the Lawson Wilkins Pediatric Endocrine Society and the European Society for Pediatric Endocrinology. *Journal of Clinical Endocrinology & Metabolism, 87*(9), 4048-4053. doi:10.1210/jc.2002-020611

Jurgensen, M., Hiort, O., Holterhus, P. M., & Thyen, U. (2007). Gender role behavior in children with XY karyotype and disorders of sex development. *Hormones and Behavior, 51*(3), 443-453. doi:0.1016/j.yhbeh.2007.01.001

Kanagalingam, J., Georgalas, C., Wood, G. R., Ahluwalia, S., Sandhu, G., & Cheesman, A. D. (2005). Cricothyroid approximation and subluxation in 21 male-to-female transsexuals. *The Laryngoscope, 115*(4), 611-618. doi:10.1097/01.mlg.0000161357.12826.33

Kanhai, R. C. J., Hage, J. J., Karim, R. B., & Mulder, J. W. (1999). Exceptional presenting conditions and outcome of augmentation mammaplasty in male-to-female transsexuals. *Annals of Plastic Surgery, 43*(5), 476-483.

Kimberly, S. (1997). I am transsexual - hear me roar. *Minnesota Law & Politics, June,* 21-49.

Klein, C., & Gorzalka, B. B. (2009). Sexual functioning in transsexuals following hormone therapy and genital surgery: A review (CME). *The Journal of Sexual Medicine, 6*(11), 2922-2939. doi:10.1111/j.1743-6109.2009.01370.x

Knudson, G., De Cuypere, G., & Bockting, W. (2010a). Process toward consensus on recommendations for revision of the DSM diagnoses of gender identity disorders by The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 54-59. doi:10.1080/15532739.2010.509213

Knudson, G., De Cuypere, G., & Bockting, W. (2010b). Recommendations for revision of the DSM diagnoses of gender identity disorders: Consensus statement of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 12*(2), 115-118. doi:10.1080/15532739.2010.509215

Kosilek v. Massachusetts Department of Corrections/Maloney, C.A. No. 92-12820-MLW (U.S. Federal District Court, Boston, MA, 2002).

Krege, S., Bex, A., Lümmen, G., & Rübben, H. (2001). Male-to-female transsexualism: A technique, results and long-term follow-up in 66 patients. *British Journal of Urology, 88*(4), 396-402. doi:10.1046/j.1464-410X.2001.02323.x

Kuhn, A., Bodmer, C., Stadlmayr, W., Kuhn, P., Mueller, M. D., & Birkhäuser, M. (2009). Quality of life 15 years after sex reassignment surgery for transsexualism. *Fertility and Sterility, 92*(5), 1685-1689. doi:10.1016/j.fertnstert.2008.08.126

Kuhn, A., Hiltebrand, R., & Birkhauser, M. (2007). Do transsexuals have micturition disorders? *European Journal of Obstetrics & Gynecology and Reproductive Biology, 131*(2), 226-230. doi:10.1016/j.ejogrb.2006.03.019

Landén, M., Wålinder, J., & Lundström, B. (1998). Clinical characteristics of a cohort of female and male applicants for sex reassignment: A descriptive study. *Acta Psychiatrica Scandinavica, 97*(3), 189-194. doi:10.1111/j.1600-0447.1998.tb09986.x

Lawrence, A. A. (2003). Factors associated with satisfaction or regret following male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 32*(4), 299-315. doi:10.1023/A:1024086814364

Lawrence, A. A. (2006). Patient-reported complications and functional outcomes of male-to-female sex reassignment surgery. *Archives of Sexual Behavior, 35*(6), 717-727. doi:10.1007/s10508-006-9104-9

Lev, A. I. (2004). *Transgender emergence: Therapeutic guidelines for working with gender-variant people and their families.* Binghamton, NY: Haworth Clinical Practice Press.

Lev, A. I. (2009). The ten tasks of the mental health provider: Recommendations for revision of The World Professional Association for Transgender Health's standards of care. *International Journal of Transgenderism, 11*(2), 74-99. doi:10.1080/15532730903008032

Levy, A., Crown, A., & Reid, R. (2003). Endocrine intervention for transsexuals. *Clinical Endocrinology, 59*(4), 409-418. doi:10.1046/j.1365-2265.2003.01821.x

MacLaughlin, D. T., & Donahoe, P. K. (2004). Sex determination and differentiation. *New England Journal of Medicine, 350*(4), 367-378.

Maheu, M. M., Pulier, M. L., Wilhelm, F. H., McMenamin, J. P., & Brown-Connolly, N. E. (2005). *The mental health professional and the new technologies: A handbook for practice today.* Mahwah, NJ: Lawrence Erlbaum Associates, Inc.

Malpas, J. (in press). Between pink and blue: A multi-dimensional family approach to gender nonconforming chldren and their families. *Family Process.*

Mazur, T. (2005). Gender dysphoria and gender change in androgen insensitivity or micropenis. *Archives of Sexual Behavior, 34*(4), 411-421. doi:10.1007/s10508-005-4341-x

McNeill, E. J. M. (2006). Management of the transgender voice. *The Journal of Laryngology & Otology, 120*(07), 521-523. doi:10.1017/S0022215106001174

McNeill, E. J. M., Wilson, J. A., Clark, S., & Deakin, J. (2008). Perception of voice in the transgender client. *Journal of Voice, 22*(6), 727-733. doi:10.1016/j.jvoice.2006.12.010

Menvielle, E. J., & Tuerk, C. (2002). A support group for parents of gender-nonconforming boys. *Journal of the American Academy of Child & Adolescent Psychiatry, 41*(8), 1010-1013. doi:10.1097/00004583-200208000-00021

Meyer, I. H. (2003). Prejudice as stress: Conceptual and measurement problems. *American Journal of Public Health, 93*(2), 262-265.

Meyer, J. K., & Reter, D. J. (1979). Sex reassignment: Follow-up. *Archives of General Psychiatry, 36*(9), 1010-1015.

Meyer III, W. J. (2009). World Professional Association for Transgender Health's standards of care requirements of hormone therapy for adults with gender identity disorder. *International Journal of Transgenderism, 11*(2), 127-132. doi:10.1080/15532730903008065

Meyer III, W. J., Webb, A., Stuart, C. A., Finkelstein, J. W., Lawrence, B., & Walker, P. A. (1986). Physical and hormonal evaluation of transsexual patients: A longitudinal study. *Archives of Sexual Behavior, 15*(2), 121-138. doi:10.1007/BF01542220

Meyer-Bahlburg, H. F. L. (2002). Gender assignment and reassignment in intersexuality: Controversies, data, and guidelines for research. *Advances in Experimental Medicine and Biology, 511*, 199-223. doi:10.1007/978-1-4615-0621-8_12

Meyer-Bahlburg, H. F. L. (2005). Gender identity outcome in female-raised 46,XY persons with penile agenesis, cloacal exstrophy of the bladder, or penile ablation. *Archives of Sexual Behavior, 34*(4), 423-438. doi:10.1007/s10508-005-4342-9

Meyer-Bahlburg, H. F. L. (2008). Treatment guidelines for children with disorders of sex development. *Neuropsychiatrie De l'Enfance Et De l'Adolescence, 56*(6), 345-349. doi:10.1016/j.neurenf.2008.06.002

Meyer-Bahlburg, H. F. L. (2009). Variants of gender differentiation in somatic disorders of sex development. *International Journal of Transgenderism, 11*(4), 226-237. doi:10.1080/15532730903439476

Meyer-Bahlburg, H. F. L. (2010). From mental disorder to iatrogenic hypogonadism: Dilemmas in conceptualizing gender identity variants as psychiatric conditions. *Archives of Sexual Behavior, 39*(2), 461-476. doi:10.1007/s10508-009-9532-4

Meyer-Bahlburg, H. F. L. (in press). Gender monitoring and gender reassignment of children and adolescents with a somatic disorder of sex development. *Child & Adolescent Psychiatric Clinics of North America.*

Meyer-Bahlburg, H. F. L., & Blizzard, R. M. (2004). Conference proceedings: Research on intersex: Summary of a planning workshop. *The Endocrinologist, 14*(2), 59-69. doi:10.1097/01.ten.0000123701.61007.4e

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Carlson, A. D., Obeid, J. S., & New, M. I. (2004). Prenatal androgenization affects gender-related behavior but not gender identity in 5–12-year-old girls with congenital adrenal hyperplasia. *Archives of Sexual Behavior, 33*(2), 97-104. doi:10.1023/B:ASEB.0000014324.25718.51

Meyer-Bahlburg, H. F. L., Dolezal, C., Baker, S. W., Ehrhardt, A. A., & New, M. I. (2006). Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Archives of Sexual Behavior, 35*(6), 667-684. doi:10.1007/s10508-006-9068-9

Meyer-Bahlburg, H. F. L., Migeon, C. J., Berkovitz, G. D., Gearhart, J. P., Dolezal, C., & Wisniewski, A. B. (2004). Attitudes of adult 46,XY intersex persons to clinical management policies. *The Journal of Urology, 171*(4), 1615-1619. doi:10.1097/01.ju.0000117761.94734.b7

Money, J., & Ehrhardt, A. A. (1972). *Man and woman, boy and girl.* Baltimore, MD: The Johns Hopkins University Press.

Money, J., & Russo, A. J. (1979). Homosexual outcome of discordant gender identity/role in childhood: Longitudinal follow-up. *Journal of Pediatric Psychology, 4*(1), 29-41. doi:10.1093/jpepsy/4.1.29

Monstrey, S., Hoebeke, P., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Blondeel, P., . . . De Cuypere, G. (2009). Penile reconstruction: Is the radial forearm flap really the standard technique? *Plastic and Reconstructive Surgery, 124*(2), 510-518.

Monstrey, S., Selvaggi, G., Ceulemans, P., Van Landuyt, K., Bowman, C., Blondeel, P., . . . De Cuypere, G. (2008). Chest-wall contouring surgery in female-to-male transsexuals: A new algorithm. *Plastic and Reconstructive Surgery, 121*(3), 849-859. doi:10.1097/01.prs.0000299921.15447.b2

Moore, E., Wisniewski, A., & Dobs, A. (2003). Endocrine treatment of transsexual people: A review of treatment regimens, outcomes, and adverse effects. *Journal of Clinical Endocrinology & Metabolism, 88*(8), 3467-3473. doi:10.1210/jc.2002-021967

More, S. D. (1998). The pregnant man-an oxymoron? *Journal of Gender Studies, 7*(3), 319-328. doi:10.1080/09589236.1998.9960725

Mount, K. H., & Salmon, S. J. (1988). Changing the vocal characteristics of a postoperative transsexual patient: A longitudinal study. *Journal of Communication Disorders, 21*(3), 229-238. doi:10.1016/0021-9924(88)90031-7

Mueller, A., Kiesewetter, F., Binder, H., Beckmann, M. W., & Dittrich, R. (2007). Long-term administration of testosterone undecanoate every 3 months for testosterone supplementation in female-to-male transsexuals. *Journal of Clinical Endocrinology & Metabolism, 92*(9), 3470-3475. doi:10.1210/jc.2007-0746

Murad, M. H., Elamin, M. B., Garcia, M. Z., Mullan, R. J., Murad, A., Erwin, P. J., & Montori, V. M. (2010). Hormonal therapy and sex reassignment: A systematic review and meta-analysis of quality of life and psychosocial outcomes. *Clinical Endocrinology, 72*(2), 214-231. doi:10.1111/j.1365-2265.2009.03625.x

Nanda, S. (1998). *Neither man nor woman: The hijras of India*. Belmont, CA: Wadsworth Publishing.

Nestle, J., Wilchins, R. A., & Howell, C. (2002). *Genderqueer: Voices from beyond the sexual binary*. Los Angeles, CA: Alyson Publications.

Neumann, K., & Welzel, C. (2004). The importance of voice in male-to-female transsexualism. *Journal of Voice, 18*(1), 153-167.

Newfield, E., Hart, S., Dibble, S., & Kohler, L. (2006). Female-to-male transgender quality of life. *Quality of Life Research, 15*(9), 1447-1457. doi:10.1007/s11136-006-0002-3

Nieschlag, E., Behre, H. M., Bouchard, P., Corrales, J. J., Jones, T. H., Stalla, G. K., . . . Wu, F. C. W. (2004). Testosterone replacement therapy: Current trends and future directions. *Human Reproduction Update, 10*(5), 409-419. doi:10.1093/humupd/dmh035

North American Menopause Society. (2010). Estrogen and progestogen use in postmenopausal women: 2010 position statement. *Menopause, 17*(2), 242-255. doi:10.1097/gme.0b013e3181d0f6b9

Nuttbrock, L., Hwahng, S., Bockting, W., Rosenblum, A., Mason, M., Macri, M., & Becker, J. (2010). Psychiatric impact of gender-related abuse across the life course of male-to-female transgender persons. *Journal of Sex Research, 47*(1), 12-23. doi:10.1080/00224490903062258

Oates, J. M., & Dacakis, G. (1983). Speech pathology considerations in the management of transsexualism-a review. *International Journal of Language & Communication Disorders, 18*(3), 139-151. doi:10.3109/13682828309012237

Olyslager, F., & Conway, L. (2007). On the calculation of the prevalence of transsexualism. Paper presented at the *World Professional Association for Transgender Health 20th International Symposium,* Chicago, Illinois. Retrieved April 22, 2010 from http://www.changelingaspects.com/PDF/2007-09-06-Prevalence_of_Transsexualism.pdf

Oriel, K. A. (2000). Clinical update: Medical care of transsexual patients. *Journal of the Gay and Lesbian Medical Association, 4*(4), 185-194. doi:1090-7173/00/1200-0185$18.00/1

Pauly, I. B. (1965). Male psychosexual inversion: Transsexualism: A review of 100 cases. *Archives of General Psychiatry, 13*(2), 172-181.

Payer, A. F., Meyer III, W. J., & Walker, P. A. (1979). The ultrastructural response of human leydig cells to exogenous estrogens. *Andrologia, 11*(6), 423-436. doi:10.1111/j.1439-0272.1979.tb02232.x

Peletz, M. G. (2006). Transgenderism and gender pluralism in southeast asia since early modern times. *Current Anthropology, 47*(2), 309-340. doi:10.1086/498947

Pfäfflin, F. (1993). Regrets after sex reassignment surgery. *Journal of Psychology & Human Sexuality, 5*(4), 69-85.

Pfäfflin, F., & Junge, A. (1998). Sex reassignment. Thirty years of international follow-up studies after sex reassignment surgery: A comprehensive review, 1961-1991. *International Journal of Transgenderism*. Retrieved from http://web.archive.org/web/20070503090247/http://www.symposion.com/ijt/pfaefflin/1000.htm

*Physicians' desk reference.* (61st ed.). (2007). Montvale, NJ: PDR.

*Physicians' desk reference.* (65th ed.). (2010). Montvale, NJ: PDR.

Pleak, R. R. (1999). Ethical issues in diagnosing and treating gender-dysphoric children and adolescents. In M. Rottnek (Ed.), *Sissies and tomboys: Gender noncomformity and homosexual childhood* (pp. 34-51). New York: New York University Press.

Pope, K. S., & Vasquez, M. J. (2011). *Ethics in psychotherapy and counseling: A practical guide* (Fourth ed.). Hoboken, NJ: John Wiley & Sons, Inc.

Prior, J. C., Vigna, Y. M., & Watson, D. (1989). Spironolactone with physiological female steroids for presurgical therapy of male-to-female transsexualism. *Archives of Sexual Behavior, 18*(1), 49-57. doi:10.1007/BF01579291

Prior, J. C., Vigna, Y. M., Watson, D., Diewold, P., & Robinow, O. (1986). Spironolactone in the presurgical therapy of male to female transsexuals: Philosophy and experience of the Vancouver Gender Dysphoria Clinic. *Journal of Sex Information & Education Council of Canada, 1*, 1-7.

Rachlin, K. (1999). Factors which influence individual's decisions when considering female-to-male genital reconstructive surgery. *International Journal of Transgenderism, 3*(3). Retrieved from http://www.WPATH.org

Rachlin, K. (2002). Transgendered individuals' experiences of psychotherapy. *International Journal of Transgenderism, 6*(1). Retrieved from http://www.wpath.org/journal/www.iiav.nl/ezines/web/IJT/97-03/numbers/symposion/ijtvo06no01_03.htm.

Rachlin, K., Green, J., & Lombardi, E. (2008). Utilization of health care among female-to-male transgender individuals in the United States. *Journal of Homosexuality, 54*(3), 243-258. doi:10.1080/00918360801982124

Rachlin, K., Hansbury, G., & Pardo, S. T. (2010). Hysterectomy and oophorectomy experiences of female-to-male transgender individuals. *International Journal of Transgenderism, 12*(3), 155-166. doi:10.1080/15532739.2010.514220

Reed, B., Rhodes, S., Schofield, P. & Wylie, K. (2009). *Gender variance in the UK: Prevalence, incidence, growth and geographic distribution.* Retrieved June 8, 2011, from http://www.gires.org.uk/assets/Medpro-Assets/GenderVarianceUK-report.pdf

Rehman, J., Lazer, S., Benet, A. E., Schaefer, L. C., & Melman, A. (1999). The reported sex and surgery satisfactions of 28 postoperative male-to-female transsexual patients. *Archives of Sexual Behavior, 28*(1), 71-89. doi:10.1023/A:1018745706354

Robinow, O. (2009). Paraphilia and transgenderism: A connection with Asperger's disorder? *Sexual and Relationship Therapy, 24*(2), 143-151. doi:10.1080/14681990902951358

Rosenberg, M. (2002). Children with gender identity issues and their parents in individual and group treatment. *Journal of the American Academy of Child and Adolescent Psychiatry, 41*(5), 619-621. doi:10.1097/00004583-200205000-00020

Rossouw, J. E., Anderson, G. L., Prentice, R. L., LaCroix, A. Z., Kooperberg, C., Stefanick, M. L., . . . Johnson, K. C. (2002). Risks and benefits of estrogen plus progestin in healthy postmenopausal women: Principal results from the women's health initiative randomized controlled trial. *JAMA: The Journal of the American Medical Association, 288*(3), 321-333.

Royal College of Speech Therapists, United Kingdom. http://www.rcslt.org/

Ruble, D. N., Martin, C. L., & Berenbaum, S. A. (2006). Gender development. In N. Eisenberg, W. Damon & R. M. Lerner (Eds.), *Handbook of child psychology* (6th ed., pp. 858-932). Hoboken, NJ: John Wiley & Sons, Inc.

Sausa, L. A. (2005). Translating research into practice: Trans youth recommendations for improving school systems. *Journal of Gay & Lesbian Issues in Education, 3*(1), 15-28. doi:10.1300/J367v03n01_04

Simpson, J. L., de la Cruz, F., Swerdloff, R. S., Samango-Sprouse, C., Skakkebaek, N. E., Graham, J. M. J., . . . Willard, H. F. (2003). Klinefelter syndrome: Expanding the phenotype and identifying new research directions. *Genetics in Medicine, 5*(6), 460-468. doi:10.1097/01.GIM.0000095626.54201.D0

Smith, Y. L. S., Van Goozen, S. H. M., Kuiper, A. J., & Cohen-Kettenis, P. T. (2005). Sex reassignment: Outcomes and predictors of treatment for adolescent and adult transsexuals. *Psychological Medicine, 35*(1), 89-99. doi:10.1017/S0033291704002776

Sood, R., Shuster, L., Smith, R., Vincent, A., & Jatoi, A. (2011). Counseling postmenopausal women about bioidentical hormones: Ten discussion points for practicing physicians. *Journal of the American Board of Family Practice, 24*(2), 202-210. doi:10.3122/jabfm.2011.02.100194

Speech Pathology Australia. http://www.speechpathologyaustralia.org.au/

Speiser, P. W., Azziz, R., Baskin, L. S., Ghizzoni, L., Hensle, T. W., Merke, D. P., . . . Oberfield, S. E. (2010). Congenital adrenal hyperplasia due to steroid 21-hydroxylase deficiency: An endocrine society clinical practice guideline. *Journal of Clinical Endocrinology & Metabolism, 95*(9), 4133-4160. doi:10.1210/jc.2009-2631

Steensma, T. D., Biemond, R., de Boer, F., & Cohen-Kettenis, P. T. (2011). Desisting and persisting gender dysphoria after childhood: A qualitative follow-up study. *Clinical Child Psychology and Psychiatry*. Advance online publication. doi:10.1177/1359104510378303

Steensma, T. D., & Cohen-Kettenis, P. T. (2011). Gender transitioning before puberty? *Archives of Sexual Behavior, 40*(4), 649-650. doi:10.1007/s10508-011-9752-2

Stikkelbroeck, N. M. M. L., Beerendonk, C., Willemsen, W. N. P., Schreuders-Bais, C. A., Feitz, W. F. J., Rieu, P. N. M. A., . . . Otten, B. J. (2003). The long term outcome of feminizing genital surgery for congenital adrenal hyperplasia: Anatomical, functional and cosmetic outcomes, psychosexual development, and satisfaction in adult female patients. *Journal of Pediatric and Adolescent Gynecology, 16*(5), 289-296. doi:10.1016/S1083-3188(03)00155-4

Stoller, R. J. (1964). A contribution to the study of gender identity. *International Journal of Psychoanalysis, 45*, 220-226.

Stone, S. (1991). The empire strikes back: A posttransexual manifesto. In J. Epstein, & K. Straub (Eds.), *Body guards: The cultural politics of gender ambiguity* (pp. 280-304). London: Routledge.

Tangpricha, V., Ducharme, S. H., Barber, T. W., & Chipkin, S. R. (2003). Endocrinologic treatment of gender identity disorders. *Endocrine Practice, 9*(1), 12-21.

Tangpricha, V., Turner, A., Malabanan, A., & Holick, M. (2001). Effects of testosterone therapy on bone mineral density in the FTM patient. *International Journal of Transgenderism, 5*(4).

Taywaditep, K. J., Coleman, E., & Dumronggittigule, P. (1997). Thailand (muang thai). In R. Francouer (Ed.), *International encyclopedia of sexuality*. New York: Continuum.

The World Professional Association for Transgender Health, Inc. (2008). *WPATH clarification on medical necessity of treatment, sex reassignment, and insurance coverage in the U.S.A.* Retrieved from http://www.wpath.org/documents/Med%20Nec%20on%202008%20Letterhead.pdf

Thole, Z., Manso, G., Salgueiro, E., Revuelta, P., & Hidalgo, A. (2004). Hepatotoxicity induced by antiandrogens: A review of the literature. *Urologia Internationalis, 73*(4), 289-295. doi:10.1159/000081585

Tom Waddell Health Center. (2006). *Protocols for hormonal reassignment of gender.* Retrieved from http://www.sfdph.org/dph/comupg/oservices/medSvs/hlthCtrs/TransGendprotocols122006.pdf

Tsoi, W. F. (1988). The prevalence of transsexualism in Singapore. *Acta Psychiatrica Scandinavica, 78*(4), 501-504. doi:10.1111/j.1600-0447.1988.tb06373.x

Van den Broecke, R., Van der Elst, J., Liu, J., Hovatta, O., & Dhont, M. (2001). The female-to-male transsexual patient: A source of human ovarian cortical tissue for experimental use. *Human Reproduction, 16*(1), 145-147. doi:10.1093/humrep/16.1.145

van Kesteren, P. J. M., Asscheman, H., Megens, J. A. J., & Gooren, L. J. G. (1997). Mortality and morbidity in transsexual subjects treated with cross-sex hormones. *Clinical Endocrinology, 47*(3), 337-343. doi:10.1046/j.1365-2265.1997.2601068.x

van Kesteren, P. J. M., Gooren, L. J., & Megens, J. A. (1996). An epidemiological and demographic study of transsexuals in the Netherlands. *Archives of Sexual Behavior, 25*(6), 589-600. doi:10.1007/BF02437841

van Trotsenburg, M. A. A. (2009). Gynecological aspects of transgender healthcare. *International Journal of Transgenderism, 11*(4), 238-246. doi:10.1080/15532730903439484

Vancouver Coastal Health, Vancouver, British Columbia, Canada. http://www.vch.ca/

Vanderburgh, R. (2009). Appropriate therapeutic care for families with pre-pubescent transgender/gender-dissonant children. *Child and Adolescent Social Work Journal, 26*(2), 135-154. doi:10.1007/s10560-008-0158-5

Vilain, E. (2000). Genetics of sexual development. *Annual Review of Sex Research, 11*, 1-25.

Wålinder, J. (1968). Transsexualism: Definition, prevalence and sex distribution. *Acta Psychiatrica Scandinavica, 43*(S203), 255-257.

Wålinder, J. (1971). Incidence and sex ratio of transsexualism in Sweden. *The British Journal of Psychiatry, 119*(549), 195-196.

Wallien, M. S. C., & Cohen-Kettenis, P. T. (2008). Psychosexual outcome of gender-dysphoric children. *Journal of the American Academy of Child & Adolescent Psychiatry, 47*(12), 1413-1423. doi:10.1097/CHI.0b013e31818956b9

Wallien, M. S. C., Swaab, H., & Cohen-Kettenis, P. T. (2007). Psychiatric comorbidity among children with gender identity disorder. *Journal of the American Academy of Child & Adolescent Psychiatry, 46*(10), 1307-1314. doi:10.1097/chi.0b013e3181373848

Warren, B. E. (1993). Transsexuality, identity and empowerment. A view from the frontlines. *SIECUS Report, February/March,* 14-16.

Weitze, C., & Osburg, S. (1996). Transsexualism in Germany: Empirical data on epidemiology and application of the German Transsexuals' Act during its first ten years. *Archives of Sexual Behavior, 25*(4), 409-425.

Wilson, J. D. (1999). The role of androgens in male gender role behavior. *Endocrine Reviews, 20*(5), 726-737. doi:10.1210/er.20.5.726

Winter, S. (2009). Cultural considerations for The World Professional Association for Transgender Health's standards of care: The Asian perspective. *International Journal of Transgenderism, 11*(1), 19-41. doi:10.1080/15532730902799938

Winter, S., Chalungsooth, P., Teh, Y. K., Rojanalert, N., Maneerat, K., Wong, Y. W., . . . Macapagal, R. A. (2009). Transpeople, transprejudice and pathologization: A seven-country factor analytic study. *International Journal of Sexual Health, 21*(2), 96-118. doi:10.1080/19317610902922537

Wisniewski, A. B., Migeon, C. J., Malouf, M. A., & Gearhart, J. P. (2004). Psychosexual outcome in women affected by congenital adrenal hyperplasia due to 21-hydroxylase deficiency. *The Journal of Urology, 171*(6, Part 1), 2497-2501. doi:10.1097/01.ju.0000125269.91938.f7

World Health Organization. (2007). *International classification of diseases and related health problems-10th revision.* Geneva, Switzerland: World Health Organization.

World Health Organization. (2008). *The world health report 2008: Primary health care - now more than ever.* Geneva, Switzerland: World Health Organization.

WPATH Board of Directors. (2010). *De-psychopathologisation statement released May 26, 2010.* Retrieved from http://wpath.org/announcements_detail.cfm?pk_announcement=17

Xavier, J. M. (2000). *The Washington, D.C. transgender needs assessment survey: Final report for phase two.* Washington, DC: Administration for HIV/AIDS of District of Columbia Government.

Zhang, G., Gu, Y., Wang, X., Cui, Y., & Bremner, W. J. (1999). A clinical trial of injectable testosterone undecanoate as a potential male contraceptive in normal Chinese men. *Journal of Clinical Endocrinology & Metabolism, 84*(10), 3642-3647. doi:10.1210/jc.84.10.3642

Zitzmann, M., Saad, F., & Nieschlag, E. (2006, April). *Long term experience of more than 8 years with a novel formulation of testosterone undecanoate (nebido) in substitution therapy of hypogonadal men.* Paper presented at European Congress of Endocrinology, Glasgow, UK, April 2006.

Zucker, K. J. (1999). Intersexuality and gender identity differentiation. *Annual Review of Sex Research, 10*(1), 1-69.

Zucker, K. J. (2004). Gender identity development and issues. *Child and Adolescent Psychiatric Clinics of North America, 13*(3), 551-568. doi:10.1016/j.chc.2004.02.006

Zucker, K. J. (2006). 'I'm half-boy, half-girl'': Play psychotherapy and parent counseling for gender identity disorder. In R. L. Spitzer, M. B. First, J. B. W. Williams & M. Gibbons (Eds.), *DSM-IV-TR casebook, volume 2* (pp. 321-334). Arlington, VA: American Psychiatric Publishing, Inc.

Zucker, K. J. (2010). The DSM diagnostic criteria for gender identity disorder in children. *Archives of Sexual Behavior, 39*(2), 477-498. doi:10.1007/s10508-009-9540-4

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., & Cantor, J. M. (2008). Is gender identity disorder in adolescents coming out of the closet? *Journal of Sex & Marital Therapy, 34*(4), 287-290. doi:10.1080/00926230802096192

Zucker, K. J., Bradley, S. J., Owen-Anderson, A., Kibblewhite, S. J., Wood, H., Singh, D., & Choi, K. (in press). Demographics, behavior problems, and psychosexual characteristics of adolescents with gender identity disorder or transvestic fetishism. *Journal of Sex & Marital Therapy.*

Zucker, K. J., & Lawrence, A. A. (2009). Epidemiology of gender identity disorder: Recommendations for the standards of care of The World Professional Association for Transgender Health. *International Journal of Transgenderism, 11*(1), 8-18. doi:10.1080/15532730902799946

Zucker, K. J., Owen, A., Bradley, S. J., & Ameeriar, L. (2002). Gender-dysphoric children and adolescents: A comparative analysis of demographic characteristics and behavioral problems. *Clinical Child Psychology and Psychiatry, 7*(3), 398-411.

Zuger, B. (1984). Early effeminate behavior in boys: Outcome and significance for homosexuality. *Journal of Nervous and Mental Disease, 172*(2), 90-97.

# APPENDIX A
## GLOSSARY

Terminology in the area of health care for transsexual, transgender, and gender nonconforming people is rapidly evolving; new terms are being introduced, and the definitions of existing terms are changing. Thus, there is often misunderstanding, debate, or disagreement about language in this field. Terms that may be unfamiliar or that have specific meanings in the *SOC* are defined below for the purpose of this document only. Others may adopt these definitions, but WPATH acknowledges that these terms may be defined differently in different cultures, communities, and contexts.

WPATH also acknowledges that many terms used in relation to this population are not ideal. For example, the terms *transsexual* and *transvestite* – and, some would argue, the more recent term *transgender* – have been applied to people in an objectifying fashion. Yet such terms have been more or less adopted by many people who are making their best effort to make themselves understood. By continuing to use these terms, WPATH intends only to ensure that concepts and processes are comprehensible, in order to facilitate the delivery of quality health care to transsexual, transgender, and gender nonconforming people. WPATH remains open to new terminology that will further illuminate the experience of members of this diverse population and lead to improvements in health care access and delivery.

**Bioidentical hormones**: Hormones that are *structurally* identical to those found in the human body (ACOG Committee of Gynecologic Practice, 2005). The hormones used in bioidentical hormone therapy (BHT) are generally derived from plant sources and are structurally similar to endogenous human hormones, but they need to be commercially processed to become bioidentical.

**Bioidentical compounded hormone therapy (BCHT):** Use of hormones that are prepared, mixed, assembled, packaged, or labeled as a drug by a pharmacist and custom-made for a patient according to a physician's specifications. Government drug agency approval is not possible for each compounded product made for an individual consumer.

**Crossdressing (transvestism):** Wearing clothing and adopting a gender role presentation that, in a given culture, is more typical of the other sex.

**Disorders of sex development (DSD):** Congenital conditions in which the development of chromosomal, gonadal, or anatomic sex is atypical. Some people strongly object to the "disorder" label and instead view these conditions as a matter of diversity (Diamond, 2009), preferring the terms *intersex* and *intersexuality*.

**Female-to-Male (FtM):** Adjective to describe individuals assigned female at birth who are changing or who have changed their body and/or gender role from birth-assigned female to a more masculine body or role.

**Gender dysphoria:** Distress that is caused by a discrepancy between a person's gender identity and that person's sex assigned at birth (and the associated gender role and/or primary and secondary sex characteristics) (Fisk, 1974; Knudson, De Cuypere, & Bockting, 2010b).

**Gender identity:** A person's intrinsic sense of being male (a boy or a man), female (a girl or woman), or an alternative gender (e.g., boygirl, girlboy, transgender, genderqueer, eunuch) (Bockting, 1999; Stoller, 1964).

**Gender identity disorder:** Formal diagnosis set forth by the *Diagnostic Statistical Manual of Mental Disorders, 4th Edition, Text Rev (DSM IV-TR)* (American Psychiatric Association, 2000). Gender identity disorder is characterized by a strong and persistent cross-gender identification and a persistent discomfort with one's sex or sense of inappropriateness in the gender role of that sex, causing clinically significant distress or impairment in social, occupational, or other important areas of functioning.

**Gender nonconforming:** Adjective to describe individuals whose gender identity, role, or expression differs from what is normative for their assigned sex in a given culture and historical period.

**Gender role or expression:** Characteristics in personality, appearance, and behavior that in a given culture and historical period are designated as masculine or feminine (that is, more typical of the male or female social role) (Ruble, Martin, & Berenbaum, 2006). While most individuals present socially in clearly male or female gender roles, some people present in an alternative gender role such as genderqueer or specifically transgender. All people tend to incorporate both masculine and feminine characteristics in their gender expression in varying ways and to varying degrees (Bockting, 2008).

**Genderqueer:** Identity label that may be used by individuals whose gender identity and/or role does not conform to a binary understanding of gender as limited to the categories of man or woman, male or female (Bockting, 2008).

**Male-to-Female (MtF):** Adjective to describe individuals assigned male at birth who are changing or who have changed their body and/or gender role from birth-assigned male to a more feminine body or role.

**Natural hormones:** Hormones that are derived from natural *sources* such as plants or animals. Natural hormones may or may not be bioidentical.

**Sex:** Sex is assigned at birth as male or female, usually based on the appearance of the external genitalia. When the external genitalia are ambiguous, other components of sex (internal genitalia, chromosomal and hormonal sex) are considered in order to assign sex (Grumbach, Hughes, & Conte,

2003; MacLaughlin & Donahoe, 2004; Money & Ehrhardt, 1972; Vilain, 2000). For most people, gender identity and expression are consistent with their sex assigned at birth; for transsexual, transgender, and gender nonconforming individuals, gender identity or expression differ from their sex assigned at birth.

**Sex reassignment surgery (gender affirmation surgery):** Surgery to change primary and/or secondary sex characteristics to affirm a person's gender identity. Sex reassignment surgery can be an important part of medically necessary treatment to alleviate gender dysphoria.

**Transgender:** Adjective to describe a diverse group of individuals who cross or transcend culturally-defined categories of gender. The gender identity of transgender people differs to varying degrees from the sex they were assigned at birth (Bockting, 1999).

**Transition:** Period of time when individuals change from the gender role associated with their sex assigned at birth to a different gender role. For many people, this involves learning how to live socially in "the other" gender role; for others this means finding a gender role and expression that is most comfortable for them. Transition may or may not include feminization or masculinization of the body through hormones or other medical procedures. The nature and duration of transition is variable and individualized.

**Transphobia, internalized:** Discomfort with one's own transgender feelings or identity as a result of internalizing society's normative gender expectations.

**Transsexual:** Adjective (often applied by the medical profession) to describe individuals who seek to change or who have changed their primary and/or secondary sex characteristics through femininizing or masculinizing medical interventions (hormones and/or surgery), typically accompanied by a permanent change in gender role.

# APPENDIX B
## OVERVIEW OF MEDICAL RISKS OF HORMONE THERAPY

The risks outlined below are based on two comprehensive, evidence-based literature reviews of masculinizing/feminizing hormone therapy (Feldman & Safer, 2009; Hembree et al., 2009), along with a large cohort study (Asscheman et al., 2011). These reviews can serve as detailed references for providers, along with other widely recognized, published clinical materials (e.g., Dahl et al., 2006; Ettner et al., 2007).

# Risks of Feminizing Hormone Therapy (MtF)

**Likely increased risk:**

## Venous thromboembolic disease

- Estrogen use increases the risk of venous thromboembolic events (VTE), particularly in patients who are over age 40, smokers, highly sedentary, obese, and who have underlying thrombophilic disorders.

- This risk is increased with the additional use of third generation progestins.

- This risk is decreased with use of the transdermal route of estradiol administration, which is recommended for patients at higher risk of VTE.

## Cardiovascular, cerebrovascular disease

- Estrogen use increases the risk of cardiovascular events in patients over age 50 with underlying cardiovascular risk factors. Additional progestin use may increase this risk.

## Lipids

- Oral estrogen use may markedly increase triglycerides in patients, increasing the risk of pancreatitis and cardiovascular events.

- Different routes of administration will have different metabolic effects on levels of HDL cholesterol, LDL cholesterol and lipoprotein(a).

- In general, clinical evidence suggests that MtF patients with pre-existing lipid disorders may benefit from the use of transdermal rather than oral estrogen.

## Liver/gallbladder

- Estrogen and cyproterone acetate use may be associated with transient liver enzyme elevations and, rarely, clinical hepatotoxicity.

- Estrogen use increases the risk of cholelithiasis (gall stones) and subsequent cholecystectomy.

**Possible increased risk:**

### Type 2 diabetes mellitus

- Feminizing hormone therapy, particularly estrogen, may increase the risk of type 2 diabetes, particularly among patients with a family history of diabetes or other risk factors for this disease.

### Hypertension

- Estrogen use may increase blood pressure, but the effect on incidence of overt hypertension is unknown.

- Spironolactone reduces blood pressure and is recommended for at-risk or hypertensive patients desiring feminization.

### Prolactinoma

- Estrogen use increases the risk of hyperprolactinemia among MtF patients in the first year of treatment, but this risk unlikely thereafter.

- High-dose estrogen use may promote the clinical appearance of preexisting but clinically unapparent prolactinoma.

**Inconclusive or no increased risk:**  Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

### Breast cancer

- MtF persons who have taken feminizing hormones do experience breast cancer, but it is unknown how their degree of risk compares to that of persons born with female genitalia.

- Longer duration of feminizing hormone exposure (i.e., number of years taking estrogen preparations), family history of breast cancer, obesity (BMI >35), and the use of progestins likely influence the level of risk.

**Other side effects of feminizing therapy:**

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with feminizing hormone therapy.

<u>Fertility and sexual function</u>

- Feminizing hormone therapy may impair fertility.

- Feminizing hormone therapy may decrease libido.

- Feminizing hormone therapy reduces nocturnal erections, with variable impact on sexually stimulated erections.

**Risks of anti-androgen medications:**

Feminizing hormone regimens often include a variety of agents that affect testosterone production or action. These include GnRH agonists, progestins (including cyproterone acetate), spironolactone, and 5-alpha reductase inhibitors. An extensive discussion of the specific risks of these agents is beyond the scope of the *SOC*. However, both spironolactone and cyproterone acetate are widely used and deserve some comment.

Cyproterone acetate is a progestational compound with anti-androgenic properties (Gooren, 2005; Levy et al., 2003). Although widely used in Europe, it is not approved for use in the United States because of concerns about hepatotoxicity (Thole, Manso, Salgueiro, Revuelta, & Hidalgo, 2004). Spironolactone is commonly used as an anti-androgen in feminizing hormone therapy, particularly in regions where cyproterone is not approved for use (Dahl et al., 2006; Moore et al., 2003; Tangpricha et al., 2003). Spironolactone has a long history of use in treating hypertension and congestive heart failure. Its common side effects include hyperkalemia, dizziness, and gastrointestinal symptoms (*Physicians' Desk Reference*, 2007).

# Risks of Masculinizing Hormone Therapy (FtM)

**Likely increased risk:**

### Polycythemia

- Masculinizing hormone therapy involving testosterone or other androgenic steroids increases the risk of polycythemia (hematocrit > 50%), particularly in patients with other risk factors.

- Transdermal administration and adaptation of dosage may reduce this risk

### Weight gain/visceral fat

- Masculinizing hormone therapy can result in modest weight gain, with an increase in visceral fat.

**Possible increased risk:**

### Lipids

- Testosterone therapy decreases HDL, but variably affects LDL and triglycerides.

- Supraphysiologic (beyond normal male range) serum levels of testosterone, often found with extended intramuscular dosing**,** may worsen lipid profiles, whereas transdermal administration appears to be more lipid neutral.

- Patients with underlying polycystic ovarian syndrome or dyslipidemia may be at increased risk of worsening dyslipidemia with testosterone therapy.

### Liver

- Transient elevations in liver enzymes may occur with testosterone therapy.

- Hepatic dysfunction and malignancies have been noted with oral methyltestosterone. However, methyltestosterone is no longer available in most countries and should no longer be used.

Psychiatric

Masculinizing therapy involving testosterone or other androgenic steroids may increase the risk of hypomanic, manic, or psychotic symptoms in patients with underlying psychiatric disorders that include such symptoms. This adverse event appears to be associated with higher doses or supraphysiologic blood levels of testosterone

**Inconclusive or no increased risk:** Items in this category include those that may present risk, but for which the evidence is so minimal that no clear conclusion can be reached.

Osteoporosis

- Testosterone therapy maintains or increases bone mineral density among FtM patients prior to oophorectomy, at least in the first three years of treatment.

- There is an increased risk of bone density loss after oophorectomy, particularly if testosterone therapy is interrupted or insufficient. This includes patients utilizing solely oral testosterone.

Cardiovascular

- Masculinizing hormone therapy at normal physiologic doses does not appear to increase the risk of cardiovascular events among healthy patients.

- Masculinizing hormone therapy may increase the risk of cardiovascular disease in patients with underlying risks factors.

Hypertension

- Masculinizing hormone therapy at normal physiologic doses may increase blood pressure but does not appear to increase the risk of hypertension.

- Patients with risk factors for hypertension, such as weight gain, family history, or polycystic ovarian syndrome, may be at increased risk.

Type 2 diabetes mellitus

- Testosterone therapy does not appear to increase the risk of type 2 diabetes among FtM patients overall.

- Testosterone therapy may further increase the risk of type 2 diabetes in patients with other risk factors, such as significant weight gain, family history, and polycystic ovarian syndrome. There are no data that suggest or show an increase in risk in those with risk factors for dyslipidemia.

### Breast cancer

- Testosterone therapy in FtM patients does not increase the risk of breast cancer.

### Cervical cancer

- Testosterone therapy in FtM patients does not increase the risk of cervical cancer, although it may increase the risk of minimally abnormal Pap smears due to atrophic changes.

### Ovarian cancer

- Analogous to persons born with female genitalia with elevated androgen levels, testosterone therapy in FtM patients may increase the risk of ovarian cancer, although evidence is limited.

### Endometrial (uterine) cancer

- Testosterone therapy in FtM patients may increase the risk of endometrial cancer, although evidence is limited.

**Other side effects of masculinizing therapy:**

The following effects may be considered minor or even desired, depending on the patient, but are clearly associated with masculinization.

### Fertility and sexual function

- Testosterone therapy in FtM patients reduces fertility, although the degree and reversibility are unknown.

- Testosterone therapy can induce permanent anatomic changes in the developing embryo or fetus.

- Testosterone therapy induces clitoral enlargement and increases libido.

<u>Acne, androgenic alopecia</u>

Acne and varying degrees of male pattern hair loss (androgenic alopecia) are common side effects of masculinizing hormone therapy.

# APPENDIX C
## SUMMARY OF CRITERIA FOR HORMONE THERAPY AND SURGERIES

As for all previous versions of the *SOC*, the criteria put forth in the *SOC* for hormone therapy and surgical treatments for gender dysphoria are clinical guidelines; individual health professionals and programs may modify them. Clinical departures from the *SOC* may come about because of a patient's unique anatomic, social, or psychological situation; an experienced health professional's evolving method of handling a common situation; a research protocol; lack of resources in various parts of the world; or the need for specific harm reduction strategies. These departures should be recognized as such, explained to the patient, and documented through informed consent for quality patient care and legal protection. This documentation is also valuable to accumulate new data, which can be retrospectively examined to allow for health care – and the *SOC* – to evolve.

## Criteria for Feminizing/Masculinizing Hormone Therapy (one referral or chart documentation of psychosocial assessment)

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental concerns are present, they must be reasonably well-controlled.

# Criteria for Breast/Chest Surgery (one referral)

Mastectomy and creation of a male chest in FtM patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Hormone therapy is not a pre-requisite.

Breast augmentation (implants/lipofilling) in MtF patients:

1. Persistent, well-documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country (if younger, follow the *SOC* for children and adolescents);

4. If significant medical or mental health concerns are present, they must be reasonably well controlled.

Although not an explicit criterion, it is recommended that MtF patients undergo feminizing hormone therapy (minimum 12 months) prior to breast augmentation surgery. The purpose is to maximize breast growth in order to obtain better surgical (aesthetic) results.

# Criteria for genital surgery (two referrals)

Hysterectomy and ovariectomy in FtM patients and orchiectomy in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones).

The aim of hormone therapy prior to gonadectomy is primarily to introduce a period of reversible estrogen or testosterone suppression, before a patient undergoes irreversible surgical intervention.

These criteria do not apply to patients who are having these surgical procedures for medical indications other than gender dysphoria.

Metoidioplasty or phalloplasty in FtM patients and vaginoplasty in MtF patients:

1. Persistent, well documented gender dysphoria;

2. Capacity to make a fully informed decision and to consent for treatment;

3. Age of majority in a given country;

4. If significant medical or mental health concerns are present, they must be well controlled;

5. 12 continuous months of hormone therapy as appropriate to the patient's gender goals (unless the patient has a medical contraindication or is otherwise unable or unwilling to take hormones);

6. 12 continuous months of living in a gender role that is congruent with their gender identity.

Although not an explicit criterion, it is recommended that these patients also have regular visits with a mental health or other medical professional.

The criterion noted above for some types of genital surgeries – i.e., that patients engage in 12 continuous months of living in a gender role that is congruent with their gender identity – is based on expert clinical consensus that this experience provides ample opportunity for patients to experience and socially adjust in their desired gender role, before undergoing irreversible surgery.

# APPENDIX D
## EVIDENCE FOR CLINICAL OUTCOMES
## OF THERAPEUTIC APPROACHES

One of the real supports for any new therapy is an outcome analysis. Because of the controversial nature of sex reassignment surgery, this type of analysis has been very important. Almost all of the outcome studies in this area have been retrospective.

One of the first studies to examine the post-treatment psychosocial outcomes of transsexual patients was done in 1979 at Johns Hopkins University School of Medicine and Hospital (USA) (J. K. Meyer & Reter, 1979). This study focused on patients' occupational, educational, marital, and domiciliary stability. The results revealed several significant changes with treatment. These changes were not seen as positive; rather, they showed that many individuals who had entered the treatment program were no better off or were worse off in many measures after participation in the program. These findings resulted in closure of the treatment program at that hospital/medical school (Abramowitz, 1986).

Subsequently, a significant number of health professionals called for a standard for eligibility for sex reassignment surgery. This led to the formulation of the original *Standards of Care* of the Harry Benjamin International Gender Dysphoria Association (now WPATH) in 1979.

In 1981, Pauly published results from a large retrospective study of people who underwent sex reassignment surgery. Participants in that study had much better outcomes: Among 83 FtM patients, 80.7% had a satisfactory outcome (i.e., patient self report of "improved social and emotional adjustment"), 6.0% unsatisfactory. Among 283 MtF patients, 71.4% had a satisfactory outcome, 8.1% unsatisfactory. This study included patients who were treated before the publication and use of the *Standards of Care*.

Since the *Standards of Care* have been in place, there has been a steady increase in patient satisfaction and decrease in dissatisfaction with the outcome of sex reassignment surgery. Studies conducted after 1996 focused on patients who were treated according to the *Standards of Care*. The findings of Rehman and colleagues (1999) and Krege and colleagues (2001) are typical of this body of work; none of the patients in these studies regretted having had surgery, and most reported being satisfied with the cosmetic and functional results of the surgery. Even patients who develop severe surgical complications seldom regret having undergone surgery. Quality of surgical results is one of the best predictors of the overall outcome of sex reassignment (Lawrence, 2003). The vast majority of follow-up studies have shown an undeniable beneficial effect of sex reassignment surgery on postoperative outcomes such as subjective well being, cosmesis, and sexual function (De Cuypere et al., 2005; Garaffa, Christopher, & Ralph, 2010; Klein & Gorzalka, 2009), although the specific magnitude of benefit is uncertain from

the currently available evidence. One study (Emory, Cole, Avery, Meyer, & Meyer III, 2003) even showed improvement in patient income.

One troubling report (Newfield et al., 2006) documented lower scores on quality of life (measured with the SF-36) for FtM patients than for the general population. A weakness of that study is that it recruited its 384 participants by a general email rather than a systematic approach, and the degree and type of treatment was not recorded. Study participants who were taking testosterone had typically being doing so for less than 5 years. Reported quality of life was higher for patients who had undergone breast/chest surgery than for those who had not (p<.001). (A similar analysis was not done for genital surgery). In other work, Kuhn and colleagues (2009) used the King's Health Questionnaire to assess the quality of life of 55 transsexual patients at 15 years after surgery. Scores were compared to those of 20 healthy female control patients who had undergone abdominal/pelvic surgery in the past. Quality of life scores for transsexual patients were the same or better than those of control patients for some subscales (emotions, sleep, incontinence, symptom severity, and role limitation), but worse in other domains (general health, physical limitation, and personal limitation).

It is difficult to determine the effectiveness of hormones alone in the relief of gender dysphoria. Most studies evaluating the effectiveness of masculinizing/feminizing hormone therapy on gender dysphoria have been conducted with patients who have also undergone sex reassignment surgery. Favorable effects of therapies that included both hormones and surgery were reported in a comprehensive review of over 2000 patients in 79 studies (mostly observational) conducted between 1961 and 1991 (Eldh, Berg, & Gustafsson, 1997; Gijs & Brewaeys, 2007; Murad et al., 2010; Pfäfflin & Junge, 1998). Patients operated on after 1986 did better than those before 1986; this reflects significant improvement in surgical complications (Eldh et al., 1997). Most patients have reported improved psychosocial outcomes, ranging between 87% for MtF patients and 97% for FtM patients (Green & Fleming, 1990). Similar improvements were found in a Swedish study in which "almost all patients were satisfied with sex reassignment at 5 years, and 86% were assessed by clinicians at follow-up as stable or improved in global functioning" (Johansson, Sundbom, Höjerback, & Bodlund, 2010). Weaknesses of these earlier studies are their retrospective design and use of different criteria to evaluate outcomes.

A prospective study conducted in the Netherlands evaluated 325 consecutive adult and adolescent subjects seeking sex reassignment (Smith, Van Goozen, Kuiper, & Cohen-Kettenis, 2005). Patients who underwent sex reassignment therapy (both hormonal and surgical intervention) showed improvements in their mean gender dysphoria scores, measured by the Utrecht Gender Dysphoria Scale. Scores for body dissatisfaction and psychological function also improved in most categories. Fewer than 2% of patients expressed regret after therapy. This is the largest prospective study to affirm the results from retrospective studies that a combination of hormone therapy and surgery improves gender dysphoria and other areas of psychosocial functioning. There is a need for further research on the effects of hormone therapy without surgery, and without the goal of maximum physical feminization or masculinization.

Overall, studies have been reporting a steady improvement in outcomes as the field becomes more advanced. Outcome research has mainly focused on the outcome of sex reassignment surgery. In current practice there is a range of identity, role, and physical adaptations that could use additional follow-up or outcome research (Institute of Medicine, 2011).

# APPENDIX E
## DEVELOPMENT PROCESS FOR THE STANDARDS OF CARE, VERSION 7

The process of developing *Standards of Care, Version 7* began when an initial *SOC* "work group" was established in 2006. Members were invited to examine specific sections of *SOC, Version 6*. For each section, they were asked to review the relevant literature, identify where research was lacking and needed, and recommend potential revisions to the *SOC* as warranted by new evidence. Invited papers were submitted by the following authors: Aaron Devor, Walter Bockting, George Brown, Michael Brownstein, Peggy Cohen-Kettenis, Griet DeCuypere, Petra DeSutter, Jamie Feldman, Lin Fraser, Arlene Istar Lev, Stephen Levine, Walter Meyer, Heino Meyer-Bahlburg, Stan Monstrey, Loren Schechter, Mick van Trotsenburg, Sam Winter, and Ken Zucker. Some of these authors chose to add co-authors to assist them in their task.

Initial drafts of these papers were due June 1, 2007. Most were completed by September 2007, with the rest completed by the end of 2007. These manuscripts were then submitted to the *International Journal of Transgenderism (IJT)*. Each underwent the regular *IJT* peer review process. The final papers were published in Volume 11 (1-4) in 2009, making them available for discussion and debate.

After these articles were published, a *Standards of Care* Revision Committee was established by the WPATH Board of Directors in 2010. The Revision Committee was first charged with debating and discussing the *IJT* background papers through a Google website. A subgroup of the Revision Committee was appointed by the Board of Directors to serve as the Writing Group. This group was charged with preparing the first draft of *SOC, Version 7* and continuing to work on revisions for consideration by the broader Revision Committee. The Board also appointed an International Advisory Group of transsexual, transgender, and gender nonconforming individuals to give input on the revision.

A technical writer was hired to (1) review all of the recommendations for revision – both the original recommendations as outlined in the *IJT* articles and additional recommendations that emanated from the online discussion – and (2) create a survey to solicit further input on these potential revisions. From the survey results, the Writing Group was able to discern where these experts stood in terms of areas of agreement and areas in need of more discussion and debate. The technical writer then (3) created a very rough first draft of *SOC, Version 7* for the Writing Group to consider and build on.

The Writing Group met on March 4 and 5, 2011 in a face-to-face expert consultation meeting. They reviewed all recommended changes and debated and came to consensus on various controversial areas. Decisions were made based on the best available science and expert consensus. These decisions were incorporated into the draft, and additional sections were written by the Writing Group with the assistance of the technical writer.

The draft that emerged from the consultation meeting was then circulated among the Writing Group and finalized with the help of the technical writer. Once this initial draft was finalized it was circulated among the broader *SOC* Revision Committee and the International Advisory Group. Discussion was opened up on the Google website and a conference call was held to resolve issues. Feedback from these groups was considered by the Writing Group, who then made further revision. Two additional drafts were created and posted on the Google website for consideration by the broader *SOC* Revision Committee and the International Advisory Group. Upon completion of these three iteratations of review and revision, the final document was presented to the WPATH Board of Directors for approval. The Board of Directors approved this version on September 14, 2011.

The plans are to disseminate this version of the *SOC* and invite feedback for further revisions. The WPATH Board of Directors decides the timing of any revision of the *SOC*.

## Funding

The *Standards of Care* revision process was made possible through a generous grant from the Tawani Foundation and a gift from an anonymous donor. These funds supported the following:

1. Costs of a professional technical writer;

2. Process of soliciting international input on proposed changes from gender identity professionals and the transgender community;

3. Working meeting of the Writing Group;

4. Process of gathering additional feedback and arriving at final expert consensus from the professional and transgender communities, the *Standards of Care, Version 7* Revision Committee, and WPATH Board of Directors;

5. Costs of printing and distributing *Standards of Care, Version 7* and posting a free downloadable copy on the WPATH website;

6. Plenary session to launch the *Standards of Care, Version 7* at the 2011 WPATH Biennial Symposium in Atlanta, Georgia, USA.

## Members of the Standards of Care Revision Committee[1]

Eli Coleman, PhD (USA)✷ - Committee chair
Richard Adler, PhD (USA)
Walter Bockting, PhD (USA)✷
Marsha Botzer, MA (USA)✷
George Brown, MD (USA)
Peggy Cohen-Kettenis, PhD (Netherlands)✷
Griet DeCuypere, MD (Belgium)✷
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)
Randi Ettner, PhD (USA)
Evan Eyler, MD (USA)
Jamie Feldman, MD, PhD (USA)✷
Lin Fraser, EdD (USA)✷
Rob Garofalo, MD, MPH (USA)
Jamison Green, PhD, MFA (USA)✷
Dan Karasic, MD (USA)
Gail Knudson, MD (Canada)✷

Arlene Istar Lev, LCSW (USA)
Gal Mayer, MD (USA)
Walter Meyer, MD (USA)✷
Heino Meyer-Bahlburg, Dr. rer.nat. (USA)
Stan Monstrey, MD, PhD (Belgium)✷
Blaine Paxton Hall, MHS-CL, PA-C (USA)
Friedmann Pfaefflin, MD, PhD (Germany)
Katherine Rachlin, PhD (USA)
Bean Robinson, PhD (USA)
Loren Schechter, MD (USA)
Vin Tangpricha, MD, PhD (USA)
Mick van Trotsenburg, MD (Netherlands)
Anne Vitale, PhD (USA)
Sam Winter, PhD (Hong Kong)
Stephen Whittle, OBE (UK)
Kevan Wylie, MB, MD (UK)
Ken Zucker, PhD (Canada)

## International Advisory Group Selection Committee

Walter Bockting, PhD (USA)
Marsha Botzer, MA (USA)
Aaron Devor, PhD (Canada)
Randall Ehrbar, PsyD (USA)

Evan Eyler, MD (USA)
Jamison Green, PhD, MFA (USA)
Blaine Paxton Hall, MHS-CL, PA-C (USA)

---

1  ✷ Writing Group member
   All members of the *Standards of Care, Version 7 Revision Committee* donated their time to work on this revision.

The Standards of Care
7TH VERSION

## International Advisory Group

Tamara Adrian, LGBT Rights Venezuela (Venezuela)
Craig Andrews, FTM Australia (Australia)
Christine Burns, MBE, Plain Sense Ltd (UK)
Naomi Fontanos, Society for Transsexual Women's Rights in the Phillipines (Phillipines)
Tone Marie Hansen, Harry Benjamin Resource Center (Norway)
Rupert Raj, Shelburne Health Center (Canada)
Masae Torai, FTM Japan (Japan)
Kelley Winters, GID Reform Advocates (USA)

## Technical Writer

Anne Marie Weber-Main, PhD (USA)

## Editorial Assistance

Heidi Fall (USA)



ZSQUAREDESIGN LLC | MPLS, MN

WWW.ZACHSCHAAR.COM

**HHS Public Access**

Author manuscript

*Am J Bioeth.* Author manuscript; available in PMC 2019 December 01.

Published in final edited form as:

*Am J Bioeth.* 2018 December ; 18(12): 3–9. doi:10.1080/15265161.2018.1531159.

# Facial Feminization Surgery: The Ethics of Gatekeeping in Transgender Health

**Alex Dubov, PhD** and

Assistant Professor, Loma Linda University, School of Public Health, Sanitarium Dr., Loma Linda, CA 92350, Phone: 404-914-7231, adubov@llu.edu

**Liana Fraenkel, MD, MPH**

Professor of Medicine, Yale University School of Medicine, Section of Rheumatology PO Box 208031, 300 Cedar Street, TAC Bldg., New Haven, CT 06520-8031, Phone: (203) 932-5711 ×5914, liana.fraenkel@yale.edu

## Abstract

The lack of access to gender-affirming surgery represents a significant unmet healthcare need within transgender community frequently resulting in depression and self-destructive behavior. While some transgender people may have access to Gender Reassignment Surgery (GRS), an overwhelming majority cannot afford Facial Feminization Surgery (FFS). The former may be covered as a 'medical necessity', but FFS is considered 'cosmetic' and excluded from insurance coverage. This demarcation between 'necessity' and 'cosmetic' in transgender healthcare based on specific body parts is in direct opposition to the scientific community's understanding of gender dysphoria and professional guidelines for transgender health. GRS affects one's ability to function in intimate relationship while FFS has the same impact on social interactions and, therefore, may have a far greater implication for one's quality of life. FFS is a cost-effective intervention that needs to be covered by insurance policies. The benefits of such coverage far exceed the insignificant costs.

"Medical necessity" is a legal doctrine in the U.S. used as a means to control healthcare costs (Dolgin 2015). Health care services that are deemed medically necessary to diagnose or treat an illness or injury are meant to be covered by insurers, while the remaining "non-essential" services (ranging for rhinoplasty to unproven but potentially lifesaving experimental treatments) are not.

There is no Federal definition of 'medical necessity' and only one-third of States have a regulatory definition of this concept (Abbott and Stevens 2013). As a result, the definition of 'medical necessity' is often found in individual insurance contracts, where it is framed in a broad, multidimensional way, and controlled by the insurer, not the medical professional (Skinner 2013). The process of medical necessity determination is rarely transparent and available for public review. Even when it is possible to demonstrate that a proposed treatment is consistent with professional clinical standards, the insurer may invoke 'medical

---

Correspondence to: Alex Dubov.

necessity' to reject claims. Therefore, insurer's reliance on the notion of medical necessity in reviewing claims can be a form of rationing, driven by concerns for costs over the potential advantages of the intervention at stake (Hill 2012). For example, in the early 2000s insurance companies considered bariatric surgery as cosmetic and not medically necessary, despite the evidence demonstrating its efficacy (Hall 2003). Further, the approval or refusal of medical claims can reflect ideological or political agendas. For instance, anti-abortion groups may question decisions to cover abortions because the procedure is not medically necessary (Kaposy 2009).

Transgender people often have a critical need for medical treatment that mitigates their gender dysphoria. Facial feminization surgery (FFS) is an important component in the treatment of gender dysphoria and it can be more important than genital reassignment surgery in alleviating symptoms of gender dysphoria (Capitán et al. 2014). However, FFS is commonly denied by insurers as cosmetic and not medically necessary treatment for gender dysphoria. These denials reflect a long history of labeling medical care for transgender people as unnecessary, unproven, and unworthy of payment by insurance premiums. In this article, we argue that by labeling FFS as cosmetic and denying coverage insurers discriminate on the basis of diagnosis and fail to provide medically necessary treatment. As noted above, the definition of medical necessity can be ambiguous. Some documents define it as 'the services that a prudent physician would provide to a patient to prevent, diagnose, or treat a medical ailment, as determined by generally accepted standards of medical practice.' (American Medical Association 2011) The medical consensus and published standards of practice (Deutsch and Feldman 2013) explain that medical procedures related to sex reassignment (including FFS) are not 'cosmetic' or performed for the mere convenience of the patient. Transgender people do not seek these procedures due to their personal preference, but rather to change sex characteristics as treatment for their gender dysphoria (Rosh 2017). Therefore, FFS is not cosmetic or optional, but needs to be understood as medically necessary for the treatment of gender dysphoria.

In 2011, the Institute of Medicine (IOM) released a landmark report on the health of sexual and gender minority people who are lesbian, gay, bisexual, and transgender (LGBT). The report specifically emphasized the importance of transgender health research to better understand the needs of this underserved population. Transgender is an umbrella term that is used to identify people who experience incongruence between their sex assigned at birth and gender identity (Graham 2011). While there is nothing inherently pathological about the transgender experience, some people may experience significant distress associated with their gender incongruence or, in other words, gender dysphoria. Gender dysphoria refers to the discomfort and distress that arise from a discrepancy between a person's gender identity and sex assigned at birth (American Psychological Association 2015).

The diagnostic criteria for gender dysphoria are as follows: (1) desire to live and be accepted as a member of the opposite sex, usually accompanied by the wish to make his or her body as congruent as possible with the preferred gender through surgery and hormone treatment; (2) has lived as transgender for at least two years; (3) the condition is not a symptom of a mental disorder; and (4) it causes significant distress or social impairment (Cohen-Kettenis and Pfäfflin 2010). The underlying logic for the treatment of gender dysphoria rests on a

several presuppositions: (1) the person's body is wrongly gendered in relation to a self-identified gender identity; (2) the wrong gender is a series of bodily properties that can be identified and changed to what is considered normal for the chosen gender. (3) the conflict between 'self' and 'body' cannot be resolved through psychotherapy alone, but can be alleviated through medico-surgical interventions (Wylie et al. 2014).

The exact prevalence of gender dysphoria is difficult to estimate due to the stigma and limited access to healthcare among the transgender population (Collin et al. 2016). Furthermore, only in 2013 did the first medical center in the US begin adding gender identity as part of standardized demographic data in the electronic medical record (Zucker and Lawrence 2009). Recent estimates suggest that 0.5 to 0.9 percent of the U.S. population (or at least 1.4 million) have some degree of gender dysphoria (Herman et al. 2017). The rising prevalence and acceptance of transgenderism along with improved evidence-based surgical standards of care for gender-confirming surgery has resulted in a greater number of people seeking gender-affirming surgeries. However, despite the recent surge in media attention regarding the transgender community and decreasing stigma surrounding transgenderism, the access to necessary gender-affirming health care remains unacceptably poor. Transgender persons requiring effective treatment continue to face significant barriers to affordable medical care because of exclusions in health insurance policies and a scarcity of specialized providers.

The 2015 survey of 27,715 people by the National Center for Transgender Equality (NCTE) found that while the majority of respondents wanted to access gender-affirming treatment, only 49% had transitioned medically, while 25% were able to transition surgically (James et al. 2016). These numbers speak to significant unmet healthcare needs. While transgender people approach their transitions differently, the number of existing providers equipped to care for the US transgender patients remains profoundly low. For example, endocrinologists are often key healthcare providers for transgender people. However, a third of endocrinologists are unwilling to care for transgender patients, and fewer than half say they feel at least somewhat competent in providing that care (Irwig 2016). With respect to surgical reassignment surgery (GRS) and facial feminization surgery (FFS) more specifically, 22 states[1] do not have a single surgeon specializing in FFS and additional 7 states[2] have only one FFS trained surgeon according to a national registry (TransHealthCare). Furthermore, some studies point out that many surgeons who market themselves as being able to perform FFS are only trained to work with soft tissue modification. There are only a few surgeons in the US who are skilled in bone modification (Plemons 2012).

Lack of qualified providers is not the only barrier to gender-affirming care. Many transgender people are reluctant to seek needed care due to prevailing stigma and mistreatment. According to the NCTE survey, nearly one-quarter of respondents reported that they avoided seeking healthcare because they feared being mistreated. However, the most significant barrier to care is lack of insurance and ability to pay for treatment. One in

---

[1]AL, AK, CT, DE, HI, ID, IA, KS, ME, MS, MT, NE, NH, ND, OK, SC, SD, UT, VT, WV, WY
[2]AK, KY, LS, MN, MO, NM, WV

*Am J Bioeth.* Author manuscript; available in PMC 2019 December 01.

Author Manuscript

four respondents experienced a problem in the past year with their insurance related to being transgender. More than half (55%) of those who sought coverage for gender-affirming surgery in the past year were denied, and 25% of those who sought coverage for hormones in the past year were denied (James et al. 2016). Thus, a significant proportion of persons in the US with gender dysphoria continue to suffer despite the availability of effective treatment.

Transgender people who are unable to access gender-affirming care are more likely to have depression, more prone to self-destructive behavior and are less likely to be employed (Wilson et al. 2015). Furthermore, according to the gender affirmation theory, anxiety and maladaptive coping strategies result from stigma-related stressors that threaten one's identity and exceed one's coping resources. When the need for gender affirmation is high (due to psychological distress) and access to gender affirmation is low (due to social oppression), identity threat may result (Sevelius 2013). Transgender people may attempt to reduce identity threat by either attempting to increase their access to gender affirmation or decrease their need for gender affirmation, and these coping strategies may often be maladaptive (i.e. engaging in sex work or pursuing dangerous silicone injections). In New York City (NYC), 22% of transgender women have had underground silicone injections, and widespread non-prescribed hormone use has been documented in various convenience samples ranging 58% of transgender respondents in DC (Xavier 2000), nearly 60% in Virginia (Xavier, Honnold and Bradford 2007), 71% in Chicago (Garofalo 2006), 29% in San Francisco (Clements-Nolle 2001), and 23% in NYC (Sanchez, Sanchez and Danoff 2009). In the worst-case scenario, identity threat may lead to suicide. The suicide rate in transgender persons is 40%, a rate demanding swift change and implementation at a minimum of effective therapies.

In this paper, we argue that the ability to 'pass' as the member of one's target gender is required for transgender persons' well-being and ability to successfully function in the current American society, and thus medical treatment and surgical procedures required to meet this goal should be considered as medically necessary and covered by insurance. Gender affirming hormone replacement therapy (HRT) is covered by many private insurance companies, Medicare, and Medicaid. Some government insurance plans cover GRS, but they usually exclude other procedures including masculinizing chest surgery (for female-to-male or FtM), facial feminization procedures, reduction thyrochondroplasty, voice surgery, and electrolysis. Insurance coverage for gender-affirming care is rare with 8% of employers with 500 or more workers covering GRS and none covering FFS (Human Rights Campaign 2015).

Facial feminization surgery refers to a set of surgical procedures that alter the characteristic male facial features to provide a more feminine appearance. FFS procedures include common facial plastic procedures like brow lift, rhinoplasty, cheek implantation, and lip augmentation, as well as more specific ones intended to modify bone structure like scalp advancement, frontal cranioplasty, and reduction mandibuloplasty (Ousterhout 2015). In most cases, the desired degree of feminization is impossible to achieve through soft tissue procedures alone since bone structure provides the architecture of facial sex differences. In this regard FFS is different from cosmetic surgery (Altman 2012). The objective of FFS is to decrease gender dysphoria by aligning the facial features of gender with the inward

Author Manuscript    Author Manuscript    Author Manuscript    Author Manuscript

identification of gender. Male-to-female (MtF) transgender persons have greater difficulty changing their outward appearance compared to FtM transgender persons (van de Grift 2016). Facial features, such as jaw line or facial hair growth, are difficult to modify and they are often the main area of concern for MtF patients. It is essential for these patients that their facial features be adjusted in such a way that the face will be recognized as belonging to the female gender.

Feeling congruent with one's outward appearance alleviates anxiety and depressive symptoms (Kozee, Tylka and Bauerband 2012). A number of relatively limited retrospective studies have assessed the quality of life after FFS and have demonstrated favorable outcomes in both appearance (Ainsworth and Spiegel 2010) and patient satisfaction (Raffaini, Magri and Agostini 2016). These studies concluded that FFS can significantly enhance the quality of life and reduce the psychosocial sequelae faced by transgender women, who are often marginalized and discriminated against in healthcare and society (Ousterhout 2015). One recent prospective study assessed psychological outcomes pre- and post-surgery. Six months after the surgery subjects reported improvement in overall appearance congruence and body image satisfaction, less avoidance, less day-to-day distress, and greater success in forming relationships (Isung et al. 2017). Furthermore, one recent study found that utilization of gender-affirming care, including FFS, can serve as a protective factor for health disparities in mental health, substance use, and HIV, which all impact transwomen (Wilson 2015). This study emphasizes that FFS is protective against violence and discrimination. Violence is often the result of being "visibly gender non-conforming," which has been found to elicit anti-transgender bias (Grant et al. 2010). When a transwoman has an appearance that does not transgress typical conceptions of gender, it serves as a protection from violence and discrimination, and by extension reduces their risk of depression and suicide.

FFS accomplishes a number of outcomes that GRS alone cannot deliver. While GRS is most commonly associated with transition, it has minor impact on how other recognize and respond to a person's gender. Genitals are hidden from the vast majority of daily encounters. If the ultimate goal of MtF transition is for the patient to be recognized by others as a woman, then the most profound change can be achieved by focusing not on what others see the most – the face. The overarching goal of FFS is to enable one to 'pass' in order to be accepted and consequently function in society.

While many insurance companies have recognized the importance of gender-affirming therapy, FFS remains unachievable for most MtF patients. On July 18, 2016, a set of rules entitled "Nondiscrimination in Health Programs and Activities" became effective. These new rules prohibit discrimination based on gender identity and are applicable to every health program that receives federal financial assistance, is administered by Human Health Services' health programs, or is established under Title 1 of the Affordable Care Act. Currently, ten jurisdictions prohibit health plans from using blanket exclusions for transgender healthcare services. In addition, eight states explicitly require coverage of transgender benefits for their state employee health plans and 12 cover gender transition services for their Medicaid populations (Budge, Katz-Wise and Garza 2016). However, these benefits are limited to hormone treatment and GRS. Furthermore, state laws that prohibit exclusions of services based on gender identity may still allow plans to deny services based

on medical necessity. FFS is generally considered 'cosmetic' and not a medical necessity and, therefore, excluded from insurance coverage. The average cost of FFS is $60.000 while the average cost of GRS is $20.000. Few MtF persons are able to afford FFS (The Philadelphia Center for Transgender Surgery).

This distinction between 'medical necessity' for GRS coverage and 'cosmetic' when it comes to FFS coverage based on specific body parts is in direct opposition to the scientific community's understanding of gender identity. The recent change in DSM manual from gender identity disorder to gender dysphoria conceptualizes gender as the way one views oneself in relation to others in society, rather than a property of one's anatomical structure. However, most insurance policies imply that 'gender' is defined by external genitalia, while all other body characteristics contribute to 'appearance.' For instance, New York has provisions for gender transition services, excluding, however, coverage for "cosmetic surgery, services, and procedures," defined as "anything solely directed at improving an individual's appearance." (New York Commissioner of Health 2016) This demarcation between 'necessity' and 'cosmetic' goes against the World Professional Association for Transgender Health Standards of Care. The document describes FFS as both medically necessary and essential to the well-being of transgender individuals. It states "these surgical interventions are often of greater practical significance in the patient's daily life than reconstruction of the genitals." (WPATH 2016) For transgender women, GRS affects one's ability to function in intimate relationships as fully female but it otherwise has little impact on non-intimate relationships with the exception of providing legal status (Ainsworth and Spiegel 2010). Most relationships are by their nature social rather than sexual, and so FFS has a far greater impact on one's quality of life than GRS (Plemons 2012).

In the policies of the house of delegates of the American Medical Association, the definition of cosmetic surgery is that of "surgery performed to reshape normal structures of the body to improve the patient' s appearance and self-esteem." (American Medical Association 198_) However, a medically-necessary surgery "is performed on an abnormal structure of the body caused by congenital defects, developmental abnormalities, trauma, infection, tumors, or disease and is generally performed to improve the function but may also be done to approximate normal appearance." We argue that if one considers abovementioned treatment logic for gender dysphoria, FFS must be categorized as a medical necessity. While cosmetic surgery is intended to produce beauty, FFS is undertaken to produce femaleness. Like GRS, FFS is intended to transform the patient's gender from male to female. FFS is not driven by a desire to achieve cosmetic improvement; it is driven by a desire to obtain a body that enables one to engage and function in society

A number of surgeons have now recognized FFS as a critical part of transition process. They point out that FFS should be judged according to the same standards and logic as GRS, as both procedures are about creation of gender and not about restoration or enhancement of physical appearance. Nouraei, et al. 2007, indicated that FFS is an important part of "aligning the patient's physical appearance with his or her perceived sex." They write, "the face is the most noticeable part of the human body, and facial feminization in male-to-female transsexualism is an important part of the gender reassignment process." (Nouraei et al. 2007) Dempf et al. 2010 include FFS as a part of "gender reassignment" when the face of

the patient warrants it. "In male-to-female transsexuals with strong masculine facial features facial feminization surgery can be performed as part of gender reassignment."

There are many examples of when evidence regarding the impact of a given procedure on quality of life has led to changes in insurance coverage and reclassification of a procedure from 'cosmetic' to 'necessary.' Breast augmentation is considered a cosmetic procedure and not covered by insurance but reconstructive breast surgery for cancer patients that have undergone mastectomies is considered medically necessary and therefore a covered service. Similarly, we no longer consider facial surgery for victims of extensive burns to be 'cosmetic'. So too should FFS no longer be considered 'cosmetic' but medically necessary and universally covered by insurance plans. Considering this important procedure as purely 'cosmetic' is a failure to understand why FFS is felt to be an absolute necessity and to act on the significant improvements we have made in understanding the impact of gender dysphoria over the past few decades.

Sweden was the first country to recognize that FFS should be covered as part of gender-affirming care. In April 2015, the Swedish National Board of Health and Welfare published a new national guideline of care for patients suffering from gender dysphoria (Lundgren 2016). While GRS, hormone therapy, speech therapy, and electrolysis have been offered in Sweden for a number of years, medical professionals recognized the disparity in treatment and developed guidelines outlining the role of FFS. So too should the US healthcare system recognize this disparity and reclassify FFS as a medical necessity for successful MtF transition. Ideally, the goals of medical care should enable a transgender person to successfully function socially as a member of their desired gender. The ability to "pass" in daily social interactions as a member of the desired gender is critical to the well-being of transgender persons. When we consider the ability to "pass" as the ultimate treatment goal, FFS is a clear critical necessary service.

The current lack of uniform medical standards for, and access to, transition-related services leave many transgender persons without hope. The cost to cover transition-related care would be fewer than two pennies per month for every person with health insurance in the US and will not result in increased premiums (Padula, Heru and Campbell 2016). For instance, a recent research on cost efficiency of policies expanding access to transgender-inclusive coverage in Massachusetts showed that covering transition-related services is cost-effective, particularly given the high financial and human costs associated with untreated gender dysphoria (Padula, Heru and Campbell 2016). An economic-impact analysis of California's regulation found that removing transgender exclusions had an "immaterial" effect on premium costs, leading the California Department of Insurance to conclude that "the benefits of eliminating discrimination far exceed the insignificant costs"; those benefits include improved health outcomes among transgender people, such as reduced suicide risk, lower rates of substance use, and increased adherence to HIV treatment (Baker 2017). A recent study published estimated that without the transition surgeries (one time cost) healthcare for a transgender person will cost $10,712 a year (Padula and Baker 2017). Therefore, FFS is a cost-effective intervention that needs to be covered by insurance policies. There are ample reasons and precedents supporting classification of FFS as a

medical necessity. It is time for the delivery of health care to catch up with the needs of transgender persons.

In this article we made an argument to justify the public and private coverage of FFS that recognizes this intervention as medically necessary and crucial for psychological and social well-being of transgender people. This argument can be supported by a more fundamental need for justice in the administration of our social institutions. The thesis is that FFS should be publicly and privately covered because preventing access to FFS by denying insurance coverage is unjust. The argument can be summarized as follows:

1.  Managed care is built on the notion that only services needed to treat a sickness or injury should be reimbursed. Delivery of unnecessary services increases the cost of health services.

2.  Medical providers and insurance companies are entrusted with the role of distinguishing which treatments are cosmetic and which are medically necessary.

3.  These policy decisions on funding can have significant impact on well-being of certain groups of people. Health is just one of many aspects of individual well-being.

4.  Decisions about insurance coverage of certain conditions can be considered unjust if they create, compound, or perpetuate harm or disadvantage with respect to well-being of specific groups of people.

5.  Denials of coverage for FFS have adverse and unjust effects on essential dimensions of the well-being of transgender people. Transgender individuals with untreated or only partially treated gender dysphoria face much greater risk of suicide (Haas 2010) or self-harm (Liu and Mustanski 2012) than the general population. Furthermore, the discrimination that transgender individuals face is inversely related to their ability to access transition related medical care. Transgender individuals whose appearance does not conform to their gender identity experience notably higher rates of discrimination by employers (Koch and Bales 2008) and even healthcare providers (Hughto, Reisner and Pachankis 2015) in receiving medical care.

6.  The staggering rates of transgender self-harm and suicide, as well as discrimination faced by transgender people, together with structural barriers to employment and healthcare, should be considered in decisions about coverage of FFS. It is unjust to deny coverage of FFS as this policy decision will perpetuate harms and disadvantages faced by transgender people.

## Acknowledgments

Financial support for this study was provided in part by the National Institute of Arthritis and Musculoskeletal and Skin Diseases (AR060231–05, Fraenkel). The content is solely the responsibility of the authors and does not necessarily **represent the official views of the National Institutes of Health.** The funding agreement ensured the authors' independence in designing the study, interpreting the data, writing, and publishing the report.

## Reference list

Abbott Ryan, and Stevens Carl. "Redefining medical necessity: a consumer-driven solution to the US health care crisis." Loy. LAL Rev. 47 (2013): 943.

Ainsworth Tiffiny A., and Spiegel Jeffrey H.. "Quality of life of individuals with and without facial feminization surgery or gender reassignment surgery." Quality of Life Research 19.7 (2010): 1019–1024. [PubMed: 20461468]

Altman K "Facial feminization surgery: current state of the art." International journal of oral and maxillofacial surgery 41.8 (2012): 885–894. [PubMed: 22682235]

American Medical Association Policies of House of Delegates. Definitions of "Cosmetic" and "Reconstructive" Surgery, H-475.992. Council Medical Services Annual Meeting, 6 1989, Chicago, IL

American Medical Association. "Statement of the American Medical Association to the Institute of Medicine's Committee on Determination of Essential Health Benefits." Retrieved June 26 (2011): 2016.

American Psychological Association. "Guidelines for psychological practice with transgender and gender nonconforming people." American Psychologist70.9 (2015): 832–864. [PubMed: 26653312]

Baker Kellan E. "The Future of Transgender Coverage." New England Journal of Medicine 376.19 (2017): 1801–1804. [PubMed: 28402247]

Budge Stephanie L., Katz-Wise Sabra L., and Garza Michael V.. "Health disparities in the transgender community: Exploring differences in insurance coverage." Psychology of Sexual Orientation and Gender Diversity 3, no. 3 (2016): 275.

Capitán Luis, et al. "Facial feminization surgery: The forehead. Surgical techniques and analysis of results." Plastic and reconstructive surgery 134.4 (2014): 609–619. [PubMed: 24945951]

Clements-Nolle K, Marx R, Guzman R, Katz M. HIV prevalence, risk behaviors, health care use, and mental health status of transgender persons: implications for public health intervention. American journal of public health. 2001 6;91(6):915. [PubMed: 11392934]

Cohen-Kettenis Peggy T., and Friedemann Pfäfflin. "The DSM diagnostic criteria for gender identity disorder in adolescents and adults." Archives of sexual behavior 39.2 (2010): 499–513. [PubMed: 19838784]

Collin Lindsay, et al. "Prevalence of transgender depends on the "case" definition: a systematic review." The journal of sexual medicine 13.4 (2016): 613–626. [PubMed: 27045261]

Dempf Rupert, and Eckert Alexander W.. "Contouring the forehead and rhinoplasty in the feminization of the face in male-to-female transsexuals." Journal of Cranio-Maxillofacial Surgery 38.6 (2010): 416–422. [PubMed: 20036572]

Deutsch Madeline B., and Feldman Jamie L.. "Updated recommendations from the world professional association for transgender health standards of care." American family physician 87.2 (2013): 89–93. [PubMed: 23317072]

Dolgin Janet L. "Unhealthy Determinations Controlling Medical Necessity." Va. J. Soc. Pol'y & L 22 (2015): 435.

Garofalo Robert, Deleon Joanne, Osmer Elizabeth, Doll Mary, and Harper Gary W.. "Overlooked, misunderstood and at-risk: Exploring the lives and HIV risk of ethnic minority male-to-female transgender youth." Journal of adolescent health 38, no. 3 (2006): 230–236. [PubMed: 16488820]

Graham Robert, et al. "The health of lesbian, gay, bisexual, and transgender people: Building a foundation for better understanding." Washington, DC: Institute of Medicine (2011).

Grant JM, Mottet LA, Tanis J, Herman JL, Harrison J, Keisling M. National Transgender Discrimination Survey Report on health and health care: National Center for Transgender Equality, 2010;

Haas Ann P., et al. "Suicide and suicide risk in lesbian, gay, bisexual, and transgender populations: Review and recommendations." Journal of homosexuality 58.1 (2010): 10–51.

Hall Mark A. "State regulation of medical necessity: The case of weight-reduction surgery." Duke LJ 53 (2003): 653.

Author Manuscript

Author Manuscript

Author Manuscript

Author Manuscript

Herman Jody L., et al. "Age of individuals who identify as transgender in the United States." The Williams Institute (2017).

Hill B. Jessie. "What Is the Meaning of Health? Constitutional Implications of Defining "Medical Necessity" and "Essential Health Benefits" Under the Affordable Care Act." American journal of law & medicine 38.2-3 (2012): 445–470. [PubMed: 22696976]

Hughto Jaclyn M. White, Reisner Sari L., and Pachankis John E.. "Transgender stigma and health: a critical review of stigma determinants, mechanisms, and interventions." Social Science & Medicine 147 (2015): 222–231. [PubMed: 26599625]

Human Rights Campaign. (2015). Finding insurance for transgender-related healthcare. Retrieved from http://www.hrc.org/resources/finding-insurance-for-transgender-related-healthcare

Irwig MS. Transgender care by endocrinologists in the United States. Endocrine Practice. 2016 2 26;22(7):832–6. [PubMed: 26919656]

Isung Josef, et al. "Craniofacial Reconstructive Surgery Improves Appearance Congruence in Male-to-Female Transsexual Patients." Archives of Sexual Behavior 46.6 (2017): 1573–1576. [PubMed: 28681189]

James SE, Herman JL, Rankin S, Keisling M, Mottet L, Ana M. The Report of the 2015 U.S. Transgender Survey. Washington, DC: National Center for Transgender Equality, 2016.

Kaposy Chris. "The public funding of abortion in Canada: going beyond the concept of medical necessity." Medicine, Health Care and Philosophy 12.3 (2009): 301–311.

Koch Katie, and Bales Richard. "Transgender employment discrimination." UCLA Women's LJ 17 (2008): 243.

Kozee HB, Tylka TL, & Bauerband LA (2012). Measuring transgender individuals' comfort with gender identity and appearance: Development and validation of the Transgender Congruence Scale. Psychology of Women Quarterly, 36, 179–196.

Liu Richard T., and Mustanski Brian. "Suicidal ideation and self-harm in lesbian, gay, bisexual, and transgender youth." American journal of preventive medicine 42.3 (2012): 221–228. [PubMed: 22341158]

Lundgren T. Kalle, et al. "Moving transgender care forward within public health organizations: Inclusion of facial feminizing surgery in the Swedish National Treatment Recommendations." Archives of sexual behavior 45.8 (2016): 1879–1880. [PubMed: 27502349]

Maguen Shira, Shipherd Jillian C., and Harris Holly N.. "Providing culturally sensitive care for transgender patients." Cognitive and Behavioral Practice 12, no. 4 (2005): 479–490.

New York Commissioner of Health (2016) Transgender related care and services. Retrieved from: https://regs.health.ny.gov/sites/default/files/pdf/recently_adopted_regulations/Transgender%20Related%20Care%20and%20Services.pdf

Nouraei SA Reza, et al. "The role of nasal feminization rhinoplasty in male-to-female gender reassignment." Archives of facial plastic surgery 9.5 (2007): 318–320. [PubMed: 17875823]

Ousterhout Douglas K. "Facial Feminization Surgery: The Forehead. Surgical Techniques and Analysis of Results." Plastic and reconstructive surgery 136.4 (2015): 560e–561e.

Padula WV, Heru S, Campbell JD. Societal implications of health insurance coverage for medically necessary services in the US transgender population: A cost-effectiveness analysis. Journal of general internal medicine. 2016 4 1;31(4):394–401. [PubMed: 26481647]

Padula William V., and Baker Kellan. "Coverage for Gender-Affirming Care: Making Health Insurance Work for Transgender Americans." LGBT health (2017).

Plemons Eric Douglas. Making the Gendered Face: The Art and Science of Facial Feminization Surgery. University of California, Berkeley, 2012.

Raffaini Mirco, Alice Sara Magri, and Tommaso Agostini. "Full facial feminization surgery: Patient satisfaction assessment based on 180 procedures involving 33 consecutive patients." Plastic and reconstructive surgery 137, no. 2 (2016): 438–448. [PubMed: 26818277]

Rosh Samuel. "Beyond Categorical Exclusions: Access to Transgender Healthcare in State Medicaid Programs." Colum. JL & Soc. Probs. 51 (2017): 1.

Sanchez NF, Sanchez JP, Danoff A. Health care utilization, barriers to care, and hormone usage among male-to-female transgender persons in New York City. American Journal of Public Health. 2009 4;99(4):713–9. [PubMed: 19150911]

Author Manuscript

Sevelius Jae M. "Gender affirmation: a framework for conceptualizing risk behavior among transgender women of color." Sex roles 68.11-12 (2013): 675–689. [PubMed: 23729971]

Skinner Daniel. "Defining medical necessity under the patient protection and affordable care act." Public Administration Review 73.s1 (2013).

The Philadelphia Center for Transgender Surgery retrieved from: http://www.thetransgendercenter.com/index.php/mtf-price-list.html

TransHealthCare SRS Surgeon Directory. Retrieved from: http://www.transhealthcare.org

van de Grift, Tim C et al. "Body satisfaction and physical appearance in gender dysphoria." Archives of sexual behavior 45.3 (2016): 575–585. [PubMed: 26474976]

Wilson Erin C., Chen Yea-Hung, Arayasirikul Sean, Wenzel Conrad, and Raymond H. Fisher. "Connecting the dots: examining transgender women's utilization of transition-related medical care and associations with mental health, substance use, and HIV." Journal of Urban Health 92, no. 1 (2015): 182–192. [PubMed: 25476958]

WPATH (2016) Position Statement on Medical Necessity of Treatment, Sex Reassignment, and Insurance Coverage in the USA. Retrieved from: http://www.wpath.org/site_page.cfm?pk_association_webpage_menu=1352&pk_association_webpage=3947

Wylie Kevan, et al. "Good practice guidelines for the assessment and treatment of adults with gender dysphoria." Sexual and Relationship Therapy29.2 (2014): 154–214.

Xavier Jessica, Honnold Julie A., and Bradford Judith B.. The Health, Health-related Needs and Life Course Experiences of Transgender Virginians. Virginia Department of Health, 2007.

Xavier J Final Report of the Washington Transgender Needs Assessment Survey Washington, DC: Administration for HIV and AIDS, Government of the District of Columbia, 2000.

Zucker Kenneth J., and Lawrence Anne A.. "Epidemiology of gender identity disorder: Recommendations for the standards of care of The World Professional Association for Transgender Health." International Journal of Transgenderism 11.1 (2009): 8–18.

Letter by Pekar, Felix Samuel Evans, LICSW on 5/23/2023

 **KAISER PERMANENTE.**

5/23/2023

RE: Letter of Support for Gender-Affirming Facial Feminization Surgery, Breast Augmentation and Vaginoplasty Surgery

Dear Medical Case Review Professional:

I am a Licensed Clinical Social Worker in Washington State (LW60376199). I am employed by Kaiser Permanente of Washington in the Gender Health Case Management Department. Regarding my training, I have a master's degree in Social Work obtained in 2009 with licensure in 2013. I have over ten years of experience working in clinical social work in a medical setting.

Francis Faye Oak (DOB: ████/1981, KPWA ████0933) has been a client of mine enrolled in the Gender Health Program since August 2021. Though assigned male at birth, Francis identifies as female, and uses she/her pronouns. Francis notes that she first knew her gender identity differed from her assigned sex since a young age, but did not have a fuller sense of what this meant to her until a little over two years ago. She started HRT in September of 2021. She has been living in her affirmed gender over two years. She underwent orchiectomy in May of 2023.

Despite all these interventions, Francis reports significant distress due to long-standing dysphoria directly caused by some of her facial features, specifically her hairline, brow, chin, nose, large upper lip area and Adam's apple. She notes that she dislikes looking in the mirror and cannot wait to look in the mirror and "finally see myself," and "to undo 40 years of testosterone damage." Francis also voices significant distress around her genitals, although a great deal of this discomfort has been alleviated with her recent orchiectomy. At this point she is not entirely sure if it will be necessary to move forward with bottom surgery, but she plans to move forward with her consultation with Dr. Meltzer later this year. She continues to weigh the pros and cons of breast augmentation surgery. While she feels she would like to do this, she is concerned about the need to potentially require replacements ten years from now and she is not certain if the politics of this country will be supportive of trans healthcare at that time.

By my independent evaluation of Francis, she meets all criteria for Gender Dysphoria (ICD 10, F64.1). She has expressed a persistent and consistent desire for FFS, BA and bottom surgery for at least two years. While she remains uncertain as to whether or not she will move forward with top/bottom surgery, she has demonstrated the capacity to make an informed decision for herself.

Francis is physically healthy to undergo this surgery and is under consistent and regular care of a gender-affirming primary care physician. She has no physical or mental health diagnoses that would negatively impact their experience of, or results from surgery; in fact, it is highly likely that any symptoms of anxiety, depression, and/or distress Francis has experienced over the last several years would significantly decrease with this gender-affirming surgery. Francis is stably housed and is well-prepared for her post-op recovery with her support system, which includes a network of friends and her partner. Francis has no issues with illicit drug or substance use or abuse.

Francis has more than met the WPATH criteria for FFS, BA and vaginoplasty (persistent and well-documented gender dysphoria, capacity to make a fully informed decision and to consent for treatment, age of majority, and no other significant medical or mental health concerns that would pose any risk or contraindication).

This letter represents appropriate documentation for Francis to pursue facial feminization surgery, breast augmentation and vaginoplasty as a necessary gender-affirming surgery, as explicated in the most recent version of the World Professional Association for Transgender Health (WPATH)

Standards of Care. It confirms that this client has been evaluated for the presence of coexisting behavioral health conditions and while she has current diagnoses of Depression, Anxiety and CPTSD these are currently adequately managed. She is a good candidate for these gender-affirming surgeries.

Francis is fully aware of the risks, benefits, and alternatives for these surgeries, and has discussed these risks, benefits, and alternatives in session with me. I believe that Francis is fully capable of making an informed decision about undergoing these surgeries. I have assessed Francis' readiness for surgery and fully support her decision to move forward. Therefore, it is my strong recommendation that Francis be granted authorization to undergo this life-saving surgery; it is the only appropriate next step.

Thank you for your time, and please do not hesitate to contact me if you have any questions or concerns.

Sincerely,

Felix Pekar, MSW, LICSW
Gender Health Care- Social Worker
Pronouns: He/Him/His
(509) 389-3463
5615 W Sunset Highway, Spokane, WA 99224



*Anna S. Garcia, MA, LMHC*

NPI 1619149770 / LH000010619

*3301 College St SE H-3, Lacey WA 98503*
*Phone: (360) 259-6023*
*Fax: (800) 694-7501*

March 4, 2024

Re:    Francis Faye Oak    DOB: ▇▇/81

To Whom It May Concern:

I am a nationally certified and licensed mental health counselor currently working with Francis Faye since 2/20/24.

I concur with the diagnoses and conclusions of her previous provider Felix Pekar, MSW, LICSW. Francis Faye meets all of the criteria for Gender Dysphoria as defined in the DSM-5. Francis Faye identifies as female and uses she/her pronouns. She reported starting HRT in September 2021 and has been living in her affirmed gender for over two years.

Francis Faye has been fully informed of the risks, benefits, and alternatives for her gender affirming surgeries and because she has continued to manage her current diagnoses of Depression, Anxiety and CPTSD, I believe she is a good candidate for, and I recommend she be granted authorization for them.

If you have any further questions, please feel free to contact me.

Respectfully,

Anna S Garcia, LMHC
**NPI 1619149770 / LH000010619**

1

# ⁞ First Choice Health®

**Medical Management**
One Union Square
600 University Street, Suite 1400
Seattle, WA 98101
(800) 808-0450
Fax: (833) 227-4256
www.fchn.com

## Pre-Authorization Request Form

Please include supporting clinical documentation with your request. Submissions without clinical documentation will be considered incomplete. Submit completed forms via fax at (833) 227-4256. Questions? Contact FCH Medical Management at (800) 808-0450 or preauthorization@fchn.com.

**Expedited Requests:** For expedited processing, please submit your Pre-Authorization Request online at www.fchn.com/TPAProviders.

*Please note: Pre-authorization is not a guarantee of payment; payment is subject to member eligibility and benefits at the time of service.*

| 1. MEMBER/PATIENT INFORMATION | | | |
|---|---|---|---|
| First Name<br>Oak | Last Name<br>Francis | Middle Name<br>Faye | Date of Birth<br>981 |
| Member ID<br>620-01 | Group ID<br>5230 | Group Name<br>MultiCare Heath System - MCC | |

| 2. PROVIDER INFORMATION | |
|---|---|
| Referring Provider Name<br>Toby Mayer, MD | Address<br>436 N Bedford Dr Ste 202, Beverly Hills, CA 90210 |
| NPI<br>1831254846 | Specialty<br>Facial Plastic Surgery |
| Office Contact Name<br>Keely Rivera | Phone Number<br>424-245-4156 · Fax Number<br>323-338-7939 |
| Servicing Provider Name<br>Toby Mayer, MD | Address<br>436 N Bedford Dr Ste 202, Beverly Hills, CA 90210 |
| NPI<br>1831254846 | Phone Number<br>424-245-4156 · Fax Number<br>323-338-7939 |
| Specialty<br>Facial Plastic Surgery | |
| Facility Name<br>Institue of Surgical Arts | Facility Address<br>436 N Bedford Dr Ste 210, Beverly Hills, CA 90210 |
| Tax ID<br>208556964 | Phone Number<br>310-385-0000 · Fax Number<br>310-385-0001 |

| 3. SERVICE REQUESTED | | |
|---|---|---|
| ◯ Inpatient  ● Outpatient | Clinical Urgency: ● Standard  ◯ Urgent  ◯ Emergent Inpatient Admission | |
| Primary Diagnosis | | |
| Code/Description       F64.0 / Gender Identity Disorder | Date of Service       03/13/2024 | |
| Services Requested | | |
| Code/Description<br>99244 IFO search, 00150 Anesthesia, 15824 Forehead lift, 21270 Cheek Implants, 15773 Grafting of Fat, 21137 Orbital bony contour, 21120 Chin Implant | Number of Units<br>1 | |
| Code/Description<br>31599 Voice Feminization, 30420 Septorhinoplasty, 21209 Chin Reduction and Contour, 31399 Thyroid Cartilage Shave, 11951 Filler (over 1 cc), 40799 Lip Lift, 15769 Soft Tissue Harvesting | Duration<br>9 hours | |

©2021 First Choice Health

# TOBY MAYER MD

January 30, 2024

RE: **Francis Faye Oak**      I.D. #: ▮▮▮▮7620-01

Dear Pre-certification Department,

I am writing on behalf of my patient, **Francis Faye, to request a Negotiated Agreement (Letter of Agreement), Pre-authorization and an In for Out Exception (Gap Exception).**

Please let me know what additional information is needed.

| | |
|---|---|
| Provider: | Toby G. Mayer MD<br>436 N Bedford Dr #202, Beverly Hills, CA 90210<br>P: 424-245-4156<br>F: 323-338-7939<br>NPI#18-31254846<br>Tax ID: 95-3169580 |
| Facility location: | IOSA<br>436 N Bedford Dr #210, Beverly Hills, CA 90210<br>P: 310-385-0000<br>F: 310-385-0001<br>NPI# 16-19186251<br>Tax ID: 20-8556964<br>Type: Ambulatory Surgery Center |
| Anesthesia Provider: | Laura Alexander MD<br>PO BOX 7001 Tarzana, CA 91357<br>P: (818) 888-7815 ext 100<br>NPI#1558519280<br>Tax ID: 20-4363133 |

Very truly yours,

Toby G. Mayer, M.D., F.A.C.S
TGM: nd

**Toby G Mayer, MD, APC**
*436 N. Bedford Drive, Ste 202*
*Beverly Hills, CA 90210*
*(424) 245-4156 Tel*
*(323) 338-7939 Fax*
*www.drtobymayer.com*

# TOBY MAYER MD

January 30, 2024

**MultiCare**
**PO Box 12659**
**Seattle, WA 98111-4659**

RE: **Francis Faye Oak**       I.D. #: ▮▮▮▮▮**620-01**

Dear Pre-certification Department,

I am writing on behalf of my patient, **Francis Faye** to document the medical necessity of facial feminization surgery for the treatment of **Gender Identity Disorder**. I am a cosmetic and reconstructive plastic surgeon; 95% of my practice is devoted to transgender patients.

I saw the above referenced patient for initial evaluation on **August 22, 2022**. The patient is a male to female transgender diagnosed with **GID (F64.0)** and is beginning the process of transition. This letter provides information about the patients medical history and diagnosis and a statement summarizing my treatment rationale.

**Patient's History and Diagnosis:**
**Francis Faye** has been on hormones for 3 years. **She** is now seeking **Facial Feminization** to aid in **her** medical transition. **She** was entered into therapy in **2021.** At this time, **she** presents with no apparent residual psychiatric symptoms and is quite stable. **Francis Faye** intends to continue their therapy regime which they believes has been helpful.

**Assessment and Plan:**
**Francis Faye** is certainly an excellent candidate for male to female facial feminization surgery as part of their transition. The risks and benefits were discussed extensively with the patient. She had a significant amount of excellent questions regarding the procedures and these questions were all addressed. The risks, benefits, incisions, possible complications, tradeoffs, recovery, and alternatives were all discussed extensively with the patient.

**Francis Faye** stated she has been misgendered due to her masculine features and her voice. **Francis Faye** has typically masculine features including a high hairline, male pattern baldness, temporal recessions, low eyebrows, a large supraorbital rim, small or sunken cheeks, a large nose, a long upper lip, thin lips, a large/square chin, a prominent Adam's Apple, and a deep masculine voice. The following list of procedures will change **Francis Faye's** typically masculine features in the ways described below:

* **99244    Search for In Network Provider** - We are requesting a negotiated agreement there are no in network providers in the patients area.
* **00160   Anesthesia Services** - The anesthesia provider is not an employee of the facility and requires a separate LOA for their services.
* **15824    Forehead lift** - This procedure is used to raise the eyebrows into a feminine position.
* **21137   Orbital bony contour** - This procedure removes the prominent male brow bone so that the forehead is smooth and appears female.
* **30420   Septorhinoplasty** - This procedure will reshape and feminize the nose and add balance to the overall feminine appearance.
* **21270  Cheek Implants** - Cheek implants will provide the patient higher cheekbones and more fullness to the mid face.

**Toby G Mayer, MD, APC**
*436 N. Bedford Drive, Ste 202*
*Beverly Hills, CA 90210*
*(424) 245-4156 Tel*
*(323) 338-7939 Fax*
*www.drtobymayer.com*

- **21120  Chin Implant** - A chin implant is used when the patient's chin is too receded. When the implant is used with contour and reduction, Dr. Mayer can create a well balanced, female chin.
- **21209  Chin Reduction and Contour** - This surgery will decrease the width of the chin and narrow the chin to appear more feminine.
- **40799  Lip Lift** - This procedure shortens the distance between the upper lip and base of nose giving the upper lip more turn out like women have.
- **15773  Grafting of Fat** - Once the fat is grafted is it injected into the lips to provide fuller, more feminine lips.
- **15769  Soft Tissue Harvesting** - The soft tissue will be placed in the nasolabial folds to provide a younger, smoother, more feminine appearance.
- **31599  Voice Feminization** - This procedure will change the pitch of a person's voice from male to female allowing the patient to speak freely without the conscious effort to control their voice.
- **31899  Thyroid Cartilage Shave** - The thyroid cartilage shave is performed when a patient has a prominent Thyroid Cartilage or Adam's Apple. This surgery removed the cartilage so that it is undetectable.
- **11951  Filler (over 1 cc)** - Filler is used to fill in wrinkles throughout the face giving the patient a more smooth and feminine appearance. Fillers are also used to give patients higher cheekbones which appear more feminine or fuller lips to appear more feminine.

In summary, the procedures listed above are medically necessary for this patient's medical condition and quality of life. Having facial feminization will allow **Francis Faye** to live life as her true self without the fear of being misgendered.  Please contact me if any additional information is required to ensure the prompt approval of her facial feminization procedures.

| | |
|---|---|
| Provider: | Toby G. Mayer MD |
| | 436 N Bedford Dr #202, Beverly Hills, CA 90210 |
| | P: 424-245-4156 |
| | F: 323-338-7939 |
| | Tax ID: 95-3169580 |
| Facility location: | IOSA |
| | 436 N Bedford Dr #210, Beverly Hills, CA 90210 |
| | P: 310-860-0000 |
| | F: 310-385-0001 |
| | Tax ID: 20-8556964 |
| Type: | Ambulatory Surgery Center |

Very truly yours,

*Toby G. Mayer MD* (signature)

Toby G. Mayer, M.D., F.A.C.S
Office: nd

Letter by Pekar, Felix Samuel Evans, LICSW on 5/23/2023

 KAISER PERMANENTE.

5/23/2023

RE: Letter of Support for Gender-Affirming Facial Feminization Surgery, Breast Augmentation and Vaginoplasty Surgery

Dear Medical Case Review Professional:

I am a Licensed Clinical Social Worker in Washington State (LW60376199). I am employed by Kaiser Permanente of Washington in the Gender Health Case Management Department. Regarding my training, I have a master's degree in Social Work obtained in 2009 with licensure in 2013. I have over ten years of experience working in clinical social work in a medical setting.

Francis Faye Oak (DOB: ████ 1981, KPWA ████ 0933) has been a client of mine enrolled in the Gender Health Program since August 2021. Though assigned male at birth, Francis identifies as female, and uses she/her pronouns. Francis notes that she first knew her gender identity differed from her assigned sex since a young age, but did not have a fuller sense of what this meant to her until a little over two years ago. She started HRT in September of 2021.   She has been living in her affirmed gender over two years.  She underwent orchiectomy in May of 2023.

Despite all these interventions, Francis reports significant distress due to long-standing dysphoria directly caused by some of her facial features, specifically her hairline, brow, chin, nose, large upper lip area and Adam's apple. She notes that she dislikes looking in the mirror and cannot wait to look in the mirror and "finally see myself," and "to undo 40 years of testosterone damage." Francis also voices significant distress around her genitals, although a great deal of this discomfort has been alleviated with her recent orchiectomy. At this point she is not entirely sure if it will be necessary to move forward with bottom surgery, but she plans to move forward with her consultation with Dr. Meltzer later this year. She continues to weigh the pros and cons of breast augmentation surgery. While she feels she would like to do this, she is concerned about the need to potentially require replacements ten years from now and she is not certain if the politics of this country will be supportive of trans healthcare at that time.

By my independent evaluation of Francis, she meets all criteria for Gender Dysphoria (ICD 10, F64.1). She has expressed a persistent and consistent desire for FFS, BA and bottom surgery for at least two years. While she remains uncertain as to whether or not she will move forward with top/bottom surgery, she has demonstrated the capacity to make an informed decision for herself.

Francis is physically healthy to undergo this surgery and is under consistent and regular care of a gender-affirming primary care physician. She has no physical or mental health diagnoses that would negatively impact their experience of, or results from surgery; in fact, it is highly likely that any symptoms of anxiety, depression, and/or distress Francis has experienced over the last several years would significantly decrease with this gender-affirming surgery. Francis is stably housed and is well-prepared for her post-op recovery with her support system, which includes a network of friends and her partner. Francis has no issues with illicit drug or substance use or abuse.

Francis has more than met the WPATH criteria for FFS, BA and vaginoplasty (persistent and well-documented gender dysphoria, capacity to make a fully informed decision and to consent for treatment, age of majority, and no other significant medical or mental health concerns that would pose any risk or contraindication).

This letter represents appropriate documentation for Francis to pursue facial feminization surgery, breast augmentation and vaginoplasty as a necessary gender-affirming surgery, as explicated in the most recent version of the World Professional Association for Transgender Health (WPATH)

Standards of Care. It confirms that this client has been evaluated for the presence of coexisting behavioral health conditions and while she has current diagnoses of Depression, Anxiety and CPTSD these are currently adequately managed. She is a good candidate for these gender-affirming surgeries.

Francis is fully aware of the risks, benefits, and alternatives for these surgeries, and has discussed these risks, benefits, and alternatives in session with me. I believe that Francis is fully capable of making an informed decision about undergoing these surgeries. I have assessed Francis' readiness for surgery and fully support her decision to move forward. Therefore, it is my strong recommendation that Francis be granted authorization to undergo this life-saving surgery; it is the only appropriate next step.

Thank you for your time, and please do not hesitate to contact me if you have any questions or concerns.

Sincerely,

Felix Pekar

Felix Pekar, MSW, LICSW
Gender Health Care- Social Worker
Pronouns: He/Him/His
(509) 389-3463
5615 W Sunset Highway, Spokane, WA 99224

# Toby G. Mayer, M.D., APC

## HISTORY

Date: _____01/15/24_____ Name: ___Francis Faye Oak_____

Occupation: ___Bereavement Counselor_____

Facebook/Instagram handle(s): _____

Are you interested in being filmed for social media purposes? __No_____

How did you hear about Dr. Mayer? _Reddit_____

City: ___Tacoma_____ State: _____WA_____ Date of Birth: ____█████1981

Age: __42____ Height: ___5'11___ Weight: ____155____ Sex: Male☐ Female☐ TG ☒

Chief Complaints: __Male presenting face_____

Family Doctor: _Dr. Tara Olson (Kaiser Permanente)_____

Have you ever had any of the following? Bleeding☐ Scarring☐ Keloids☐ None☒

Are you currently taking any Medications and or OTC/Homeopathics? __Yes (150mg/day Buproprion)___

Hormones? Yes☒ No☐ For how long? _Since 11/2021_____

Any Allergies to Medications? _Bandage Adhesive_____

Operations (including- wisdom teeth, tonsils, appendix): _____

_Wisdom teeth removal, 1996; Ruptured appendix removal 2014; Orthopedic surgery 2017_

Operations- Cosmetic Surgery (with surgeon name and dates): _None_____

Injuries: _Hip fracture; broken collar bone; separated shoulder_____

Smoker: Cigarettes? Yes☐ No☒ Marijuana? Yes☒ No☐ Drinker: (more than occasional)? Yes☐ No☒

Serious Illnesses: _Vitiligo_____

Family History: ___Heart disease, cancer_____

Any problems with Anesthesia? Yes☐ No☒

Ever seen a Psychologist, Therapist or Psychiatrist? Yes☒ No☐

Who did you see? _LMHC_____

How long? __3+ years_____

# Exhibit 5



**Appeals Department**
PO Box 12659
Seattle, WA 98111-4659
(877) 749-2031
Appeal Fax: (888) 400-1654

April 3, 2024

FRANCIS F OAK

TACOMA, WA ███

| | |
|---|---|
| **Patient Name:** | FRANCIS F OAK |
| **Patient ID:** | ███7620-01 |
| **Patient DOB:** | ███1981 |
| **Group:** | 5230 MultiCare Health System - MCC |

Dear FRANCIS,

We have reviewed your appeal surrounding a pre-authorization denial for facial feminization surgery as part of gender affirming care and have made a decision on coverage. This letter will explain our decision and your options.

**Our decision.**
Your appeal was denied. That means the original decision was not changed.

**What was denied.**
Authorization: 2024169828
Service: Anesthesia for procedures on nose and accessory sinuses, Forehead lift, Removal of the male brow bone, Reshaping your nose, Cheek implants, Chin implant, Chin reduction, Lip lift, Fat injections to your lips, Soft tissue harvesting that is put into your nasolabial folds to provide a feminine appearance and Filler.
Dates: 2/15/2024 - 5/15/2024
Servicing Provider: Toby Mayer
Facility: Institute of Surgical Arts

**Why the appeal was denied.**
The services requested are determined to be not medically necessary and cosmetic as defined by your summary plan document. Services that are not medically necessary or cosmetic are a plan exclusion and therefore not a covered benefit.

**How we made the decision.**
This appeal and all information included with the appeal was carefully reviewed using the

following resources:

Authorization history, summary plan documents, community standards, clinical information from your provider, and was also sent out to an external review organization (ERO) and reviewed by a specialty matched provider who is board certified in Plastic Surgery with added expertise in Gender Reassignment Surgery.

**Other important information.**
If you are dissatisfied with the decision, see the enclosed Appeal Rights information.

We can provide copies of all documents, records, and information used to make this decision. That includes procedure codes and what the codes mean. It also includes the criteria upon which the decision was based. This information will be made available upon request and at no cost to you. Such requests can be submitted in writing to:

> PO Box 12659
> Seattle, WA 98111-4659

**Questions.**
If you have any questions, please call us at **(877) 749-2031** or email **appeals@fchn.com**. We are available Monday through Friday from 8:00 AM to 5:00 PM PST.

Sincerely,
Appeals Department

Enclosure(s):

External Appeal Rights

Plan Exclusions and Definitions

**For your provider.**
The following information is for your healthcare provider. The External Reviewer stated the following:

"In the opinion of the reviewer, the below surgical procedures are not considered medically necessary (as defined in the patient's Summary Plan Document). They are considered cosmetic (as noted in FCH Medical Policy MP.07.10b ), for the management of this patient's diagnosis.

The Summary Plan Document defines a Medically necessary service as:

- "It is required for the treatment or diagnosis of a covered medical condition
- It is the most appropriate supply or level of care that is essential for the diagnosis or

treatment of the patient's covered medical condition
• It is known to be effective in improving health outcomes for the patient's medical condition in accordance with sufficient scientific evidence and professionally recognized standards
• It is not furnished primarily for the convenience of the patient or provider of services
• It represents the most economically efficient use of medical services and supplies that may be provided safely and effectively to the patient."

In the absence of photos and physical examination notes it is not clear which of the proposed procedures is not indicated, gender affirming, rejuvenating, or cosmetic. Therefore, the procedures do not meet the definition of medically necessary.

Per FCH Medical Policy MP.07.10b Surgical Treatment of Gender Dysphoria LAST REVISION DATE: 05/2023:

"The following surgeries or procedures are considered to be cosmetic and not medically necessary when performed to improve a member's gender specific appearance (list is not all-inclusive):

Abdominoplasty
Blepharoplasty
Calf Implants
Cheek/malar implants
Chin augmentation (reshaping or enhancing the size of the chin)
Collagen injections
Cricothyroid approximations (voice modification surgery)
Face-lift
Facial bone reduction
Forehead lift
Hair transplantation
Laryngoplasty (reshaping of laryngeal framework/voice modification surgery)
Lip reductions/enhancement (decreasing/increase lip size)
Liposuction
Mastopexy (breast lift)
Neck tightening
Nipple/Areola Reconstruction or Grafting as part of a breast augmentation procedure
Pectoral implants
Rhinoplasty"

Therefore, the proposed procedures below are all cosmetic:

00160-Anesthesia for procedures on nose and accessory sinuses; not otherwise specified
15824-Rhytidectomy; forehead Forehead lift - This procedure is used to raise the eyebrows into a feminine position.
21137-Reduction forehead; contouring only - Orbital Bony Contour - This procedure removes the prominent male brow bone so that the forehead is smooth and appears female.
30420-Rhinoplasty, primary; including major septal repair Septorhinoplasty - This procedure will reshape and feminize the nose and add balance to the overall feminine appearance.
21270-Malar augmentation, prosthetic material Cheek implants - Cheek implants will provide the patient higher cheekbones and more fullness to the mid face.
21120-Genioplasty; augmentation (autograft, allograft, prosthetic material)Chin implant - A chin implant is used when the patient's chin is too receded. When the implant is used with contour

and reduction, Dr. Mayer can create a well balanced female chin.

21209-Osteoplasty, facial bones; reduction Chin Reduction and Contour - This surgery will decrease the width of the chin and narrow the chin to appear more feminine.

40799-Unlisted procedure, lips Lip Lift - This procedure shortens the distance between the upper lip and the base of the nose giving the upper lip more turn out like women have.

15773-Grafting of autologous fat harvested by liposuction technique to face, eyelids, mouth, neck, ears, orbits, genitalia, hands, and/or feet; 25 cc or less injectate Grafting of fat - Once the fat is grafted it is injected into the lips to provide fuller, more feminine lips.

15769-Grafting of autologous soft tissue, other, harvested by direct excision (eg, fat, dermis, fascia) Soft tissue harvesting - The soft tissue will be placed in the nasolabial folds to provide younger, smoother, more feminine appearance.

11951-Subcutaneous injection of filling material (eg, collagen); 1.1 to 5.0 cc Filler (over 1cc) - Filler is used to fill in wrinkles throughout the face giving the patient a more smooth feminine appearance.

Fillers are also used to give patients higher cheekbones which appear more feminine or fuller lips to appear more feminine."

### References

1. Escandón JM, Morrison CS, Langstein HN, Ciudad P, Del Corral G, Manrique OJ. Applications of three-dimensional surgical planning in facial feminization surgery: A systematic review. J Plast Reconstr Aesthet Surg. 2022 Jul;75(7): e1-e14. doi: 10.1016/j.bjps.2022.02.073. Epub 2022 Mar 7. PMID: 35400593 Review.

2. Brown E, Perrett DI. What gives a face its gender? Perception. 1993:22(7):829-40 [PubMed PMID: 8115240]

3. Santos M, Monteiro D, Coutinho M, E Sousa CA, Ferreira MG. Caucasian Mediterranean patients seeking rhinoplasty-Anthropometric measurements and prevalence of major deformities. Clin Otolaryngol. 2019 Jul;44(4):581-587. doi: 10.1111/coa.13341. Epub 2019 May 16. PMID: 31002471

4. Chaya BF, Berman ZP, Boczar D, Siringo N, Rodriguez Colon R, Trilles J, Diep GK, Rodriguez ED. Facial Feminization Surgery Current Trends in Facial Feminization Surgery: An Assessment of Safety and Style. J Craniofac Surg. 2021 Oct 1;32(7):2366-2369. doi: 10.1097/SCS.0000000000007785. PMID: 34054085

5. Rodman R. Developments in facial feminization surgery. Curr Opin Otolaryngol Head Neck Surg. 2022 Aug 1;30(4):249-253. doi: 10.1097/MOO.0000000000000811. PMID: 35906977 Review.

6. Spiegel JH. Facial Feminization for the Transgender Patient. J Craniofac Surg. 2019 Jul;30(5):1399-1402. doi: 10.1097/SCS.0000000000005645. PMID: 31299730 Review.

7. Fisher M, Lu SM, Chen K, Zhang B, Di Maggio M, Bradley JP. Facial Feminization Surgery Changes Perception of Patient Gender. Aesthet Surg J. 2020 Jun 15;40(7):703-709. doi: 10.1093/asj/sjz303. PMID: 31676906

8. Rodrigues Dias D, Cardoso L, Santos M, Sousa E Castro S, Almeida E Sousa C, Gonçalves Ferreira M. The Caucasian Hump: Radiologic Study of the Osteocartilaginous Vault versus Surface Anatomy. Clinical Implications in Structured and Preservation

Rhinoplasty. Plast Reconstr Surg. 2021 Sep 1;148(3):523-531. doi: 10.1097/PRS.0000000000008213. PMID: 34270513

**For Provider billing purposes:**

Denied:

00160 ANESTHESIA NOSE & ACCESSORY SINUSES NOS
15824 RHYTIDECTOMY FOREHEAD
21270 MALAR AUGMENTATION PROSTHETIC MATERIAL
15773 GRAFTING OF AUTOLOGOUS FAT BY LIPO 25 CC OR LESS
21137 REDUCTION FOREHEAD CONTOURING ONLY
21120 GENIOPLASTY AUGMENTATION
30420 RHINOPLASTY PRIMARY W/MAJOR SEPTAL REPAIR
21209 OSTEOPLASTY FACIAL BONES REDUCTION
11951 SUBCUTANEOUS INJECTION FILLING MATRL 1.1-5.0 CC
40799 UNLISTED PROCEDURE LIPS
15769 GRAFTING OF AUTOLOGOUS SOFT TISS BY DIRECT EXC

**First Choice Health.**

## Important Information about Your Rights to External Review

**What if I need help understanding this denial?**
Contact us at (877) 749-2031 Monday through
Friday between 8 am and 5 pm (Pacific Time), if
you need assistance understanding this notice or
our decision to deny your service or coverage.

**What if I don't agree with this decision?** You
have a right to appeal any decision that does not
provide you or pay for any item or service in
whole or in part. Contact FCH Appeals
Coordinator with any questions on your rights to
external review

**How do I file a request for external review**?  You
can submit a written letter or complete the
attached form. You have 125 days from the
receipt of this notice to submit your request.
Send to the attention of Appeals Coordinator
| First Choice Health | P.O. Box 12659 | Seattle,
WA 98111-4569. If you are requesting an appeal
of a medication or drug, you have the right to ask
for the appeal to be completed by a peer
reviewer.

**What if my situation is urgent?**  If your situation
meets the definition of urgent under the law,
your review will be conducted on an expedited
basis. Generally, an urgent situation is one in
which your health may be in serious jeopardy or,
in the opinion of your physician, you may
experience pain that cannot be adequately
controlled while you wait for a decision on your
appeal. If you believe your situation is urgent,
you may request an expedited appeal by
contacting FCH Appeals at (877)749-2031
Monday through Friday between 8 am and 5 pm
(Pacific Time).

**Who may file a request for external review?**
You or someone you name to act on your behalf
(your designated authorized representative) may
file a request for external review. Complete the
attached form to designate a designated
authorized representative if you wish to
designate someone to act on your behalf. A
provider cannot be a Designated Authorized
Representative, but can submit additional
information to support your appeal. Plan
participant or beneficiary may not assign or
transfer rights to a provider of services, other
than the assignment of the member's benefit
payment.

**Can I provide additional information about my
claim?**  Yes. Once your external review is
initiated, you will receive instructions on how to
supply additional information.

**Can I request copies of information relevant to
my claim?**  Yes. You may request copies (free of
charge) by submitting a written request to the
attention of Appeals Coordinator | First Choice
Health | P.O. Box 12659 | Seattle, WA
98111-4569.

**What happens next?**  If you request an external
review, an Independent Review Organization will
review the previous decision and provide you
with a written determination. If this organization
decides to overturn the previous decision, we
will provide coverage or payment for the health
care items that were overturned.

**Other resources to help you:** For questions
about your appeal rights, this notice, or for
assistance, you can contact the Employee
Benefits Security Administration at (866)
444-EBSA (3272) if your plan is governed by
ERISA.

Model Notice Denial External Review 05/2023

**First Choice Health.**

# APPEAL FILING FORM
*(You may use this form or submit your own letter)*

Patient Name: _____     Member ID: _____

Name of Person Filing Appeal: _____

☐ Patient     ☐ Designated Authorized Representative (DAR)
Please note: A provider cannot be a DAR, but can submit information to support the appeal.

Mailing Address: _____

*Street Address*

_____
*City                                   State                                   Zip*

Contact Phone: _____     *Email: _____

You have the right to choose a person to represent you in your appeal. If you choose to have someone serve as your representative, you must complete and sign the Designated Authorized Representative form found at the end of this information packet. A Plan participant or beneficiary may not assign or transfer rights to a provider of services, other than the assignment of benefit payment.

**Reference Number or Claim Number:** _____

**Reason for Appeal:** Tell us why you are appealing this denial. Include any claim numbers, dates of service, provider names, and any/all relevant information you would like us to review. Additional pages may be attached.

_____

_____

**Additional Information:** You may choose to include additional information in your appeal to support your case. Please check one of the following:

☐ I am including additional information.          ☐ I am not including additional information.

☐ Please consider any information from my provider.

☐ I am interested in attending a meeting by phone to provide additional information about my case. I understand there are no decisions made during the meeting.

**Signature and Release:**
I promise that all of the information on this form is true to the best of my knowledge.

_____          _____
Patient or Designated Authorized Representative Signature          Date
**Send to:**

**Appeals Coordinator | First Choice Health | P.O. Box 12659 | Seattle, WA 98111-4659**
**(877) 749-2031 | FAX:  (888) 400-1654 | Appeals@fchn.com**

*\* First Choice Health utilizes encryption to secure your Protected Health Information (PHI).  If you do not want to receive encrypted emails, you may ask FCH to communicate with you by regular e-mail (e-mail that is not secured by a technical process called encryption). However, there may be some level of risk that your Protected Health Information (PHI) could be read by someone besides you in an Unencrypted Electronic Transmission (such as an Unencrypted Email or Unencrypted Text Message).*

Appeal Filing Form 10/2023

**: First Choice Health.**

## DESIGNATION OF AUTHORIZED REPRESENTATIVE (DAR)

In order to recognize someone other than the claimant as an authorized representative, First Choice Health Appeals Department must receive a valid Designation of Authorized Representative form that has been completed by the Plan Participant. *(Please note, a provider cannot be a designated authorized representative, but may submit any additional information available to support an appeal).*

_____          _____
**Plan Participant's Name (print)**                                 **Member ID**

I hereby authorize the Plan to recognize the person named herein as my designated authorized representative for the purposes described below, and to disclose relevant Protected Health Information (PHI) to:

_____
*Name of person representing you*

_____
*Street Address*

_____
*City, State, Zip Code*

_____
*Telephone Number*

□ All Medical Claims
□ All Dental Claims
□ Pre-Service Claims (Urgent Care)
□ Other (please be as specific as possible): _____

_____

I understand that this Authorization does not ensure that the person I am authorizing to receive PHI about me will treat such information as confidential. I understand that I may revoke this Authorization at any time by submitting a Cancellation of Designated Authorized Representative Form to Appeals. This Authorization is valid for one year following the date on which it is signed below unless a different expiration date or event is indicated here,_____, or upon receipt by Appeals of a Cancellation of Authorization form, if earlier.

_____          _____
**Plan Participant's Signature**                                 **Date**

*Please note, a copy of this authorization form will be sent to your designated representative at the address listed above.*

**Send to:  Appeals Coordinator | First Choice Health | P.O. Box 12659 | Seattle, WA 98111-4659**
**(877) 749-2031 | FAX: (888) 400-1654 | Appeals@fchn.com**

Designation of Authorized Representative Form 10/2023

Appeal Denial

**First Choice Health.**

## CANCELLATION OF DESIGNATED AUTHORIZED REPRESENTATIVE

A Plan Participant may cancel their Designated Authorized Representative(s) on file by completing this cancellation form.

_____     _____
**Plan Participant's Name (print)**                      **Member ID**

I hereby direct the Appeals Coordinator to **cancel** all previous designations of the person named below as my Designated Authorized Representative (DAR).

_____
*Name of person representing you*

_____
*Street Address*

_____
*City, State, Zip Code*

_____
*Telephone Number*

This cancellation will be effective as soon as possible after receipt of this form by the Appeals Coordinator.

_____     _____
**Plan Participant's Signature**                        **Date**

*Please note, a copy of this cancellation form will be sent to your previously designated representative at the address listed above.*

**Send to:**
> **Appeals Coordinator | First Choice Health | P.O. Box 12659 | Seattle, WA 98111-4659**
> **(877) 749-2031 | FAX: (888) 400-1654| Appeals@fchn.com**

Cancellation of Designation of Authorized Representative Form 10/2023

Appeal Denial



MultiCare

# MultiCare Health System
# Flexible Benefits Program
# Medical, Pharmacy and Vision Benefits

## MyConnected Care Plan
## Standard PPO Plan
## High Deductible PPO Plan

Effective January 1, 2023

[www.fchn.com](http://www.fchn.com)

**Puget Sound Region benefits**

*In the event there is a discrepancy between information provided during open enrollment and the contents of this Benefits Summary, the contents herein shall prevail.*

# Medical Management

## Pre-authorization Requirements

All inpatient admissions and certain outpatient services and procedures **require FCH pre-authorization**, unless noted as a benefit exclusion in your Summary Plan Document. If pre-authorization is not obtained on the services noted below, your claim may be denied. Submit requests via our Provider Portal at www.fchn.com/Providers#PreAuthorization or via fax to (888) 272-3289. For questions, call FCH at (800) 808-0450. *Emergency Services* do not need to be pre-authorized. Pre-authorization is required for:

- **Ambulance**
  - Air Ambulance Transport - non-urgent transport
  - Non-emergent ground or air ambulance transport to a MultiCare Health facility
- **Anesthesia for Dental Services**
- **Clinical Trials** (including all interventions/medications)
- **Dental Trauma Services** (follow-up services)
- **Durable Medical Equipment, Medical Supplies and Prosthetics**
  - Bone growth stimulators
  - Compression devices for home use
  - Custom and power operated wheelchairs and supplies
    - Standard, manual wheelchair rental for transition of care for up to 3 months does not require pre-authorization
  - Electrical stimulators- spinal- external
  - Myoelectric components for upper limb and powered components for ankle-foot and knee Prosthetics
  - Oscillatory devices and cough stimulating devices
  - Scooters
  - Speech generating devices
  - Tumor treating fields for glioblastoma
- **Enteral Formula, Medical Food and Associated Services**
- **Facet Joint Injections, Medial Branch Blocks and Neurotomies** (any location)
- **Gene, Immune, and CAR T-Cell Therapy**
- **Genetic Testing**
  - Over $500
- **Home Health Care Services** (certain home infusion drugs may still require pre-authorization. See *Medical Injectables*)
  - Home health visits (for wound therapy only)
- **High Dose Rate Electronic Brachytherapy**
- **Hyperbaric Oxygen Therapy**
- **Imaging**
  - PET scans
- **Inpatient Admissions**

- **Medical Injectables, Chemotherapy and Other Drugs over $5,000/annually** (The following list includes drugs that may require pre-authorization and/or may require use of a designated specialty pharmacy provider, regardless if covered under Medical or Pharmacy Benefit. This list is not all inclusive. Newly FDA-approved drugs not included on the list below may also require pre-authorization. For questions, call FCH at the number above.)
  - Biosimilar or alternative comparable biologics (eg. Renflexis, Ogivri, Mcasi, Truxima) are preferred over originator biologics (eg. Remicade, Herceptin, Avastin, Rituxan) unless the patient has had an inadequate response or intolerance to biosimilars or alternative comparable biologics.
  - Botulinum toxin A (Xeomin® is plan preferred for covered medical indications, cosmetic is not covered)
  - Other Medications including:
    - Blood Clotting Factors, All types, All brands
    - Select Hormone Therapy
    - Intravenous Immunoglobulin Therapy- IVIG, All types, All brands
    - Botulinum Toxin, All types, All brands
- **Oral Appliances for Sleep Apnea Therapy**
- **Organ and Bone Marrow Transplants**
- **Peripheral Nerve Blocks** (except Occipital and Cranial)
- **Radiation Therapy**
  - Proton beam, neutron beam or helium ion radiation therapy
  - Stereotactic body radiation therapy (SBRT)
  - Stereotactic radiosurgery (Gamma Knife, Cyber Knife)
- **Surgery**
  - BAHA-bone anchored hearing aid (surgical benefit applies)
  - Bariatric surgery (No benefit on the Standard PPO Plan)
  - Breast surgeries- selected (Pre-authorization is not required for breast reconstruction and nipple/areola reconstruction following mastectomy for breast cancer)
    - Implant removal
    - Mastectomy for gynecomastia
    - Reduction mammoplasty
  - Cochlear implants (surgical benefit applies)
  - Cosmetic or reconstructive surgery
  - Deep brain stimulation
  - Fetal/Intrauterine surgery
  - Gender affirming surgery
  - Implantable peripheral nerve and/or spinal cord stimulator placement (temporary and permanent) including electrodes and/or pulse generator/receiver
  - Orthognathic surgery
  - Ovarian, internal iliac and gonadal vein embolization, ablation and sclerotherapy
  - Spinal surgery (selected)
    - Artificial intervertebral disc
    - Cervical fusions
    - Lumbar fusions
    - Minimally invasive, percutaneous & endoscopic spine surgery
  - Surgical interventions for sleep apnea

# Summary of Medical Benefits

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Allergy Care** | ✓ | ✓ | 90% | 50% | | | 90% | 70% | 50% | | 90% | 70% | 50% | |
| **Alternative Care -** * MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible. | | | | | | | | | | | | | | |
| • **Acupuncture*** Maximum 12 visits per Plan year. | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| • **Massage Therapy*** Maximum 20 visits per Plan year. | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | 70% | 50% | |

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023
Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder: The High Deductible PPO Plan is referred to within the table as "HDHP."

| | Applies to Deductible | Applies to OOP Max | MyConnected Care Plan | | | | Standard PPO Plan | | | | HDHP Plan | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 | Tier 1 | Tier 2 | Tier 3 | Tier 4 |
| | | | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) | MultiCare Connected Care Network (MCC CIN) | First Choice Health Network (FCHN) | Prov/ Swed/ VMFH/ PacMed | Out of Network (OON) |
| **Transgender/Gender Affirming Services**<br><br>FCH pre-authorization required for surgery. Limited benefit, see *Transgender/Gender Affirming Services* for details. | | | Payment is based on Place of Service and Provider type | | | | | | | | | | | |
| **Transplants** (Organ and Bone Marrow) - * *MyConnected Care Plan "Network" Benefits apply to Tier 1 Out-of-Pocket. No deductible.*<br>FCH pre-authorization required. Case Management for Transplants provided by FCH.<br>Subject to benefit waiting period of 6 months. | | | | | | | | | | | | | | |
| • **Recipient/Donor Expenses*** | ✓ * | ✓ * | 90% | | 50% | | 90% | | 50% | | 90% | | 50% | |
| • **Transportation and Lodging***<br>Travel and Lodging maximum: $2,500 per episode. | ✓ * | ✓ * | 90% | | | | | | | | | | | |

First Choice Health | One Union Square | 600 University Street, Suite 1400 | Seattle, WA 98101

MultiCare Health System Flexible Benefits Program Benefit Booklet 2023

Tier 3 includes any Providence, Swedish, Virginia Mason Franciscan Health, and Pacific Medical Center provider or facility within Washington State.
*Any Out-of-Network Inpatient Admissions are limited to 10 per calendar year combined.*
Reminder: The High Deductible PPO Plan is referred to within the table as "HDHP."

57

# Medical Benefits

FCH administers the benefits described in this section for MultiCare Plan participants. All benefits are subject to plan exclusions and limits. Coinsurance and deductibles apply as previously noted above. See *Payment Provisions*, *Summary of Medical Benefits* and *Medical Limitations and Exclusions* for more details, along with definitions in the Group Health Summary Plan Description.

Coverage is provided only when all these conditions are met:

- The service or supply is a listed covered benefit;
- Specific benefit limits or lifetime maximums are not exhausted;
- All pre-authorization and benefit requirements are met;
- The participant is eligible for coverage and enrolled in this plan at the time the service or supply is received; and,
- The service or supply is considered *medically necessary* for a covered medical condition, as defined.

## Acupuncture

Refer to *Alternative Care.*

## Allergy Care

Benefits include allergy tests, injections, and serums. Coverage is provided when administered by a physician, allergist or specialist. Serum is covered only when received and administered within the provider's office. If received from a pharmacy, the serum may be covered under the pharmaceutical benefit.

## Alternative Care

Benefits include services of an acupuncturist and or massage therapist to treat a covered illness or injury. Maintenance therapy is not covered. The massage therapy benefit applies to services coded as massage therapy on the claim, which include, but are not limited to, manual lymphatic drainage, mobilization, and manual traction. These services will process to the appropriate benefit based on the codes submitted on the claim.

## Ambulance Services

The plan covers medically necessary licensed ambulance transportation when the following conditions apply:

- The transportation is to the nearest available health care facility where medically necessary services can be provided;
- Other forms of transportation would likely endanger the participant's health.

Air ambulance transport services require pre-authorization for non-urgent transport and non-emergent ground or air ambulance transport to a MultiCare Health facility.

For reimbursement of smoking cessation programs, send receipt and claim form to FCH Claims Department, PO Box 12659, Seattle, WA 98111-4659.

# Transgender/Gender Affirming Services

FCH pre-authorization required for inpatient admissions and gender affirming surgery. These services are intended to provide treatment for patients with gender dysphoria. This assistance may include primary care, gynecologic and urologic care, reproductive options, mental health services (e.g., assessment, counseling, psychotherapy, psychotropic medication management), and hormonal and gender affirming surgical treatments. Gender affirming surgical treatments are limited to members age 18 and older. Transportation and lodging are not covered. FDA approved medications for support and treatment of transgender related services are covered through the Pharmacy Benefit.

# Transplants (Organ and Bone Marrow)

**FCH pre-authorization is required** for transplant service. Case Management services for Organ and Bone Marrow Transplants are provided by First Choice Health. There is a **6-month waiting period** for this benefit, meaning, services are not available to you until the first day of your seventh month of continuous coverage under this Plan. Services directly related to organ transplants must be coordinated by your participating provider. If a transplant is not successful (defined as the need for a retransplantation within 18 months of the original transplant), only one re-transplant will be covered. **Proposed transplants will not be covered if considered experimental or investigational for the participant's condition.**

FCH pre-authorization approval for transplants is based on these criteria:

- Your provider submits a written recommendation and supporting documentation.
- Your medical condition requires the requested transplant based on medical necessity.
- The requested procedure, and associated protocol, is not considered experimental or investigational treatment for your condition.
- The procedure is performed at a facility and by a provider approved by FCH.
- After an evaluation, you are accepted into the approved facility's transplant program and comply with all program requirements.

*Note: Corneal transplants are not considered an organ transplant and are covered under the medical-surgical benefits, and not under the transplant benefit.*

Have your provider send a request, prior to evaluation, to:

Email:
preauthorization@fchn.com

Written:
FCH Medical Management
600 University St., Suite 1400
Seattle, WA 98101

Alternatively, Fax:
(206) 268-2920 or (888) 272-3289

# Plan (Medical and Vision) Exclusions and Limitations

Covered services are limited to the diagnosis, therapeutic care or treatment, and prevention of disease, sickness or injury as described in this document. In addition to limits and exclusions stated elsewhere in this document, coverage is specifically excluded for each of the following items and any related services and charges.

- Abdominoplasty/panniculectomy
- Abortion (termination of pregnancy) for female dependent children
- Adoption expenses
- Amounts over and above UCR, as defined by the Plan
- Amounts for which the covered person has no obligation to pay
- Any condition resulting from declared or undeclared acts of terrorism, war, military service, participation in a riot or civil disobedience
- Any service not medically necessary for the diagnosis, treatment or prevention of injury or illness, even if it is not specifically listed as an exclusion (except for specific services offered through the Preventive Care benefit)
- Any service received before the participant's effective date of coverage or after the coverage termination date
- Applied Behavior Analysis (ABA) - the following are not covered:
  – Providers accompanying children or family members to health care appointments that are not part of the direct provision of ABA services
  – Services by more than one program manager for each child/family (program development, treatment planning, supervision)
  – Training of therapy assistants and family members (as distinct from supervision)
  – Parent training or classes, except for one-on-one or one-on-two direct training of the parents of one identified patient
  – Services provided in a home school, or public/private school environment that are part of a child's schooling as distinct from specific ABA treatment services (e.g. acting as the "Teacher's Aide," or helping a child with homework)
- Aromatherapy
- Athletic training, body-building, fitness training or related expenses
- Autopsies
- Bariatric surgery (except for specific services offered through the weight management benefit applicable to MCC and HDHP plans), prescription drugs for weight loss, gym memberships, prescription or non-prescription nutritional and/or food supplements including weight loss shakes, exercise programs and equipment, other surgical procedures primarily for reduction of adipose tissue, abdominoplasty and other cosmetic surgery/liposuction
- Benefits relating to any condition, illness, or injury for which the participant receives compensation or reimbursement through another contractual arrangement or benefit, other than employer-based disability payments, such as surrogate pregnancy.

- Special diets, nutritional supplements, vitamins and minerals or other dietary formulas or supplements except as covered by the Plan
- Special education for the developmentally disabled
- Specialized intraocular lenses associated with cataract surgery that correct vision disorders, such as Multifocal and Toric intraocular lenses
- Tooth damage due to biting or chewing
- Transplant services listed below (organ and bone marrow):
  - Animal-to-human transplants
  - Artificial or mechanical devices designed to replace human organs
  - Complications arising from the donation procedure if the donor is not a plan participant
  - Donor expenses for a plan participant who donates an organ or bone marrow (however, complications from the donation are covered as any other illness to the extent they're not covered under the recipient's health plan)
  - Donor procurement services and costs incurred outside the United States unless approved by the Plan
  - Expenses incurred when government funding of any kind is provided
  - Services in a facility not approved by the Plan
  - Transplants considered experimental and investigational, as defined by the Plan
- Transgender/gender affirming services
  - Services that are considered cosmetic including but not limited to:
    - Abdominoplasty
    - Blepharoplasty
    - Calf Implants
    - Cheek/malar implants
    - Chin augmentation (reshaping or enhancing the size of the chin)
    - Collagen injections
    - Cryothyroid approximations (voice modification surgery)
    - Face-lift
    - Facial bone reduction
    - Forehead lift
    - Hair transplantation
    - Laryngoplasty (reshaping of laryngeal framework/voice modification surgery)
    - Lip reductions/enhancement (decreasing/increase lip size)
    - Liposuction
    - Mastopexy (breast lift)
    - Neck tightening
    - Pectoral implants
    - Rhinoplasty
  - Travel and lodging
- Transportation for personal or convenience reasons is not a covered benefit and is excluded
- Treatment furnished without charge or paid directly or indirectly by any government or for which a government prohibits payment of benefits
- Viscosupplementation
- Vision, the following vision benefits are not covered:

# Plan Definitions

**Adverse benefit determination** means a denial, decrease or ending of a benefit. This includes a failure to provide or make payment (in whole or in part) for a benefit including claims based on medical necessity or experimental and investigational exclusions.

**Allowed amount** means the maximum amount considered for payment by the Plan for a medically necessary covered service. This amount is equal to one of the following:

- The contracted amount agreed to by a FCHN participating provider or a First Health participating provider.
- The Usual, Customary and Reasonable (UCR) amount for services received from out-of-network providers (see related definition).
- For out-of-network emergency services, the Allowed Amount is determined annually by FCH based on federal guidelines stating the Allowed Amount must be equal to the greatest of the following amounts: 1) the median of the contracted amounts described above; 2) the Usual, Customary and Reasonable (UCR) amount (see related definition); or 3) the Medicare amount.

For Emergency Services provided by out-of-network emergency facilities and out-of-network providers, certain non-emergency services furnished by out-of-network providers at certain in-network facilities, and out-of-network air ambulances, the cost-sharing amount is determined by the Qualifying Payment Amount (see related definition).

**Ancillary Services** means services related to Emergency Services, such as radiology, anesthesiology, pathology, neonatology, laboratory, and specialty services needed to respond to unexpected complications (such as those delivered by a neonatologist or cardiologist) and also in situations where an in-network provider is not available at the in-network facility to provide the services.

**Applied Behavior Analysis (ABA)** is a term describing principles, techniques and interventions used in assessment and treatment to increase behaviors that are helpful, reduce behaviors that are harmful and demonstrate that the interventions employed are responsible for the improvement of behavior in individuals with autism. ABA incorporates many techniques for understanding and changing behavior and may involve a multi-disciplinary approach to increase language and communication skills, improve attention, focus, social skills and memory. ABA is flexible in that it can be adapted to meet the needs of each individual.

**Aural therapy** is a service provided to both children and adults who have been diagnosed with hearing loss. Typically, aural therapy is an intervention that takes place following hearing aid fitting or cochlear implant hook-up. It involves working with the hearing-impaired individual providing the patient with strategies to better utilize his or her listening skills. Aural therapy involves training the brain to process and understand auditory information, teaching how to monitor speech through listening, and learning to develop listening skills in each ear separately and integrated. Usually provided by a speech therapist.

**Authorized representative** means an individual acting on behalf of the participant or beneficiary claimant in obtaining or appealing a benefit claim. The authorized representative must have a signed form (specified by the Plan) by the claimant except for urgent care benefits or appeals. Once an authorized representative is selected, all information and notifications should be directed to that representative until the claimant states otherwise.

abuse evaluations. Individual, group, and/or family therapy occurs daily. The focus of the program is stabilization of client's psychiatric symptoms through the use of assessment, medication management, evidenced-based treatment strategies, group and individual therapy, behavior management, and active family engagement/therapy.

- **Partial Hospitalization Programs** provide multi-disciplinary care for Mental Health or Chemical Dependency Condition at least 6 hours a day, 5 days a week, and schedule at least three distinct services per day. Services include individual and group therapy, medication evaluation and management, family therapy, activity therapy, occupational therapy, and education training directed at treating the Condition. Services for Mental Health Conditions must include evaluation by a psychiatrist within 48 hours and weekly thereafter. All programs must include a substance abuse evaluation. Treatment must follow a written plan of care.

- **Mental Health Residential Treatment Program** provides around- the- clock behavioral health services that do not need the high level of physical security and psychiatric and nursing interventions that are available in an acute inpatient program. Care is medically monitored with on-site nursing and medical services. The focus of the program is an improvement of client's psychiatric symptoms through the use of assessment, evidenced-based treatment strategies, group and individual therapy, behavior management, medication management and active family engagement/therapy. Treatment must follow a written plan of care. The facility must be state licensed for residential treatment. Residential settings not meeting these criteria, such as group homes, halfway houses or adult/child foster homes, are not considered to be Mental Health Residential Treatment Programs.

- **Chemical Dependency Rehabilitation/Residential Programs** provide 24-hour rehabilitation treatment 7 days a week for Substance Related Conditions. Care is medically monitored, with 24-hour medical and/or nursing availability. Services include group, individual and when indicated family or multi-family group. The facility must offer sufficient availability of medical and nursing services to manage ancillary detoxification needs. Treatment must follow a written plan of care.

**Lifetime** is a reference to benefit maximums and limitations, understood to mean while covered under this Plan. Under no circumstances does lifetime mean during the lifetime of the participant.

**Medical group** means a group or association of providers, including hospital(s), listed in the provider directory.

**Medically necessary** is a medical service or supply that meets all the following criteria:

- It is required for the treatment or diagnosis of a covered medical condition
- It is the most appropriate supply or level of care that is essential for the diagnosis or treatment of the patient's covered medical condition
- It is known to be effective in improving health outcomes for the patient's medical condition in accordance with sufficient scientific evidence and professionally recognized standards
- It is not furnished primarily for the convenience of the patient or provider of services
- It represents the most economically efficient use of medical services and supplies that may be provided safely and effectively to the patient.

The fact that a service or supply is furnished, prescribed or recommended by a physician or other provider does not, of itself, make it medically necessary. A service or supply may be medically necessary in part only.

**Mental Health Condition** means a mental disorder listed in the most current version of the Diagnostic and Statistical Manual of Mental Disorders (DSM), published by the American Psychiatric Association. The following conditions, although considered mental health conditions under the DSM, are not included in the Mental Health Care benefit under this Plan, and are either excluded or are covered under other benefits offered by this Plan (subject to all terms, limitations and exclusions):

- Conditions related to Substance Related and Addictive Disorders (see Chemical Dependency definition)
- Relational, family, and lifestyle stressors absent a primary psychiatric diagnosis
- Sexual dysfunctions, personality disorders, paraphilic disorders.

**Network provider** means a contracted FCHN provider in Washington, Idaho, Montana, Oregon, Alaska, Wyoming, North Dakota and South Dakota that is listed in the provider directory. Outside these states, participants must use the First Health Network for network providers.

**No Surprises Act** holds patients harmless from surprise medical bills and pre-authorization requirements. See *Your Rights and Protections Against Surprise Medical Bills.* This act:

- Bans balance billing for Emergency Services.
- Requires that patient cost-sharing, such as copayments, co-insurance, or a deductible, for Emergency Services and certain non-emergency services provided by an out-of-network provider at an in-network facility cannot be higher than if such services were provided by an in-network provider, and any cost-sharing obligation must be based on in-network provider rates.
- Prohibits out-of-network charges for items or services provided by an out-of-network provider at an in-network facility, unless certain notice and consent is given. Providers and facilities must provide patients with a plain-language consumer notice explaining that patient consent is required to receive care on an out-of-network basis before that provider can bill the patient more than in-network cost-sharing rates.

**Open enrollment period** is a defined time when you are allowed to enroll yourself and/or your dependents for benefit coverage.

**Out of area/out of the service area** means outside the FCHN service area as described under network provider and out-of-network provider.

**Out-of-network provider** means a provider who delivers or furnishes health care services but is not a contracted FCHN provider in Washington, Idaho, Montana, Oregon, Alaska, Wyoming, North Dakota or South Dakota. Outside these states, an out-of-network provider means a provider who delivers or furnishes health care services but is not a contracted First Health Network provider.

**Participant** means any eligible employee or other eligible individual enrolled in the Plan, also referred to as covered member.

**Plan Administrator** means the department designated by an employer group to administer a plan on behalf of participants. Usually, the Plan Administrator is your Benefits Department. (The principal duty of the Plan Administrator is to see that the Plan is carried out, in accordance with its terms, for the exclusive benefit of eligible participants and beneficiaries, without

# Exhibit 6



**MIKE KREIDLER**
STATE INSURANCE COMMISSIONER

**OLYMPIA** OFFICE:
INSURANCE BUILDING
P.O. BOX 40255
OLYMPIA, WA 98504-0255
Phone: (360) 725-7000

**OFFICE OF**
**INSURANCE COMMISSIONER**

June 25, 2014

To Health Insurance Carriers in Washington State:

The purpose of this letter is to clarify prohibitions in Washington State against discrimination in insurance coverage on the basis of gender identity or gender dysphoria.[1]

Recent changes in policy at the federal and the state level relating to transgender health care services, coupled with the potential harm to consumers arising from the denial or exclusion of services on the basis of gender identity and related medical conditions, has prompted a review of transgender health care service exclusions and denials in plans licensed or regulated by the Insurance Commissioner's Office.

As described in further detail below, broad exclusions of coverage on the basis of gender identity are prohibited under Washington state law. Additionally, denial of a medically necessary service on the basis of gender identity is prohibited under Washington state law.

Section 1557 of the federal Patient Protection and Affordable Care Act (ACA)[2] provides that an individual shall not be "excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance, or under any program or activity that is administered by an Executive Agency or any entity established under [Title I of the Patient Protection and Affordable Care Act.]" on any of the grounds prohibited under various federal discrimination provisions.

The Department of Health and Human Services Office of Civil Rights (OCR) is responsible for some enforcement of Section 1557 of the ACA. In a July 12, 2012 letter[3] to the National Center for Lesbian Rights, OCR clarified that sex-based discrimination includes discrimination on the basis of gender identity and sex stereotypes under Section 1557 of the ACA. OCR agreed that Section 1557's sex discrimination prohibition extended to claims of discrimination based on gender identity or failure to conform to stereotypical notions of masculinity and femininity. The section also prohibits discrimination regardless of actual or perceived sexual orientation or gender identity of the individuals involved.

At the state level, Washington state's Law Against Discrimination, codified at Chapter 49.60 RCW, prohibits discrimination based upon sexual orientation, which includes "gender expression or identity,"

---

[1] Gender dysphoria (formerly known as gender identity disorder) is a condition based on the gender identity or expression of the insured. *See, e.g.*, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition, Code 302.85 (gender dysphoria is a "marked incongruence between one's experienced/expressed gender and assigned gender, of at least 6 months' duration," as manifested by certain criterion).

[2] 42 U.S.C.§18116.

[3] HHS, Office of Civil Rights letter dated July 12, 2012 http://www.nachc.com/client//OCRLetterJuly2012.pdf

Letter to Health Insurance Carriers in Washington State
Transgender health issues and discrimination
June 25, 2014
Page 2

defined as "having or being perceived to have a gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the sex assigned to that person at birth." RCW 49.60.040(26).

Washington state law expressly prohibits discrimination based on the "sex, marital status, or sexual orientation as defined in RCW 49.60.040, or the presence of any sensory, mental, or physical handicap of the insured or prospective insured." RCW 48.30.300. This prohibition applies in the issuance, cancellation, or renewal of any contract of insurance, as well as amount of benefits payable, or any term, rate, condition, or type of coverage offered. RCW 48.30.300. While discrimination based on certain classifications is permissible "when bona fide statistical differences in risk or exposure have been substantiated," sexual orientation, including gender identity, is not one of those permitted classifications of discrimination.

The prohibition in state law against discrimination applies "notwithstanding any provision contained in Title 48 RCW to the contrary." RCW 48.30.300. This phrase indicates that the nondiscrimination requirement applies throughout state law. As such, provisions of Title 48 RCW that could otherwise be seen as permitting broad exclusions of health care services related to gender identity should not be used for this purpose.

Reading the provisions of state law in conjunction with the definitions contained in Washington state's Law Against Discrimination, and the requirements of the federal Affordable Care Act, it is clear that exclusions, prohibitions, and other forms of discrimination by issuers against policy holders who identify as transgender is prohibited.

The Insurance Commissioner's Office will review filings and coverage for prohibited exclusions and for whether medically necessary services for transgender individuals are covered to the same extent that those services are covered for non-transgender individuals enrolled in the same plan. Additionally, those affected by exclusions and denials of service will be encouraged to contact the agency so that specific issues can be investigated and addressed.

This letter serves as a reminder that Washington state law affords policyholders who identify as transgender the full measure of benefits under health insurance policies as individuals seeking medically necessary treatment for non-gender identity related conditions.

Questions about this letter should be directed to Jason Siems, Deputy Commissioner for Policy and Legislative Affairs, jasons@oic.wa.gov or (360) 725-7037.

Sincerely,

Mike Kreidler
Insurance Commissioner